ACCEPTED
03-14-00718-CV
4288348
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/25/2015 6:42:32 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00718-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS,
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/25/2015 6:42:32 PM
JEFFREY D. KYLE
Clerk

CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD; MICHAEL
MCCALL; WAYNE KNOX; AND THE CITY OF HEMPSTEAD,
Plaintiffs/Appellees,
v.
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND
PINTAIL LANDFILL, L.L.C., Defendants/Appellants.

From 201st District Court,
Travis County, Texas

**APPELLANTS CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD,
MICHAEL MCCALL, WAYNE KNOX, AND CITY OF HEMPSTEAD'S
BRIEF**

**KELLY HART & HALLMAN LLP**
Monica M. Jacobs
State Bar No. 24007433
Diana L. Nichols
State Bar No. 00784682
301 Congress Avenue, Suite 2000
Austin, TX 78701
Telephone: (512) 495-6400
Facsimile: (512) 495-6401

**ATTORNEYS FOR THE
CITY OF HEMPSTEAD**

**HANCE SCARBOROUGH, LLP**
Terry L. Scarborough
State Bar No. 17716000
Michael L. Woodward
State Bar No. 21979300
V. Blayre Pena
State Bar No. 24050372
Wesley P. McGuffey
State Bar No. 24088023
400 W. 15th Street, Ste. 950
Austin, TX 78701
Telephone: (512) 479-8888
Facsimile: (512) 482-6891

**ATTORNEYS FOR APPELLANTS
CITIZENS AGAINST THE LANDFILL
IN HEMPSTEAD, MICHAEL
MCCALL, AND WAYNE KNOX**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 53.2(a), the parties to the judgment at issue in this appeal are:

Citizens Against the Landfill in Hempstead, Michael McCall, and Wayne Knox
APPELLANTS/PLAINTIFFS

**HANCE SCARBOROUGH, LLP**
Terry L. Scarborough
Michael L. Woodward
V. Blayre Pena
Wesley P. McGuffey
400 W. 15th Street, Ste. 950
Austin, TX 78701
ATTORNEYS FOR APPELLANTS CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD, MICHAEL MCCALL, AND WAYNE KNOX

City of Hempstead
APPELLANT/PLAINTIFF

**KELLY HART & HALLMAN LLP**
Monica M. Jacobs
Diana L. Nichols
301 Congress Avenue, Suite 2000
Austin, Texas 78701
ATTORNEYS FOR APPELLANT, CITY OF HEMPSTEAD

Texas Commission on Environmental Quality
APPELLEE/DEFENDANT

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS, ENVIRONMENTAL PROTECTION DIVISION**
Nancy Elizabeth Olinger
Cynthia Woelk
Daniel C. Wiseman
P.O. Box 12548
Austin, TX 78711-2548

ATTORNEYS FOR APPELLANT, TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

Pintail Landfill, LLC
APPELLEE/DEFENDANT

**MCELROY, SULLIVAN, MILLER, WEBER & OLMSTEAD, L.L.P.**
Brent W. Ryan
Paul R. Tough
P.O. Box 12127
Austin, Texas  78711

ATTORNEYS FOR APPELLANT, PINTAIL LANDFILL, LLC

# TABLE OF CONTENTS

IDENTITY OF PARTIES & COUNSEL …………………….…………2

TABLE OF CONTENTS ……………………………………..………4

INDEX OF AUTHORITIES ……………………………………………6

INDEX OF APPENDICIES…………………………………...………9

STATEMENT OF THE CASE …………………………………..……11

STATEMENT REGARDING ORAL ARGUMENT ……………………….13

ISSUES PRESENTED ……………………………………….……14

STATEMENT OF THE FACTS ……………………..………………..……16

SUMMARY OF THE ARGUMENT ………………….…..……………26

ARGUMENT …………………………………………..……………29

THE REGISTRATION MUST BE REVERSED BECAUSE TCEQ'S APPROVAL OF APPLICANT'S REGISTRATION FAILED TO FOLLOW THE CLEAR, UNAMBIGUOUS LANGUAGE OF ITS REGULATIONS..................................................................................29

A. Standard of Review………………………….…………………30

B. TCEQ's Spontaneous Interpretation of 30 Texas Administrative Code §§ 330.9(f) and 330.9(b)(3)……………………………………31

C. TCEQ Failed to Follow the Clear, Unambiguous Language of Its Regulations.………………………………………………… 33

1. TCEQ Failed to Follow the Clear, Unambiguous Language of 30 Texas Administrative Code § 330.9(b)(3)……….……..……35

2. TCEQ Failed to Follow the Clear, Unambiguous Language of 30 Texas Administrative Code § 330.9(f)…………....……….36

3. TCEQ Failed to Follow the Clear, Unambiguous Language of its Regulations Defining Transfer Station and Waste Separation/Recycling Facility.………………………..…………37

D. A Loophole Big Enough to Drive a Truck Through: Even if the Regulations Were Ambiguous, TCEQ's Interpretation Would Not Be Entitled to Deference Because it is Plainly Erroneous or Inconsistent with the Regulation or its Underlying Statutes.……………..….……39

THE TCEQ DENIED AFFECTED PERSONS DUE PROCESS BY AUTHORIZING THE FACILITY THROUGH REGISTRATION RATHER THAN A PERMIT.……………………………..…………….………….…40

THE REGISTRATION SHOULD BE REVERSED BECAUSE TCEQ ALLOWED AN EXCESSIVE NUMBER OF NOTICES OF DEFICIENCY WELL BEYOND ITS PUBLICLY PRONOUNCED POLICY.……...……42

PRAYER ……………………………………………………………48

CERTIFICATE OF SERVICE …………………………………..….……50

5

# INDEX OF AUTHORITIES

**Constitution Provisions**

Article 1, Section 19 of the Texas Constitution……………………….………..41

**Statutes**

Texas Health and Safety Code

    § 361.002(a)…………………………………………………………16, 40

    § 361.061..…………………………………………….…...………... 16, 40

    § 361.086(a)…………………………………………………...… 16, 40

    § 3611.0861……………………………………………...……..18, 40

    § 361.088…………………………………………………...…..41, 42

    § 361.0665………………………………………………….…….41, 42

    § 361.0666………………………………………………….……..41, 42

    § 361.067…………………………………………..…….…….……41, 42

    § 361.079………………………………………….…………41, 42

    § 361.0791…………………………………….…………….…41, 42

    § 361.081…………………………………………….…………41, 42

    § 361.089……………………………………………….………..17

    § 361.321 (e)………………………………………………….30

Tex. Gov't Code §§ 2001.174(2)(A)-(F)………………………………..30, 31

## Rules

30 Texas Administrative Code

§ 39, subchapter H……………...……………………………………17

§ 55 (f)……………………………………………………………..17

§ 50.139 (b)………………………...……………………………………18

§ 330………………………………...……………………………………*passim*

§ 330.3(157)…..………………...……………………………26, 29, 37, 38

§ 330.3 (174)……………………...…………………………21, 26, 29, 37, 38

§ 330.7(a)…………...………………...………...………….........14, 16, 17, 26

§ 330.9(a)……………...……………………………………….…………16

§ 330.9(b)(3)……………...……………….14, 21, 26, 29, 31, 32, 34, 35, 39

§ 330.9(f)……………….…………14, 17, 21, 22, 26, 29, 31, 32, 33, 34, 36, 37

§ 330.11……………………………………………………...……………16, 26

§ 330.13……………………………………………………...……………16, 26

## Cases

*CenterPoint Energy Houston Elec., LLC v. PUC*,
    408 S.W. 3d 910 (Tex. App. – Austin 2013, pet denied)………29, 31, 33, 39

*County of Dallas v. Wiland*,
    216 S.W.3d 344, 347 (Tex. 2007)………………………...…..………42

*Moore v. State,*
    739 S.W. 2d 347, 349 (Tex. Crim. App. 1987)……………….………39

*PUC v. Gulf States Utilities Co.*,
    809 S.W. 2d 201 (Tex. 1991)……………………….……..………29, 31, 33, 39

*Railroad Comm'n of Texas v. Home Transp. Co.*,
    670 S.W.2d 319, 325 (Tex. App. – Austin 1984, no writ)…………....………33

*Rodriguez v. Service Lloyds Ins. Co.*,
    997 S.W.2d 248, 254 (Tex. 1999)……………………….….…33, 34, 35, 38

*SWEPI, LP v. Railraod Comm'n of Texas*,
    314 S.W. 3d 253 (Tex. App. – Austin 2010, pet denied)……………...…..33

*Tex. Dept. of Transp.. V. Needham*,
    82 S.W. 3d 314, 318 (Tex. 2002)…………………………………………35, 38

*TGS-NOPEC Geophysical Co. v. Combs*,
    340 S.W.3d 432, 439 (Tex. 2011)……………………...……………35, 38

*United Copper v. Grissom,*
    17 S.W.3d 797 (Tex. App.—Austin 2000)…………………………...…….31

## Other Authority

31 Tex. Reg. 2506………………………………………………...........……17, 18, 34

31 Tex. Reg. 2548……...…………………….……………………….............……17

**INDEX OF APPENDICIES**

Appendix A      Final Judgment dated September 4, 2014

Appendix B      Traditional Municipal Solid Waste Disposal: A Guide for Local Governments

Appendix C      31 Tex. Reg. 2506 (March 24, 2006);
31 Tex. Reg. 2548 (March 24, 2006)

Appendix D      Guidelines for Utilizing the Source-Separated Recycling Permit Exemption for Municipal Solid Waste Transfer Facilities.

Appendix E      Waller County's Request for Determination and Denial of Permit Application and Registration Application

Appendix F      CALH's Comments on Pintail Landfill Transfer Station

Appendix G      Text of Statutes (Tab 1–Tab 14), Regulations (Tab 15–Tab 23), and Constitutional Provisions (Tab 24).

        Tab 1      Texas Health & Safety Code § 361.002(a)

        Tab 2      Texas Health & Safety Code § 361.061

        Tab 3      Texas Health & Safety Code § 361.086(a)

        Tab 4      Texas Health & Safety Code § 361.0861

        Tab 5      Texas Health & Safety Code § 361.088

        Tab 6      Texas Health & Safety Code § 361.0665

        Tab 7      Texas Health & Safety Code § 361.0666

        Tab 8      Texas Health & Safety Code § 361.067

        Tab 9      Texas Health & Safety Code § 361.079

        Tab 10      Texas Health & Safety Code § 361.0791

Tab 11      Texas Health & Safety Code § 361.081

Tab 12      Texas Health & Safety Code § 361.089

Tab 13      Texas Health & Safety Code § 361.321(e)

Tab 14      Texas Government Code §§ 2001.174(2)(A)-(F)

Tab 15      30 Texas Administrative Code § 50.139 (b)

Tab 16      30 Texas Administrative Code § 330.3(157)

Tab 17      30 Texas Administrative Code § 330.3 (174)

Tab 18      30 Texas Administrative Code § 330.7(a)

Tab 19      30 Texas Administrative Code § 330.9(a)

Tab 20      30 Texas Administrative Code § 330.9(b)(3)

Tab 21      30 Texas Administrative Code § 330.9(f)

Tab 22      30 Texas Administrative Code § 330.11

Tab 23      30 Texas Administrative Code § 330.13

Tab 24      Article 1, Section 19 of the Texas Constitution

## STATEMENT OF THE CASE

On August 16, 2013, CALH and City of Hempstead ("Plaintiffs" or "Appellants") timely filed Motions to Overturn the issuance of Registration No. 40259 to Pintail Landfill, LLC ("Applicant" or "Pintail") with the Texas Commission on Environmental Quality ("TCEQ").[1] On August 23, 2013, TCEQ's General Counsel requested further briefing on Motions to Overturn filed by Plaintiffs.[2] On September 11, 2013, response briefs to the Motions to Overturn were filed by the TCEQ Public Interest Counsel, the TCEQ Executive Director, and Pintail.[3] TCEQ's Public Interest Counsel recommended denial of the registration because TCEQ violated its own NOD policy.[4] On September 20, 2013, reply briefs were filed by Plaintiffs.[5] On October 11, 2013, Plaintiffs' Motions to Overturn were overruled by operation of law.[6] Plaintiffs exhausted administrative remedies and timely appealed the issuance of Registration No. 40259 to Travis County District Court.[7] Plaintiffs filed briefs on the merits.[8]

---

[1] R.R. at Joint Ex. 1, Administrative Record ("AR") Vol. 8, Item 58 and 59 (CALH's and City's Motions to Overturn).

[2] R.R. at Joint Ex. 1, AR Vol. 8, Item 60 (Letter from TCEQ General Counsel Requesting Briefing).

[3] R.R. at Joint Ex. 1, AR Vol. 8, Items 61, 62 and 63 (Responses to Motions to Overturn).

[4] R.R. at Joint Ex. 1, AR Vol. 8, Item 61.

[5] R.R. at Joint Ex. 1, AR Vol. 8, Items 64 and 65 (Replies to Responses to Motions to Overturn).

[6] *See* R.R. at Joint Ex. 1, AR Vol. 8, Item 66.

[7] C.R. at 3 (relating to CALH); C.R. at 49 (relating to City).

[8] Supp. C.R. at 3 (Supplemented February 11, 2015); Supp. C.R. at 207 (Supplemented February 11, 2015).

Defendants TCEQ and Pintail filed response briefs.[9] Plaintiffs filed reply briefs.[10] On September 3, 2013, a hearing was held on the administrative appeal in district court.[11] On September 4, 2013, the district court denied Plaintiffs' requests for relief, finding that it "must affirm" the decision of TCEQ's Executive Director to issue the registration.[12] On October 6, 2013, Plaintiffs timely filed a Joint Motion for New Trial.[13] Neither TCEQ nor Pintail filed substantive responses to Plaintiffs' Motion for New Trial. On October 16, 2013, the district court denied Plaintiffs' Joint Motion for New Trial.[14] On November 14, 2013 and November 18, 2013, respectively, Plaintiffs timely filed notices of appeal.[15] Plaintiffs file this Joint Appellants' Brief to challenge the district court's ruling.[16]

---

[9] Supp. C.R. at 3 (Supplemented January 26, 2015); Supp. C.R. at 97 (Supplemented January 26, 2015).

[10] C.R. at 389 (CALH Reply Brief); C.R. at 448 (City Reply Brief).

[11] C.R. at 503 (Final Judgment).

[12] C.R. at 503 (Final Judgment).

[13] C.R. at 505 (Plaintiffs' Joint Motion for New Trial).

[14] C.R. at 674 (Order denying Plaintiffs' Joint Motion for New Trial).

[15] C.R. at 675 (CALH's Notice of Appeal); C.R. at 678 (City's Notice of Appeal).

[16] Plaintiffs file this brief jointly, but reserve the right to file separate reply briefs in this appeal.

# STATEMENT REGARDING ORAL ARGUMENT

Texas agencies, including the Texas Commission on Environmental Quality ("TCEQ"), are required to follow their regulations and underlying statutes. In the case of TCEQ, these are the regulations and statutes that are designed to protect our health and our environment. Maintaining these safeguards as they were intended is important to the preserve Texans' heath and natural resources. The decisional process regarding these important issues would be significantly aided by oral argument. Oral argument will bring clarity to the written arguments presented by the briefs and appreciably aid the Court in its consideration of the issues and in determining the correct result.

# ISSUES PRESENTED

## I.    Issue 1

An agency is required to follow the clear, unambiguous language of its own regulations. TCEQ Rule 330.7(a) generally requires a permit for Municipal Solid Waste ("MSW") facilities, but there are specific exceptions. Rule 330.9(b)(3) allows transfer stations that transfer 125 tons of municipal solid waste per day or less to qualify for registration, rather than requiring a permit. Rule 330.9(f) allows transfer stations that include materials recovery operations to qualify for registration, but only if certain requirements set forth in the rule are met. TCEQ issued a registration to a transfer station that includes a materials recovery facility, but the facility does not meet the requirements of Rule 330.9(f). Did the trial court err in its judgment upholding this registration when TCEQ failed to follow the clear, unambiguous language of its regulations?

## II.    Issue 2

TCEQ rules and the Solid Waste Act generally require a permit for an MSW facility. The permitting process provides affected persons the opportunity for hearing. On the other hand, the registration process does not provide an opportunity for hearing. Plaintiffs assert that TCEQ acted in violation of its permitting requirement by utilizing a registration to authorize this Facility. Under the permitting requirements, Plaintiffs would have had a statutory right to a hearing

as affected persons.  Did the trial court err in its judgment denying all claims that due process rights were violated when there was no opportunity for hearing on this registration authorization?

## III.    Issue 3

The TCEQ publicly pronounced its policy regarding technical notices of deficiency (NODs) in letters to the regulated entities, instructions to its staff members, communications with the public, and representations to the Texas legislature.  TCEQ's stated policy is to allow no more than two (2) NODs before returning an MSW registration application.  In this case, TCEQ allowed six (6) NODs and two (2) extensions of time, which is far more than the two (2) NOD limit.  Did the trial court err in its judgment upholding this registration when more than two (2) NODs were issued?

## STATEMENT OF THE FACTS

### A.    Statutory and Regulatory Framework

The Texas Solid Waste Disposal Act (the "Act") was enacted "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste."[17] The Act authorizes Texas Commission on Environmental Quality ("TCEQ") to issue permits governing the construction, operation, and maintenance of solid waste facilities.[18] The Act generally requires that a person apply for and obtain a separate permit for each solid waste facility.[19]

To implement its statutory authority under the Act, TCEQ promulgated rules found in Title 30, Chapter 330 of the Texas Administrative Code ("TCEQ Rules"). The TCEQ Rules generally require a permit for any storage, processing, or disposal of any solid waste unless the activity is exempted from permitting requirements and authorized through a less rigorous process.[20] These less rigorous authorization processes include registration, notification, and exemption of certain waste management activities from permitting or registration. Consistent with its

---

[17] Tex. Health & Safety Code Ann. § 361.002(a) (West 2010).
[18] Tex. Health & Safety Code Ann. § 361.061(West 2010).
[19] Tex. Health & Safety Code Ann. § 361.086(a) (West 2010).
[20] 30 Tex. Admin. Code § 330.7(a) (2014) (relating to "Permit Required"); 30 Tex. Admin. Code § 330.9(a) (2014) (relating to "Registration Required"); 30 Tex. Admin. Code § 330.11 (2014) (relating to "Notification Required"); 30 Tex. Admin. Code § 330.13 (2014) (relating to Waste Management Activities Exempt from Permitting, Registration, or Notification).

16

rules, the TCEQ repeatedly and habitually acknowledges its general permit requirement.[21]

To obtain a solid waste permit, an applicant must show that the facility will be designed, constructed, and operated in a manner that complies with applicable TCEQ regulations designed to protect the public's health, welfare, and property.[22] The permitting process involves substantial opportunities for affected persons to participate, including the opportunity to request and participate in a contested case hearing before TCEQ.[23] After the public participation process is complete, including any contested case hearing, TCEQ decides whether to grant or deny the permit.[24] The Executive Director may not issue a permit without an opportunity

---

[21] *See* C.R. at 401–02 (CALH's Reply Brief at 12–13 (citing 30 Tex. Admin. Code § 330.7(a) (2014) (relating to "Permit Required"); TCEQ Publication No. RG-469, Traditional Municipal Solid Waste Disposal: A Guide for Local Governments (listing transfer station registration exceptions in 330.9(b) and stating, "If none of these criteria can be met, a permit is required"); 31 Tex. Reg. 2548; 31 Tex. Reg. 2506 ("The commission adopts new §330.9, Registration Required, to list <u>all</u> MSW management activities that are exempt from <u>permitting requirements</u> but that still require commission approval by registration."); TCEQ Waste Permits Division Publication titled "Guidelines for Utilizing the Source-Separated Recycling Permit Exemption for Municipal Solid Waste Transfer Facilities" at 1 ("**What is the Source-Separated Recycling Permit Exemption?** The source-separated recycling permit exemption, described in 30 TAC §330.9(f), allows qualifying MSW transfer facilities to operate under a registration instead of a permit. . . . This provision to operate under a registration instead of a permit is distinct from other provisions for registration of a transfer facility based on the population of the area served, waste acceptance rate, and location within a permitted facility (30 TAC §330.9(b))).").

[22] 30 Tex. Admin. Code Ch. 330 (2014) (TCEQ Rules for solid waste permitting program).

[23] *See* 30 Tex. Admin. Code Ch. 330 (2014); 30 Tex. Admin. Code Ch. 39, Subch. H (2014) (TCEQ rules setting forth the public notice requirements for permits); 30 Tex. Admin. Code Ch. 55, Subch. F (2014) (TCEQ rules for requesting a contested case hearing on permit applications).

[24] Tex. Health and Safety Code Ann. § 361.089 (West Supp. 2013).

for hearing and a final decision from the TCEQ commissioners unless the application is not opposed by an affected person.[25]

The Act provides certain narrow exceptions to the general permitting requirement, which are reflected in the TCEQ Rules. Specifically, the Act allows certain types of facilities to be authorized by a mere registration, rather than by a permit.[26] An applicant seeking authorization by registration must file an application, but unlike the permitting process, the registration process does not include an opportunity for a contested case hearing. Moreover, unlike permit approval, the Executive Director has exclusive authority to review and approve registrations without a vote by TCEQ commissioners.[27]

In accordance with the Act's provisions, TCEQ Rule 330.9 allows authorization of certain specific and precisely defined types of facilities pursuant to a registration, rather than a permit.[28] Rule 330.9 was expressly promulgated "to list *all* those MSW management activities that are exempt from permitting requirements but that still require commission approval by registration."[29] Thus, an applicant for a registration must be seeking approval for one of the specific types of facilities specified in Rule 330.9 and must meet the applicable requirements of 330.9 for that particular type of waste management activity.

---

[25] Tex. Water Code Ann. § 5.122 (West 2008).
[26] Tex. Health and Safety Code Ann. §§ 361.0861, 361.111 (West 2010).
[27] 30 Tex. Admin. Code § 50.139(b) (2014).
[28] 30 Tex. Admin. Code § 330.9 (2014).
[29] 31 Tex. Reg. 2502 (March 24, 2006), at 2506 (emphasis added).

## B. The Proposed Solid Waste Complex

Pintail Landfill, LLC ("Applicant" or "Pintail") wishes to construct and operate a large solid waste complex within the extraterritorial jurisdiction of the city of Hempstead.[30] The complex would consist of two solid waste facilities: 1) a 223-acre, 410-foot high landfill (the "Landfill"); and 2) a transfer station/material recovery facility to be located at the same site as the Landfill.[31] This appeal pertains to the transfer station/material recovery facility, but information is provided below relating to the larger proposed Landfill for context.

## C. The Pending Landfill Permit Application

The Applicant has filed an application for a Type I municipal solid waste ("MSW") permit to authorize construction and operation of the proposed Landfill.[32] The Applicant filed Parts I and II of the Landfill application on July 22, 2011, and filed Parts III and IV of the Landfill application on January 20, 2012.[33] The Landfill is proposed to be constructed and operated on top of the sandy recharge zone of the regional aquifer that serves as the sole source of drinking water for the citizens of the city of Hempstead and other nearby residents.[34]

---

[30] R.R. at Joint Ex. 1, AR Vol. 1, Item 1, (Registration Application for MSW Facility), at p. I-1.

[31] *See generally* R.R. at Joint Ex. 1, AR Vol. 1, Item 1 (Registration Application Transmittal Letter), p. 2; AR Vol. 1, Item 1 (Registration Application), at p. I-1.

[32] R.R. at Joint Ex. 1, AR Vol. 7, Item 53, p. 5.

[33] **APPENDIX E:** R.R. at Joint Ex. 1, AR Vol. 67, p. 4-10 (Waller County's Request for Determination and Denial of Permit Application and Registration Application).

[34] **APPENDIX F:** R.R. at Joint Ex. 1, AR Vol. 67, p. 2 (CALH's Comments on Pintail Landfill Transfer Station).

Accordingly, the proposed Landfill has generated considerable public concern and opposition, having received 1,302 hearing requests at the time CALH filed its reply to responses to its motion to overturn this registration.[35]

A number of commenters, including attorneys for Waller County, asked TCEQ to uphold Waller County Ordinance 2001-001, which prohibits developing a landfill at this location.[36] These commenters pointed out that the proposed landfill did not qualify for the statutory grandfathering provision because only Parts I and II, which requested only a land use determination rather than an actual permit, had been filed at the time the ordinance was passed, and Parts I through IV are required for a landfill application seeking a permit.[37] Furthermore, commenters asserted that the transfer station/materials recovery registration application did not qualify the proposed landfill for the statutory grandfathering provision because the registration application was incomplete at the time of final passage of the ordinance on August 26, 2011.[38] The proposed landfill is currently the subject of a contested case hearing.

### D.    The Registration

---

[35] R.R. at Joint Ex. 1, AR Vol. 8, Item 65 (CALH's Reply to Responses to MTO's).

[36] *See e.g.*, **APPENDIX E:** R.R. at Joint Ex. 1, AR Vol. 67 (Waller County's Request for Determination and Denial of Permit Application and Registration Application).

[37] **APPENDIX E:** R.R. at Joint Ex. 1, AR Vol. 67, p. 4-10 (Waller County's Request for Determination and Denial of Permit Application and Registration Application).

[38] **APPENDIX E:** R.R. at Joint Ex. 1, AR Vol. 67, pp. 1-4, 9 (Waller County's Request for Determination and Denial of Permit Application and Registration Application).

On August 2, 2011, the Applicant filed its application for MSW Facility Registration No. 40259 (the "Registration Application"), requesting authority to operate a transfer station/materials recovery facility (the "Facility").[39] On the first page of its Registration Application, the Applicant explains that the Facility will transfer and recycle waste at the same location as the proposed Landfill in order to initiate a market for incoming waste materials.[40] Claiming authority under Rule 330.9(b)(3), the Applicant improperly utilized the registration process to authorize its transfer station/materials recovery facility.[41] Rule 330.9(b)(3) allows registration for transfer station facilities that transfer less than 125 tons of waste or less per day. Rule 330.9(b)(3) expressly applies only to transfer station facilities only, and does not authorize the registration of materials recovery, waste separation, or recycling facilities.[42]

Importantly, Applicant did not claim to use Rule 330.9(f) to authorize its registration. That rule does apply to transfer stations that include materials recovery operations, such as the facility proposed by the Applicant. The rule requires "any new MSW Type V transfer station that includes a materials recovery operation" to meet two qualifications: (1) it must recover at least ten percent of the waste stream for recycling, and (2) it must send the remaining waste to a landfill

---

[39] R.R. at Joint Ex. 1, AR Vol. 1, Item 1, (Registration Application for MSW Facility).
[40] R.R. at Joint Ex. 1, AR Vol. 1, Item 1, (Registration Application for MSW Facility).
[41] R.R. at Joint Ex. 1, AR Vol. 1, Item 1, p. 2 (Registration Application for MSW Facility).
[42] The terms "materials recovery facility," "recycling facility," and "waste separation facility" are used interchangeably in TCEQ rules. *See* 30 Tex. Admin. Code 330.3(174).

facility within 50 miles (the so-called "10/50 requirement").[43] It is undisputed that Applicant did not meet the 10/50 requirement. In Part II of the Registration Application, Applicant openly fails to meet the requirement, stating (1) that materials will be recovered at a rate not to interfere with proper operations of the facility, and (2) that waste materials will be transported to a landfill within 100 miles.[44]

During TCEQ's registration review process, CALH commented that registration was inappropriate for this facility because the recycling activities exceeded those authorized for registration, and therefore permitting was required.[45]

### E.    TCEQ's Extended Review of the Registration

During review of the Registration Application, the TCEQ allowed more than two (2) technical notices of deficiency ("NODs") and afforded multiple extensions of time for the Applicant to respond to the deficiencies.[46] This conduct violated TCEQ's own repeatedly published policies.[47] The six NOD's and two letters granting extensions were mailed to Pintail on August 15, 2011 (NOD), October 27,

---

[43] 30 Tex. Admin. Code § 330.9(f) (2014).
[44] R.R. at Joint Ex. 1, AR Vol. 1, Item 1, p. II-3 (Registration Application) ("The facility will recover recyclable materials at a rate not to interfere with proper operations of the facility. Non-recyclable materials will be transported to a properly permitted Type I or Type IV landfill that is located within 100 miles of the proposed facility.").
[45] R.R. at Joint Ex. 1, AR Vol. 9, Item 67, pp. 3-6 (CALH's Comments submitted by Hance Scarborough, LLP).
[46] R.R. at Joint Ex. 1, AR Vol. 8, Item 61, p. 3-4 (Office of Public Interest Counsel's Response to Motions to Overturn).
[47] *Id.*

2011 (NOD), December 2, 2011 (letter granting extension), February 17, 2012

(NOD), April 12, 2012 (NOD), May 8, 2012 (letter granting extension), June 25,

2012 (NOD), and August 16, 2012 (NOD).[48]  Notably, the second NOD from the

TCEQ dated October 27, 2011 stated,

> Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.  Please note we do not anticipate granting an extension of time to fulfill this request.  Also, please be aware that a third notice of technical deficiency will not be issued.[49]

The TCEQ's policy banning more than two NOD's was also published in its TCEQ

Sunset Evaluation Report dated October 2009.[50]  The policy is also described in

TCEQ's Municipal Solid Waste ("MSW") Permit Application Review Process

document for its staff.[51]  Finally, the policy specifically applicable to a registration

request is dictated to TCEQ staff as follows:

> Review the second NOD response.  If the application still has significant deficiencies, prepare a letter for the **Section Manager's** signature returning the application with an explanation why the application is being returned.  If the deficiencies are very minor in nature, work with the applicant/consultant to resolve them.  There are no third NODs.[52]

---

[48] *See* R.R. at Joint Ex. 1, AR Index, Items 3, 13, 16, 22, 24, 27, 32, and 39.

[49] R.R. at Joint Ex. 1, AR Vol. 2, Item 13 (NOD Letter and Policy Notice to Pintail).

[50] R.R. at Joint Ex. 1, AR Vol. 8, Item 61, p. 3–4 (citing TCEQ Sunset Self-Evaluation Report, Sec. VII, p. 248).

[51] R.R. at Joint Ex. 1, AR Vol. 8, Item 59, p. 7 ("There will be no 3rd NOD…" and only a few minor deficiencies may be addressed within one week.).

[52] R.R. at Joint Ex. 1, AR Vol. 8, Item 65, Exhibit 1, p. 3 of "Registration Application Procedures" document (CALH's Reply to Responses to MTO's).

As a result of the numerous NOD's and deficiencies in the Registration Application, Pintail had eleven (11) different versions of the application.[53] These versions are dated August 1, 2011, August 8, 2011, August 29, 2011; November 16, 2011; January 18, 2012; March 15, 2012; May 1, 2012; May 31, 2012; July 20, 2012; September 14, 2012, and October 18, 2012.[54] Despite the excessive number of NOD's, the Registration was issued by the Executive Director on July 23, 2013.[55]

### F.    Citizens Against the Landfill in Hempstead ("CALH").

Citizens Against the Landfill in Hempstead (CALH)[56] is an organization created to protest the Applicant's proposed MSW complex near Hempstead, Texas, and to inform the public about the issues related to the proposed MSW facilities. CALH has over 400 members comprised of Waller County landowners, residents, business owners, businesses, and many other affected parties who have legitimate reasons to oppose the proposed MSW complex. Several of CALH's members own land, reside, and work adjacent to and near the proposed facility site, and would be affected in a manner distinct from members of the general public. Plaintiff Michael McCall is a resident of Waller County and lives less than a mile from the

---

[53] R.R. at Joint Ex. 1, AR Vol. 7, Item 55, p. 6 (MSW Registration No. 40259).

[54] R.R. at Joint Ex. 1, AR Vol. 7, Item 55, p. 6 (MSW Registration No. 40259).

[55] R.R. at Joint Ex. 1, AR Vol. 7, Item 55, p. 1 (MSW Registration No. 40259 (referring to the facility as a Type V Transfer Station, but authorizing registrant to "store and process wastes, and to recycle recovered materials…")).

[56] For purposes of this document, CALH also includes Appellants Michael McCall and Wayne Knox.

proposed site of the Landfill. Plaintiff Wayne Knox is a resident of Waller County who owns and operates Pipe and Valve. Pipe and Valve is located in Waller County directly across from the proposed Facility.

**G.    The City of Hempstead.**

The City of Hempstead (the "City") is a home rule municipality with a growing and diverse population of approximately 5,800 residents located in northern Waller County, Texas. The proposed landfill complex would be located within the City's extraterritorial jurisdiction and very near the important junction of State Highway 6 and U.S. Highway 290, which serves as the gateway into the City. The City supplies water to its residents from wells located near the proposed landfill complex.

## SUMMARY OF THE ARGUMENT

This Court has held that rules must be followed. When an agency fails to follow the clear, unambiguous language of its own regulation, the court must reverse the agency's action. TCEQ did not follow its rules when it issued a registration to this Facility, so the issuance must be reversed. At least four rules were broken:[57]

1)  30 Texas Administrative Code § 330.9(b)(3). This registration rule expressly applies only to transfer stations, and TCEQ broke this rule by applying it to a materials recovery, or recycling, facility.

2)  30 Texas Administrative Code § 330.9(f). This registration rule applies to transfer stations with materials recovery operations (*i.e.* this Facility). TCEQ broke this rule by failing to apply it. It was not claimed as authority for registration and its requirements (the "10/50 requirements") were ignored.

3)  30 Texas Administrative Code § 330.3(157). This rule defines a transfer station as a facility that transfers waste and does nothing more. TCEQ broke this rule by treating a materials recovery facility as a transfer station.

4)  30 Texas Administrative Code § 330.3(174). This rule defines materials recovery, waste separation, and recycling facilities. TCEQ broke this rule by treating a materials recovery facility as a transfer station.

If a facility does not qualify for registration (or any other permitting exemption), the law requires a permit and allows affected persons to request a

---

[57] Five rules were broken if Rule 330.7(a) is counted, which generally requires a permit. This rule states: "Except as provided in §§330.9, 330.11, 330.13, or 330.25 of this title (relating to Registration Required; Notification Required; Waste Management Activities Exempt from Permitting, Registration, or Notification; and Relationship with County Licensing System), no person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any solid waste unless such activity is authorized by a permit or other authorization from the commission."

hearing. By issuing this registration, TCEQ eviscerated the permit requirement of its rules. TCEQ impermissibly expanded the scope of 330.9(b), which expressly applies only to "transfer station facilities." A transfer station is not a materials recovery or recycling facility. Therefore, TCEQ failed to follow the plain language of its own rules. Accordingly, reversal is required.

The permitting process is important because it provides affected persons an opportunity for contested case hearing. The registration process does not. The opportunity for hearing invokes obligatory statutory protections that provide a meaningful evidentiary hearing for affected persons. Plaintiffs affected by the improperly registered solid waste facility and its larger landfill counterpart were denied their opportunity for hearing by this registration issuance. Because a permit was required and the permitting process provides opportunity for a hearing, the affected persons were denied their rights to due process. Accordingly, issuance of the registration should be reversed.

Finally, the registration should be reversed because of excessive Notices of Deficiency ("NOD's"). The TCEQ arbitrarily disregarded its publicly pronounced policy that only two NOD's are issued to applicants. According to the TCEQ own Public Interest Counsel, the public must have confidence that the TCEQ applies its stated policies, including its two NOD policy, in a uniform manner. The TCEQ repeatedly expressed its NOD policy to the legislature, its staff, applicants, and

affected persons. The policy expressed is clear. Applications are required to be returned after unsuccessful resolution of two (2) NOD's. The TCEQ acted arbitrarily and unreasonably violated its publicly pronounced NOD policy when it issued six (6) NODs and two (2) extensions of time to respond to Applicant. Therefore, issuance of the registration should be reversed.

## ARGUMENT

## I. THE REGISTRATION MUST BE REVERSED BECAUSE TCEQ'S APPROVAL OF APPLICANT'S REGISTRATION FAILED TO FOLLOW THE CLEAR, UNAMBIGUOUS LANGUAGE OF ITS REGULATIONS.

Issuance of this registration must be reversed because this Facility is not just a transfer station. Rule 330(b)(3) only allows registration for transfer station facilities that transfer less than 125 tons of waste per day. This Facility is not a transfer station—it is a transfer station with a materials recovery operation. Therefore, the 10/50 requirements of Rule 330.9(f) apply. TCEQ and Applicant, however, ignored this rule and its requirements. As discussed further below, TCEQ failed to follow the clear, unambiguous language of at least four of its regulations when it improperly issued a registration for Applicant's transfer station/materials recovery facility (the "Facility") utilizing Rule 330.9(b)(3).[58] Therefore, the Court must reverse the agency's action as arbitrary and capricious.[59]

Additionally, even if a rule is ambiguous or leaves room for policy determinations, a court may not defer to an agency's interpretation that is plainly erroneous or inconsistent with the regulation or its underlying statutes.[60] TCEQ's unauthorized interpretation of its rules is plainly erroneous and inconsistent with

---

[58] *See* 30 Tex. Admin. Code §§330.9(f), 330.9(b)(3), 330.3(157), and 330.3(174) (2010).
[59] *PUC v. Gulf States Utilities Co.*, 809 S.W.2d 201, 207 (Tex. 1991); *CenterPoint Energy Houston Elec., LLC v. PUC*, 408 S.W.3d 910, 917 (Tex. App.—Austin 2013, pet. denied).
[60] *Id.*

the underlying statute because it creates a dangerous loophole that eviscerates the permitting requirement of the Solid Waste Act and TCEQ Rules.  Accordingly, the registration of this Facility must be reversed.

## A.    Standard of Review

In this appeal brought under Texas Health and Safety Code § 361.321(a), the issue is whether the action of TCEQ was invalid, arbitrary, or unreasonable.[61]  The Third Court of Appeals specifically addressed this standard of review in *Smith v. Houston Chemical Services, Inc.*, opining that the issue of whether the action is invalid, arbitrary, or unreasonable was intended to incorporate the provisions of Administrative Procedures Act ("APA"), Texas Government Code § 2001.174(2)(A)–(F).[62]  In accordance with these provisions, a reviewing court shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

(A)  in violation of a constitutional or statutory provision;

(B)  in excess of the agency's statutory authority;

(C)  made through unlawful procedure;

(D)  affected by other error of law;

(E)  not reasonably supported by substantial evidence considering the

---

[61] Tex. Health & Safety Code Ann. § 361.321(e) (West 2010).
[62] 872 S.W.2d 252, 257 n 2 (Tex. App.—Austin 1994, writ denied).

reliable and probative evidence in the record as a whole;  or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[63]

This case raises a question of rule construction, which courts review de novo.[64]  Courts interpret administrative rules, like statutes, under traditional principles of statutory construction.[65]  When an agency fails to follow the clear, unambiguous language of its own regulation, the court must reverse the agency's action as arbitrary and capricious.[66]  Furthermore, the agency's decision is reversible upon a finding of any errors listed in Texas Government Code § 2001.174(2)(A)–(F).[67]

## B.     TCEQ's Spontaneous Interpretation of 30 Texas Administrative Code §§ 330.9(f) and 330.9(b)(3).

The first public pronouncement of TCEQ's interpretation of 330.9(b)(3) was at the hearing on this appeal in district court.  At that hearing, the district court asked the Applicant why it claimed it did not need to register under Rule 330.9(f) and satisfy the 10/50 requirements.  For the first time, the Applicant presented a new interpretation of Rule 330.9(f) and 330.9(b)(3) that was not asserted at the agency level, was not asserted in briefing, and flew in the face of TCEQ definitions

---

[63] Tex. Gov't Code Ann. § 2001.174(2)(A)–(F) (West 2008).
[64] *CenterPoint*, 408 S.W.3d at 916.
[65] *Id.*
[66] *Gulf States Utilities*, 809 S.W.2d at 207; *CenterPoint*, 408 S.W.3d at 917.
[67] *United Copper v. Grissom*, 17 S.W.3d 797, 801 (Tex. App.—Austin 2000, pet. dism'd).

and the plain language of both rules.[68]  Even though 330.9(f) expressly applies to *any* transfer station that includes materials recovery operations, Applicant argued that the 10/50 requirements of 330.9(f) only apply to transfer stations that include material recovery operations if the facility exceeds the volume limitation of 125 tons of waste per day that is imposed by Rule 330.9(b)(3).  As discussed later, this reading plainly contradicts the rules.

At the same hearing, the court asked TCEQ's attorneys to explain a guidance document appearing to apply the requirements of Rule 330.9(f) to transfer stations with material recovery operations.  After a brief deliberation among the TCEQ attorneys, they deferred to the Applicant's interpretation of the rules.  Thus, also for the first time, TCEQ attorneys adopted the new interpretation that Rule 330.9(f) only applies to transfer stations that include a material recovery operation if the facility exceeds the waste volume limitation set forth in Rule 330.9(b)(3).

As discussed below, Applicant and TCEQ's reading of the rules disregards their plain language and therefore is impermissible.  Furthermore, Applicant and TCEQ's position ignores relevant TCEQ guidance on the very rule at issue – 330.9(f).  Also as discussed below, TCEQ's own guidance document[69] emphasizes that, to receive a registration, *any* transfer station that includes a materials recovery

---

[68] *See* C.R. at 512–14 (Plaintiff's Joint Motion for New Trial at 8–10).
[69] *See* **APPENDIX D:**  TCEQ Waste Permits Division Publication titled "Guidelines for Utilizing the Source-Separated Recycling Permit Exemption for Municipal Solid Waste Transfer Facilities."

facility *must* meet the 10/50 rule requirements set forth in Rule 330.9(f). The guidance document further explains that this requirement is *distinct* from other provisions for registration in Rule 330.9(b).[70]

### C.   TCEQ Failed to Follow the Clear, Unambiguous Language of Its Regulations.

When an agency fails to follow the clear, unambiguous language of its own regulation, the court must reverse the agency's action as arbitrary and capricious.[71] A rule's plain language must be followed unless it is ambiguous.[72] If a rule is ambiguous or leaves room for policy determinations, a court may not defer to an agency's interpretation that is plainly erroneous or inconsistent with the regulation or its underlying statutes.[73]

A court construes an administrative rule in the same manner it construes a statute.[74] The court's primary objective is to give effect to the agency's intent.[75] As the Texas Supreme Court has explained, other than the plain language of the rule itself, the "best source" of an agency's intent is found in the Texas Register, where the agency publishes its notice of the proposed rule and its "explanation of

---

[70] *Id.*

[71] *Gulf States Utilities*, 809 S.W.2d at 207 (Tex. 1991); *CenterPoint*, 408 S.W.3d at 917.

[72] *CenterPoint*, 408 S.W.3d at 916.

[73] *Id.*

[74] *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999); *SWEPI, LP v. Railroad Comm'n*, 314 S.W. 3d 253, 260 (Tex. App. –Austin 2010, pet. denied); *Railroad Comm'n of Texas v. Home Transp. Co.*, 670 S.W.2d 319, 325 (Tex. App. –Austin 1984, no writ).

[75] *Rodriguez*, 997 S.W.2d at 254 (Tex. 1999); *CenterPoint*, 408 S.W.3d at 917; *SWEPI*, 314 S.W.3d at 260; *Home Transp. Co.*, 670 S.W.2d at 325.

the rule."[76]  Here, in the notice published in the Texas Register, TCEQ explained that Rule 330.9 was adopted "to list ***all*** those MSW management activities that are exempt from permitting requirements but that still require commission approval by registration."[77]

TCEQ failed to follow the clear, unambiguous language of at least four of its regulations when it issued a registration for the Facility.  First, TCEQ failed to follow Rule 330.9(b)(3), the provision under which Applicant claimed authority for registration.  This rule expressly applies only to transfer station facilities. Second, TCEQ failed to follow Rule 330.9(f), which requires that any transfer stations facilities with materials recovery operations must meet the 10/50 requirements.  It is undisputed that the Facility is a transfer station with materials recovery operations, and that the 10/50 requirements were not met.  Third, TCEQ failed to follow the clear, unambiguous language of its own definitions.  TCEQ rules specifically define both types of facilities at issue, transfer stations and waste separation/recycling facilities (also referred to as a materials recovery facilities), and these facilities engage in different waste management activities.  Because TCEQ failed to follow the plain language of its rules, the registration of this Facility must be reversed.

---

[76] *Rodriguez*, 997 S.W.2d at 254.
[77] **APPENDIX C:**  31 Tex. Reg. 2502 (March 24, 2006), at 2506 (emphasis added).

**1.  TCEQ Failed to Follow the Clear, Unambiguous Language of 30 Texas Administrative Code § 330.9(b)(3).**

TCEQ and Applicant have improperly claimed authority to register the Facility under Rule 330.9(b)(3), which applies only to transfer station facilities that transfer less than 125 tons of waste per day.  Applying this rule to other types of facilities in addition to transfer stations controverts the plain language of the Rule itself.  Rule 330.9(b)(3) expressly applies to "transfer station facilities," not recycling facilities or any other types of waste management facilities.[78]  The rule states that "[a] registration is required for an MSW **transfer station facility** that is used in the transfer of MSW to a solid waste processing or disposal facility…."[79] As discussed below, transfer station facilities and recycling facilities are separately defined in TCEQ regulations, each involing distinct waste management activities. TCEQ and reviewing courts are bound to construe these terms by their regulatory definitions only.[80]  Because TCEQ failed to follow the clear, unambiguous language of its own regulation, the Court must reverse the agency's action as arbitrary and capricious.

---

[78] 30 Tex. Admin. Code § 330.9(b) (2014).
[79] 30 Tex. Admin. Code § 330.9(b) (2014).
[80] *Tex. Dept. of Transp. V. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) ("But if a statute defines a term, a court is bound to construe that term by its statutory definition *only*.") (emphasis added); *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("If a statute … assigns a particular meaning to a term, we are bound by the statutory usage."); *id*. at 438 ("We interpret administrative rules, like statutes, under traditional principles of statutory construction."); *Rodriguez*, 997 S.W.2d at 254 ("We construe administrative rules, which have the same force as statutes, in the same manner as statutes.").

## 2. TCEQ Failed to Follow the Clear, Unambiguous Language of 30 Texas Administrative Code § 330.9(f).

TCEQ failed to follow Rule 330.9(f), which requires any new MSW Type V transfer station that includes a materials recovery operation to meet two qualifications: (1) it must recover at least ten percent of the waste stream for recycling, and (2) it must send the waste to a landfill within 50 miles (the so-called "10/50 requirement"). It is undisputed that the Facility is not merely a transfer station facility, but includes a material recover operation.[81] Thus, the requirements of Rule 330.9(f) expressly apply to this Facility because they apply to "**any** new MSW Type V transfer station that includes a material recovery operation."[82]

Even though this rule fits like a glove, the Applicant did not meet its requirements. Indeed, in Part II of Applicant's Registration Application, Applicant openly states (1) that materials will be recovered at a rate not to interfere with proper operations of the facility, and (2) that waste materials will be transported to a landfill within 100 miles.[83] This fails to meet the applicable 10/50 requirements, and therefore, the registration must be reversed.

As previously discussed, TCEQ contended for the first time in hearing before the district court that the requirements of 330.9(f) were inapplicable to this

---

[81] C.R. at 509 (Plaintiff's Joint Motion for New Trial, Note 10 and accompanying text).

[82] 30 Tex. Admin. Code § 330.9(f) (2014) (emphasis added).

[83] R.R. at Joint Ex. 1, AR Vol. 1, Item 1, p. II-3 (Registration Application) ("The facility will recover recyclable materials at a rate not to interfere with proper operations of the facility. Non-recyclable materials will be transported to a properly permitted Type I or Type IV landfill that is located within 100 miles of the proposed facility.").

Facility. This assertion fails because it conflicts with the plain language of the rule, which expressly applies to "any" Type V transfer station that includes a material recovery operation.

Furthermore, this assertion is surprising because TCEQ's published guidance on Rule 330.9(f)[84] emphasizes that, to receive a registration, **any** transfer station that includes a materials recovery facility **must** meet the 10/50 rule requirements set forth in Rule 330.9(f). The guidance document explains that Rule 330.9(f) is ***distinct*** from other provisions for registration of a ***transfer facility*** based on the population of the area served, <u>waste acceptance rate</u>, and location within a permitted facility (30 TAC §330.9(b))."[85] Further, the guidance document does not suggest that applicants wishing to operate a materials recovery facility may use Rule 330.9(b) if they self-impose waste acceptance limitations. On the contrary, Rule 330.9(f) expressly applies to "**any** … station that includes a material recovery operation,"[86] regardless of waste acceptance rates.

### 3. TCEQ Failed to Follow the Clear, Unambiguous Language of its Regulations Defining Transfer Station and Waste Separation/Recycling Facility.

Registration of this Facility violates the clear, unambiguous language of Rules 330.3(157) and 330.3(174), which define transfer station and waste

---

[84] *See* **APPENDIX D:** TCEQ Waste Permits Division Publication titled "Guidelines for Utilizing the Source-Separated Recycling Permit Exemption for Municipal Solid Waste Transfer Facilities."

[85] *Id.*

[86] 30 Tex. Admin. Code § 330.9(f) (2014).

separation/recycling facilities, respectively.[87]  When an agency's rules expressly

define a term, a court is bound to construe the term by that regulatory definition

*only*.[88]  The term "transfer station" in Rule 330.9(b) cannot include a material

recovery facility, because that would be inconsistent with the express definitions of

a "transfer station" and "material recovery facility" set forth in the TCEQ's own

rules.

The term "transfer station" is expressly defined in the TCEQ rules as "[a]

facility used for transferring solid waste from collection vehicles to long haul

vehicles…."[89]  That definition is not ambiguous, and it plainly does ***not*** include a

"material recovery facility," which is also expressly defined in the rules and is a

completely different kind of facility – *i.e.*, one where "recyclable materials are

removed from the waste stream" for recycling.[90]  Moreover, since TCEQ expressly

provided different definitions for the term "transfer station" and the term "material

---

[87] 30 Tex. Admin. Code § 330.3(157) ("Transfer station—A facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit)."); 30 Tex. Admin. Code § 330.3(174) ("Waste-separation/recycling facility--A facility, sometimes referred to as a material recovery facility, in which recyclable materials are removed from the waste stream for transport off-site for reuse, recycling, or other beneficial use.")

[88] *Tex. Dept. of Transp. V. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) ("But if a statute defines a term, a court is bound to construe that term by its statutory definition *only*.") (emphasis added); *see also TGS-NOPEC Geophysical*, 340 S.W.3d at 439 ("If a statute … assigns a particular meaning to a term, we are bound by the statutory usage."); *id*. at 438 ("We interpret administrative rules, like statutes, under traditional principles of statutory construction."); *Rodriguez*, 997 S.W.2d at 254 ("We construe administrative rules, which have the same force as statutes, in the same manner as statutes.").

[89] 30 Tex. Admin. Code § 330.3(157) (2014) (emphasis added).

[90] *Id*. § 330.3(174) (emphasis added).

recovery facility," the Court must presume that the agency intended there to be a meaningful difference between the two terms.[91]  In short, under the plain language of the TCEQ rules, the term "transfer station" as used in Rule 330.9(b) means a transfer station, and nothing more.  It does **not** mean a transfer station **and** a material recovery facility.

> **D.**     **A Loophole Big Enough to Drive a Truck Through:  Even if the Regulations Were Ambiguous, TCEQ's Interpretation Would Not Be Entitled to Deference Because it is Plainly Erroneous or Inconsistent with the Regulation or its Underlying Statutes.**

Even if the regulations were ambiguous, the Facility registration must be reversed because TCEQ's interpretation of §330.9(b)(3) is plainly erroneous and inconsistent with the regulation or its underlying statutes.[92]  TCEQ's interpretation of 330.9(b)(3) is plainly erroneous because it leads to an absurd result.  Reading this rule to allow activities beyond the stated "transfer" activities would eviscerate the Act and TCEQ Rules' permitting requirement for many MSW storage, processing, and disposal facilities.  Indeed, under TCEQ's impromptu interpretation, so long as a facility called itself a "transfer station" and transferred less than 125 tons per day of MSW, it would be able to perform any other MSW

---

[91] *See Moore v. State*, 739 S.W.2d 347, 349 (Tex. Crim. App. 1987).  Also, there is certainly nothing in the TCEQ rules that would support any suggestion that the term "transfer station" is an umbrella term encompassing various kinds of facilities, like, for example, the term "Type V Facility."

[92] *Gulf States,* 809 S.W.2d at 207; *CenterPoint*, 408 S.W.3d at 917 (Tex. App.—Austin 2013, pet. denied) (holding that if a rule is ambiguous or leaves room for policy determinations, a court may not defer to an agency's interpretation that is plainly erroneous or inconsistent with the regulation or its underlying statutes.).

waste management activities at that facility, including long-term storage, processing activities such as recycling, and even land disposal. This cannot be the state of law, and is plainly erroneous.

As discussed at length above, TCEQ's interpretation is inconsistent with its regulations. Furthermore, the interpretation is also inconsistent with the Act. The stated purpose of the Act is "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste."[93] The Act authorizes TCEQ to issue permits governing the construction, operation, and maintenance of solid waste facilities,[94] and the Act generally requires that a person apply for and obtain a separate permit for each solid waste facility.[95] Furthermore, the Act provides certain specific exceptions to the general permitting requirement, which are reflected in the TCEQ Rules (as discussed above). Specifically, the Act allows certain types of facilities to be authorized by a mere registration, rather than by a permit.[96] The TCEQ's interpretation is inconsistent with the Act because it would result in registration of solid waste management activities that should require a permit under the Act.

## II. THE TCEQ DENIED AFFECTED PERSONS DUE PROCESS BY AUTHORIZING THE FACILITY THROUGH REGISTRATION RATHER THAN A PERMIT.

---

[93] Tex. Health & Safety Code Ann. § 361.002(a) (West 2010).
[94] Tex. Health & Safety Code Ann. § 361.061 (West 2010).
[95] Tex. Health & Safety Code Ann. § 361.086(a) (West 2010).
[96] Tex. Health & Safety Code Ann. §§ 361.0861, 361.111 (West 2010).

Circumventing the permitting requirements of the Act and the TCEQ Rules is not harmless error because it denies affected persons due process in the form of a contested case hearing.[97] CALH, the City, and other affected persons, were entitled to a contested case hearing prior to authorization of this Facility. This Facility is actually part of the proposed Landfill that has not been permitted, and which is the subject of an ongoing contested case hearing. This registration improperly denied these requestors their opportunity for hearing on the storage and recycling component of the larger Landfill facility.

No one has disputed CALH or the City's standing, and each is a party in the ongoing contested case hearing for the Pintail Landfill at the same location as this Facility. CALH members and City of Hempstead have property interests that would be affected by the proposed facility. For example, CALH has members that reside adjacent to the proposed location and rely on water wells as their sole source of domestic water, and the City supplies water to its residents from wells located near the Facility. The legislature has determined that a contested case hearing is the process that is due to protect the property interests of affected persons and has codified the requirements in the Health and Safety Code.[98] Where there is a

---

[97] Article 1, Section 19 of the Texas Constitution (due process).

[98] *See* Tex. Health & Safety Code Ann. §§ 361.088, 361.0665, 361.0666, 361.067, 361.079, 361.0791, and 361.081 (relating to various application notice requirements, published notice requirements, mailed notice requirements, hearing notice requirements, and contested case hearing requirements for MSW permit applications).

statutory right to a hearing and a right to a hearing under applicable rules, denial of the hearing is a violation of procedural due process.[99]

CALH and the City's interests should have been afforded the protection of the permitting process. The permitting process, unlike the registration process, triggers statutorily granted due process rights to notice and a contested case hearing by virtue of the Texas Health and Safety Code.[100] Here, the issuance of a registration when a permit was required denied members of CALH, the City, and all other affected persons their right to notice and a contested case hearing, as required under the Health and Safety Code for MSW permit applications.[101]

## III. THE REGISTRATION SHOULD BE REVERSED BECAUSE TCEQ ALLOWED AN EXCESSIVE NUMBER OF NOTICES OF DEFICIENCY WELL BEYOND ITS PUBLICLY PRONOUNCED POLICY.

The TCEQ failed to follow its publicly stated policy controlling Notice of Deficiency ("NOD") procedures. A NOD is sent by TCEQ to notify applicants of deficiencies in their applications and allows them to submit additional information to address the deficiencies. TCEQ publicly represented that they employ a limit of

---

[99] *County of Dallas v. Wiland*, 216 S.W.3d 344, 347 (Tex. 2007) (holding that "the deputies were discharged without the hearing before the civil service commission promised by system rules to determine whether just cause existed, and thus they were denied procedural due process.") (emphasis added).

[100] *See* Tex. Health & Safety Code §§ 361.088, 361.0665, 361.0666, 361.067, 361.079, 361.0791, and 361.081 (relating to various application notice requirements, published notice requirements, mailed notice requirements, hearing notice requirements, and contested case hearing requirements for MSW permit applications).

[101] *See id.*

two NOD's.  TCEQ should follow its own public policy pronouncements.  Even TCEQ's own Public Interest Counsel agrees, stating "the public must have confidence that the TCEQ applies its stated policies, including the two NOD policy, to all applicants in a uniform manner."[102]

This Registration Application should have been returned to Pintail because excessive Technical Notices of Deficiency (NOD's) were allowed in violation of clearly established TCEQ Policy.  During the review, Pintail was afforded at least six (6) separate NOD's and two (2) extensions of time to respond to the NOD's from the TCEQ.[103]  This is in direct conflict with the TCEQ's previous warnings to Pintail and the TCEQ policies outlined in the MSW registration process description, which is located in the TCEQ Sunset Evaluation Report.  In its First Technical NOD dated October 27, 2011, the TCEQ flatly warned Pintail that the TCEQ did not "anticipate granting an extension of time to fulfill this request," and that a "third notice of technical deficiency will not be issued."[104]  The public should be entitled to rely on the clear and unambiguous policies and directives of the TCEQ when the TCEQ evaluates applications that could have catastrophic effects on the health, safety, and financial well being of affected parties.

---

[102] R.R. at Joint Ex. 1, AR Vol. 8, Item 61, p. 3–4 (Office of Public Interest Counsel's Response to MTO).
[103] *See* R.R. at Joint Ex. 1, AR Index, Items 3, 13, 16, 22, 24, 27, 32, and 39.
[104] R.R. at Joint Ex. 1, AR Vol. 2, Item 13 (NOD Letter and Policy Notice to Pintail).

Instead, Pintail got at least eleven (11) bites at the apple to supply required information and respond to the numerous concerns outlined by the TCEQ staff regarding this "transfer station" and recycling facility.[105] As stated in the MSW Registration No. 40259 itself, the registration request was submitted on August 1, 2011, and ten (10) additional revisions were submitted on August 8, 2011, August 29, 2011; November 16, 2011; January 18, 2012; March 15, 2012; May 1, 2012; May 31, 2012; July 20, 2012; September 14, 2012, and October 18, 2012.

In the initial Technical NOD[106] dated October 27, 2011, the TCEQ reviewer of the Registration Application wrote, "we do not anticipate granting an extension of time to fulfill this request. Also, please be aware **a third notice of technical deficiency will not be issued**." (emphasis added).[107] The reviewer also stated in the same correspondence that "Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies." These statements by staff are consistent with TCEQ policies, as recently expressed in its TCEQ Sunset Evaluation Report.[108] As stated in the report, which contains a flowchart of the MSW registration review process,

---

[105] R.R. at Joint Ex. 1, AR Vol. 7, Item 55, p. 6 (MSW Registration No. 40259).
[106] Although this Technical NOD was labeled the First Technical NOD, there was actually correspondence from the TCEQ dated August 15, 2011 that was labeled "Preliminary Review" asking for information to be added to the original registration request.
[107] R.R. at Joint Ex. 1, AR Vol. 2, Item 13 (NOD Letter and Policy Notice to Pintail).
[108] R.R. at Joint Ex. 1, AR Vol. 8, Item 61, p. 3–4 (citing TCEQ Sunset Self-Evaluation Report, Sec. VII, P. 248).

registration requests are returned to the applicant after an applicant unsuccessfully resolves the Second NOD.[109]

The registration review process documents from 2009-2010 and 2010-Current reveal a consistent TCEQ instruction to its staff, applicable to all registrants:

> "Review the second NOD response. If the application still has significant deficiencies, prepare a letter for the **Section Manager's** signature returning the application with an explanation why the application is being returned. If the deficiencies are very minor in nature, work with the applicant/consultant to resolve them. **There are no third NODs.**" (second emphasis added).[110]

According to the registration procedures, only very minor deficiencies may be addressed, and there are no third NODs. A consultation between the reviewer and team leader to determine the next course of actions (*i.e.*, whether the issues are easily addressed minor issues) is consistent with the stated procedure.

Regardless of these statements and the dissonance with applicable TCEQ policies, on December 2, 2011, an extension was granted to allow Pintail additional time to respond to the First NOD.[111] Pintail did respond on January 18, 2012, but the response was again inadequate, as the reviewer sent another request for additional information on February 17, 2012.[112] And, even though it is labeled

---

[109] R.R. at Joint Ex. 1, AR Vol. 8, Item 58, Ex. 2 at 248.
[110] R.R. at Joint Ex. 1, AR Vol. 8, Item 65, Ex. 1, p. 3 of registration procedures document (CALH's Reply to Responses to Motion to Overturn).
[111] R.R. at Joint Ex. 1, AR Vol. 2, Item 16.
[112] R.R. at Joint Ex. 1, AR Vol. 4, Item 22.

"First Technical Notice of Deficiency," the letter is clearly an indication that Pintail did not submit a satisfactory response to each of the noted deficiencies in the first technical notice of deficiency. As such, it appears the Registration Application should have been returned at this time. However, not only was the Application not returned, Pintail was granted yet another extension to respond to the Third Technical NOD.[113] Despite the statements from TCEQ staff that there would not be more than two (2) NOD's, this pattern continued for a total of at least six (6) NOD's.[114]

The registration should have been returned after Pintail's failure to address TCEQ's concerns in the Second NOD, in accordance with the TCEQ's policy and the TCEQ staff's statements. Allowing Pintail to continue to inadequately respond to more than two (2) Technical NOD's is a departure from the stated policy, and should not be allowed by the Commission. For this reason alone, the Commission's approval of MSW Registration No. 40259 is marred by abuse of discretion, unlawful procedure, and unreasonable errors of law. Accordingly, issuance of the registration should be reversed.

The TCEQ has argued that it is entitled to publicly pronounce its policy

---

[113] R.R. at Joint Ex. 1, AR Vol. 5, Item 24. Interestingly, this Technical NOD was not given a number (nor were the two subsequent NODs of June 25, 2012 and August 16, 2012, given a number), but by our count it is actually the Fourth NOD when you count the "Preliminary Review".

[114] *See* R.R. at Joint Ex. 1, AR Index, Items 3, 13, 16, 22, 24, 27, 32, and 39.

controlling NOD procedures, yet not follow that policy because it is not incorporated into TCEQ rules.[115] Appellants respectfully disagree. The TCEQ should be bound to follow its public pronouncements. Without such a requirement, the public will lose trust in their state environmental regulators. Here, the Registration Application should have been returned to Pintail after the unsuccessful resolution of the Second NOD. Instead, Pintail received six (6) separate NOD's resulting in eleven (11) different versions of the Registration Application. The TCEQ's refusal to follow its own publicly pronounced NOD policy harmed CALH and its members, harmed the City, and harmed the public of Texas. Such refusal was an abuse of discretion, unlawful procedure, and an unreasonable error of law, and accordingly, was invalid, arbitrary, or unreasonable. For this reason, Appellants respectfully request that registration of this Facility be reversed by the Court.

---

[115] R.R. at Joint Ex. 1, AR Vol. 7, Item 53, p. 8 (Response to Comment 10).

## PRAYER

TCEQ acted in violation of its own rules and policies, and in abrogation of the due process rights of affected persons, in granting the Registration Application and issuing Registration No. 40259. Therefore, CALH and the City respectfully pray that the trial court's Judgment affirming the TCEQ's action be reversed, and that Court reverse, or suspend and set aside, the Registration and remand this matter to TCEQ for further proceedings consistent with this Court's opinion. CALH and the City further pray for all other and further relief, both general and special, at law and in equity, to which they may be justly entitled.

Respectfully submitted,

HANCE SCARBOROUGH, LLP
400 W. 15th Street, Ste. 950
Austin, TX 78701
Telephone: (512) 479-8888
Facsimile: (512) 482-6891

By: _____
    Terry L. Scarborough
    State Bar No. 17716000
    Michael L. Woodward
    State Bar No. 21979300
    mwoodward@hslawmail.com
    V. Blayre Pena
    State Bar No. 24050372
    bpena@hslawmail.com
    Wesley P. McGuffey
    State Bar No. 24088023
    wmcguffey@hslawmail.com

ATTORNEYS FOR APPELLANTS CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD, MICHAEL MCCALL, AND WAYNE KNOX

**KELLY HART & HALLMAN LLP**
301 Congress Avenue, Suite 2000
Austin, Texas 78701
Telephone: (512) 495-6400
Facsimile: (512) 495-6401

By: /s/ Diana L. Nichols
    Monica M. Jacobs
    State Bar No. 24007433
    Monica.Jacobs@kellyhart.com
    Diana L. Nichols
    State Bar No. 00784682
    Diana.Nichols@kellyhart.com

**ATTORNEYS FOR THE CITY OF HEMPSTEAD**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4, I hereby certify that this brief contains 8,319 words. This is a computer generated document created in Microsoft Word, using 14 point typeface for all text, except for footnotes, which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Terry L. Scarborough

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Appellants' Brief was served on the following counsel of record on February 25, 2015, via certified mail, return receipt requested, and/or the electronic filing system:

Nancy Elizabeth Olinger
Nancy.Olinger@texasattorneygeneral.gov
Cynthia Woelk
Cynthia.Woelk@texasattorneygeneral.gov
Daniel C. Wiseman
Daniel.Wiseman@texasattorneygeneral.gov
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division (MC-066)
P.O. Box 12548
Austin, TX 78711-2548
**ATTORNEYS FOR TCEQ**

Paul R. Tough
ptough@msmtx.com
Brent W. Ryan
bryan@msmtx.com
MCELROY, SULLIVAN, MILLER, WEBER & OLMSTEAD, LLP
P.O. Box 12127
Austin, TX 78711
**ATTORNEYS FOR THE PINTAIL LANDFILL, LLC**

Terry L. Scarborough

# APPENDIX A

Notice sent: Final Interlocutory None

Disp Parties:

Disp code: CVD / CLS

Redac

Judge

Filed in The District Court
of Travis County, Texas

SEP 04 2014

At 10.31 A.M.

Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-13-002918

| | | |
|---|---|---|
| CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD, MICHAEL McCALL, WAYNE KNOX, and CITY OF HEMPSTEAD, Plaintiffs, | § § § § § § § | IN THE DISTRICT COURT |
| v. | § § | TRAVIS COUNTY, TEXAS |
| TEXAS COMMISSION ON ENVIRONMENTAL QUALITY and PINTAIL LANDFILL, LLC, Defendants. | § § § § § | 201ST JUDICIAL DISTRICT |

## FINAL JUDGMENT

On September 3, 2014, this cause came on for hearing on the merits before the Court. All parties appeared through their counsel of record. The Court, having considered the pleadings, briefs, and Administrative Record, and having heard the arguments of counsel, is of the opinion and finds that this Court must affirm the July 23, 2013 decision of the Executive Director of the Texas Commission on Environmental Quality ("Executive Director") to approve and issue Registration No. 40259 to Pintail Landfill, LLC.

Accordingly,

IT IS, THEREFORE, ORDERED that the Executive Director's July 23, 2013 decision to approve and issue Registration No. 40259 to Pintail Landfill, LLC be and is in all things AFFIRMED.

IT IS FURTHER ORDERED that all relief not expressly granted herein is DENIED, and this judgment finally disposes of all parties and all claims and is appealable.

IT IS FURTHER ORDERED that each party shall bear its/his own costs.

SIGNED this 4th day of September, 2014.

_____
SCOTT H. JENKINS
Judge Presiding

# APPENDIX B



**TCEQ REGULATORY GUIDANCE**

Small Business and Environmental Assistance Division

RG-469 • Revised July 2013

# Traditional Municipal Solid Waste Disposal: A Guide for Local Governments

## Contents

Who Should Use This Guide? ................................................................................ 2

Authorities and Regulations .............................................................................. 2

Traditional Waste Management—Landfills ....................................................... 2
Types of Landfills ............................................................................................................ 3
Initial Collection ............................................................................................................. 4
Transportation ................................................................................................................ 4
Consolidation .................................................................................................................. 4
Operations ....................................................................................................................... 6

Cleaning Up Your Community ........................................................................... 8
Waste from Disposal of Nuisance and Abandoned Buildings ..................................... 8
Special Collection Days ................................................................................................. 9
Collection Days for Household Hazardous Waste ..................................................... 10
Agricultural Waste Pesticides .................................................................................... 11
Storm Debris ................................................................................................................. 11
Preventing Illegal Dumping ........................................................................................ 13
Don't Mess with Texas Water ..................................................................................... 13
Options for Material Diversion ................................................................................... 13
Material ......................................................................................................................... 14
Option ........................................................................................................................... 14
Benefits ......................................................................................................................... 14

Additional Requirements for MSW Facilities ................................................ 14
Supervisor or Manager ................................................................................................ 14
Financial Assurance ..................................................................................................... 15
Water Regulations ........................................................................................................ 16
Air-Pollution Control ................................................................................................... 16
Reports .......................................................................................................................... 17
Fees ................................................................................................................................ 19
Statewide and Regional Planning .............................................................................. 19

Inspections: What to Expect ........................................................................... 20

Texas Councils of Governments ...................................................................... 21

For More Information ....................................................................................... 22

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY • PO BOX 13087 • AUSTIN, TX 78711-3087

The TCEQ is an equal opportunity employer. The agency does not allow discrimination on the basis of race, color, religion, national origin, sex, disability, age, sexual orientation, or veteran status. In compliance with the Americans with Disabilities Act, this document may be requested in alternate formats by contacting the TCEQ at 512-239-0028, fax 512-239-4488, or 800-RELAY-TX (TDD), or by writing PO Box 13087, Austin TX 78711-3067. We authorize you to use or reproduce any original material contained in this publication—that is, any material we did not obtain from other sources. Please acknowledge the TCEQ as your source. Printed on recycled paper.

## Who Should Use This Guide?

This document is intended to help local officials and governments understand and comply with the rules on landfills and management of municipal solid waste (MSW), and the associated authorizations, reports, and fees. This publication is not a substitute for the actual rules.

## Authorities and Regulations

Texas has been authorized by the U.S. Environmental Protection Agency to manage its MSW program. Texas statutes are consistent with the federal rules, but MSW in Texas is managed specifically in accordance with Title 30, Texas Administrative Code, Chapter 330 (30 TAC 330) and Title 5, Texas Health and Safety Code, Chapters 361 and 363. Municipal solid waste is defined in 30 TAC 330.3(88) as:

> Solid waste resulting from or incidental to municipal, community, commercial, institutional, and recreational activities, including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.

Other rules for MSW in Texas are found in 30 TAC 332 (for composting) and 30 TAC 328 (for recycling). You can obtain the most current, official copy of state rules by contacting the Secretary of State's office, at 512-305-9623, or visiting our website, at <www.tceq.state.tx.us/goto/rules-pdf>.

Your local city and county authorities may also have regulations that affect your facility's waste management operations. Contact your local government to determine if your operations are authorized.

The federal rules for MSW are contained in Title 40, Code of Federal Regulations, Parts 257 and 258. These rules can be obtained by contacting the U.S. Government Printing Office at 866-512-1800, or by visiting the GPO website, at <www.ecfr.gov>.

## Traditional Waste Management—Landfills

The traditional waste-management solution is the landfill. A local government must determine which kinds of landfill and which procedures for the collection, transportation, consolidation, and disposal of waste are appropriate for its community. From collection to disposal in a landfill, each phase has a number of rules that apply.

## *Types of Landfills*

### Type I and IV Landfills
(30 TAC 330.5)

Type I landfills are the standard and most common landfills for the disposal of routine MSW in Texas. They may accept most types of household and putrescible waste. Type IV landfills may accept brush, construction and demolition waste, and rubbish, but may not accept household or putrescible waste. Household waste is defined as:

> Any solid waste (including garbage, trash, and sanitary waste in septic tanks) derived from households (including single and multiple residences, hotels and motels, bunkhouses, ranger stations, crew quarters, campgrounds, picnic grounds, and day-use recreation areas); does not include brush.
> [30 TAC 330.3(64)]

Putrescible waste is defined as:

> Organic wastes, such as garbage, wastewater treatment plant sludge, and grease trap waste, that are capable of being decomposed by microorganisms with sufficient rapidity as to cause odors or gases or are capable of providing food for or attracting birds, animals, and disease vectors. [30 TAC 330.3(119)]

### Arid Exempt Landfills
(30 TAC 330.5)

In the case of small municipal governments in arid areas of the state, the TCEQ may authorize *arid exempt landfills*, which are generally exempt from regulations on liners and groundwater monitoring in 30 TAC 330, Subchapters H and J. To operate as an arid exempt landfill, the facility must first be authorized by the TCEQ in accordance with 30 TAC 330.5(b). To qualify as such, an arid-exempt (AE) landfill must:

- Accept less than 20 tons per day, based on an annual average of authorized waste in either a Type I-AE or Type IV-AE landfill unit (a discrete area of land or excavation that receives waste). A facility with both unit types may have a total waste acceptance of 40 tons per day.

- Serve a community that has no practical alternative for waste management.

- Be in an area that receives no more than 25 inches of annual average precipitation based on data from the nearest official recording station for the most recent 30-year reporting period.

## Initial Collection
(30 TAC 330, Subchapter C)

Collection of MSW is regulated by 30 TAC 330, Subchapter C. To minimize odors and nuisance conditions, waste that contains putrescible material must be collected at least weekly. All collection vehicles must be built, operated, and maintained to prevent loss of waste, whether liquid or solid; minimize health and safety hazards; and preclude odors and fly breeding.

Waste collection is usually the largest portion of an MSW budget. To help local governments increase the efficiency of waste collection and thereby lower its costs, the EPA prepared the guidance document *Getting More for Less: Improving Collection Efficiency* (EPA 530-R-99-038). EPA publications on waste can be found at <www.epa.gov/wastes/inforesources/pubs/>. Some of the principal methods for cutting costs are changing the frequency of collections, improving routing, and using automated equipment.

## Transportation
(30 TAC 330, Subchapter C)

MSW transporters are regulated by 30 TAC 330, Subchapter C. It is the transporter's responsibility to ensure that waste is delivered to a facility that is authorized to accept that type of waste. Transporters must maintain records for a minimum of three years, which documents that each load of waste was taken to an authorized MSW facility. In addition, if a discharge of waste occurs during transport, the waste hauler must take immediate action to contain the waste and deliver it to an authorized facility.

## Consolidation
(30 TAC 330, Subchapters A and E)

Consolidation of waste is an interim waste-management solution for lowering operational costs. Money is saved by storing waste at a facility before transporting it to its final disposal destination. A few large-volume trucks then take the waste to the final disposal facility, rather than numerous small trucks traveling the distance—saving both fuel and labor.

There are various consolidation options, including transfer stations and citizen collection stations. Depending on size of the population served or the volume of waste handled, your facility may require authorization from the TCEQ, ranging from notification to permit. Authorization requirements for each consolidation option are covered later in this document.

In areas of the state that are underserved by waste-collection services or do not have access to proper disposal facilities, funds may be available to study the feasibility of a waste consolidation facility. Contact your local council of governments (COG) to determine whether there are grants available for this kind of study.

## Transfer Stations

A *transfer station* is defined at 30 TAC 330.3(157) as:

> A facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit). It is not a storage facility such as one where individual residents can dispose of their wastes in bulk storage containers that are serviced by collection vehicles.

Transfer facilities offer an alternative when the landfill is so far away that it is not economical for each waste-collection vehicle to make round trips. Transfer stations allow local waste haulers to temporarily store waste and then use large-volume trucks to haul waste to the distant landfill.

Though transfer stations save money, they have their own operating expenses. It is important to determine whether a transfer facility would be cost effective. The EPA's *Waste Transfer Station: A Manual for Decision Making* (EPA 530-R-02-002) can help local governments with cost analysis.

Operating a transfer station typically requires a registration or a permit. However, small communities may be able to establish low-volume transfer stations with just a notification. To qualify for this type of authorization, the community must control the facility, comply with local ordinances, notify adjacent landowners, and haul collected waste to a final disposal facility at least weekly. A low-volume transfer station may store, at most, 40 cubic yards of waste.

To start a low-volume transfer station, a local government must submit a Notice of Intent to Operate a Low-Volume Transfer Station (Form TCEQ-20370). TCEQ forms can be found at <www.tceq.texas.gov/search_forms.html>.

Transfer stations that cannot meet the 40-cubic-yard limit will have to obtain either a registration or a permit. To be eligible for registration as a transfer station, the facility must meet one of the following criteria:

- It serves a municipality with a population of fewer than 50,000.
- It serves a county with a population of fewer than 85,000.

- It transfers or proposes to transfer no more than 125 tons per day of MSW.
- It is within the permitted boundaries of an MSW Type I or Type IV facility.

If none of these criteria can be met, a permit is required.

All transfer stations must follow the operating procedures outlined in 30 TAC 330, Subchapter E, which include, but are not limited to, recordkeeping, safety procedures, and maintaining sanitary conditions. Templates for the preparation of site operating plans for a transfer station can be found on the TCEQ's website, at <www.tceq.state.tx.us/goto/ msw_sop>. Transfer facilities are also required to submit annual reports on the volume of waste accepted. See the "Reports" section of this document, under "Additional Requirements."

### Citizen Collection Stations

A second waste-consolidation option, used when door-to-door waste pickup service is not cost effective, is a citizen collection station (CCS). CCSs are temporary holding facilities where residents can take their household waste for storage until it can be transported to an MSW disposal facility. The collection facility should be located in an area that is convenient and easily accessible. It gives a community the ability to conveniently and legally dispose of household waste.

CCSs are regulated by 30 TAC 330.11(e) and 330.213. If your local government would like to establish a citizen collection facility, it must submit a Notice of Intent to Operate a Citizen's Collection Station (Form TCEQ-20429, available at <www.tceq.texas.gov/search_forms.html>). The containers provided at the facility should be compatible with the type and quantity of household waste accepted. To prevent illegal dumping, you should post rules governing the use of the CCS facility (including who may use it and what may or may not be deposited), collect waste on a scheduled basis, and—if possible—have an on-site operator supervising the facility. CCSs must follow the same standards as landfills for safety, prevention of scavenging, and control of litter and odor.

## Operations

(30 TAC 330, Subchapter D)

All registered or permitted MSW disposal facilities must follow the site operating plan (SOP) designed and approved specifically for that site. The SOP describes the day-to-day procedures for facility operations. You can find a few of the key elements for an SOP below.

## Unloading

It is the generator's responsibility not to send unauthorized material to a landfill for disposal, and it is the landfill operator's responsibility to prevent the disposal of unauthorized waste or disposal in the wrong location. It is imperative that a trained operator visually screen all collected and unloaded waste to prevent disposal of unauthorized material. Unloading should be confined to as small an area as practical, and the facility's SOP should define the maximum size and number of unloading areas.

The operator must:

- reject unauthorized waste
- arrange to have unauthorized material removed by the generator or transporter
- maintain the facility's operating records of visual load inspections and rejected materials
- list unauthorized materials
  - on signs posted at the entrance
  - on bills
  - on fliers handed out to haulers at the gate

## Daily Cover

To control disease and nuisance conditions, it is critical to control odors with daily cover. Waste must be covered at least daily in Type I and Type I-AE facilities, and weekly in Type IV and Type IV-AE facilities. If the facility would like to use an alternative daily cover, it must secure approval from the TCEQ in accordance with 30 TAC 330.165. For more information about alternative daily covers, contact the Waste Permits Division at 512-239-2335.

## Preventing Nuisance Conditions

Ponding of water over waste or cover, windblown litter or waste, and scavenging must be managed to prevent nuisance conditions. Ponded water must be removed, and the surface filled in and re-graded within seven days of the occurrence. When the facility is operating, windblown solid waste must be removed daily from around the site, along fences and access roads, at the gate, and along any public roads connected to the facility's entrances (at a minimum, two miles in either direction from the entrances). To help prevent scavenging, the perimeter of the site must be controlled by means of artificial barriers, natural barriers, or a combination of the two.

### Special Waste

Facilities operating in compliance with Chapter 330 may obtain authorization to accept some special wastes not specifically identified in 330.171(c). Special waste approvals will be waste-specific or site-specific. To receive authorization for a waste that your permit does not currently allow in accordance with 30 TAC 330.171(b), contact the TCEQ. Additional information is available in *Special Waste Regulations in Texas* (TCEQ publication RG-029).

*Note:* Certain waste streams are prohibited from MSW facilities. See 30 TAC 330.15 for a comprehensive list.

# Cleaning Up Your Community

Every community deals with waste beyond everyday household waste. These other waste streams can be offensive to the senses, as well as take up limited landfill space. Local governments can take a proactive approach to managing these wastes—planning saves both labor and landfill capacity.

As you develop your recycling or disposal strategy, you can determine whether your cleanup will generate revenue or cost money. If your cleanup is not properly budgeted, your local government may be stuck with materials that it cannot properly dispose of or recycle. Stockpiling materials without the prospect of recycling them could be considered *abandonment,* plus it increases your risk of creating nuisance conditions.

## *Waste from Disposal of Nuisance and Abandoned Buildings*

[30 TAC 330.7(i)]

Counties or municipalities with 12,000 or fewer people may obtain a permit by rule (PBR) to dispose of demolition waste from properties with nuisance or abandoned buildings. The PBR applies to buildings that have been acquired by a county or municipality by bankruptcy, tax delinquency, or condemnation. Disposal can only occur on land that is owned or controlled by the county or municipality, and that receives 25 inches average annual rainfall or less.

To claim this PBR, contact the MSW Permits Section for a simple application form. You must submit the form to the TCEQ, and the agency must acknowledge receipt, before you begin construction of the disposal site. The complete rules appear in 30 TAC 330.7(i).

For more information or help with claiming this PBR, call the TCEQ's MSW Permits Section at 512-239-2335 or the TCEQ's Small Business and Local Government Assistance section at 800-447-2827.

## Special Collection Days

If your community would like to hold a special collection day for residents that deters illegal dumping and beautifies the community, preparation is key. To have a successful event, you must plan each component of the cleanup—from acceptance to final disposal—well in advance.

A permit, registration, notification, or other authorization is not required for a collection point for wastes collected and received in sealed plastic bags from such activities as periodic citywide cleanup campaigns and cleanup of rights-of-way or roadside parks.

One of the major priorities of a public collection event is to arrange for final disposal of every waste stream before the collection date. If waste remains at the collection area for an extended period of time, it creates an "out-of-sight, out-of-mind" mentality and promotes illegal dumping. Ideally, all wastes should be removed immediately following the event or as soon as possible to avoid the creation and maintenance of a nuisance, or the endangerment of human health or the environment. Options for final disposal include recycling, composting, and using landfills. With each option, you should consider several basic questions:

### Recycling

- What materials do we want to recycle?
- Who accepts these materials for recycling?
- Is more than one recycling company required to meet the needs of our cleanup?
- Are these companies reputable and reliable?

### Composting and mulching

- Is there a demand for compost or mulch?
- Where will we store the processed and unprocessed material?
- Should we hire a company to compost or mulch the materials that are collected?
- Will we use our own equipment and workforce to process materials?
- Should we promote household composting at the event? (If so, see the TCEQ's *Mulching and Composting* [GI-036], available at <www.tceq.texas.gov/publications/search_pubs.html >.)

428

### Using landfills

- What waste does the landfill accept?
- Does the landfill have the available capacity?

### General

- What wastes will not be accepted during the collection?
- How will we prevent dumping of unaccepted waste?
- If unacceptable waste is found, how will we dispose of it?
- What is our plan to prevent and, if necessary, contain spills?
- Is TCEQ authorization required for the collection?

## Collection Days for Household Hazardous Waste
(30 TAC 335, Subchapter N)

Often, residents store household hazardous waste (HHW) because they are unsure of how to properly dispose of it. Although HHW can usually be legally disposed of in the normal trash, there are better disposal options that local governments can arrange. For more information, contact the TCEQ's Pollution Prevention and Education Section at 512-239-3100.

### Operational Plan

An HHW collection requires more time to plan than other types of collection events. The TCEQ requires notification and development of an operational plan in accordance with 30 TAC 335, Subchapter N.

To hold an HHW collection, you must:

- Complete the notification no later than 45 days before the collection date.
- Develop and address in your operational plan all the components identified in 30 TAC 335, Subchapter N.
- Make your operational plan readily available upon request by the TCEQ.
- Include the following key components—along with other appropriate measures—in your operational plan:
- safety measures
- training about collection for employees or volunteers
- a determination of the types and amounts of waste expected
- arrangements for the proper disposal of all the wastes collected

Contact the TCEQ's Pollution Prevention and Education Section at 512-239-3100 for a list of companies that conduct HHW collections and that package, transport, and dispose of hazardous waste. You can also

arrange for other HHW programs in the area to take the wastes from your collection. The contact information for these programs is available from the Pollution Prevention and Education Section or online at <www.tceq.texas.gov/goto/hhw-contacts>.

## Agricultural Waste Pesticides

Improper disposal of waste pesticide can have serious adverse effects on the environment, such as groundwater contamination. Take special care to recycle or properly dispose of all pesticides.

### Empty Plastic Pesticide Containers

Plastic pesticide containers that have been triple rinsed or pressure washed and rendered unusable are not considered hazardous waste, and can be disposed of in an MSW facility that is permitted to accept this special waste. Not all landfills choose to accept pesticide containers, however, even if the containers have been properly rinsed, and the landfills that do accept them usually charge a fee. Instead of disposing of these containers, consider recycling them. For more information, see USAg Recycling, at <www.usagrecycling.com>.

## Storm Debris

At one time or another, every local government will be faced with managing debris caused by tornadoes, hurricanes, hail, or winds. If improperly managed, the cleanup and removal of storm debris can unnecessarily cost thousands of dollars in transportation charges and disposal fees alone. Table 1 (under "Options for Material Diversion," below), lists options for recycling different materials.

In general, outdoor burning is prohibited in Texas. If your local government would like an exception, you will need to meet specific requirements and obtain approval from the appropriate TCEQ regional office **before** doing any burning. You will also need to check local ordinances or other regulations about outdoor burning. If there is a burn ban in your county, the TCEQ will not approve any exception to the rule. For additional information concerning outdoor burning in Texas, including a copy of the rule, consult the TCEQ's *Outdoor Burning in Texas* (Pub. No. RG-049).

*Note:* It is strictly prohibited to burn any electrical insulation, treated lumber, plastics, non-wooden construction or demolition materials, heavy oils, asphaltic materials, potentially explosive materials, chemical wastes, or items that contain natural or synthetic rubber (such as tires).

### Planning for the Inevitable

Initiate and design a plan that fits your specific area. Texas is a big state; some options may not be practical for all areas. You should develop a plan for the transport, storage, processing, and disposal of various forms of storm debris. This should include identification of suitable sites to temporarily store, segregate, or process large amounts of debris following a disaster. You should consider requesting that residents set appliances, household hazardous waste, brush, construction debris, and putrescible wastes in separate piles for pickup after a storm. Tell contract haulers to maintain separation of materials during the collection, transport, and storage of storm debris to maximize your options for recycling waste and minimize waste-disposal costs. Before designing your plan, you should consider the following:

### Available landfill space

- Where is the closest landfill?
- What is its disposal capacity?
- What types of waste does it accept?

### Recycling options

- What recycling options are available in or near the area?
- What do we need to do to make certain that materials are adaptable for recycling?
- Which specific materials are not recyclable in this area?

### Labor resources *(available workforce)*

- Are there labor sources in the city or county?
- Are there optional labor sources (such as prison or jail inmates) in the area?
- Is it possible to recruit volunteers from the community?

### Available equipment *(hauling trucks, loaders, chippers, grinders, storage trailers)*

- What equipment is available for cleaning up storm debris?
- Is there access to chippers and grinders?
- Can we borrow equipment from surrounding communities?
- Can we establish a memorandum of understanding for mutual aid with neighboring communities?

Available storage locations

- Where could source-separated materials (those sorted at their origin) be temporarily stored?
- Do storage areas have adequate space for processing source-separated materials if required?

In an emergency, recycling is not always the most time-efficient way to manage storm debris, but if you prepare in advance, you will most likely make after-storm cleanup a more cost-effective, manageable experience.

## Preventing Illegal Dumping

Many communities across Texas are facing problems with illegal dumping. Not only is it offensive to the senses, it can drain local government resources. The city or county often becomes responsible for the collection and disposal of the trash left at an illegal dump site. The labor and disposal costs associated with these sites can eat away at a local government's budget. To help combat illegal dumping in your community, see the TCEQ's *Prevent Illegal Dumping: A Guide for Local Governments* (RG-455).

## Don't Mess with Texas Water

The Don't Mess with Texas Water program offers local governments another tool to help prevent illegal dumping. The TCEQ, Texas Department of Transportation, and participating communities are working together to place signs on major highway water crossings that notify drivers of a toll-free number to call to report illegal dumping.

The TCEQ forwards calls from the toll-free number to the appropriate law-enforcement agency to handle complaints of illegal dumping in a participating area.

For more information on the program or to find out how your community can participate, visit our Web page at <www.tceq.texas.gov/goto/dumpreport>.

## Options for Material Diversion

Once waste is collected, separating sources of waste is critical to the success of any cleanup activity. Depending on your area and the options available, separating materials at the time of the cleanup can save you hundreds or even thousands of dollars. For recycling services in your area, visit Earth 911's recycling website at <earth911.org/recycling>. Below are some ideas for managing recyclable waste.

## Table 1. Options for Material Diversion

| Material | Option | Benefits |
|---|---|---|
| Chipped wood: Clean, untreated lumber, wooden shingles, tree limbs, brush. | Mulch | Prevents soil erosion, controls weeds, retains soil moisture, protects plants, adds nutrients to the soil |
| Wood shavings, cardboard, paper | Use in compost | Adds nutrients to the soil, prevents runoff, protects plants from diseases and pests, retains soil moisture |
| Appliances (white goods) | Recycle | Conserves landfill space and natural resources |
| Metal: Signs, poles, sheet metal, mobile home frames, bicycles, swing sets, trampolines | Recycle | Conserves landfill space and natural resources |
| Cinder block, concrete, brick, glass | Recycle | Conserves landfill space and natural resources |
| Electronic equipment | Recycle | Best management practice to prevent groundwater contamination |
| Glass | Recycle | Conserves landfill space and natural resources |
| Plastics | Recycle | Conserves landfill space and natural resources |

# Additional Requirements for MSW Facilities

## Supervisor or Manager

According to 30 TAC 30, Subchapters A and F, all MSW facilities that require a permit or registration must employ at least one licensed person to supervise or manage the facility. The license requirements for the various types of facilities are as outlined in Table 2.

Unless otherwise specified in their permit, all MSW facilities must have a supervisor who holds the license level indicated in Table 2. Provisional licenses are valid for two years and may not be renewed. Any missing requirements must be completed before the standard license can be obtained.

## Table 2. Licenses Required for Different Facilities

| Type of MSW Facility | Level of License Required |
|---|---|
| All landfill facilities[a] and Type IX landfill mining facilities | Class A |
| Type V storage or processing facilities not otherwise specified, Type IX energy or material-recovery facilities, Type VI demonstration facilities, and permitted or registered compost facilities | Class A or Class B |

[a] Landfill facilities include these types of landfills:

Type I
Type I-AE
Type IV
Type IV-AE

The following are exempt from the supervisor license requirement:

o   Type IX beneficial landfill gas-recovery facilities

o   Animal crematories, dual-chamber incinerators, and air-curtain incinerators operating in accordance with an MSW PBR

o   MSW facilities exempt from permitting or registration

o   Nuisance and abandoned buildings

o   demolition waste disposal sites.

*The TCEQ will administer field citations to facilities that do not have the required licensed supervisor or manager.*

## Financial Assurance

(30 TAC 330, Subchapter L, and 30 TAC 37, Subchapter R)

Most MSW facilities are required to demonstrate financial assurance for closure, post-closure, and corrective-action costs. They must be able to show that they are capable of paying the projected costs of closing the facility and the associated post-closure, as well as the costs of any required corrective action. The following mechanisms can be used to demonstrate financial assurance: a trust fund, a surety bond guaranteeing payment or performance, insurance, or a corporate financial test.

## Water Regulations

### Wastewater

To protect the waters of the state, all MSW facilities must comply with the Texas Pollutant Discharge Elimination System (TPDES). Any liquids that the facility produces must be disposed of in a manner that will not cause surface water or groundwater pollution. You should determine how to handle any wastewater that your operation creates, such as vehicle wash water or water that has come into contact with waste. With the wastewater system's approval, your wastewater may be discharged to the local sanitary sewer. To discharge directly into the waters of Texas, your facility must have a TPDES permit.

### Stormwater

To prevent stormwater from being contaminated with solid waste, landfills must obtain a stormwater permit. You can get coverage through either the Multi-Sector General Permit No. TXR050000 or an individual permit. The application process for the general permit is much simpler, less expensive, and less time-consuming than that for an individual permit.

To apply for the general permit, you must:

- develop a Storm Water Pollution Prevention Plan (SWP3) and
- file the Notice of Intent (Form TCEQ-10382) with the TCEQ.

Templates to help you develop an SWP3 are available online at <www.tceq.texas.gov/assistance/water/sw-industrial.html>

For assistance on obtaining coverage and meeting the requirements of the permit, contact the TCEQ's Small Business and Local Government Assistance Section at 800-447-2827.

## Air-Pollution Control

### Landfill Air Authorizations

MSW facilities are required to have applicable air authorizations based on the activities at the site. There are three categories of air authorizations for MSW sites: permit by rule (PBR), standard permit, or a new source review case-by-case permit.

The simplest, least expensive, and least time-consuming air authorization to obtain is the PBR 106.534, Municipal Solid Waste Landfills and Transfer Stations. This air authorization is for cell (landfill-unit) construction and activities related to waste disposal; it is not intended for other activities. See

the section "Additional Air Authorizations" to find out if there are activities at your facility that require other air authorizations. When claiming a PBR 106.534 air authorization, your facility must follow the requirements in 30 TAC 106.534 and 30 TAC 330, Subchapter U.

If a landfill operation cannot meet the requirements of PBR 106.534, then the MSW air standard permit may be required. Depending on the level of activity at the landfill, a general operating permit may be required. To determine what level of permit is required for your facility, see the reference guide for reviewers of air permits, *Municipal Solid Waste Landfills (MSWLF) and Transfer Stations* (PDF), at <www.tceq.state.tx.us/goto/mswlf>.

### Additional Air Authorizations

MSW facilities using PBR 106.534 may conduct activities that require additional air authorizations. The most common PBRs and standard permits that MSW facilities obtain are:

> 106.181, Used-Oil Combustion Units
> 106.183, Boilers, Heaters, and Other Combustion Devices
> 106.261, Facilities (Emissions and Distance Limitations)
> 106.433, Surface Coat Facility
> 106.436, Auto Body Refinishing Facility
> 106.451, Wet Blast Cleaning
> 106.452, Dry Abrasive Cleaning
> 106.454, Degreasing Units
> 106.472, Organic and Inorganic Liquid Loading and Unloading
> 106.492, Flares
> 106.496, Air Curtain Incinerators
> 106.512, Stationary Engines and Turbines
> Standard Permit for Temporary Rock Crushers
> Standard Permit for Electric Generating Units

## Reports

(30 TAC 330.675)

> The TCEQ requires reports from registered and permitted facilities that track the amounts and types of waste they store, treat, process, recover, recycle, or dispose of in the state, enabling the agency to equitably assess fees. In addition, the state tracks the available disposal capacity for future waste. It is important that the facility operator submit the required report by the due date. Late reports are sufficient cause for the TCEQ to revoke a permit or registration.

## Measuring Waste

To accurately record waste for reporting to the agency, the facility must measure or weigh waste received at the gate, prior to disposal or processing. For quarterly reporting, the waste accepted is reported as it was recorded at the gate, whether compacted/uncompacted tons or compacted/uncompacted cubic yards. For annual reporting, the total waste accepted must be reported in tons; if you use volumetric measurements in your facility's records, you can convert them to short tons.

## Small Community Equivalent Factor

If your landfill or transfer station serves fewer than 5,000 people, you may use a population-equivalent factor instead of maintaining records of the actual amount of waste deposited. Under this system, the amount of waste is calculated as 1 ton per person a year. The report must document the population served by the facility and reflect any changes in population since the previous report.

## Quarterly Report

You must submit a quarterly solid-waste summary report to the TCEQ no later than 20 days following the end of each fiscal quarter. Table 3 lists the due dates.

### Table 3. Due Dates for Quarterly Reports

| Quarterly Report | Due Date |
|---|---|
| 1st Qtr (Sep–Nov) | Dec 20 |
| 2nd Qtr (Dec–Feb) | Mar 20 |
| 3rd Qtr (Mar–May) | Jun 20 |
| 4th Qtr (Jun–Aug) | Sep 20 |

## Annual Report

The operator must submit an annual summary of the yearly totals and the year-end status of the facility. An operator must file a separate report for each facility that has a unique permit or registration number. For more information on how to determine your year-end-status, refer to instructions and guidance for the MSW Annual Report at <www.tceq.texas.gov/assets/public/permitting/waste/msw/ MSWAnnualRpt_Online_Instructions.pdf>.

Operators of facilities such as transfer stations, shredders, balers, and methane extractors—also known as facilities not for disposal—must submit annual reports to the TCEQ. Online reporting is available or you

can submit a hard-copy report. For more information, go to
<www.tceq.texas.gov/goto/msw-annual>.

## Fees

*(Texas Health and Safety Code 361.013)*

A collection fee is required for all solid waste disposed of within the state
and from transporters who are required to register with the state. The
amount may be raised or lowered in accordance with spending levels
authorized by the Texas Legislature. The TCEQ calculates the fee using
information from the facility's quarterly solid-waste summary reports. We
will generate a billing statement quarterly and forward it to the applicable
permittee or registrant. For additional information, see *Municipal Solid
Waste Reporting and Disposal Fee* (RG-289).

## Statewide and Regional Planning

Each council of governments develops a regional solid waste plan. The
TCEQ aids the COGs in their efforts to ensure proper waste management by
permitting and registering facilities, licensing operators, and requiring all
registered or permitted facility operators to report the types and amounts of
waste processed or disposed of at a facility. COGs can use the information
reported to the TCEQ to monitor capacity in their regions.

### COG Permit Review

After the TCEQ conducts an administrative review of each MSW permit
application, the application is forwarded to the appropriate COG for review.
The COG's review considers the compatibility of the proposed facility with
the region's MSW plan, along with the viability of the proposed facility and
the need for it.

### COG Solid Waste Grants

As part of its waste planning efforts, the TCEQ administers a Regional Solid
Waste Grants Program, which supports regional planning of solid-waste
management by the state's 24 regional COGs, as well as a pass-through
grant program administered by the COGs to fund regional and local solid-
waste management projects. The COGs also use these funds to inventory
closed MSW landfills.

## Inspections: What to Expect

To ensure compliance with MSW rules, inspections by a TCEQ representative are required. We conduct routine inspections on an established timeline using standardized checklists, and you can request a copy of the applicable checklist before the inspection. However, if there are consumer complaints, operational problems, or requests for assistance, or if the facility is an unsatisfactory performer, we may inspect more frequently.

Immediately after the inspection, the TCEQ investigator will go over the findings in an exit interview. Then you will receive from us one of three mailed letters: a compliance letter, if there were no violations found; a notice of violation (NOV) with a compliance schedule to resolve the violations; or a notice of enforcement, if violations are of a serious enough nature to warrant automatic enforcement.

We may begin formal enforcement if you have not resolved the violations after issuance of an NOV and you have not requested a justifiable extension. If you receive an NOV, be certain to respond in writing within the time stated in the letter, explaining your actions to resolve any violations, and including pictures if possible. Send the response "return receipt requested" to the regional office of the TCEQ, and keep a copy for your files.

For additional information on the inspection and enforcement process, see *The TCEQ Has Inspected Your Business: What Does This Mean to You?* (RG-344), or contact the Enforcement Division at 512-239-2545, or the Small Business and Local Government Assistance Section at 800-447-2827.

# Texas Councils of Governments

| Name | Abbrev. | Website |
| --- | --- | --- |
| Alamo Area Council of Governments | AACOG | www.aacog.com |
| Ark-Tex Council of Governments | ARK-TEX | www.atcog.org |
| Brazos Valley Council of Governments | BVCOG | www.bvcog.org |
| Capital Area Council of Governments | CAPCOG | www.capcog.org |
| Central Texas Council of Governments | CTCOG | www.ctcog.org |
| Coastal Bend Council of Governments | CBCOG | cbcog98.org |
| Concho Valley Council of Governments | CVCOG | www.cvcog.org |
| Deep East Texas Council of Governments | DETCOG | www.detcog.org |
| East Texas Council of Governments | ETCOG | www.etcog.org |
| Golden Crescent Regional Planning Commission | GCRPC | www.gcrpc.org |
| Heart of Texas Council of Governments | HOTCOG | www.hotcog.org |
| Houston-Galveston Area Council | H-GAC | www.h-gac.com |
| Lower Rio Grande Valley Development Council | LRGVDC | www.lrgvdc.org |
| Middle Rio Grande Development Council | MRGDC | www.mrgdc.org |
| Nortex Regional Planning Commission | NORTEX | www.nortexrpc.org |
| North Central Texas Council of Government | NCTCOG | www.nctcog.dst.tx.us |
| Panhandle Regional Planning Commission | PRPC | www.prpc.cog.tx.us |
| Permian Basin Regional Planning Commission | PBRPC | www.pbrpc.org |
| Rio Grande Council of Governments | RGCOG | www.riocog.org |
| South East Texas Regional Planning Commission | SETRPC | www.setrpc.org |
| South Plains Association of Governments | SPAG | www.spag.org |
| South Texas Development Council | STDC | www.stdc.cog.tx.us |
| Texoma Council of Governments | TEXOMA | www.texoma.cog.tx.us |
| West Central Texas Council of Governments | WCTCOG | www.wctcog.org |

# For More Information

There are a variety of good sources available for further information. Here is a basic list with contact information.

**To find a publication or form** mentioned in this document:
*TCEQ website,*
<www.tceq.texas.gov/publications/search_pubs.html>
or <www.tceq.texas.gov/search_forms.html>
**For confidential assistance** on environmental compliance for small businesses and local governments:
*Small Business and Local Government Assistance Hotline,* 800-447-2827
or <www.TexasEnviroHelp.org>
**To report ...**

- A spill (24 hours a day):
  *Spill Reporting,* 800-832-8224

- An environmental complaint or violation:
  *Environmental Violations Hotline,* 888-777-3186

**For information on ...**

- Waste authorizations:
  *TCEQ Waste Permits Division,* 512-239-2335

- Air permits:
  *TCEQ Air Permits Division,* 512-239-1250

- Water quality issues:
  *TCEQ Water Quality Division,* 512-239-4671

- Financial assurance:
  *TCEQ Financial Assurance Office,* 512-239-0300

- The investigation process:
  Your regional TCEQ office

- Enforcement:
  *TCEQ Enforcement Division,* 512-239-2545

- Household hazardous waste programs:
  *TCEQ Pollution Prevention and Education Section,* 512-239-3100

- Councils of Governments:
  *Texas Association of Regional Councils,*
  512-478-4715 or <www.txregionalcouncil.org>

- Federal MSW programs:
  *Environmental Protection Agency, Region 6,*
  800-887-6063 or
  <www.epa.gov/epawaste/nonhaz/municipal/index.htm>

# APPENDIX C

# Texas Register

*Volume 31  Number 12*                    *March 24, 2006*                    *Pages 2335-2762*



Dora Delgado
9th Grade

School children's artwork is used to decorate the front cover and blank filler pages of the *Texas Register*. Teachers throughout the state submit the drawings for students in grades K-12. The drawings dress up the otherwise gray pages of the *Texas Register* and introduce students to this obscure but important facet of state government.

The artwork featured on the front cover is chosen at random. Inside each issue, the artwork is published on what would otherwise be blank pages in the *Texas Register*. These blank pages are caused by the production process used to print the *Texas Register*.

*Texas Register*, (ISSN 0362-4781, USPS 120-090), is published weekly (52 times per year) for $211.00 ($311 for first class mail delivery) by LexisNexis Matthew Bender & Co., Inc., 1275 Broadway, Albany, N.Y. 12204-2694.

Material in the *Texas Register* is the property of the State of Texas. However, it may be copied, reproduced, or republished by any person without permission of the *Texas Register* Director, provided no such republication shall bear the legend *Texas Register* or "Official" without the written permission of the director.

The *Texas Register* is published under the Government Code, Title 10, Chapter 2002. Periodicals Postage Paid at Albany, N.Y. and at additional mailing offices.

POSTMASTER: Send address changes to the *Texas Register*, 136 Carlin Rd., Conklin, N.Y. 13748-1531.



a section of the
Office of the Secretary of State
P.O. Box 13824
Austin, TX 78711-3824
(800) 226-7199
(512) 463-5561
FAX (512) 463-5569
http://www.sos.state.tx.us
subadmin@sos.state.tx.us

**Secretary of State –**
Roger Williams

**Director** - Dan Procter

**Staff**
Ada Aulet
Leti Benavides
Dana Blanton
Belinda Bostick
Kris Hogan
Roberta Knight
Jill S. Ledbetter
Juanita Ledesma
Diana Muniz

but are currently required by §106.496(g)(4)(i) to have separate authorization from the executive director at landfills. As a streamlining initiative, the commission adopts new §330.7(g) to eliminate the need for a separate authorization from the executive director at MSW facilities.

The commission also adopts an air PBR in new §330.7(h) for air emissions at MSW landfill facilities if the owner or operator complies with new Subchapter U, Standard Air Permits for Municipal Solid Waste Landfill Facilities and Transfer Stations.

The commission repeals §330.8, Notification Requirements, and moves the requirements of this section with changes to new §330.11, Notification Required.

The commission adopts new §330.9, Registration Required, to list all MSW management activities that are exempt from permitting requirements but that still require commission approval by registration. To promote communication and coordination with TCEQ's regional offices, the commission requires in new §330.9(a) that a person shall submit a claim for a registration by rule in duplicate with one copy sent directly to the TCEQ's regional office. The commission moves the requirements from §330.73(b)(1) and (c)(1) to new §330.9(a); §330.4(d) to new §330.9(b); §330.4(g) to new §330.9(c); §330.4(h) to new §330.9(d); §330.4(k) to new §330.9(e); §330.4(q) to new §330.9(f); §330.4(s) to new §330.9(g); §330.4(t) and §330.72(h) to new §330.9(h); §330.4(u) to new §330.9(i); and §330.402 to new §330.9(j). The commission adopts new §330.9(h)(5) to state that transporters who only adjust septage pH during transportation are not subject to the registration requirement of §330.9(h), but must instead register under §312.142. The commission adopts this provision to provide clarity about which rules apply to transporters who adjust septage pH during transportation.

The commission adopts a solid waste registration by rule for Type IX facilities that recover landfill gas for beneficial use. New §330.9(k) replaces §330.4(n) and §330.70. Since owners or operators of such facilities must receive separate commission authorizations for air emissions from these facilities, the commission adopts the Type IX facility registration by rule to streamline the authorization process for these low-impact waste management activities.

The commission adopts a solid waste registration by rule for transporters of untreated medical waste that are not the generator. The commission adopts this solid waste registration by rule to streamline the authorization process for low-impact waste management activities. The commission replaces §330.1005(b) with new §330.9(l). Drivers' names and license numbers are no longer required as part of the registration by rule. The commission deletes this requirement since this information does not impact whether the vehicle meets the requirements in this chapter. Since the registrations expire on an annual basis, the commission intends to transition these authorizations from a registration to a registration by rule upon expiration of the registration.

The commission adopts a solid waste registration by rule for owners or operators of mobile treatment units conducting on-site treatment of medical waste that are not the generator. The commission replaces §330.1010(b), (d), and (e) with new §330.9(m). The commission adopts the solid waste registration by rule to streamline the authorization process. The commission eliminates the requirement for drivers' names and license numbers as part of the registration by rule since this information does not impact whether the mobile treatment unit meets the requirements

in this chapter. The commission adopts new §330.9(m)(1)(E) - (H) to require owners or operators of mobile treatment units to provide the chemical preparations that will be used as part of the treatment process, evidence of competency, a description of the management and disposal of process waters generated during treatment events, and a written contingency plan to describe how waste will be managed in the event of equipment breakdown. This additional information is necessary to ensure that all waste and treatment residues will be properly treated. The commission adopts new §330.9(m)(1)(i) to require owners or operators of medical waste mobile treatment units to provide evidence of financial assurance using procedures specified in Subchapter L of this chapter and 30 TAC Chapter 37, Subchapter R, Financial Assurance for Municipal Solid Waste Facilities, to ensure that money is available to provide for the removal of all waste and waste residues if the owner or operator abandons the medical waste mobile treatment unit. A cost estimate of the cost to remove and dispose of waste and disinfect the waste treatment equipment shall be submitted prior to initiating operation or in conjunction with the transition from operating under a registration to operating under the new registration by rule. The commission changes an incorrect rule reference in new §330.9(m)(4) to refer to the annual fees enumerated in §330.1221(l). The commission extends the requirement to notify the executive director of changes to the registration in new §330.9(m)(6) from 15 days to 30 days to allow additional reporting flexibility. Since the registrations under the former rules expire on an annual basis, the commission intends to transition these authorizations from a registration to a registration by rule upon expiration of each registration.

To reduce the level of agency approvals of low-impact waste management activities and to facilitate treatment of medical waste throughout Texas, the commission adopts new §330.9(n) to allow the registration of facilities that will store or process untreated medical waste that is received from off-site sources, as described in new §330.1205(b).

The commission will now require a solid waste registration for owners or operators of new liquid waste transfer facilities that receive 32,000 gallons per day (gal/day) or less or will be located on, or at, other commission authorized facilities. These facilities had been authorized through a notification, but the commission believes that these facilities are best evaluated through the registration process. All existing liquid waste transfer facilities will be allowed to continue operation as a notification to the commission. The commission replaces §330.4(r) and §330.66(a)(1) with new §330.9(o) for new liquid waste transfer facilities that receive 32,000 gal/day or less and new §330.11(e)(4) for existing facilities. The commission replaces §330.66(a)(7) with new §330.9(p) for new liquid waste transfer facilities located on, or at, other commission authorized facilities and new §330.11(e)(7) for existing facilities.

The commission repeals §330.10, Closure, and moves the requirements of this section to new §330.21.

The commission repeals §330.11, Relationships with Other Governmental Entities. The commission moves the requirements of §330.11(a) to new Subchapter U, and §330.11(b) - (i) to new §330.23(a) - (h).

The commission adopts new §330.11, Notification Required, to clarify those persons that do not need commission approval for certain MSW management activities but who still must notify the commission before starting MSW management activity at a location or property. The notification is a one-time requirement

by the agency and update this population equivalent figure in this definition so that it is more accurate with current studies. HCPHES stated that updating this figure will make for more realistic projections of permit applications.

Response

The amount of household waste disposed per person per day in Texas in fiscal year 2004 was 5.4 pounds per person per day when adjusted for those waste streams used by the United States Environmental Protection Agency in its calculations. The five pounds per person per day in rule is very close to the current disposal rate of household waste. The commission made no change in response to this comment.

Comment

HCPHES commented that the definition of small municipal solid waste landfill should clarify that the less than 20 tons of construction or demolition waste is based on an annual average, that the revised definition does not specify a time period which is necessary for enforcement purposes.

Response

The commission considered this comment and has made some revision to the definition. Related to enforcement, provisions have been added to provide for a transition to dispose of the additional waste in a separate Type IV landfill unit. Without prescribing a specific time period by which a facility meets the criteria for the arid exempt site, per §330.5(b)(4) the TCEQ has the flexibility to consider the compliance criteria whenever appropriate.

Comment

HCPHES sought TCEQ concurrence that the definition of solid waste management unit also includes transfer stations.

Response

The commission believes that a transfer station is more appropriately characterized as a facility which may contain several units such as a waste pile, a container storage area where dumpsters or roll-off containers might be stored, and possibly one or more tanks for storage of contaminated wash water, for example. The commission has made no change in response to this comment.

Comment

HCPHES commented that the proposed deletion of the term "transfer" from the definition of processing would change the meaning of §330.7(a) relating to Permit Required. By this proposed definition change, transfer stations would no longer be required to obtain permits to operate. HCPHES stated that by their nature, transfer stations require agency and public review of the permitting process unless exempted due to location on an existing landfill or if they meet registration requirements under §330.9(b).

Response

The commission agrees with this comment and has reinserted the term "transfer" back into the definition of processing in response to these comments and also to be consistent with THSC, §361.003, Definitions.

Comment

HCPHES commented that the revised definition for medical waste should be revised to more closely follow the definition of special waste from health care-related facility found in 25

TAC §1.136. TCE commented that the definition for medical waste in §330.3(85) creates ambiguity. TCE recommended that for consistency the rule should utilize the definition in 34 TAC for hotel and that the term "related services to the public" is vague. TCE and HCPHES also commented that exemptions provided for single or multi-family dwellings, hotels, and other establishments that provide lodging should be removed from the rule. TCE stated that the exemption for farms and ranches is intended to, and should be revised, to include only animal waste.

Response

The commission revised the definition of medical waste to include bulk human blood products and bulk human body fluids, as stated in 25 TAC §1.136. The reference to 34 TAC is to distinguish farms and ranches from other types of industrial operations. The exemption for single and multi-family dwellings, hotels, and other establishments that provide lodging is consistent with other regulatory exemptions for individuals (e.g., household hazardous waste, conditionally exempt small quantity generators). The exemption for those who provide lodging is intentionally broad and makes further regulatory definition unnecessary. The commission does not agree that the exemption for farms and ranches is intended to apply only to animal waste and does not agree that the exemption should be limited to animal waste. The commission has not changed this part of the definition in response to these comments.

Comment

One commenter fully supported the definition of a solid waste as found in current rule as being supportive of recycling. The commenter also felt that the definition would allow the stockpiling of inert material prior to recycling.

Response

Staff concurs with the comment as long as the inert material is being stockpiled prior to recycling and meets other agency requirements for recycling in Chapter 328.

Comment

Within the definition of special waste, several commenters expressed concern that the segregation and disposal of treated medical waste identified as a special waste, will be unnecessarily burdensome and costly to health care facilities. APIC and THA stated that the term "special characteristics or properties" is vague, making compliance or enforcement impossible. APIC, DRMC, and THA stated that there is no scientific evidence that treated medical waste poses a greater risk than routine MSW, and requested that language which designates treated medical waste with special characteristics or properties as a special waste be removed.

Response

The commission believes that treated whole, unencapsulated hypodermic needles and syringes are a concern for landfill workers who may be unaware of a waste shipment's contents. Additionally, treated medical waste that is still in intact red bag packaging may cause unnecessary alarm and concern when accidently spilled or viewed from a distance. The commission believes that special handling of those waste streams is necessary, but acknowledges that categorizing those treated medical wastes as special wastes may unnecessarily increase the cost of disposal. The commission amends the proposal to provide that treated medical waste may be managed as routine MSW with

# APPENDIX D



# Guidelines for Utilizing the Source-Separated Recycling Permit Exemption for Municipal Solid Waste Transfer Facilities

Texas Commission on Environmental Quality
Waste Permits Division
June 2006

## Introduction

This document provides information for owners and operators of municipal solid waste (MSW) Type V transfer facilities (transfer stations) seeking to utilize the "source-separated recycling permit exemption" under Title 30 Texas Administrative Code (30 TAC), Chapter 330, Section (§) 330.9 (relating to Registration Required). It explains what the exemption is, what is needed to qualify, and how owners or operators of facilities may apply for and utilize the exemption. Several examples are also presented. Terms used in this document have the meanings assigned by Texas Health and Safety Code, Chapter 361, and 30 TAC Chapters 328, 330, and 332.

## What is the Source-Separated Recycling Permit Exemption?

The source-separated recycling permit exemption, described in 30 TAC §330.9(f), allows qualifying MSW transfer facilities to operate under a registration instead of a permit. It was established by a rule amendment, published in the April 9, 2004, issue of the *Texas Register*, volume 29, pages 3634-3640. This provision to operate under a registration instead of a permit is distinct from other provisions for registration of a transfer facility based on the population of the area served, waste acceptance rate, and location within a permitted facility (30 TAC §330.9(b)).

## What Are the Basic Eligibility Requirements for the Exemption?

### *Materials Recovery*

30 TAC §330.9(f) allows owners and operators of MSW Type V transfer facilities to register their operations instead of permitting them, provided:

- The transfer facility recovers 10 percent or more by weight or weight equivalent of the incoming waste stream for reuse or recycling;

- Incoming waste has already been reduced by at least 10 percent through a source-separation recycling program; or

- The transfer facility owner and/or operator also operate(s) one or more source-separation recycling programs in the county where the transfer facility is located and those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10 percent or more by weight or weight equivalent of the total incoming waste stream to all transfer facilities that the person owns or operates under the exemption.

### *Distance to Landfill*

The owner or operator of the transfer facility must demonstrate in the registration application that it will transfer the remaining nonrecyclable waste to a landfill not more than 50 miles from the facility.

**What <mark>Other Requirements</mark> Apply to a Facility Operating under the Exemption?**

*Operational Requirements*

A Type V transfer facility operating under the exemption must comply with applicable operational requirements for MSW storage and processing units detail in 30 TAC Chapter 330, Subchapter E.

*Documentation (Recordkeeping)*

After transfer facility operations commence, documentation of the recycling or recovery of at least 10 percent of waste material from the waste stream (at the transfer facility, and/or by the source-separation recycling program(s)), must be annually updated and maintained at the transfer facility for records inspection. Failure to maintain the standard of at least 10 percent recovery of materials shall be grounds for revocation of the registration.

*Reporting*

A Type V transfer facility operating under the exemption must also provide reports in accordance with 30 TAC §330.671(b)(3).

*Recycling and Composting Facilities*

All recycling and composting facilities must comply with applicable requirements of 30 TAC Chapter 328 (Waste Minimization and Recycling) and Chapter 332 (Composting), as well as all other applicable laws and regulations, including maintaining records to demonstrate that the materials recovered (including compost derived from those materials) were reused or recycled.

**How May Owners or Operators of Facilities Apply for and Utilize the Exemption?**

Owners or operators wishing to utilize the exemption must register their facilities in accordance with 30 TAC Chapter 330, Subchapter B (relating to Permit and Registration Application Procedures).

An applicant must demonstrate in a registration application the methods that will be used to measure amounts of waste and recycled materials handled and to assure and document that the recycling requirement is achieved. The procedures and methods should be contained in the Site Operating Plan (SOP) or placed in a Recycling Plan as an attachment to the SOP. Owners or operators of existing registered facilities may modify the facility SOP pursuant to 30 TAC Chapter 305, §305.70, to include the methods and procedures needed to utilize the exemption, provided there is no increase in the daily maximum limit of waste acceptance. The modification may be pursued as a notice modification under §305.70(l). If there is an increase in the daily maximum limit of waste acceptance, then the owner or operator must apply for a new registration pursuant to §305.70(c).

**Contents of an Application**

In addition to the information required by 30 TAC Chapter 330, Subchapter B (relating to Permit and Registration Application Procedures), and 30 TAC §305.70 (relating to Municipal Solid Waste Permit and Registration Modifications), an application must include:

*For all facilities:*

- The estimated total amount of waste to be received by the transfer facility in an average month.

*For operations that will recover recyclable materials at the transfer facility:*

- A description of the materials that the facility intends to recover from the incoming waste stream at the transfer facility, and the estimated percentage of those materials in that waste stream;

- The design features, equipment, and processes that will be employed to recover an amount of targeted materials equivalent to at least 10 percent of the incoming waste that has not already been reduced by at least 10 percent through source-separation recycling programs within the service area of the facility; and

- The procedures that will be used to measure and document the types and amounts of materials recovered at the facility.

*For operations that will reduce waste at its source through source-separation recycling:*

- The procedures to document the sources of the waste;

- The procedures that will be used to measure the amount of incoming waste that has already been reduced by at least 10 percent through source-separation recycling programs within the service area of the facility; and

- The procedures that will be used to measure and document the types, sources, and amounts of material reused or recycled through the source-separation recycling programs within the service area of the facility.

*For facilities by owners and/or operators that also operate source-separation recycling programs in the county where the transfer facility is located:*

- The procedures that will be used to identify and document the source-separation recycling programs operated by the owner or operator of the exempt facility in the same county as the exempt facility;

- The procedures that will be used to document the types and sources of materials managed for reuse or recycling by the source-separation recycling programs operated by the owner or operator of the exempt facility in the same county as the exempt facility; and

- The procedures that will be used to measure and document that those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10 percent or more (by weight or weight equivalent) of the total incoming waste stream to all transfer facilities to which the exemption is being applied.

**Required Recordkeeping**

After transfer facility operations commence under the source-separated recycling permit exemption, documentation of recycling or recovery of 10 percent of waste material from the waste stream must be annually updated and maintained at the transfer facility for inspection.

A facility must maintain the following documentation for the past calendar year or fiscal year, and make these records available to agency personnel at all times during its regular business hours:

- Business records showing the total amount of waste incoming to the transfer facility;

- Business records showing the total amount of waste transferred from the transfer facility to a disposal facility;

- Business records showing the amount of incoming waste that had previously been reduced by at least 10 percent through source-separation recycling programs operated within the service area of the facility;

- Signed, dated statements from the operator(s) of the source-separation recycling program(s) within the service area of the transfer facility showing the amount of material recovered from that waste stream for reuse or recycling; and

- Business records of the operator(s) of the source-separation recycling program(s) showing the types and amounts of recovered materials transferred to recycling companies or end users of the material.

Acceptable business records may include a facility's formal business accounts, ledger entries, and similar records. If requested by agency personnel, original or copied invoices and receipts must be produced to verify these records. All documentation of amounts of waste and recyclable materials must be maintained consistently for each material in either short tons or cubic yards. If this is not possible, standard Environmental Protection Agency volume-to-weight conversion factors may be applied to determine a facility's compliance with the requirements of its permit exemption.

Failure to maintain the standard of at least 10 percent recovery of materials shall be grounds for revocation of the registration.

### Examples

*Example 1.*     A facility expects to receive 1,600 tons of municipal solid waste (MSW) in an average month from a combination of sources:

- 500 tons of waste per month from residential customers in an area served by a curbside source-separation recycling program that recycles approximately 20 percent (by weight) of the total waste generated;

- 100 tons of waste per month from a company that conducts its own source-separation recycling program that recycles approximately 50 percent (by weight) of the total waste generated by the company; and

- 1,000 tons of waste per month from other sources, including residential customers not served by a curbside recycling program, containing the following estimated percentages (by weight) of recyclable materials:

| | |
|---|---|
| Yard trimmings | 15 % |
| Clean wood | 5 % |
| Appliances & other scrap metals | 5 % |
| Total targeted recoverable material | 25 % |

The facility gatehouse personnel will question customers and act as spotters to identify targeted recyclable materials in incoming loads. Loads containing significant amounts of targeted materials will be directed to a clearly marked material recovery area to off-load these materials. Facility staff in this area will assist customers in the placement of yard trimmings and clean wood in an area where they will be loaded into containers and taken to a compost facility for

processing.   The finished compost product will be sold to the public or used as mulch on the landscaped areas of city parks.   Air-conditioning units, refrigerators, and freezers will be placed in a 40 cubic yard roll-off container for transport to a local secondary metal recycler, after refrigerants have been recovered by trained personnel in compliance with state and federal law.

The recovery rate for this facility is calculated as follows:

| | | |
|---|---|---|
| | 1600 | Tons of waste received per month |
| | - 500 | Tons of waste per month already reduced by at least 10 percent by weight through a curbside recycling program |
| | = 1100 | Tons of waste per month |
| | – 100 | Tons of waste per month already reduced by at least 10 percent by weight through a private recycling program |
| | =1000 | Tons of waste per month remaining subject to the requirement to recover 10 percent or more of the waste for reuse or recycling |

From this remaining quantity, the facility is able to recover the following amounts of targeted materials:

| | | |
|---|---|---|
| Yard trimmings | 115 tons | (11.5 %) |
| Clean wood | 2 tons | (0.2 %) |
| Appliances & other scrap metals | 3 tons | (0.3 % |
| Total material recovered | 120 tons | (12.0 %) |

The 120 tons recovered for reuse or recycling represents 120/1000, or 12 percent of the incoming waste stream that still needed to be reduced by at least 10 percent. The required records were kept and are available for inspection, enabling the facility to demonstrate that it met its obligation.

*Example 2.*    A facility expects to receive 5,000 tons of municipal solid waste (MSW) in an average month from a combination of residential and commercial customers.

The owner or operator of this facility also operates a curbside, source-separation recycling program in the same county in which the transfer facility is located, but not necessarily within any part of the area served by the exempt transfer station. The curbside recycling program takes in about 300 tons of glass and plastic bottles, metals cans, and newspapers that are sold to a recycling company, and 500 tons of yard trimmings that are taken to a compost facility where they are processed.   The finished compost is used in mulching of landscape in and around municipal facilities, given free to customers of the waste service operator, and the rest sold to others.

The 300 + 500 = 800 tons of materials taken in by the curbside recycling program and sold to a recycler or delivered to a compost facility (and compost used) represents 800/5000, or 16 percent (by weight) of the waste stream incoming to the exempt transfer facility.   The required records were kept and are available for inspection, enabling the facility to demonstrate that it met its obligation.

# APPENDIX E

## ALLISON, BASS & ASSOCIATES, L.L.P.

*Attorneys at Law*

A. O. WATSON HOUSE
402 WEST 12ᵗʰ STREET
AUSTIN, TEXAS 78701
law@allison-bass.com
(512) 482-0701
FAX (512) 480-0902

**JAMES P. ALLISON**
jallison@allison-bass.com

**ROBERT T. BASS**
r.bass@allison-bass.com

**J. ERIC MAGEE**
e.magee@allison-bass.com

**JANA CLIFT WILLIAMS**
j.williams@allison-bass.com

**PHILLIP L. LEDBETTER**
p.ledbetter@allison-bass.com

July 25, 2012

**REVIEWED**

**JUL 3 0 2012**

By _____

CHIEF CLERKS OFFICE     2012 JUL 26 AM 9: 53     TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

**VIA FACSIMILE: 512-239-3939**
**AND CERTIFIED MAIL**

Mr. Zak Covar
Executive Director
Texas Commission on Environmental Quality
12100 Park 35 Circle, MC 109
Austin, TX 78753

RE:    Pintail Landfill, L.L.C.
       Waller County, Texas
       Proposed TCEQ Permit No. MSW 2377 – Permit Application; &
       Proposed TCEQ Registration No. 40259 – Transfer Station.

Dear Mr. Covar:

Enclosed please find Waller County's Request for Determination and Denial of Permit Application and Registration Application regarding the above referenced matters. Waller County requests an expedited decision on this Request.

Please contact me if you have any questions.

Sincerely,

James P. Allison

JPA/afb

cc:    Senator Glenn Hegar



Proposed TCEQ Permit No. MSW 2377
Proposed TCEQ Registration No. 40259

| | | |
|---|---|---|
| IN THE MATTER OF THE | § | |
| PINTAIL LANDFILL, L.L.C., FOR A | § | |
| NEW TYPE I MUNICIPAL SOLID | § | |
| WASTE LANDFILL AND | § | |
| NEW TYPE V TRANSFER STATION | § | |

**WALLER COUNTY'S REQUEST FOR DETERMINATION
AND DENIAL OF PERMIT APPLICATION
AND REGISTRATION APPLICATION**

Waller County submits its Request for Determination and Denial of Permit Application

and Registration Application concerning the Proposed Pintail Landfill, L.L.C.'s ("Pintail") New

Type I Municipal Solid Waste Landfill and New Type V Transfer Station. Specifically, Waller

County requests that the Executive Director of the Texas Commission on Environmental Quality

("the Commission") determine that Waller County adopted an Ordinance prohibiting the

processing and disposal of solid waste in certain areas of the County and that Pintail's

applications for the proposed landfill and transfer station fail to comply with that Ordinance.

Therefore, the Executive Director should deny the municipal solid waste permit application and

the transfer station registration application. Waller County would show the Executive Director

the following:

I.

**Prohibition on Solid Waste Disposal and Processing**

It is policy of the State of Texas to safeguard the health, general welfare, and physical

property of the people and to protect the environment by encouraging the reduction in solid

waste generation and the proper management of solid waste, including disposal and processing to

extract usable materials or energy. Tex. Health & Safety Code § 363.002. The Texas

Legislature has found that the improper management of solid waste creates hazards to the public

health, can cause air and water pollution, creates public nuisances, and causes a blight on the

landscape; and that there is increasing public opposition to the location of solid waste land disposal facilities. *Id.* § 363.003. As such, the Comprehensive Municipal Solid Waste Management, Resource Recovery, and Conservation Act ("Comprehensive Solid Waste Act") authorizes Texas counties to prohibit the processing and disposal of solid waste in certain areas. *Id.* § 363.112. The County Solid Waste Control Act further authorizes a county to prohibit the disposal of municipal or industrial solid waste in a county. *Id.* § 364.012. These statutes are similar in language and effect. They provide for the prohibition of solid waste disposal through the passage of an ordinance that specifically designating the areas where such disposal is not prohibited. *Id.* §§ 363.112(a), 364.012(b). Both statutes expressly provide that the Commission may not grant an application for a permit to process or dispose of municipal or solid waste in an area in which the processing or disposal of such waste is prohibited by a county ordinance. *See id.* §§ 363.112(d), 364.012(f).

There are limited restrictions on the counties' authority to prohibit the processing and disposal of solid waste. Subsections 363.112(b) and 364.012(c) prescribe that an ordinance prohibiting such activity must be published for two consecutive weeks in a newspaper of general circulation in the county, prior to its enactment. *Id.* Subsection 364.012(d) also prescribes that a public hearing must be held on a proposed ordinance before it is considered by the commissioners court. *Id.* Finally, Subsections 363.112(c) and 364.012(e) provide that a county may not prohibit the processing or disposal of a municipal or industrial solid waste in an area of that county for which, "(1) an application for a permit or other authorization under Chapter 361 [of the Health and Safety Code] has been filed with and is pending before the commission; or (2) a permit or authorization under Chapter 361 has been issued by the commission." *Id.*

On August 26, 2011, the Waller County Commissioners Court enacted Ordinance No. 2011-001 (the "Ordinance"), exercising the full authority conferred on the County under the

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 2 of 13

Texas Health and Safety Code, Sections 363.112 and 364.012, to prohibit the processing and disposal of solid waste in certain areas of Waller County. Prior to its enactment, the Ordinance was published for two consecutive weeks in a newspaper of general circulation, and a public hearing was held on the proposed Ordinance before the Waller County Commissioners Court considered it. *See* attached Exhibit A.

The Ordinance prohibits solid waste processing and disposal in certain areas of Waller County and provides that the disposal of municipal or solid waste is not prohibited in following areas:

a)  Any are within a two (2) mile radius of any privately-owned solid waste disposal site holding a currently or previously valid permit for municipal or solid waste disposal issued by the Texas Commission on Environmental Quality ("TCEQ") and/or its predecessor agencies, as of the date of adoption for this Ordinance, but not afterwards.

b)  This Ordinance shall not apply to any municipal or solid waste disposal facility owned and/or operated by any unit of local government (i.e., City, Town, or Municipality) within Waller County. Any such municipal or solid waste facilities are not included in the designations of areas where disposal or municipal or solid waste is not prohibited, and such municipal or solid waste facilities shall not be considered in calculating the two (2) mile radius discussed above.

Waller County Ordinance No. 2011-001 (attached hereto and incorporated by reference as Exhibit B.).

At the time that the Ordinance was enacted, there were no privately-owned solid waste disposal sites in Waller County holding currently valid permits for municipal or solid waste disposal. As such, the Ordinance did not prohibit the processing or disposal of municipal or solid waste in an area of Waller County for which a permit or other authorization under Health and Safety Code Chapter 361 (the "Solid Waste Disposal Act") had been issued by the Commission. Further, the Ordinance did not prohibit the processing or disposal of solid waste in an area of the County for which an application for a permit or other authorization under the Solid

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 3 of 13

Waste Disposal Act had been filed with, and was pending before the Commission. Accordingly, the Ordinance complied with all provisions of Sections 363.112 and 364.012 of the Texas Health and Safety Code. Moreover, under Texas case law, the Ordinance is presumed to be valid and binding. *See e.g., Live Oak County v. Lower Nueces River Water Supply Dist.*, 396 S.W.2d 450, 457 (Tex. Civ. App.--Corpus Christi 1965). Therefore, effective August 26, 2011, solid waste processing and disposal was prohibited in certain areas of Waller County and only allowed as provided in the specific areas mentioned above.

## II.
## The Actions of Pintail

Shortly before the Ordinance's enactment, Pintail filed various documents with the Commission related to a proposed landfill project in Waller County. These documents appear to have been filed in an effort to subvert Waller County's statutory authority to regulate solid waste processing and disposal. Those efforts, however, did not limit the effect of the Ordinance.

### A. Proposed Landfill

The first documents filed by Pintail related to a partial application for a new Type I Municipal Solid Waste Disposal Facility ("Proposed Landfill") permit. The Commission received these documents on July 22, 2011. These documents indicated that the Proposed Landfill would be operated on a tract of ranchland located in northwest Waller County, approximately one mile north of the intersection of State Highway 6 and U.S. Highway 290 (southeast of the intersection of Highway 6 and Kelley Road). Pintail had purportedly entered into an agreement with Marengo Family Properties, Ltd., for the purchase of this property. The documents that Pintail submitted to the Commission on July 22, 2011 were filed for the purpose of requesting that the Commission determine only whether the subject real property is compatible with Pintail's proposed use. *See* 30 Tex. Admin. Code § 330.57.

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 4 of 13

The Commission's rules provide that it is the duty of the owner of a municipal solid waste facility to submit the application for a permit. 30 Tex. Admin. Code § 305.43(c). If a new municipal solid waste facility is proposed on land which the proposed operator does not own, the operator must obtain the land owner's written authorization before it may submit a permit application. *Id.* The Commission's rules provide that the proposed operator of a new municipal solid waste facility may submit an application for a permit with the written consent of the land owner. *Id.* This would demonstrate that the proposed operator has legal capacity to submit the application. *Id.* When Pintail filed its partial application, however, it did not include written authorization from Marengo Family Properties, Ltd. Rather, it included a "Property Owner Affidavit" wherein a single co-trustee for a management trust, the General Partner of the Marengo Family Properties, Ltd., acknowledges certain deed recordation responsibilities set out in Title 30, Texas Administrative Code Section 330.19. This affidavit does not provide written authorization to Pintail from the property owner to file even a partial application. As such, it appears that the Pintail's initial filing was void *in abnitio.*

The Commission has promulgated specific rules addressing Permit and Registration Applications for Municipal Solid Waste Facilities. *See* 30 Tex. Admin. Code § 330.57. Subjection 330.57(a) deals with the manner in which applications for permits are processed. It provides in pertinent part:

(a) Permit application. The application for a municipal solid waste facility is divided into Parts I-IV. Parts I-IV of the application shall be required before the application is declared administratively complete in accordance with Chapter 281 of this title (relating to Applications Processing). The owner or operator shall submit a complete application, containing Parts I-IV, before a hearing can be conducted on the technical design merits of the application. An owner or operator applying for a permit may request a land-use only determination. If the executive director determines that a land-use only determination is appropriate, the owner or operator shall submit a partial application consisting of Parts I and II of the application. The executive director may process a partial permit application to the extent necessary to determine land-use compatibility alone. If the facility is

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 5 of 13

determined to be acceptable on the basis of land use, the executive director will consider technical matters related to the permit application at a later time. When this procedure is followed, an opportunity for a public hearing will be offered for each determination in accordance with § 39.419 of this title (relating to Notice of Application and Preliminary Decision). A complete application, consisting of Parts I-IV of the application, shall be submitted based upon the results of the land-use only public hearing...

Section 330.57 sets out the parameters for a bifurcated application process, where land-use may be addressed before technical matters are even considered. Under this process, a proposed landfill operator initially submits a partial application. The Executive Director is under no obligation to consider the partial application. If the Executive Director determines that a land-use only determination is appropriate, he may process parts I and II of the application to the extent necessary to determine land-use compatibility alone. The proposed operator is not applying for authority to conduct any activity by submitting a partial application. Rather, it is merely requesting the Commission to determine whether a municipal solid waste facility would be acceptable at a particular location, on the basis of land use. If the Executive Director determines that the proposed land-use would be acceptable at that location, he may consider technical matters related to the permit application for a proposed facility at a later time (i.e., after Parts III and IV are submitted). Every Part of a municipal solid waste facility application (i.e., Parts I through IV) must be filed with the Commission before the application can be declared administratively complete.

Whether an application can be declared administratively complete also depends on whether it contains complete information. The Executive Director determines when an application is administratively complete. Tex. Health & Safety Code § 361.066(a). The Commission's rules set out the basic elements of a municipal solid waste application. *See* 30 Tex. Admin. Code §§ 330.57 – 330.65. Failure to provide complete information as required by those rules may be cause for the Executive Director to return the application without further

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 6 of 13

action. *Id.* § 330.57(d). Submission of false information shall constitute grounds for denial of the permit or registration application. *Id.* If the application is not amended to include the information that the Executive Director determines is necessary for administrative completeness, "the application is considered withdrawn, unless there are extenuating circumstances. Tex. Health & Safety Code § 361.066(b). In other words, the Commission makes a preliminary evaluation of an application to determine whether it contains sufficient information to even merit a substantive review. If not, it may be involuntarily withdrawn or rejected.

Until an administratively complete application has been filed, the Commission cannot conduct a substantive or technical review of the information contained in the application. The Executive Director cannot act on an application unless it meets the relevant statutory and administrative criteria. 30 Tex. Admin. Code § 50.33(a). Accordingly, during the technical review period, the Commission may send the applicant Notices of Deficiency. *See e.g.,* 45 Tex. Prac., Environmental Law § 10.5 (2d ed.). It is incumbent upon the proposed operator to correct the deficiencies to meet the relevant statutory and administrative criteria. Only at that point can the Executive Director act on an application. Therefore, an "application" for a permit under the Solid Waste Disposal Act is not pending before the Commission until the Executive Director has determined that it is both administratively and technically complete.

Pintail's July 22nd submission to the Commission included Parts I and II of an application for a municipal solid waste facility. These documents were filed in support of Pintail's request that the Executive Director decide that a land-use only determination was appropriate. The Commission's staff began to review Pintail's filing. Within a week, the Commission determined that the partial application lacked the requisite information, and sent a letter to Pintail requesting additional information. Again on September 30, 2011, the Commission sent a letter to Pintail

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 7 of 13

indicating that its partial application contained deficiencies and errors, in at least thirty-four areas. Notably, the letter included the following instruction to Pintail:

> This application is a permit application for land-use determination. Therefore, where applicable in the application document, please replace the term "Permit Application" with the "Permit Application for Land-Use Only Determination. See Letter from Kenneth Welch dated January 18, 2012 at pg. 2.[1]

More than three months later, Pintail responded. At that point, Pintail elected to abandon the bifurcated approval process, amending its application to include all four Parts of an application. The Commission did not issue notice that the Pintail application was administratively complete until February 2012. Even then, the Commission's substantive review of Pintail's application revealed that it was replete with errors and deficiencies. On April 10, 2012, the Commission sent its First Notice of Technical Deficiency to Pintail indicating that its application contained deficiencies and errors in at least 241 areas. Notably, this First Notice identified the following deficiency in Part I of the permit application form:

> Section B of the form indicates the proposed facility is not located in an area in which the governing body of the county has prohibited the disposal or processing of industrial or municipal solid waste. Our searches indicate that the Waller County, the governing body of the county where the proposed facility will be located, has adopted an ordinance in August 2011, regarding designating areas in the county where MSW disposal is not prohibited. Please revise this section and provide information about the mentioned ordinance.

Pintail did not respond until at least May 31, 2012. In response to the above noted deficiency, Pintail merely set forth a conclusory statement, asserting that the Ordinance does not prohibit its disposal of solid waste in Waller County because it submitted its partial and incomplete application forms to the Commission. *See* Letter from Kenneth Welch dated January 18, 2012.[2] Pintail ignored the fact that the Ordinance is presumed valid and binding under the law of Texas.

---

[1] Available at: http://www.biggsandmathews.com/files/55/1.0%20%20Vol%201,%20Response%20Ltr%20-%20Part%20I.pdf.
[2] Available at: http://www.biggsandmathews.com/files/65/01%20Vol%20I%20Part%20I.pdf

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 8 of 13

On June 29, 2012, the Commission sent Pintail a Second Notice of Deficiency, indicating that its permit application continued to contain deficiencies and errors, in at least 67 areas. It appears that Pintail has not yet responded to this Second NOD. *See* http://www.biggsandmathews.com/permits.php. As such, one year after filing its partial application for a land-use only determination, Pintail has still not submitted a permit application that meets the relevant statutory and administrative criteria. Accordingly, the Executive Director cannot determine the application is technically complete, and thus cannot take action on it. Therefore, Pintail still has not filed a permit application that is actually pending before the Commission.

### B. Proposed Transfer Station

The second set of documents that Pintail filed with the Commission related to a Type V Registration Application for a proposed transfer station ("Transfer Station") to be located within the boundary of the Proposed Landfill. The Commission received these documents on August 2, 2011. Such a registration is required for a transfer station located within the boundaries of a Type I municipal solid waste facility. 30 Tex. Admin. Code § 330.9(b). As mentioned above, the Executive Director cannot act on any application unless it meets the relevant statutory and administrative criteria. 30 Tex. Admin. Code § 50.33(a).

As with its partial landfill permit application, Pintail's Transfer Station registration application was grossly deficient. On October 27, 2011, the Commission sent Pintail the First Notice of Deficiency. It identified at least 39 areas where the Transfer Station registration application was deficient. Later in February of 2012, the Commission sent Pintail a Second Notice of Deficiency which identified at least 22 areas of deficiency. Then in April 2012, the Commission sent Pintail its Third Notice of Deficiency, identifying at least thirteen areas of deficiency. Finally, on June 25, 2012, the Commission sent Pintail its Fourth Notice of

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 9 of 13

Deficiency, indicating that its registration allocation still lacked a Traffic Impact Assessment Report by the Texas Department of Transportation. Pintail apparently has not responded to this latest Notice of Deficiency. *See* http://www.biggsandmathews.com/permits.php. Accordingly, nearly one year after filing its initial Transfer Station Registration Application, Pintail has still not submitted an application that meets the relevant statutory and administrative criteria. As such, the Executive Director cannot determine the application is technically complete and cannot take action on it. Therefore, Pintail still has not filed a Transfer Station registration application that is actually pending before the Commission.

### III.
### Pintail's Proposed Applications Should be Denied

For the reasons stated above, it is undisputed that Pintail was unprepared to file administratively or technically complete applications for the Proposed Landfill permit or Transfer Station registration at the time that the Waller County Commissioners Court enacted its solid waste Ordinance. Pintail sought to initiate the bifurcated permit application, after it became aware that the Waller County Commissioners Court was considering enacting an ordinance that would prohibit solid waste processing and disposal at its proposed site. Pintail hoped that it could claim that it had a permit "application" pending before the Commission when Waller County's Ordinance was enacted. Nevertheless, this effort to subvert Waller County's statutory authority to regulate solid waste processing and disposal was unsuccessful.

Pintail did not submit its proposed Application with Parts III – IV until five months after adoption of the county ordinance. Also, the Commission did not determine that Pintail's permit application for the Proposed Landfill was administratively complete until at least five months after the Waller County Commissioners Court enacted the Ordinance. Further, the Commission still has not determined whether the permit application or the Transfer Station registration

Waller County's Request for Determination<br>
and Request for Denial of Permit Application<br>
and Registration Application<br>
Page 10 of 13

applications are technically complete. As such, Pintail had no application pending before the Commission when the Ordinance became effective. It is, thus, unlawful to operate such facilities in the areas proposed by Pintail. Therefore, the Commission may not grant any applications from Pintail to process or dispose of municipal or industrial solid waste in Waller County at the proposed site.

The Texas Health and Safety Code, Section 363.112 of the Comprehensive Solid Waste Act and Section 364.012 of the County Solid Waste Control Act, cannot be construed to prohibit a county from enacting solid waste legislation where a person simply mails an incomplete solid waste application to the Commission. Such a determination would be contrary to the plain language of the applicable statutes and administrative code provisions. Such provisions provide that a partial application for a land-use determination does not constitute a request that the Commission authorize a permit for the operation of a municipal solid waste facility. It merely requests the Commission to determine whether such a facility would be acceptable at a particular location, on the basis of land-use only. Any response from the Commission in response to the partial application would be merely preliminary to the filing of the full application. A substantive review of a permit application cannot begin until all parts of the application are submitted and determined by the Executive Director to be administratively complete. Further, the Commission's rules provide that the Executive Director cannot take action on any application until he has determined that they are technically complete.

Construing a partial application for a land-use only determination or a deficient Transfer Station registration application as an actual permit application pending before the Commission would also contravene the rules of statutory construction. In enacting Sections 363.112 and 364.012, it is presumed that a just and reasonable result is intended, and that public interest is favored over any private interest. Tex. Gov't Code § 311.021. Further, in construing statutes

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 11 of 13

one should consider the object to be obtained and the consequences of a particular construction. Sections 363.112 and 364.012 clearly seek to safeguard the health, general welfare, and physical property of the people and to protect the environment by providing counties the authority to restrict or prohibit solid waste processing and disposal in certain areas. As this is a matter of public interest, the statutes prescribe that solid waste ordinances be publicized and that public interest be considered before they are enacted. The provisions in these statutes limiting solid waste prohibitions in areas where permit applications are pending before the Commission do not favor a private interest over a public interest. Consequently, these statutes should not be construed to allow a private actor to subvert the legislative authority of a commissioners court by filing documents with the Commission that in substance are merely a request for a determination about land-use, and wholly fail to meet the relevant statutory and administrative criteria for an application for a solid waste facility. The consequence of such a construction would endorse the filing of sham applications in efforts to avoid the rule of law.

## IV.
## Conclusion

For these reasons, Waller County requests that the Executive Director determine that the Waller County Commissioners Court enacted its Ordinance on August 26, 2011, exercising the full authority conferred on the County under Sections 363.112 and 364.012 of the Texas Health and Safety Code, to prohibit the processing and disposal of solid waste in certain areas of Waller County. At the time the Ordinance was enacted, Pintail did not have a permit application for its Proposed Landfill or a registration application for its proposed Transfer Station pending before Commission. The Commission should determine that Pintail failed to submit applications that meet the relevant statutory and administrative criteria before the adoption of the county

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 12 of 13

ordinance.    Therefore, the Commission should reject Pintail's request that it consider its

proposed applications to process and dispose of solid waste in Waller County at its proposed site.

Respectfully submitted,
Counsel for Waller County, Texas

James P. Allison
SBN: 01090000

ALLISON, BASS & ASSOCIATES, LLP
A.O. Watson House
402 West 12th Street
Austin, Texas 78701
512/482-0701 Phone
512/480-0902 Fax

Waller County's Request for Determination
and Request for Denial of Permit Application
and Registration Application
Page 13 of 13

# Exhibit A

## Legal Notice

## Notice of Public Hearing on Proposed Ordinance # 2011-001

Pursuant to Texas Health and Safety Code sections 363.112 and 364.012, the Commissioners Court of Waller County will consider the following ordinance at a public hearing on Wednesday, August 3rd, 2011 at its meeting place at 836 Austin Street in the Waller County Courthouse at 9:00 a.m., in Hempstead, Texas. Any interested citizen of Waller County may testify at the hearing.

Waller County, Texas  Ordinance No. _2011-001_

AN ORDINANCE DESIGNATING AREAS IN WALLER COUNTY, TEXAS WHERE MUNICIPAL OR SOLID WASTE DISPOSAL IS NOT PROHIBITED PURSUANT TO SECTIONS 363.112 AND/OR 364.012 TEXAS HEALTH AND SAFETY CODE.

WHEREAS, the Commissioners Court of Waller County, Texas, ("the Commissioners Court") has a duty to its Citizens to assure the Health, Safety, and Welfare of its Citizens and the public at large, and,

WHEREAS, a majority of the Commissioners Court has determined that the resources of the County are best served by designating certain areas in proximity to existing or formerly permitted privately - owned solid waste disposal sites within Waller County, Texas; and,

WHEREAS, such designations will allow Waller County to monitor the use, condition, and hazards associated with solid waste disposal sites without having to utilize funds to perform such actions throughout the entire area of Waller County, Texas; and,

WHEREAS, this ORDINANCE has been published for two consecutive weeks and a public hearing was held on August 3, 2011 and all interested citizens of Waller County were permitted to speak; and,

WHEREAS, all procedures, conditions, and processes required and/or afforded by the applicable sections of the Texas Health and Safety Code have been followed by the Commissioners Court, pursuant to that ORDER adopted by the Commissioners Court on July 12, 2011 and found in the Minutes of the Commissioners Court for that day;

NOW, THEREFORE:

BE IT ORDAINED BY THE COMMISSIONERS COURT OF WALLER COUNTY, TEXAS:

Section 1. The Commissioners Court adopts the Recitals above as its findings.

Section 2. Pursuant to Sections 363.112 and/or 364.012 of the Texas Health and Safety Code, the following Area(s) within Waller County, Texas in which municipal or industrial solid waste disposal is not prohibited;

a) Any area within a two (2) mile radius of any privately-owned solid waste disposal site holding a currently or previously valid permit for solid waste disposal issued by the Texas Commission on Environmental Quality ("TCEQ") and/or its predecessor agencies as of the Date of Adoption of this Ordinance, but not afterwards.

b) This Ordinance shall not apply to any solid waste disposal area owned or operated by any Municipality within Waller County. Such Municipally owned solid waste sites shall not be included for any purpose, including the calculation of the two (2) mile radius requirement.

c) This Ordinance shall have the limitations and full powers set forth in Sections 363.112 and/or 364.012 of the Texas Health and Safety Code and may not be exercised with respect to areas to which Section 361.090 of said Code applies.

Section 3. This ORDINANCE may be amended from time to time at the discretion of a Majority vote of the Commissioners Court.

Section 4. This ORDINANCE shall be recorded in the Minutes of Commissioners Court.

ORDER, PASSED AND ADOPTED (Date of Adoption) this 12th DAY OF July, 2011.

_[signature]_

County Judge of Waller County

# Exhibit B

Waller County, Texas       Ordinance No. 2011-001

## AN ORDINANCE DESIGNATING AREAS IN WALLER COUNTY, TEXAS WHERE MUNICIPAL OR SOLID WASTE DISPOSAL IS NOT PROHIBITED PURSUANT TO TEXAS HEALTH AND SAFETY CODE SECTIONS 363.112 AND/OR 364.012.

WHEREAS, the Commissioners Court of Waller County, Texas, ("the Commissioners Court") has the authority to act to protect the Health, Safety, and Welfare of its Citizens and the public at large;

WHEREAS, a majority of the Commissioners Court has determined that the resources of the County are best served by, and the Health, Safety, and Welfare of the citizens of Waller County and the public at large will be best protected by, designating the areas set forth below as areas in which municipal or solid waste disposal will not be permitted;

WHEREAS, this Ordinance was published for two consecutive weeks in a newspaper(s) of general circulation, and a public hearing was held on August 26, 2011, where all interested citizens of Waller County were permitted to speak; and

WHEREAS, this Ordinance complies with Texas Health and Safety Code Sections 363.112 and 364.012;

NOW, THEREFORE:

BE IT ORDERED BY THE COMMISSIONERS COURT OF WALLER COUNTY, TEXAS:

Section 1.     The Commissioners Court adopts the Recitals Above as its findings.

Section 2.     Unless an area is specifically designated as an area where municipal or solid waste disposal is not prohibited (discussed below), disposal of municipal or solid waste in Waller County is prohibited.

Section 3.     Pursuant to Texas Health and Safety Code Sections 363.112 and/or 364.012, the disposal of municipal or solid waste is not prohibited in the following area(s) within Waller County, Texas:

a)     Any area within a two (2) mile radius of any privately-owned solid waste disposal site holding a currently or previously valid permit for municipal or solid waste disposal issued by the Texas Commission on Environmental Quality ("TCEQ") and/or its predecessor agencies, as of the date of adoption of this Ordinance, but not afterwards.

b)     This Ordinance shall not apply to any municipal or solid waste disposal facility owned and/or operated by any unit of local

government (i.e., City, Town, or Municipality) within Waller County. Any such municipal or solid waste facilities are not included in the designations of areas where disposal of municipal or solid waste is not prohibited, and such municipal or solid waste facilities shall not be considered in calculating the two (2) mile radius discussed above.

(c)    This Ordinance shall be construed as exercising the full authority conferred on the County under Texas Health and Safety Code Sections' 363.112 and 364.012, subject only to the limitations imposed on the County's authority by state or federal law.

Section 4.    This Ordinance may be amended from time to time at the discretion of a majority vote of the Commissioners Court.

Section 5.    This Ordinance shall be recorded in the Minutes of Commissioners Court.

ORDER, PASSED AND ADOPTED on this the 26 day of August, 2011.

County Judge of Waller County

| VOTING: | AYE | NAY | (Check one) ABSTAIN |
|---|---|---|---|
| Commissioner Styers (Pct. 1) | x | | |
| Commissioner Pokluda (Pct. 2) | x | | |
| Commissioner Cedillo (Pct. 3) | x | | |
| Commissioner Kitzman (Pct. 4) | | x | |
| County Judge Beckendorff | x | | |

Waller County Clerk

A.O. Watson House
402 West 12th Street
Austin, Texas 78701
512/482-0701 Telephone
512/480-0902 Fax
Law@Allison-Bass.com

**Allison, Bass & Associates, LLP**

# *facsimile transmittal*

To:   Chief Clerk, TCBQ              Fax:    512-239-3311
From:  James P. Allison                Date:   July 26, 2012
Re:    Pintail Landfill, L.L.C.           Pages:   (Including Cover)

☐ Urgent    ☐ For review    ☐ Please        ☐ Please reply    ☐ Please recycle

Notes: Information contained in this facsimile is attorney-client privileged and confidential information intended for the use of the individual or entity named. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

CHIEF CLERKS OFFICE    2012 JUL 26 AM 9: 52    TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

confidential

# ALLISON, BASS & ASSOCIATES, L.L.P.

### Attorneys at Law

A. O. WATSON HOUSE
402 WEST 12TH STREET
AUSTIN, TEXAS 78701
law@allison-bass.com
(512) 482-0701
FAX (512) 480-0902

JAMES P. ALLISON
j.allison@allison-bass.com

ROBERT T. BASS
r.bass@allison-bass.com

J. ERIC MAGEE
e.magee@allison-bass.com

JANA CLIFT WILLIAMS
j.williams@allison-bass.com

PHILLIP L. LEDBETTER
p.ledbetter@allison-bass.com

September 4, 2012

**VIA FACSIMILE: 512-239-3939**
**AND CERTIFIED MAIL**

**REVIEWED**

**SEP 05 2012**

By _____

Mr. Zak Covar
Executive Director
Texas Commission on Environmental Quality
12100 Park 35 Circle, MC 109
Austin, TX 78753

> RE:     Pintail Landfill, L.L.C.
>         Waller County, Texas
>         Proposed TCEQ Permit No. MSW 2377 – Permit Application; &
>         Proposed TCEQ Registration No. 40259 -- Transfer Station.

Dear Mr. Covar:

On July 25, 2012, Waller County submitted its Request for Determination and Denial of Permit Application and Registration Application regarding the above referenced matters. Waller County requested an expedited decision on this Request. On July 31, 2012, we received a letter from the Chief Clerk, Bridget C. Bohac, stating that "our comments will be considered by the staff prior to the final decision on the application."

As previously requested, we seek a determination that the Waller County Ordinance prohibits the processing and disposal of solid waste at the proposed Pintail site. Further, we request that you determine that Pintail failed to submit applications that met the relevant statutory and administrative criteria before the adoption of the county ordinance. Therefore, further consideration of these applications by the TCEQ is unnecessary as Pintail cannot obtain the requisite permit and registration, as a matter of law. Waller County re-urges its request for an expedited decision on these matters.

Thank you for your time and attention to the matter. Please contact me if you have any questions.

Sincerely,

James P. Allison

JPA/afb

cc:    Senator Glenn Hegar

# APPENDIX F



# HANCE SCARBOROUGH, LLP
## ATTORNEYS AND COUNSELORS AT LAW

Michael L. Woodward
Attorney
woodward@hslawmail.com

October 29, 2012

**REVIEWED**

**OCT 3 1 2012**

By _____

Ms. Bridget Bohac
Chief Clerk
Office of the Chief Clerk, MC 105
Texas Commission on Environmental Quality
P.O. Box 13807
Austin, TX 78711-3087

RE: Pintail Landfill Transfer Station, Proposed TCEQ Registration No. 40259

Dear Ms. Bohac:

On behalf of Citizens Against the Landfill in Hempstead, please accept our comments on the above-referenced proposed Pintail Landfill Transfer Station.

## I. Introduction

Our firm represents Citizens Against the Landfill in Hempstead ("CALH") in the above-referenced matters. CALH is an organization with over 400 members comprised of Waller County landowners, residents, business owners, and many other affected parties who have legitimate reasons to oppose the above-referenced registration as well as the larger proposed landfill facility that encompasses the proposed transfer and recycling facility. Several of CALH's members own land, reside, and work adjacent to the proposed "transfer station" and landfill site. We understand that the application of Pintail Landfill, L.L.C. for TCEQ Type I MSW Facility Proposed Permit No. 2377 (landfill permit) is also under review by the



TCEQ, which proposes to include the Type V transfer station registration and recycling center within the landfill facility.

Thousands of comments and hearing requests have already been filed regarding the landfill permit and this registration. We hereby include and reiterate all other comments in opposition to the landfill application and transfer station registration stated in the TCEQ records for both matters, and on behalf of CALH and its members, we hereby formally request the Type V transfer station registration (New Municipal Solid Waste Facility Registration Application No. 40259) be denied. In the alternative, we respectfully request that the matter be consolidated with the consideration of the proposed Pintail Landfill Permit Application for the MSW facility that is to be located at the same site as the facility that is the subject of this registration (MSW Facility Proposed Permit No. 2377).

As adjacent landowners and neighboring businesses, CALH's members will be adversely affected by the proposed landfill and transfer station in a manner not common to members of the general public. Due to their close proximity, these individuals and families will be adversely impacted by the increased truck traffic traveling to and from the proposed trash facilities, will be impacted by the nuisance odors and wind-blown trash emanating from the trash operations, and will face a real threat to quantity and quality of their drinking water that comes from the shallow aquifer that lies beneath the proposed facilities. These members rely on this aquifer as their sole source of drinking water, and the trash facilities are proposed to be situated on the sandy recharge zone of this aquifer. Additionally,

those members of CALH living downstream from the proposed trash facilities on Clear Creek will be impacted by the pollution and potential flooding caused by the increased runoff containing contaminants from the trash facilities.

## II.    Summary

In summary, CALH comments that the proposed Transfer Station must be permitted, not just registered, under the applicable rules.    The registration application plainly states that the applicant is not just requesting a transfer station, but rather, is seeking a recycling facility.[1]  Therefore, a mere registration is inadequate and TCEQ should deny the registration application.  Even if TCEQ were to consider the application, a registration for a waste separation/recycling facility can only be considered after a final decision is rendered on the pending Pintail MSW landfill application at the same location.  Therefore, consideration of the registration application at this time is premature, and would violate TCEQ rules. Additionally, the Applicant failed to supplement its application with the crucial fact that there *is* a County Ordinance prohibiting disposal of waste at the proposed location.  The County Ordinance was passed soon after the registration application was filed, and Pintail has failed to satisfy the obligation to supplement its application to correct this inaccuracy.  Finally, this registration application should have already been returned to the applicant.  Even with all the above-referenced defects, the Applicant has been afforded five (5) separate Technical Notices of

---

[1] "Pintail Landfill, LLC expects to begin a C&D waste recycling and transfer operation prior to commencement of landfill operations." *See* **Exhibit 1**: Registration Application, Part 1 Form – Part I, page I-1.

Deficiency (NODs) and two (2) extensions of time to respond to the NOD's from the TCEQ. This is in direct conflict with the TCEQ's previous warnings to the applicant and the TCEQ policies outlined in the MSW Registration Application Process description, which is located in the TCEQ Sunset Evaluation Report. In its First Technical NOD dated October 27, 2011, the TCEQ flatly warned the applicant that the TCEQ did not "anticipate granting an extension of time to fulfill this request", and that a "third notice of technical deficiency will not be issued." How many bites of the apple does Pintail get to adequately respond to the numerous concerns outlined by the TCEQ staff regarding this proposed "transfer station" and recycling facility? For these reasons, and for all other reasons raised by commenters on the Pintail Transfer Facility Registration Application and the Pintail Landfill Application, we respectfully request that the TCEQ summarily deny the registration application. In the alternative, we request that the TCEQ consolidate this registration request with the consideration of the pending landfill permit application, and abstain from considering this registration until after a final decision is rendered on the pending Pintail MSW landfill application at the same location, in accordance with TCEQ rules.

III.    A Permit (Not a Mere Registration) Is Required to Operate the Proposed "Transfer Facility," Which Is Actually A Recycling Processing Facility. Because No Permit Application Was Filed, TCEQ Should Deny the Registration Application.

30 Tex. Admin. Code § 330.7 requires a permit for any activity of storage, processing, removal, or disposal of any solid waste, except as provided by § 330.9

(and a few other sections that do not apply here). A recycling facility may only be authorized through registration at a *permitted* MSW facility owned by the permitee. 30 Tex. Admin. Code § 330.9(c). In other words, a recycling facility requires a separate permit when there is no existing MSW permit.

In this case, the Applicant seeks a registration for a recycling facility when there is no existing MSW permit.[2] Such an application is illegal under TCEQ rules. Under the applicable rule, § 330.9(c), the Applicant is required to seek a permit for a processing facility that performs waste-separation/recycling activities.

Making matters worse, the Applicant seeks to circumvent the required permitting process by incorporating its unauthorized recycling application into a registration for a transfer facility.[3] Transfer facilities, recycling facilities, and waste-separation/recycling facilities are each different under the rules.[4] Each type of facility presents different environmental challenges and consequences.

---

[2] The registration application states, "A permit application for the Pintail Landfill (Proposed Permit No. MSW-2377) has been filed with TCEQ and is currently pending. Requests for authorizations to operate the composting and C&D facilities in conjunction with the Pintail Landfill will be submitted. However, in order to meet expected demand and to initiate a market for incoming C&D waste materials, *Pintail Landfill, LLC expects to begin a C&D waste recycling and transfer operation prior to commencement of landfill operations. This registration application is being submitted to obtain authorization for this initial phase C&D waste recycling and transfer operation* to be conducted on the same site on which the Pintail Landfill will eventually be developed. It is anticipated that the C&D waste recycling and transfer facility will operate for no more than five years pursuant to this registration and that subsequent C&D waste processing and recycling will be conducted under further authorizations." *See* **Exhibit 1**: Registration Application, Part 1 Form – Part I, page I-1 (emphasis added).

[3] *See id.; see also* 30 Tex. Admin. Code § 330.3(125) (defining "Registration" as "[t]he act of filing information with the commission for review and approval for specific solid waste management activities that do not require a permit, as determined by this chapter.")

[4] 30 Tex. Admin. Code § 330.3(157) ("**Transfer Station**--A facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit). It is not a storage facility..."); 30 Tex. Admin. Code § 330.3(173) ("**Waste-separation/recycling facility**--A facility, sometimes referred to as a material recovery facility, in

With these differences in mind, the rules were written in order to protect the environment—calling for a permit to operate a recycling facility or a waste-separation/recycling facility, but allowing a registration for smaller transfer facilities.[5] A transfer station transferring less than 125 tons of waste per day from collection vehicles directly to long-haul vehicles, may be registered. This type of transfer operation is not what the Applicant seeks, as described in the application.

There are real-life environmental consequences when the permitting process is circumvented. The process exists to protect the environment and the public. Here, it is the members of CALH and the environment that stand to lose if this registration application is granted. The rules are clear—a permit is required. The Applicant impermissibly seeks to operate an unpermitted recycling facility under the registration process. For this reason alone, the TCEQ should summarily deny the Transfer Station Application, which is illegal under applicable rules.

## IV. If TCEQ Considers Applicant's Illegal Registration Application, the MSW Landfill Application Must Be Considered Before Taking Action on the Registration Application

As previously discussed, waste separation/recycling facilities require a separate permit when there is no existing MSW permit. 30 Tex. Admin. Code § 330.7 (requiring a permit); 30 Tex. Admin. Code § 330.9(c) (allowing registration

which recyclable materials are removed from the waste stream for transport off-site for reuse, recycling, or other beneficial use."); 30 Tex. Admin. Code § 330.3(122) ("**Recycling**--A process by which materials that have served their intended use or are scrapped, discarded, used, surplus, or obsolete are collected, separated, or processed and returned to use in the form of raw materials in the production of new products.")

[5] 30 Tex. Admin. Code § 330.9(c) (allowing a registration for a waste-separation/recycling facility *only* when established at a *permitted MSW facility*) (emphasis added); *see also* 30 Tex. Admin. Code § 330.9(b)(3) ("relating to registration for a facility transferring less than 125 tons of municipal solid waste per day.)

when there is an existing MSW permit). Therefore, the Pintail Registration Application, which includes recycling activities, cannot be considered without first making a final determination on Pintail's MSW Application. The TCEQ should flatly deny the improper recycling registration because no MSW permit exists. However, if the registration application is to be considered, the TCEQ must at least refrain from considering it until a final decision is rendered on the pending Pintail MSW landfill application at the same location.

V.    Applicant Failed to Supplement Its Application With the County Ordinance Prohibiting a Landfill at the Location

Applicant has failed to uphold its duty to supplement its application by neglecting to inform the TCEQ that a County ordinance exists prohibiting disposal at the location. The Applicant has a duty to supplement information that is incorrect. Indeed, the affidavit attached to the application is a statement by the preparer that the information is "true, accurate, and complete." Furthermore, every MSW permit recognizes this duty with a standard permit condition—"[w]here the permittee becomes aware that it failed to submit any relevant facts in a permit application, or submitted incorrect information in an application, or in any report to the executive director, it shall promptly submit such facts or information."[6] This duty makes sense. Permits should not be granted upon false information.

The registration application was filed on 8/2/2011 and stated that no County ordinance existed prohibiting disposal at the location. *See* Exhibit 2: Registration

---

[6] 30 Tex. Admin. Code § 305.125(19).

Application Excerpt (Denial that County Ordinance Exists). However, Waller County Ordinance No. 2011-001 was passed less than a month later, on August 26, 2011. Furthermore, Applicant regularly attends Waller County Commissioners' meetings and has met with the County Commissioners on multiple occasions. Yet, Applicant chose not to abide by its duty to supplement its application. Applicant chose not to disclose the County ordinance that prohibits disposal at its proposed location.

Under 30 Tex. Admin. Code § 330.57(d), the application should have been returned for incomplete information.[7] Now, more than one year later, there has still been no supplement by Applicant. Therefore, the application should be denied because the assertion that no County ordinance prohibits disposal at the location is false and Applicant knew better.[8]

## VI. Applicant Received Five Technical Notices of Deficiency and Two Extensions to Respond, when Initially Informed there Would be No Extensions and Only 2 NOD's

In the initial Technical NOD[9] dated October 27, 2011, the TCEQ reviewer of the registration wrote, "we do not anticipate granting an extension of time to fulfill this request. Also, please be aware a third notice of technical deficiency will not be issued." The reviewer also stated in the same correspondence that "Failure to

---

[7] 30 Tex. Admin. Code § 330.57(d) ("Failure of the owner or operator to provide complete information as required by this chapter may be cause for the executive director to return the application without further action..." "Submission of false information shall constitute grounds for denial of the permit or registration application.")

[8] *Id.*

[9] Although this Technical NOD was labeled the First Technical NOD, there was actually correspondence from the TCEQ dated August 15, 2011 that was labeled "Preliminary Review" asking for information to be added to the original registration request.

submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies." These statements by staff are consistent with TCEQ policies, as recently expressed in its TCEQ Sunset Evaluation Report.[10] As stated in the report, which is a flowchart of the MSW Registration Application Process, applications are returned to the applicant after an applicant unsuccessfully resolves the Second NOD.

Regardless of these statements and the dissonance with applicable TCEQ policies, on December 2, 2011, an extension was granted to allow Pintail additional time to respond to the First NOD. Pintail did respond on January 18, 2012, but the response was again inadequate, as the reviewer sent another request for additional information on February 17, 2012. And, even though it is labeled "First Technical Notice of Deficiency", the letter is clearly an indication that Pintail did not submit a satisfactory response to each of the noted deficiencies in the first technical notice of deficiency. As such, it appears the application should have been returned at this time. However, not only was the registration not returned, Pintail was granted yet another extension to respond to the Third Technical NOD.[11] Despite the statements from TCEQ staff that there would not be more two (2) NODs, this pattern continued for a total of six (6) NODs.

---

[10] *See* **Exhibit 4**: MSW Registration Application Process, TCEQ Sunset Evaluation Report, October 2009, SFR-089 (contemplating only two (2) Notices of Deficiency (NODs) before returning an application for an MSW registration).

[11] Interestingly, this Technical NOD was not given a number (nor were the two subsequent NODs of June 25, 2012 and August 16, 2012, given a number), but by our count it is actually the Fourth NOD when you count the "Preliminary Review".

The application should have been returned after the Second NOD, in accordance with the TCEQ's policy and the TCEQ staff's statements. Allowing the Applicant to continue to inadequately respond to more than two (2) Technical NOD's is a departure from normal policy, and should not be allowed by the Commission. For this reason alone, the transfer and recycling facility registration application should be denied.

## VIII. Conclusion

The proposed "Transfer Station" must be permitted, not merely registered, under the applicable rules. It is not a transfer station, but a recycling facility. Therefore, a mere registration is inadequate and TCEQ should deny the registration application. Even if TCEQ were to consider the application, a registration for a waste separation/recycling facility can only be considered after a final decision is rendered on the pending Pintail MSW Landfill Application at the same location. Therefore, consideration of the registration application at this time is premature, and approval would violate TCEQ rules. Additionally, the Applicant failed to supplement its application with the crucial fact that there *is* a County Ordinance prohibiting disposal of waste at the proposed location. Finally, this registration application should have already been returned to the applicant. the Applicant has been afforded five (5) separate Technical Notices of Deficiency (NODs) and two (2) extensions of time to respond to the NOD's from the TCEQ. This is in direct conflict with the TCEQ's previous warnings to the applicant and

the TCEQ policies outlined in the MSW Registration Application Process, and should result in denial of the registration application.

For these reasons, and for all other reasons raised by commenters opposed to the Pintail Transfer Facility Registration Application and the Pintail Landfill Application, we respectfully request that the TCEQ summarily deny the registration application. In the alternative, we request that the TCEQ abstain from considering this matter until after a final decision is rendered on the pending Pintail MSW landfill application at the same location.

Sincerely,

Michael L. Woodward

Cc: Mr. Zak Covar, MC 109
Executive Director, TCEQ

Mr. Brent Wade, MC 123
Deputy Director, TCEQ Office of Waste

Mr. Earl Lott, MC 126
Director, TCEQ Waste Permits Division

Mr. Blas J. Coy, Jr., MC 103
Public Interest Counsel, TCEQ

**Exhibit 1**
Registration Application Excerpt (Activity Description)

# 1 GENERAL

Pintail Landfill, LLC intends to develop Pintail Park and Landfill on the east side of State Highway 6, approximately 1 mile north of US Highway 290 in northern Waller County. This project is planned to include an industrial park, a municipal solid waste landfill facility, a green waste composting facility, and a construction and demolition (C&D) waste processing and recycling operation. A permit application for the Pintail Landfill (Proposed Permit No. MSW-2377) has been filed with TCEQ and is currently pending. Requests for authorizations to operate the composting and C&D facilities in conjunction with the Pintail Landfill will be submitted. However, in order to meet expected demand and to initiate a market for incoming C&D waste materials, Pintail Landfill, LLC expects to begin a C&D waste recycling and transfer operation prior to commencement of landfill operations. This registration application is being submitted to obtain authorization for this initial phase C&D waste recycling and transfer operation to be conducted on the same site on which the Pintail Landfill will eventually be developed. It is anticipated that the C&D waste recycling and transfer facility will operate for no more than five years pursuant to this registration and that subsequent C&D waste processing and recycling will be conducted under further authorizations.

Pintail Landfill, LLC intends to register and operate a Type V municipal solid waste transfer station in northwest Waller County off State Highway 6. The Pintail Landfill Transfer Station will be a Type V municipal solid waste transfer facility that will accept only construction and demolition wastes. The site entrance will be located about 1 mile north of the intersection of State Highway 6 and US Highway 290 off of Wendt Road, on the east side of State Highway 6. The proposed facility is intended to provide transfer and recycling capabilities for construction and demolition waste for the City of Hempstead, Waller County, and the surrounding areas. The facility will be designed to protect the health and safety of the people in the region.

This application has been prepared consistent with 30 TAC Chapter 330 Municipal Solid Waste Management Regulations (MSWMR) adopted by the Texas Commission on Environmental Quality (TCEQ), effective March 27, 2006 and May 29, 2008.

It is intended that this registration be processed in accordance with §330.9(b)(3), which allows for a transfer station facility to be registered if the facility will transfer 125 tons per day or less. The proposed Pintail Landfill Transfer Station will transfer less than 125 tons per day.

Part I of this registration application contains information about the site and the applicant as required in 30 TAC §§281.5, 305.45, and 330.59. Part II of the registration application describes the existing conditions and character of the facility and surrounding area as required in §330.61. Part III of the registration application presents engineering information, detailed investigative reports, the schematic designs of the facility, and the required plans as required in §330.63. Part IV of the registration

**Exhibit 2**
Registration Application Excerpt (Denial that County Ordinance Exists)

## B. Facility Location

| | |
|---|---|
| Local Government Jurisdiction: | Waller County |
| Within City Limits of: | N/A |
| Within Extraterritorial Jurisdiction of City of: | City of Hempstead |

Is the proposed municipal or industrial solid waste disposal or processing facility located in an area in which the governing body of the municipality or county has prohibited the disposal or processing of municipal or industrial solid waste? (If YES, provide a copy of the ordinance or order):

☐ YES   ☒ NO

---

Provide a description of the location of the facility with respect to known or easily identifiable landmarks.

Located southeast of the intersection of Highway 6 and Kelley Road in Waller County, Texas approximately one mile north from Hempstead, Texas.

---

Detail the access routes from the nearest United States or state highway to the facility.

Located southeast of the intersection of Highway 6 and Kelley Road in Waller County, Texas approximately one mile north from Hempstead, Texas.

---

Provide the latitudinal and longitudinal geographic coordinates of the facility.

| | |
|---|---|
| Latitude | N 30° 08' 03" |
| Longitude | W 96° 03' 40" |
| Elevation (above msl) | Between 200' and 270' above mean sea level |

---

| | |
|---|---|
| Is the facility within the Coastal Management Program boundary? | ☐ Yes   ☒ No |

---

Texas Department of Transportation District Location:

| TXDOT District Name & Number: | Houston District | | | |
|---|---|---|---|---|
| District Engineer's Name: | Delvin Dennis, P.E. | | | |
| Street or P. O. Box: | 7600 Washington Avenue | | | |
| (City) (County) (State) (Zip Code): | Houston | Harris | TX | 77007 |
| (Area Code) Telephone Number: | 713-802-5000 | | | |
| (Area Code) FAX Number: | | | | |

---

The local governmental authority or agency responsible for road maintenance:

| Agency Name: | TXDOT Waller/West-Central Harris Area Office | | | |
|---|---|---|---|---|
| Contact Person's Name: | Gregory A. Ranft, Area Engineer | | | |
| Street or P. O. Box: | 14838 NW Freeway | | | |
| (City) (County) (State) (Zip Code): | Houston | Harris | TX | 77040 |
| (Area Code) Telephone Number: | 713-934-5900 | | | |
| (Area Code) FAX Number: | | | | |

---

State Representative:

| District Number: | Texas House of Representatives District 28 | | | |
|---|---|---|---|---|
| State Representative's Name: | The Honorable John Zerwas | | | |
| District Office Address: | P.O. Box 434 (9315 FM 1489, Suite C) | | | |
| (City) (County) (State) (Zip Code): | Simonton | Waller | TX | 77476 |
| (Area Code) Telephone Number: | 281-533-9042 | | | |
| (Area Code) FAX Number: | 281-533-9049 | | | |

Page 16

**Exhibit 3**
Waller County Ordinance No. 2011-001

Waller County, Texas    Ordinance No. 2011-001

# AN ORDINANCE DESIGNATING AREAS IN WALLER COUNTY, TEXAS WHERE MUNICIPAL OR SOLID WASTE DISPOSAL IS NOT PROHIBITED PURSUANT TO TEXAS HEALTH AND SAFETY CODE SECTIONS 363.112 AND/OR 364.012.

WHEREAS, the Commissioners Court of Waller County, Texas, ("the Commissioners Court") has the authority to act to protect the Health, Safety, and Welfare of its Citizens and the public at large;

WHEREAS, a majority of the Commissioners Court has determined that the resources of the County are best served by, and the Health, Safety, and Welfare of the citizens of Waller County and the public at large will be best protected by, designating the areas set forth below as areas in which municipal or solid waste disposal will not be permitted;

WHEREAS, this Ordinance was published for two consecutive weeks in a newspaper(s) of general circulation, and a public hearing was held on August 26, 2011, where all interested citizens of Waller County were permitted to speak; and

WHEREAS, this Ordinance complies with Texas Health and Safety Code Sections 363.112 and 364.012;

NOW, THEREFORE:

BE IT ORDERED BY THE COMMISSIONERS COURT OF WALLER COUNTY, TEXAS:

Section 1.    The Commissioners Court adopts the Recitals Above as its findings.

Section 2.    Unless an area is specifically designated as an area where municipal or solid waste disposal is not prohibited (discussed below), disposal of municipal or solid waste in Waller County is prohibited.

Section 3.    Pursuant to Texas Health and Safety Code Sections 363.112 and/or 364.012, the disposal of municipal or solid waste is not prohibited in the following area(s) within Waller County, Texas:

a)    Any area within a two (2) mile radius of any privately-owned solid waste disposal site holding a currently or previously valid permit for municipal or solid waste disposal issued by the Texas Commission on Environmental Quality ("TCEQ") and/or its predecessor agencies, as of the date of adoption of this Ordinance, but not afterwards.

b)    This Ordinance shall not apply to any municipal or solid waste disposal facility owned and/or operated by any unit of local

government (i.e., City, Town, or Municipality) within Waller County. Any such municipal or solid waste facilities are not included in the designations of areas where disposal of municipal or solid waste is not prohibited, and such municipal or solid waste facilities shall not be considered in calculating the two (2) mile radius discussed above.

(c) This Ordinance shall be construed as exercising the full authority conferred on the County under Texas Health and Safety Code Sections 363.112 and 364.012, subject only to the limitations imposed on the County's authority by state or federal law.

Section 4. This Ordinance may be amended from time to time at the discretion of a majority vote of the Commissioners Court.

Section 5. This Ordinance shall be recorded in the Minutes of Commissioners Court.

ORDER, PASSED AND ADOPTED on this the 26 day of August, 2011.

County Judge of Waller County

| VOTING: | AYE | NAY | (Check one) ABSTAIN |
|---|---|---|---|
| Commissioner Styers (Pct. 1) | x | | |
| Commissioner Pokluda (Pct. 2) | x | | |
| Commissioner Cedillo (Pct. 3) | x | | |
| Commissioner Kitzman (Pct. 4) | | x | |
| County Judge Beckendorff | x | | |

Waller County Clerk

**Exhibit 4**
MSW Registration Application Process

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

# PROTECTING

# TEXAS BY

# REDUCING AND

# PREVENTING

# POLLUTION

TCEQ SUNSET EVALUATION REPORT
OCTOBER 2009

SFR-089

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

# PROTECTING

# TEXAS BY

# REDUCING AND

# PREVENTING

# POLLUTION

TCEQ SUNSET EVALUATION REPORT

OCTOBER 2009

SFR-089



BRYAN W. SHAW, PH.D., CHAIRMAN
BUDDY GARCIA, COMMISSIONER
CARLOS RUBINSTEIN, COMMISSIONER

MARK R. VICKERY, P.G., EXECUTIVE DIRECTOR

We AUTHORIZE YOU TO USE OR REPRODUCE ANY ORIGINAL MATERIAL
CONTAINED IN THIS PUBLICATION—THAT IS, ANY MATERIAL WE DID NOT
OBTAIN FROM OTHER SOURCES. PLEASE ACKNOWLEDGE THE TCEQ AS
YOUR SOURCE.

COPIES OF THIS PUBLICATION ARE AVAILABLE FOR PUBLIC USE
THROUGH THE TEXAS STATE LIBRARY, OTHER STATE DEPOSITORY
LIBRARIES, AND THE TCEQ LIBRARY, IN COMPLIANCE WITH STATE
DEPOSITORY LAW. FOR MORE INFORMATION ON TCEQ PUBLICATIONS
CALL 512-239-0028 OR VISIT OUR WEB SITE AT:

WWW.TCEQ.STATE.TX.US/GOTO/PUBLICATIONS

PUBLISHED AND DISTRIBUTED
BY THE
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
PO BOX 13087
AUSTIN TX 78711-3087

THE TCEQ IS AN EQUAL OPPORTUNITY EMPLOYER. THE AGENCY DOES NOT ALLOW DISCRIMINATION ON THE
BASIS OF RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, DISABILITY, AGE, SEXUAL ORIENTATION OR VET-
ERAN STATUS. IN COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT, THIS DOCUMENT MAY BE RE-
QUESTED IN ALTERNATE FORMATS BY CONTACTING THE TCEQ AT 512-239-0028, FAX 512-239-4488, OR
1-800-RELAY-TX (TDD), OR BY WRITING P.O. BOX 13087, AUSTIN, TX 78711-3087.



MSW Registration Application Process



**MSW Permit
Application Process**
Page 1 of 2

**Abbreviations Used:**
ELD - Environmental Law Division
CCO - Chief Clerk's Office
RTC - Response to Comments
SOAH - State Office of Administrative Hearings
OPA - Office of Public Assistance

**Explanations:**
Agency Review Letters - Fish & Wildlife, Historical Commission, FAA, etc.



# APPENDIX G

# TAB 1



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

\*\*\* This document is current through the 2013 3rd Called Session \*\*\*
\*\*\* Federal case annotations: February 18, 2014 postings on Lexis \*\*\*
\*\*\* State case annotations: February 19, 2014 postings on Lexis \*\*\*

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER A.   GENERAL PROVISIONS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.002*   (2014)

§ 361.002.   Policy; Findings

   (a) It is this state's policy and the purpose of this chapter to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste, including accounting for hazardous waste that is generated.

   (b) The storage, processing, and disposal of hazardous waste at municipal solid waste facilities pose a risk to public health and the environment, and in order to protect the environment and to provide measures for adequate protection of public health, it is in the public interest to require hazardous waste to be stored, processed, and disposed of only at permitted hazardous industrial solid waste facilities.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1990, 71st Leg., 6th C.S., ch. 10 (S.B. 43), art. 2, § 1, effective September 6, 1990.

LexisNexis (R) Notes:

CASE NOTES

1. Substantial evidence in the record supported the Texas Natural Resource Conservation Commission's finding that a landfill owner's expansion application was administratively and technically complete because the owner had included all necessary information in the application, and while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information, and the opponents to the application did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Because

the application was determined to be administratively and technically complete prior to the contested case hearing, the owner was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality, 169 S.W.3d 258, 2005 Tex. App. LEXIS 3583 (Tex. App. Austin 2005).*

2. Substantial evidence in the record supported the Texas Natural Resource Conservation Commission's finding that a landfill owner's expansion application was administratively and technically complete because the owner had included all necessary information in the application, and while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information, and the opponents to the application did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Because the application was determined to be administratively and technically complete prior to the contested case hearing, the owner was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality, 169 S.W.3d 258, 2005 Tex. App. LEXIS 3583 (Tex. App. Austin 2005).*

3. Texas Natural Resource Conservation Commission was performing its duty under *Tex. Health and Safety Code Ann. § 361.002(b)* of the Texas Solid Waste Disposal Act, *Tex. Health and Safety Code Ann. §§ 361.001*, et seq., by carefully scrutinizing every aspect of a company's process denying a company's application for hazardous wastes disposal permits. *Hunter Indus. Facilities v. Texas Natural Resource Conservation Comm'n, 910 S.W.2d 96, 1995 Tex. App. LEXIS 2515 (Tex. App. Austin 1995).*

4. Texas Commission on Environmental Quality's findings did not conflict with its decision to grant a landfill permit, the company complied with rule requirements of the rule, and conclusions that the proposed groundwater-monitoring system would adequately monitor the groundwater and will protect the groundwater, human health, and the environment was also arbitrary or capricious. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

5. Texas Commission on Environmental Quality (TCEQ) was required to make findings that supported its determinations that the statutory requirements, for purposes of *Tex. Health & Safety Code Ann. § 361.002* and *Tex. Gov't Code Ann. § 2001.141(b)*, (d), for approving a permit application had been met, and TCEQ made 200 findings supporting its decision to grant the permit; given this, and that substantial evidence supported a finding that there were no springs near the proposed landfill, the court would have subjected the order to a hypertechnical standard of review if the court found the order to be arbitrary and capricious because TCEQ failed to make a negative finding of fact concerning the existence of springs. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

6. Texas Commission on Environmental Quality's (TCEQ) interpretation of 30 Tex. Admin. Code § 330.56(f)(4)(A)(iv) to require an analysis of stormwater discharge impact only at the permit boundary did not conflict with *Tex. Health & Safety Code Ann. § 361.002(a)* because it was reasonable, not in conflict with the rule's plain language, and concerned a matter within the administrative expertise of the *TCEQ. Heritage v. Tex. Comm'n on Envtl. Quality & Williamson County, 2012 Tex. App. LEXIS 6460 (Tex. App. Austin July 31 2012).*

7. Texas Commission on Environmental Quality's (TCEQ) interpretation of 30 Tex. Admin. Code § 330.56(f)(4)(A)(iv) to require an analysis of stormwater discharge impact only at the permit boundary did not conflict with *Tex. Health & Safety Code Ann. § 361.002(a)* because it was reasonable, not in conflict with the rule's plain language, and concerned a

matter within the administrative expertise of the *TCEQ. Heritage v. Tex. Comm'n on Envtl. Quality & Williamson County, 2012 Tex. App. LEXIS 6460 (Tex. App. Austin July 31 2012).*

8. Substantial evidence in the record supported the Texas Natural Resource Conservation Commission's finding that a landfill owner's expansion application was administratively and technically complete because the owner had included all necessary information in the application, and while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information, and the opponents to the application did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Because the application was determined to be administratively and technically complete prior to the contested case hearing, the owner was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality, 169 S.W.3d 258, 2005 Tex. App. LEXIS 3583 (Tex. App. Austin 2005).*

9. Texas Commission on Environmental Quality's (TCEQ) interpretation of 30 Tex. Admin. Code § 330.56(f)(4)(A)(iv) did not conflict with *Tex. Health & Safety Code Ann. § 361.002(a)* because the TCEQ's interpretation of its rule as requiring consideration of discharge impact only at the permit boundary did not conflict with the TCEQ's statutory mandate to safeguard the health, welfare, and physical property of the people and to protect the environment. Heritage on the San Gabriel Homeowners Ass?n v. *Tex. Comm'n on Envtl. Quality, 393 S.W.3d 417, 2012 Tex. App. LEXIS 10767 (Tex. App. Austin 2012).*

10. Group's substantial rights were not prejudiced by the addition of the special provision to the landfill application, because the appellate court could not see how the group had been harmed by the Texas Commission on Environmental Quality adopting a permit that provided more groundwater monitoring than was required by the administrative rules, when the permit not only satisfied the rules' requirements that groundwater from the uppermost aquifer be monitored, as it must, but it also provided for extra monitoring of groundwater that the evidence showed was not in the uppermost aquifer. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 5243 (Tex. App. Austin June 28 2012).*

11. Group's substantial rights were not prejudiced by the addition of the special provision to the landfill application, because the appellate court could not see how the group had been harmed by the Texas Commission on Environmental Quality adopting a permit that provided more groundwater monitoring than was required by the administrative rules, when the permit not only satisfied the rules' requirements that groundwater from the uppermost aquifer be monitored, as it must, but it also provided for extra monitoring of groundwater that the evidence showed was not in the uppermost aquifer. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 5243 (Tex. App. Austin June 28 2012).*

LAW REVIEWS

1. *53 SMU L. Rev. 965,* ANNUAL SURVEY OF TEXAS LAW ARTICLE: Environmental Law, Summer, 2000.

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 2



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.061*   (2014)

§ 361.061.   Permits; Solid Waste Facility

   Except as provided by Section 361.090 with respect to certain industrial solid waste, the commission may require and issue permits authorizing and governing the construction, operation, and maintenance of the solid waste facilities used to store, process, or dispose of solid waste under this chapter.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 11.37, effective September 1, 1995.

LexisNexis (R) Notes:

CASE NOTES

1. In company's appeal from a temporary injunction that prevented company from running a non-hazardous solid waste site until a permit was issued, the court affirmed because Texas Solid Waste Disposal Act (Act), former Tex. Rev. Civ. Stat. Ann. art. 4477-7, et seq., specifically former Tex. Rev. Civ. Stat. Ann. art. 4477-7, §§ 3(a) and 4(e), gave the state authority to license solid waste disposal sites, and the Solid Waste Disposal Act provided adequate guidelines to the state to establish rules and regulations to reasonably carry out the express purposes of the Solid Waste Disposal Act, including the licensing of solid waste disposal sites. *Med-safe, Inc. v. State, 752 S.W.2d 638, 1988 Tex. App. LEXIS 1152 (Tex. App. Houston 1st Dist. 1988).*

2. In company's appeal from a temporary injunction that prevented company from running a non-hazardous solid waste site until a permit was issued, the court affirmed because Texas Solid Waste Disposal Act (Act), former Tex. Rev. Civ. Stat. Ann. art. 4477-7, et seq., specifically former Tex. Rev. Civ. Stat. Ann. art. 4477-7, §§ 3(a) and 4(e), gave the state authority to license solid waste disposal sites, and the Solid Waste Disposal Act provided adequate guidelines to the state to establish rules and regulations to reasonably carry out the express purposes of the Solid Waste Disposal Act, including the licensing of solid waste disposal sites. *Med-safe, Inc. v. State, 752 S.W.2d 638, 1988 Tex. App. LEXIS 1152 (Tex. App. Houston 1st Dist. 1988).*

3. In company's appeal from a temporary injunction that prevented company from running a non-hazardous solid waste site until a permit was issued, the court affirmed because Texas Solid Waste Disposal Act (Act), former Tex. Rev. Civ. Stat. Ann. art. 4477-7, et seq., specifically former Tex. Rev. Civ. Stat. Ann. art. 4477-7, §§ 3(a) and 4(e), gave the state authority to license solid waste disposal sites, and the Solid Waste Disposal Act provided adequate guidelines to the state to establish rules and regulations to reasonably carry out the express purposes of the Solid Waste Disposal Act, including the licensing of solid waste disposal sites. *Med-safe, Inc. v. State, 752 S.W.2d 638, 1988 Tex. App. LEXIS 1152 (Tex. App. Houston 1st Dist. 1988).*

LAW REVIEWS

1. *53 SMU L. Rev. 965,* ANNUAL SURVEY OF TEXAS LAW ARTICLE: Environmental Law, Summer, 2000.

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 3



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

\*\*\* This document is current through the 2013 3rd Called Session \*\*\*
\*\*\* Federal case annotations: February 18, 2014 postings on Lexis \*\*\*
\*\*\* State case annotations: February 19, 2014 postings on Lexis \*\*\*

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.086*   (2014)

§ 361.086.   Separate Permit for Each Facility

   (a) Except as provided by Subsection (d), a separate permit is required for each solid waste facility.

   (b) A permit under this subchapter may be issued only to the person in whose name the application is made and only for the facility described by the permit.

   (c) A permit may not be transferred without first giving written notice to and receiving written approval of the agency that issued the permit.

   (d) A separate permit is not required for activities authorized by a general permit issued under *Section 27.025, Water Code*.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 2007, 80th Leg., ch. 901 (H.B. 2654), § 5, effective September 1, 2007; am. Acts 2009, 81st Leg., ch. 87 (S.B. 1969), § 27.002(10), effective September 1, 2009.

**NOTES:**

   2007 amendment,
   added (d), and added "Except as provided by Subsection (d)," in (a).
   2009 amendment,
   substituted "Section 27.025" for "Section 27.023" in (d).

**LexisNexis 50 State Surveys, Legislation & Regulations**

      Solid Waste Management

# TAB 4



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.0861*   (2014)

§ 361.0861.   Separate Recycling or Recovery Permit Not Required

   (a) A permit holder or a municipal solid waste management facility that has or plans to have a recycling, waste separation, energy and material recovery, or gas recovery or transfer facility established in conjunction with the permitted municipal solid waste management facility is not required to obtain for that recycling, waste separation, energy and material recovery, or gas recovery or transfer facility a separate permit from the commission or to apply for an amendment to an existing permit issued by the commission.

   (b) A facility to which this section applies must register with the commission in accordance with commission rules and comply with commission rules adopted under this chapter.

   (c) If a permit is otherwise required, the commission shall expedite the permit proceeding if the applicant is seeking a permit for a solid waste management facility that employs an innovative, high technology method of waste disposition and recycling.

**HISTORY:** Enacted by Acts 1990, 71st Leg., 6th C.S., ch. 10 (S.B. 43), art. 2, § 15, effective September 6, 1990; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 11.50, effective September 1, 1995; am. Acts 1995, 74th Leg., ch. 987 (H.B. 2315), § 1, effective September 1, 1995.


**LexisNexis 50 State Surveys, Legislation & Regulations**

   Solid Waste Management

# TAB 5



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.088*   (2014)

§ 361.088.   Permit Issuance, Amendment, Extension, and Renewal; Notice and Hearing

   (a) The commission may amend, extend, or renew a permit it issues in accordance with reasonable procedures prescribed by the commission.

   (b) The procedures prescribed by Section 361.067 for a permit application apply to an application to amend, extend, or renew a permit.

   (c) Except as provided by Subsection (e), before a permit is issued, amended, extended, or renewed, the commission shall provide an opportunity for a hearing to the applicant and persons affected. The commission may also hold a hearing on its own motion.

   (d) In addition to providing an opportunity for a hearing held under this section, the commission shall hold a public meeting and give notice as provided by Section 361.0791.

   (e) After complying with *Sections 5.552--5.555, Water Code*, the commission, without providing an opportunity for a contested case hearing, may act on an application to renew a permit for:

      (1) storage of hazardous waste in containers, tanks, or other closed vessels if the waste:

         (A) was generated on-site; and

         (B) does not include waste generated from other waste transported to the site; and

      (2) processing of hazardous waste if:

         (A) the waste was generated on-site;

         (B) the waste does not include waste generated from other waste transported to the site; and

         (C) the processing does not include thermal processing.

   (f) Notwithstanding Subsection (e), if the commission determines that an applicant's compliance history under the method for evaluating compliance history developed by the commission under *Section 5.754, Water Code*, raises an

issue regarding the applicant's ability to comply with a material term of its permit, the commission shall provide an opportunity to request a contested case hearing.

(g) The commission shall review a permit issued under this chapter every five years to assess the permit holder's compliance history.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1991, 72nd Leg., ch. 296 (S.B. 1099), § 1.14, effective June 7, 1991; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 11.51, effective September 1, 1995; am. Acts 1999, 76th Leg., ch. 1350 (H.B. 801), § 4, effective September 1, 1999; am. Acts 2001, 77th Leg., ch. 965 (H.B. 2912), §§ 4.05, 16.11, effective September 1, 2001.

**NOTES:**

1999 Note:
The changes in law made by ch. 1350 apply only to an application to issue, amend, or renew a permit that is declared to be administratively complete on or after the effective date of this Act. An application to issue, amend, or renew a permit that was declared to be administratively complete before the effective date of this Act is governed by the former law, and that law is continued in effect for that purpose. Acts 1999, 76th Leg., ch. 1350, § 7(b).

LexisNexis (R) Notes:

LAW REVIEWS

1. *62 Tex. B. J. 788,* LEGISLATIVE UPDATE: NATURAL RESOURCES, TAX, AND OTHER MISCELLANEOUS AREAS, By Charles C. Bailey, September, 1999, Copyright (c) 1999 by State Bar of Texas, Texas Bar Journal.

2. *53 SMU L. Rev. 965,* ANNUAL SURVEY OF TEXAS LAW ARTICLE: Environmental Law, Summer, 2000.

3. *53 SMU L. Rev. 1167,* ANNUAL SURVEY OF TEXAS LAW ARTICLE: Oil, Gas, and Mineral Law, Summer, 2000.

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 6



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.0665*   (2014)

§ 361.0665.   Notice of Intent to Obtain Municipal Solid Waste Permit

   (a) A person who applies for a municipal solid waste permit shall publish notice of intent to obtain a permit under this chapter at least once in a newspaper of the largest general circulation that is published in the county in which the facility is located or proposed to be located.

   (b) Notice must include:

      (1) a description of the location or proposed location of the facility;

      (2) a statement that a person who may be affected by the facility or proposed facility is entitled to request a hearing from the commission;

      (3) the manner in which the commission may be contacted for further information; and

      (4) any other information that the commission by rule requires.

   (c) If a newspaper is not published in the county, the notice must be published in a newspaper of general circulation in the county in which the facility is located or proposed to be located and in a newspaper of circulation in the immediate vicinity in which the facility is located or proposed to be located as defined by commission rule.

   (d) In addition, the commission shall publish notice in the Texas Register.

**HISTORY:** Am. Acts 1990, 71st Leg., 6th C.S., ch. 10 (S.B. 43), art. 2, § 13(a), effective September 6, 1990; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 11.41, effective September 1, 1995.


**LexisNexis 50 State Surveys, Legislation & Regulations**
      Solid Waste Management

# TAB 7



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.0666*   (2014)

§ 361.0666.   Public Meeting and Notice for Solid Waste Facilities

   (a) An applicant for a permit under this chapter for a new facility that accepts municipal solid wastes may hold a public meeting in the county in which the proposed facility is to be located.

   (b) The applicant shall publish notice of the public meeting at least once each week during the three weeks preceding the meeting. The notice must be published in the newspaper of the largest general circulation that is published in the county in which the proposed facility is to be located. If a newspaper is not published in the county, the notice must be published in a newspaper of general circulation in the county.

   (c) The applicant shall present to the commission an affidavit certifying that the notice was published as required by Subsection (b). The commission's acceptance of the affidavit raises a presumption that the applicant has complied with Subsection (b).

   (d) The published notice may not be smaller than 96.8 square centimeters or 15 square inches, with the shortest dimension not less than 7.5 centimeters or 3 inches. The notice must contain at least the following information:

      (1) the permit application number;

      (2) the applicant's name;

      (3) the proposed location of the facility; and

      (4) the location and availability of copies of the application.

   (e) The applicant shall pay the cost of the notice required under this section. The commission by rule may establish a procedure for payment of those costs.

**HISTORY:** Enacted by Acts 2001, 77th Leg., ch. 965 (H.B. 2912), § 2.01, effective September 1, 2001; am. Acts 2005, 79th Leg., ch. 582 (H.B. 1609), § 1, effective September 1, 2005.

**NOTES:**

Applicability. --

Acts 2005, 79th Leg., ch. 582 (H.B. 1609), § 6 provides: "The changes in law made by this Act to Sections 361.0666(a), *361.0791(a) and (b)*, *361.082(d),* and *361.534, Health and Safety Code, apply* only to an application that is filed on or after the effective date of this Act.  An application that was filed before the effective date of this Act is governed by the former law, and that law is continued in effect for that purpose."

2005 amendment,

in (a), substituted "may hold" for "shall hold," and deleted the second sentence, which read: "The meeting must be held before the 45th day after the date the application is filed."

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 8



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.067*   (2014)

§ 361.067.   Review of Permit Application by Other Governmental Entities

   (a) If the commission determines that a permit application submitted to it is administratively complete, it shall mail a copy of the application or a summary of its contents to:

        (1) the mayor and health authority of a municipality in whose territorial limits or extraterritorial jurisdiction the solid waste facility is located; and

        (2) the county judge and the health authority of the county in which the facility is located.

   (b) A governmental entity to whom the information is mailed shall have a reasonable time, as prescribed by the commission, to present comments and recommendations on the permit application before the commission acts on the application.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 11.42, effective September 1, 1995.


**LexisNexis 50 State Surveys, Legislation & Regulations**

        Solid Waste Management

# TAB 9



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.079*   (2014)

§ 361.079.   Notice Concerning Receipt of Permit Application; Hearing Procedures

   (a) Except as provided by Sections 361.080(b) and 361.081(c), the commission by rule shall establish procedures for public notice and a public hearing under Section 361.080 or 361.081.

   (b) The hearings shall be conducted in accordance with the hearing rules and the applicable provisions of Chapter 2001, Government Code.

   (c) To improve the timeliness of notice to the public of a public hearing under Section 361.080 or 361.081, public notice of receipt of the permit application shall be provided at the time a permit application is submitted to the commission.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1990, 71st Leg., 6th C.S., ch. 10 (S.B. 43), art. 2, § 13(b), effective September 6, 1990; am. Acts 1991, 72nd Leg., ch. 296 (S.B. 1099), § 1.03, effective June 7, 1991; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), §§ 5.95(49), 11.45, effective September 1, 1995.

**LexisNexis 50 State Surveys, Legislation & Regulations**

      Solid Waste Management

# TAB 10



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.0791*   (2014)

§ 361.0791.   Public Meeting and Notice Requirement

   (a) Notwithstanding other law, the commission may hold a public meeting on an application for a new hazardous waste management facility in the county in which the proposed hazardous waste management facility is to be located. The commission may hold a public meeting on an application for a Class 3 modification or a major amendment to an existing facility's hazardous waste permit.

   (b) Notwithstanding other law, the commission may hold a public meeting on an application for a new municipal solid waste management facility in the county in which the proposed municipal solid waste management facility is to be located.

   (c) A public meeting held as part of a local review process under Section 361.063 meets the requirement of Subsection (a) or (b) if notice is provided as required by this section.

   (d) A public meeting under this section is not a contested case hearing under Chapter 2001, Government Code.

   (e) If a meeting is required under Subsection (a), not less than once each week during the three weeks preceding a public meeting, the applicant shall publish notice of the meeting in the newspaper of the largest general circulation that is published in the county in which the proposed facility is to be located or, if no newspaper is published in the county, in a newspaper of general circulation in the county. The applicant shall provide the commission an affidavit certifying that the notice was given as required by this section. Acceptance of the affidavit creates a rebuttable presumption that the applicant has complied with this section.

   (f) The published notice may not be smaller than 96.8 square centimeters or 15 square inches with the shortest dimension at least 7.6 centimeters or three inches and shall contain, at a minimum, the following information:

      (1) the permit application number;

      (2) the applicant's name;

      (3) the proposed location of the facility; and

      (4) the location and availability of copies of the permit application.

(g) The applicant shall pay the cost of notice required to be provided under this section. The commission by rule may establish procedures for payment of those costs.

**HISTORY:** Enacted by Acts 1991, 72nd Leg., ch. 296 (S.B. 1099), § 1.04, effective June 7, 1991; am. Acts 1993, 73rd Leg., ch. 802 (H.B. 2043), § 3, effective June 18, 1993; am. Acts 1993, 73rd Leg., ch. 1044 (S.B. 639), § 3, effective June 20, 1993; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), §§ 5.95(49), 11.46, effective September 1, 1995; am. Acts 2005, 79th Leg., ch. 582 (H.B. 1609), § 2, effective September 1, 2005.

**NOTES:**

2005 amendment,
substituted "may hold" for "shall hold" in (a) and (b); and rewrote the second sentence in (a), which read: "The commission, on request of a person affected or as otherwise required by commission rule, shall hold a public meeting on an application for a Class 3 modification or a major amendment to an existing facility's hazardous waste permit."

LexisNexis (R) Notes:

LAW REVIEWS

1. *47 SMU L. Rev. 1131,* Environmental Law, Spring, 1994.

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 11



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.081*   (2014)

§ 361.081.   Notice of Hearing Concerning Application for a Solid Waste Facility

   (a) The commission shall require the applicant to mail notice to each residential or business address located within one-half mile of a new solid waste management facility and to each owner of real property located within one-half mile of a new solid waste management facility listed in the real property appraisal records of the appraisal district in which the solid waste management facility is sought to be permitted as of the date the commission determines the permit application is administratively complete. The notice must be sent by mail and must be deposited with the United States postal service not more than 45 days or less than 30 days before the date of the hearing.

   (b) The applicant must certify to the commission that the mailings were deposited as required by Subsection (a). Acceptance of the certification creates a rebuttable presumption that the applicant has complied with this section. Substantial compliance with the notice requirements of Subsection (a) is sufficient for the commission to exercise jurisdiction over an application for a solid waste facility.

   (c) In addition to the requirements of Subsection (a), the commission shall hold a public meeting and the applicant shall give notice concerning the application for a permit for a new hazardous waste management facility as provided by Section 361.0791.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1990, 71st Leg., 6th C.S., ch. 10 (S.B. 43), art. 2, § 13(c), effective September 6, 1990; am. Acts 1991, 72nd Leg., ch. 296 (S.B. 1099), § 1.06, effective June 7, 1991; am. Acts 1993, 73rd Leg., ch. 802 (H.B. 2043), § 4, effective June 18, 1993; am. Acts 1993, 73rd Leg., ch. 1044 (S.B. 639), § 4, effective June 20, 1993; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), § 11.47, effective September 1, 1995.

LexisNexis (R) Notes:

LAW REVIEWS

1. *47 SMU L. Rev. 1131,* Environmental Law, Spring, 1994.

**LexisNexis 50 State Surveys, Legislation & Regulations**

    Solid Waste Management

# TAB 12



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

HEALTH AND SAFETY CODE
TITLE 5.   SANITATION AND ENVIRONMENTAL QUALITY
SUBTITLE B.   SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND WATER
CHAPTER 361.   SOLID WASTE DISPOSAL ACT
SUBCHAPTER C.   PERMITS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Health & Safety Code § 361.089*   (2014)

§ 361.089.   Permit Denial or Amendment; Notice and Hearing

   (a) The commission may, for good cause, deny or amend a permit it issues or has authority to issue for reasons pertaining to public health, air or water pollution, or land use, or for having a compliance history that is classified as unsatisfactory according to commission standards under *Sections 5.753 and 5.754, Water Code*, and rules adopted and procedures developed under those sections.

   (b) Except as provided by Section 361.110, the commission shall notify each governmental entity listed under Section 361.067 and provide an opportunity for a hearing to the permit holder or applicant and persons affected. The commission may also hold a hearing on its own motion.

   (c) The commission by rule shall establish procedures for public notice and any public hearing under this section.

   (d) Hearings under this section shall be conducted in accordance with the hearing rules adopted by the commission and the applicable provisions of Chapter 2001, Government Code.

   (e) The commission may deny an original or renewal permit if it is found, after notice and hearing, that:

      (1) the applicant or permit holder has a compliance history that is classified as unsatisfactory according to commission standards under *Sections 5.753 and 5.754, Water Code*, and rules adopted and procedures developed under those sections;

      (2) the permit holder or applicant made a false or misleading statement in connection with an original or renewal application, either in the formal application or in any other written instrument relating to the application submitted to the commission, its officers, or its employees;

      (3) the permit holder or applicant is indebted to the state for fees, payment of penalties, or taxes imposed by this title or by a rule of the commission; or

      (4) the permit holder or applicant is unable to ensure that the management of the hazardous waste management facility conforms or will conform to this title and the rules of the commission.

   (f) Before denying a permit under this section, the commission must find:

(1) that the applicant or permit holder has a compliance history that is classified as unsatisfactory according to commission standards under *Sections 5.753 and 5.754, Water Code*, and rules adopted and procedures developed under those sections; or

(2) that the permit holder or applicant is indebted to the state for fees, payment of penalties, or taxes imposed by this title or by a rule of the commission.

(g) For purposes of this section, the terms "permit holder" and "applicant" include each member of a partnership or association and, with respect to a corporation, each officer and the owner or owners of a majority of the corporate stock, provided such partner or owner controls at least 20 percent of the permit holder or applicant and at least 20 percent of another business which operates a solid waste management facility.

**HISTORY:** Enacted by Acts 1989, 71st Leg., ch. 678 (H.B. 2136), § 1, effective September 1, 1989; am. Acts 1991, 72nd Leg., ch. 296 (S.B. 1099), § 1.11, effective June 7, 1991; am. Acts 1995, 74th Leg., ch. 76 (S.B. 959), §§ 5.95(49), 11.52, effective September 1, 1995; am. Acts 1997, 75th Leg., ch. 1072 (S.B. 1876), § 30, effective September 1, 1997; am. Acts 2001, 77th Leg., ch. 965 (H.B. 2912), § 16.12, effective September 1, 2001; am. Acts 2011, 82nd Leg., ch. 1021 (H.B. 2694), § 4.24, effective September 1, 2011.

**NOTES:**

2011 amendment,
substituted "classified as unsatisfactory according to commission standards" for "in the lowest classification" in (a), (e)(1), and (f)(1).

LexisNexis (R) Notes:


CASE NOTES


1. Texas Commission on Environmental Quality did not abuse its discretion in approving the expansion of a municipal solid-waste landfill to increase the height of allowable waste disposal by 50 to 75 feet from its existing height of 720 feet, despite odors affecting the neighbors, because odor was not a specifically delineated factor for land-use-compatibility determinations in *30 Tex. Admin. Code § 330.61*, .53. *Northeast Neighbors Coalition v. Tex. Comm'n on Envtl. Quality, 2013 Tex. App. LEXIS 4064 (Tex. App. Austin Mar. 28 2013).*


2. Texas Commission on Environmental Quality did not abuse its discretion in approving the expansion of a municipal solid-waste landfill to increase the height of allowable waste disposal by 50 to 75 feet from its existing height of 720 feet, despite odors affecting the neighbors, because odor was not a specifically delineated factor for land-use-compatibility determinations in *30 Tex. Admin. Code § 330.61*, .53. *Northeast Neighbors Coalition v. Tex. Comm'n on Envtl. Quality, 2013 Tex. App. LEXIS 4064 (Tex. App. Austin Mar. 28 2013).*


**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 13

HEALTH AND SAFETY CODE

TITLE 5. SANITATION AND ENVIRONMENTAL QUALITY

SUBTITLE B. SOLID WASTE, TOXIC CHEMICALS, SEWAGE, LITTER, AND
WATER

CHAPTER 361. SOLID WASTE DISPOSAL ACT

SUBCHAPTER A. GENERAL PROVISIONS

SUBCHAPTER K. APPEALS;  JOINDER OF PARTIES

Sec. 361.321.  APPEALS.  (a)  A person affected by a
ruling, order, decision, or other act of the commission may
appeal the action by filing a petition in a district court of
Travis County.

(b)  A person affected by a ruling, order, decision, or
other act of a county, or of a political subdivision exercising
the authority granted by Section 361.165, may appeal by filing a
petition in a district court with jurisdiction in the county or
political subdivision.

(c)  Except as provided by Section 361.322(a), the petition
must be filed not later than the 30th day after the date of the
ruling, order, decision, or other act of the governmental entity
whose action is appealed.  Service of citation must be
accomplished not later than the 30th day after the date on which
the petition is filed.

(d)  The plaintiff shall pursue the action with reasonable
diligence. The court shall presume that the action has been
abandoned if the plaintiff does not prosecute the action within
one year after it is filed and shall dismiss the suit on a
motion for dismissal made by the governmental entity whose
action is appealed unless the plaintiff, after receiving notice,
can show good and sufficient cause for the delay.

(e)  Except as provided by Section 361.322(e), in an appeal
from an action of the commission, a county, or a political

subdivision exercising the authority granted by Section 361.165, the issue is whether the action is invalid, arbitrary, or unreasonable.

Acts 1989, 71st Leg., ch. 678, Sec. 1, eff. Sept. 1, 1989. Amended by Acts 1990, 71st Leg., 6th C.S., ch. 10, art. 2, Sec. 28, eff. Sept. 6, 1990;  Acts 1995, 74th Leg., ch. 76, Sec. 11.71, eff. Sept. 1, 1995.

# TAB 14



1 of 1 DOCUMENT

LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***
*** Federal case annotations: February 18, 2014 postings on Lexis ***
*** State case annotations: February 19, 2014 postings on Lexis ***

GOVERNMENT CODE
TITLE 10.   GENERAL GOVERNMENT
SUBTITLE A.   ADMINISTRATIVE PROCEDURE AND PRACTICE
CHAPTER 2001.   ADMINISTRATIVE PROCEDURE
SUBCHAPTER G.   CONTESTED CASES: JUDICIAL REVIEW

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Gov't Code § 2001.174*   (2014)

§ 2001.174.   Review Under Substantial Evidence Rule or Undefined Scope of Review

   If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

   (1) may affirm the agency decision in whole or in part; and

   (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

      (A) in violation of a constitutional or statutory provision;

      (B) in excess of the agency's statutory authority;

      (C) made through unlawful procedure;

      (D) affected by other error of law;

      (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

      (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**HISTORY:** Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993.

LexisNexis (R) Notes:

CASE NOTES

1. Texas Railroad Commission's rejection of a gas company's fee assessment against residents of outlying areas was not supported by substantial evidence because the Commission's order did not satisfy requirements for findings of fact. *CenterPoint Energy Entex v. R.R. Comm'n, 213 S.W.3d 364, 2006 Tex. App. LEXIS 3518 (Tex. App. Austin 2006).*

2. In an appeal arising from a dispute over a highway construction contract between a contractor and the Texas Department of Transportation, the decision of the Department's executive director to reject an administrative law judge's (ALJ's) proposed findings based on credibility was arbitrary and capricious and an abuse of discretion where the ALJ, not the executive director, heard the testimony and observed the demeanor of the witnesses, and where the executive director failed to comply with *Tex. Transp. Code Ann. § 201.112(c)* by not providing a written statement for each individual change to the ALJ's findings of fact and conclusions of law that explained his rationale for each change, and his changes to particular findings and conclusions proposed by the ALJ suggested he was acting as the Department's factfinder, despite the legislature having delegated that responsibility to the ALJ in § 201.112(b). By failing to comply with the requirement to provide a written statement containing the reason and legal basis for changing the ALJ's findings and conclusions, the executive director's decision in his final order raised serious due process concerns, and without knowing on what facts the executive director relied to make his finding of credible evidence, there was no rational connection between the facts and his decision. *Jordan Paving Corp. v. Tex. DOT, 2009 Tex. App. LEXIS 3878 (Tex. App. Austin June 3 2009).*

3. Trial court erred in finding that a notice of an enforcement action hearing before the Texas Alcoholic Beverage Commission (TABC) was ineffective because evidence that the TABC sent the notice to the licensee at the address indicated in the TABC's records and that it received a signed green card in return was substantial evidence under *Tex. Alco. Bev. Code Ann. § 11.67(b)* and *Tex. Gov't Code Ann. § 2001.174(2)* for the TABC's finding that the licensee had actual notice; the agency was entitled to resolve conflicts in the evidence, and, here, the evidence could have supported a finding either way. The trial court impermissibly substituted its judgment for that of the agency as the agency's resolution of the issues of any "address problems" and the green card signature was not unreasonable. *Tex. Alcoholic Bev. Comm'n v. Aga Trading, Inc., 2009 Tex. App. LEXIS 7842 (Tex. App. Houston 14th Dist. Oct. 8 2009).*

4. Substantial evidence in the record supported the Texas Natural Resource Conservation Commission's finding that a landfill owner's expansion application was administratively and technically complete because the owner had included all necessary information in the application, and while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information, and the opponents to the application did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Because the application was determined to be administratively and technically complete prior to the contested case hearing, the owner was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality, 169 S.W.3d 258, 2005 Tex. App. LEXIS 3583 (Tex. App. Austin 2005).*

5. Trial court did not err in reversing the county civil service commission's holding that the suspended employee could be suspended as the constable's failure to show up at a hearing implicated the suspended employee's substantial rights and prejudiced him; suspended employee was entitled to have an order entered, pursuant to the civil service commission's own rules, nullifying the entire action against him. *Bexar County Civ. Serv. Comm'n v. Casals, 63 S.W.3d 57, 2001 Tex. App. LEXIS 6561 (Tex. App. San Antonio 2001).*

6. Substantial evidence existed to support administrative law judge's findings that widow was excluded from receiving benefits under insurance policy when evidence showed her dead husband was driving truck that overturned, killing

himself and a passenger, and, if husband had survived, he would have been charged with manslaughter. *Nobles v. Employees Ret. Sys. of Tex., 53 S.W.3d 483, 2001 Tex. App. LEXIS 4997 (Tex. App. Austin 2001).*

7. Pursuant to *Tex. Gov't Code Ann. § 2001.174(2)(F)*, the Board of Trustees for the Employees Retirement System of Texas (ERS) acted arbitrarily and capriciously and abused its discretion in terminating a disability retiree's occupational disability retirement benefits, resulting in the retiree's substantial rights being prejudiced, because due process and fundamental principals of fairness dictated that the Board should have provided meaningful notice to the retiree before applying its new 80 percent threshold standard in *34 Tex. Admin. Code § 73.17*, which construed *Tex. Gov't Code Ann. § 814.208(d)*, to his post disability earnings to terminate his benefits; being advised of the Board's construction of "comparable pay" to include its 80 percent threshold standard at the hearing was not sufficient notice to satisfy due process concerns, and a 2005 letter advising the retiree that his benefits had been terminated similarly was not sufficient, and, thus, prior to his hearing, the retiree did not have meaningful notice that earning 80 percent of his adjusted final annual state salary could cause his benefits to be terminated. *Patton v. Employees Ret. Sys. of Tex., 2007 Tex. App. LEXIS 9901 (Tex. App. Austin Dec. 19 2007).*

8. Granting of a certificate of convenience and necessity to the power and light company was proper where the application adequately addressed the factors of probable improvement of service or lowering of costs to consumers; further, the evidence supported that the individuals had notice of ex parte communications and an opportunity to address them, *Tex. Gov't Code Ann. §§ 2001.061*, *2001.174*. *Hammack v. PUC, 2003 Tex. App. LEXIS 8980 (Tex. App. Austin Oct. 23 2003),* opinion withdrawn by, substituted opinion at *131 S.W.3d 713, 2004 Tex. App. LEXIS 3396 (Tex. App. Austin 2004).*

9. In an appeal arising from a dispute over a highway construction contract between a contractor and the Texas Department of Transportation, the decision of the Department's executive director to reject an administrative law judge's (ALJ's) proposed findings based on credibility was arbitrary and capricious and an abuse of discretion where the ALJ, not the executive director, heard the testimony and observed the demeanor of the witnesses, and where the executive director failed to comply with *Tex. Transp. Code Ann. § 201.112(c)* by not providing a written statement for each individual change to the ALJ's findings of fact and conclusions of law that explained his rationale for each change, and his changes to particular findings and conclusions proposed by the ALJ suggested he was acting as the Department's factfinder, despite the legislature having delegated that responsibility to the ALJ in § 201.112(b). By failing to comply with the requirement to provide a written statement containing the reason and legal basis for changing the ALJ's findings and conclusions, the executive director's decision in his final order raised serious due process concerns, and without knowing on what facts the executive director relied to make his finding of credible evidence, there was no rational connection between the facts and his decision. *Jordan Paving Corp. v. Tex. DOT, 2009 Tex. App. LEXIS 3878 (Tex. App. Austin June 3 2009).*

10. By expressly excluding a decision on a disqualification for a foul from appeal, Tex. *Rev. Civ. Stat. Ann. art. 179e*, § 3.08(b) makes other decisions on disqualification of racehorses appealable by implication; thus, an owner whose horses were disqualified for wearing the wrong saddle cloth numbers had a right to an administrative appeal, and his request for declaratory relief under *Tex. Civ. Prac. & Rem. Code Ann. § 37.004* fell within the ultra vires exception to sovereign immunity. The trial court lacked subject matter jurisdiction to make further rulings on the merits until the owner exhausted administrative remedies as provided in Tex. *Rev. Civ. Stat. Ann. art. 179e*, §§ 3.02, 3.08 and *Tex. Gov't Code Ann. § 2001.174. Tex. Racing Comm'n v. Marquez, 2011 Tex. App. LEXIS 6653 (Tex. App. Austin Aug. 19 2011).*

11. Agency was in violation of takings clause when it ordered what amounted to a physical taking of appellant's cables and facilities; the order was beyond the authority of the agency, thus the court was statutorily required under *Tex. Gov't*

*Code Ann. § 2001.174(2)(B)* to reverse or remand the cause in order to prevent the impairment of substantial rights of the complaining party. *Gte S.W., Inc. v. Puc, 10 S.W.3d 7, 1999 Tex. App. LEXIS 5199 (Tex. App. Austin 1999).*

12. Texas Railroad Commission's rejection of a gas company's fee assessment against residents of outlying areas was not supported by substantial evidence because the Commission's order did not satisfy requirements for findings of fact. *CenterPoint Energy Entex v. R.R. Comm'n, 213 S.W.3d 364, 2006 Tex. App. LEXIS 3518 (Tex. App. Austin 2006).*

13. Text of 30 Tex. Admin. Code § 330.56(d)(4)(J) is clear, but even if the court found that the text of this rule was ambiguous, the court had to to give serious deference to the agency's reasonable interpretation. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

14. *16 Tex. Admin. Code § 25.263(l)(3)* was held to be invalid as it was inconsistent with the legislature's intent, expessed in Tex. Util. Code Ann. ch. 39 of the Texas Public Utility Regulatory Act, that utilities could fully recover their net, verifiable, nonmitigable stranded costs incurred in purchasing power and providing electric generation service, that existed on the last day of the freeze period (December 31, 2001). A two- or three-year gap in recovery of carrying costs would not have permitted the companies full recovery of their stranded costs as the legislature envisioned. *Centerpoint Energy, Inc. v. PUC of Tex., 2004 Tex. LEXIS 540, 47 Tex. Sup. Ct. J. 672 (Tex. 2004),* opinion withdrawn by, substituted opinion at *143 S.W.3d 81, 2004 Tex. LEXIS 881, 47 Tex. Sup. Ct. J. 1156 (Tex. 2004).*

15. Enforced suspension of appellee's pharmacist license by the Texas State Board of Pharmacy concurrently with the suspension of her North Carolina license resulted from the improper application of a "rule" as that term was defined in the Administrative Procedure Act (APA), *Tex. Gov't Code Ann. § 2001.003(6).* The Board's informally announced reciprocal-sanctions policy was invalid under *Tex. Gov't Code Ann. § 2001.174(2),* because it not adopted in accordance with the APA's rulemaking procedures. *Tex. State Bd. of Pharm. v. Witcher, 2013 Tex. App. LEXIS 5482 (Tex. App. Austin May 3 2013).*

16. *Tex. Occ. Code Ann. § 1051.703(a)* of the Architecture Practice Act did not categorically preclude licensed engineers from preparing comprehensive building plans and specifications for the class of public works projects identified in that section, nor did *Tex. Occ. Code Ann. § 1051.601* categorically exempt licensed engineers from the Act's requirements. Instead, the enforcement matter at issue depended on whether preparation of the engineers' particular building plans and specifications was within the scope and practice of engineering as defined by the Engineering Practice Act; because the record was insufficiently developed to determine that issue as a matter of law, summary disposition was not appropriate, and therefore the district court did not abuse its discretion in reversing the Board's decision and remanding the case for further proceedings. *Winton v. Tex. Bd. of Architectural Examiners (in re Rogers), 390 S.W.3d 377, 2011 Tex. App. LEXIS 6110 (Tex. App. Austin 2011).*

17. Basis of the business owner's declaratory-judgment action was simply that the Texas Department of Licensing and Regulation (Department) had no authority to regulate eyebrow threading because eyebrow threading did not constitute the practice of cosmetology, and although she presented several constitutional arguments as to how the Department's actions affected her individually, she made no broad constitutional challenge to the entire statutory scheme; her constitutional arguments could be asserted under the Administrative Procedure Act (APA), and because the relief the owner sought under the Uniform Declaratory Judgment Act would be considered "redundant" of her APA judicial-review claim, she failed to invoke the district court's subject-matter jurisdiction to grant such relief, and the district court should have dismissed those claims. *Kuntz v. Khan, 2010 Tex. App. LEXIS 7252 (Tex. App. Austin Aug. 31 2010).*

18. *Tex. Gov't Code Ann. § 2001.174* expressly authorizes courts reviewing agency decisions to affirm in whole or in part, and requires courts to reverse or remand for further proceedings when an agency's errors deprive a party of sub-

stantial rights; an affirmance in part with a remand necessarily implies that the issues affirmed are resolved and that the remaining issues will be disposed of in some other way; otherwise, if a remand to an agency necessarily meant that all issues were subject to being re-litigated, there would be no point in the court affirming any portion of the agency ruling and no reason for the legislature to have included affirmance in part as an option for the court. *Freightliner Corp. v. Motor Vehicle Bd. of the Tex. DOT, 255 S.W.3d 356, 2008 Tex. App. LEXIS 3191 (Tex. App. Austin 2008).*

19. While *Tex. Gov't Code Ann. § 2001.174(2)* requires a reviewing court to reverse or remand a case for further proceedings in the face of agency error, it must be read in conjunction with *Tex. Gov't Code Ann. § 2001.174(1)*; reading these two sections together, a court does not construe *Tex. Gov't Code Ann. § 2001.174(2)* as a limitation on the court's ability in *Tex. Gov't Code Ann. § 2001.174(1)* to affirm an agency decision in whole or in part; instead, a reviewing court may affirm part of an agency's order while also reversing part of that same order. *Granek v. Tex. State Bd. of Med. Examiners, 2008 Tex. App. LEXIS 2025 (Tex. App. Austin Mar. 19 2008).*

20. Remand for further administrative proceedings was proper under the primary jurisdiction doctrine after a trial court erred in denying a manufacturer's plea to the jurisdiction in a dealership transfer case; however, the remand order could not require the agency to act. *Ford Motor Co. v. Butnaru, 157 S.W.3d 142, 2005 Tex. App. LEXIS 465 (Tex. App. Austin 2005).*

21. Pursuant to *Tex. Water Code Ann. §§ 11.021(a), 11.022, 11.121,* and *11.046(c),* the Texas Commission on Environmental Quality incorrectly concluded that the city's effluent remained private groundwater that could be diverted without an appropriation permit; notwithstanding the city's stated intent not to abandon its effluent, the physical reality of the city's reuse project was that the effluent was abandoned to the public domain once the city discharged it into the San Marcos River where it was admittedly commingled and diluted by that state watercourse. *City of San Marcos v. Tex. Comm'n on Envtl. Quality, 128 S.W.3d 264, 2004 Tex. App. LEXIS 96 (Tex. App. Austin 2004).*

22. In applying *Tex. Gov't Code Ann. § 2001.174(2)(D),* the parties agreed that the reviewing court based its decision on an event which occurred after the ALJ rendered her decision. The statute encompassed events occurring after rendition of the ALJ's decision. *Tex. Dep't of Pub. Safety v. Story, 115 S.W.3d 588, 2003 Tex. App. LEXIS 6040 (Tex. App. Waco 2003).*

23. According to *Tex. Gov't Code Ann. § 2001.174(2),* if the reviewing court finds any of the six categories of error listed and determines that such error prejudiced the substantial rights of the party seeking review, the court must reverse or remand the case for further proceedings; this means that the reviewing court may reverse the administrative law judge's decision and render judgment in favor of the party seeking review, or reverse the ALJ's decision and remand the cause for further proceedings. *Tex. Dep't of Pub. Safety v. Story, 115 S.W.3d 588, 2003 Tex. App. LEXIS 6040 (Tex. App. Waco 2003).*

24. *Tex. Gov't Code Ann. § 2001.174(2)(D)* provides a catchall ground for reversal or remand to provide a remedy for one who has suffered an adverse administrative determination affected by some legal error other than those described in the other subcategories; such other error could conceivably occur during the administrative proceedings or afterward. *Tex. Dep't of Pub. Safety v. Story, 115 S.W.3d 588, 2003 Tex. App. LEXIS 6040 (Tex. App. Waco 2003).*

25. Trial court remanded for reconsideration the penalty of cancelling a bar's mixed beverage and late hours permits because two of the grounds for revocation of the license were not supported by substantial evidence, the determination did not require further evidence, and the appellate court found that the agency did not abuse its discretion in denying an evidentiary hearing pursuant to *Tex. Gov't Code Ann. § 2001.174(2). Allen-Burch, Inc. v. Tex. Alcoholic Bev. Comm'n, 104 S.W.3d 345, 2003 Tex. App. LEXIS 3945 (Tex. App. Dallas 2003).*

26. Trial court was not authorized to reverse and vacate the public utilities commission's order where the commission exceeded its statutory authority in conducting transmission cost of service proceedings; rather, the trial court should have reversed and remanded the commission's order. *PUC of Tex. v. City Pub. Serv. Bd. of San Antonio, 2003 Tex. App. LEXIS 3475 (Tex. App. Austin Apr. 24 2003),* opinion withdrawn by, substituted opinion at *109 S.W.3d 130, 2003 Tex. App. LEXIS 4933 (Tex. App. Austin 2003).*

27. Business owner could not bring claims for declaratory relief under *Tex. Civ. Prac. & Rem. Code Ann. § 37.004* against state agency regarding practicing cosmetology without a license as the owner had already sought judicial review of the agency decision under *Tex. Gov't Code Ann. § 2001.174*; the remedy would be redundant as the basis for both claims was that eyebrow threading did not fall within the definition of cosmetology in *Tex. Occ. Code Ann. § 1602.002(a)*, a proper basis for a claim for judicial review under *Tex. Gov't Code Ann. § 2001.174(2)(A) & (B)*. *Kuntz v. Khan, 2011 Tex. App. LEXIS 446 (Tex. App. Austin Jan. 21 2011).*

28. Declaratory judgment action against the Texas State Board of Public Accountancy claiming that the Board's standards and principles were so unconstitutionally vague that they did not sufficiently identify what constituted a violation was redundant as auditors, who had their professional certificates revoked or suspended, had filed an administrative appeal under *Tex. Occ. Code Ann. § 901.556(a). Tex. State Bd. of Pub. Accountancy v. Bass, 2011 Tex. App. LEXIS 294 (Tex. App. Austin Jan. 14 2011).*

29. By refusing to strike the Edwards Aquifer Authority's jury demand and setting landowners' appeal of the Authority's permitting decision for a jury trial, a trial court failed to apply the law correctly and fundamentally altered the nature of the judicial review prescribed by statute because the Authority had a clear right to proceed to a final determination without a jury, pursuant to *Tex. Water Code Ann. § 36.253* and *Tex. Gov't Code Ann. § 2001.174* and *Tex. Gov't Code Ann. § 2001.175(e). In re Edwards Aquifer Auth., 217 S.W.3d 581, 2006 Tex. App. LEXIS 8934 (Tex. App. San Antonio 2006).*

30. *Tex. Water Code Ann. § 36.253* expressly incorporates *Tex. Gov't Code Ann. § 2001.174* and makes it applicable to appeals from orders made by groundwater districts. *In re Edwards Aquifer Auth., 217 S.W.3d 581, 2006 Tex. App. LEXIS 8934 (Tex. App. San Antonio 2006).*

31. Under *Tex. Gov't Code Ann. § 2001.174*, the appellate court had to reverse when a substantial right had been prejudiced because the administrative decision was affected by an error of law; the administrative law judge erred in applying the law to the facts as she found them where no necessity justification existed at the time of the driver's arrest because his drive back to the scene was not in avoidance of any imminent harm. *Tex. Dep't of Pub. Safety v. Moore, 175 S.W.3d 270, 2004 Tex. App. LEXIS 4401 (Tex. App. Houston 1st Dist. 2004).*

32. In a medical license suspension case, the court erred by denying a doctor's motion for rehearing because the doctor timely filed a motion for rehearing giving the Board fair notice that he was dissatisfied with its conclusions that he failed to practice medicine in a manner consistent with public health and welfare and failed to treat a patient according to the generally accepted standard of care. *Johnson v. Tex. Med. Bd., 2010 Tex. App. LEXIS 845 (Tex. App. Austin Feb. 5 2010).*

33. Examiner's recommendations constitute a part of 'the record as a whole" that is the object of judicial review when a court considers substantial-evidence questions under *Tex. Gov't Code Ann. § 2001.174*, and may be considered in light of the pertinent evidence; but such recommendations are only entitled to such value as they intrinsically command when agency decisionmakers depart from them. *Exxon Corp. v. Railroad Comm'n, 993 S.W.2d 704, 1999 Tex. App. LEXIS 1818, 142 Oil & Gas Rep. 165 (Tex. App. Austin 1999).*

34. Pursuant to the former Texas Administrative Procedure and Texas Register Act, Tex. Rev. Civ. Stat. Ann. § 19(e)(5), the evidence was sufficient for the Texas Water Commission (Commission) to deny applicant permits to construct and operate a hazardous waste facility, where the applicant proposed to store hazardous slurry in a salt dome cavern, where the applicant could not guarantee that the slurry would maintain proper contact with the cavern walls, where the salt dome was structurally unstable, and where tow aquifers were located above the salt dome. *United Resource Recovery, Inc. v. Water Comm'n, 815 S.W.2d 797, 1991 Tex. App. LEXIS 2034 (Tex. App. Austin 1991).*

35. Trial court's provision of the alcohol permit application number in its judgment and finding that there was no late hours application did not constitute "judgment" within the meaning of former Tex. Rev. Civ. Stat. Ann. art. 6252-13a (now *Tex. Gov't Code Ann. § 2001.174*); the trial court's action did not constitute a substitution of its judgment for that of the County Judge, who had acted in an administrative capacity in reviewing an application for beer and wine licenses. *Alegria v. Texas Alcoholic Beverage Comm'n., 731 S.W.2d 723, 1987 Tex. App. LEXIS 7422 (Tex. App. Houston 14th Dist. 1987).*

36. Though a suspension hearing for a dentist's license contained some irregularities, especially the in and out presence of the overseeing board's members who were involved in decision-making regarding the dentist's license, the appeals court upheld the board's determination to suspend the dentist's license for two years in the absence of a demonstration that there was no substantial justice and fair play; former Tex. Rev. Civ. Stat. Ann. art. 6252-13A, § 19(e) (now *Tex. Gov't Code Ann. § 2001.174*) required reversal if there was unlawful procedure resulting in prejudice to substantial rights. *Blankfield v. Texas State Bd. of Dental Exmrs., 1985 Tex. App. LEXIS 6216 (Tex. App. Houston 1st Dist. Feb. 14 1985).*

37. Because it was unclear whether Texas law would allow plaintiff landowners' inverse condemnation suit for a regulatory groundwater taking, and they had not pursued compensation in state court, their Fifth Amendment takings claim against defendant water district's directors was not ripe and was dismissed without prejudice. *Coates v. Hall, 512 F. Supp. 2d 770, 2007 U.S. Dist. LEXIS 17168 (W.D. Tex. 2007).*

38. In an appeal concerning a rate supervision order issued by the Texas Commissioner of Insurance, which revoked an insurer's ability to file and use its insurance rates without prior approval from the Texas Department of Insurance, there was nothing in the order to suggest that it was not a final, completed agency action, where the only means of challenging the Commissioner's supervision order was to seek judicial review of the order, and, accordingly, the appellate court and the district court had jurisdiction to address the insurer's claims under Tex. Ins. Code Ann. ch. 36. Furthermore, several of the insurer's claims--that the actions for which the Commissioner placed it under supervision were not "rating practices," that the supervision order was arbitrary and capricious, that the Commissioner acted outside his authority in issuing the supervision order, and that its due process rights were violated--did not require review of an administrative record, and all were authorized grounds for reversal or remand of a decision under the Administrative Procedure Act, *Tex. Gov't Code Ann. §§ 2001.051-.178. Texas Dep't of Ins. v. State Farm Lloyds, 260 S.W.3d 233, 2008 Tex. App. LEXIS 5563 (Tex. App. Austin 2008).*

39. Remand for further administrative proceedings was proper under the primary jurisdiction doctrine after a trial court erred in denying a manufacturer's plea to the jurisdiction in a dealership transfer case; however, the remand order could not require the agency to act. *Ford Motor Co. v. Butnaru, 157 S.W.3d 142, 2005 Tex. App. LEXIS 465 (Tex. App. Austin 2005).*

40. When providing an independent right to judicial review in *Tex. Gov't Code Ann. § 2001.171* of the Texas Administrative Procedure Act, the legislature has necessarily understood that state agencies will be sued in court by persons exercising that right, that contested-case decisions of those agencies will be judicially reviewed under the standards set forth in *Tex. Gov't Code Ann. § 2001.174*, and that the challenged administrative decisions will be either affirmed, reversed, or remanded as provided by § 2001.174. Therefore, *Tex. Gov't Code Ann. § 2001.171* provides a limited waiver of sovereign immunity. *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc., 145 S.W.3d 170, 2004 Tex. LEXIS 780, 47 Tex. Sup. Ct. J. 1116 (Tex. 2004).*

41. Reviewing court has no authority under former Tex. Rev. Civ. Stat. Ann. art. 6252-13a § 19(e) or § 19(d)(2) (now *Tex. Gov't Code Ann. § 2001.174*) to retain jurisdiction of an appeal after it has already determined that errors of the administrative agency have substantially prejudiced the rights of the appellant. *Railroad Comm'n. v. Home Transp. Co., 654 S.W.2d 432, 1983 Tex. LEXIS 326, 26 Tex. Sup. Ct. J. 564 (Tex. 1983).*

42. Though a suspension hearing for a dentist's license contained some irregularities, especially the in and out presence of the overseeing board's members who were involved in decision-making regarding the dentist's license, the appeals court upheld the board's determination to suspend the dentist's license for two years in the absence of a demonstration that there was no substantial justice and fair play; former Tex. Rev. Civ. Stat. Ann. art. 6252-13A, § 19(e) (now *Tex. Gov't Code Ann. § 2001.174*) required reversal if there was unlawful procedure resulting in prejudice to substantial rights. *Blankfield v. Texas State Bd. of Dental Exmrs., 1985 Tex. App. LEXIS 6216 (Tex. App. Houston 1st Dist. Feb. 14 1985).*

43. Because *Tex. Gov't Code Ann. § 2001.174* prohibits a court from substituting its judgment for a state agency's judgment on the weight of the evidence on questions committed to agency discretion, the trial court did not have the authority to reduce the Texas Alcoholic Beverage Commission's sanction suspending the bar's permit. *CJSA, Ltd. v. Texas Alcoholic Bev. Comm'n, 2001 Tex. App. LEXIS 1674 (Tex. App. San Antonio Mar. 14 2001).*

44. Under the Administrative Procedure Act, specifically *Tex. Gov't Code Ann. § 2001.174*, a reviewing court acts in an appellate capacity and may not substitute its judgment for that of the agency. *Cash Am. Int'l, Inc. v. Bennett, 35 S.W.3d 12, 2000 Tex. LEXIS 82, 43 Tex. Sup. Ct. J. 1047 (Tex. 2000).*

45. There is no provision in *Tex. Gov't Code Ann. § 2001.174(2)* for a reviewing court to render a different judgment from an administrative law judge's (ALJ) decision or to modify an order of the *ALJ. Tex. Dep't of Pub. Safety v. Hudson, 2012 Tex. App. LEXIS 1148 (Tex. App. Dallas Feb. 13 2012).*

46. Group claimed, for purposes of *Tex. Gov't Code Ann. § 2001.174(2)(E)*, that its substantial rights had been prejudiced by the addition of extra groundwater monitoring wells, but the court did not see how the group was harmed by the adoption of a permit that provided more monitoring than was required; the company's groundwater-monitoring system as originally submitted, without additional monitoring, complied with *30 Tex. Admin. Code § 330.231(a). City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

47. Court could not see how a group's rights were prejudiced by the addition of extra groundwater-monitoring wells to monitor a stratum that was not required to be monitored, and the Texas Commission on Environmental Quality has the authority, under *Tex. Gov't Code Ann. §§ 2001.060, 2001.062(d)*, 30 Tex. Admin. Code § 80.259, and case law, to add special provisions to municipal-solid-waste permits after the evidentiary hearing has concluded so long as the decision to add the special provisions does not prejudice substantial rights. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

48. Record contained evidence regarding groundwater flow that a reasonable mind could accept as supporting the conclusion that the flow was north-northeast, and absent prejudice to the group's substantial rights, reversal of the order was not warranted. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

49. Driver's license suspension was proper because the facts established probable cause that the licensee was operating a motor vehicle in a public place while intoxicated for purposes of *Tex. Transp. Code Ann. § 724.042*; witnesses at an accident scene reported that a pickup had rear-ended another vehicle and driven away, a license plate at the scene was matched to the licensee's pickup, which was later found abandoned with front end damage, and according to the licensee's wife, the licensee called her to pick him up near the site of the abandoned pickup. After the wife drive the licensee to the sheriff's office, a trooper and others observed the licensee and detected an odor of an alcoholic beverage on his breath. *Tex. Dep't of Pub. Safety v. Allen, 2011 Tex. App. LEXIS 4268 (Tex. App. Amarillo June 3 2011).*

50. There was sufficient evidence for the administrative judge to uphold the suspension of the driver's license, because the driver was speeding and veering back and forth, an odor of alcohol emanated from inside the car, the driver's eyes

were bloodshot and glassy, the driver's speech was slurred, the driver was unable to complete the one-leg-stand test and he exhibited six clues of intoxication on the walk-and-turn test, and the driver displayed clues of intoxication on the horizontal gaze nystagmus test and the vertical nystagmus test. *Tex. Dep't of Pub. Safety v. Williams, 303 S.W.3d 356, 2009 Tex. App. LEXIS 9708 (Tex. App. El Paso 2009).*

51. Court erred in agreeing with the Texas Department of Insurance that self-funded plans were not insurers under Texas law, because the stop-loss insurance was reinsurance, when the companies did not make coverage decisions with respect to individuals insured by the plans and had no contractual relationship with the individuals insured by the plans and could not be sued by them, all losses were handled by the plans and then sent to the companies for indemnification, and since the stop-loss insurance sold to self-funded plans was reinsurance, *28 Tex. Admin. Code §§ 3.4002* and 3.4004(e)(2)(J) and former Tex. Ins. Code Ann. art. 3.42 did not apply to the companies. *Am. Nat'l Ins. Co. v. Tex. Dep't of Ins., 2009 Tex. App. LEXIS 9647 (Tex. App. Austin Dec. 16 2009).*

52. For purposes of *Tex. Transp. Code Ann. § 724.042*, there was substantial evidence to support the administrative law judge's findings that probable cause existed to stop and arrest a driver, that probable cause existed to believe that he was operating a motor vehicle in a public place while intoxicated, and that he was placed under arrest and was requested to submit to the taking of a breath specimen and refused to do so; thus, the trial court erred to the extent it substituted its judgment for the administrative law judge on those matters, for purposes of *Tex. Gov't Code Ann. § 2001.174*, and the error prejudiced the Texas Department of Public Safety's substantial rights. The court affirmed the suspension of the driver's license by the administrative law judge. *Tex. Dep't of Pub. Safety v. Woods, 2009 Tex. App. LEXIS 6133 (Tex. App. Austin Aug. 6 2009).*

53. Administrative suspension of an operator's license was not subject to reversal based on a clerical error made by an administrative law judge (ALJ) because it did not affect an operator's substantial rights; the ALJ relied on an improper date of arrest. *Tex. Dep't of Pub. Safety v. Gonzales, 276 S.W.3d 88, 2008 Tex. App. LEXIS 7985 (Tex. App. San Antonio 2008).*

54. Motorist was incorrect that, because the trial court made no findings or conclusions, its decision had to be affirmed on any theory finding support in the evidence. Reviewing courts reviewing administrative decisions, like the suspension of the motorist's license under *Tex. Transp. Code Ann. § 724.042*, had to comply with *Tex. Gov't Code Ann. § 2001.174*. *Tex. Dep't of Pub. Safety v. Perkins, 2004 Tex. App. LEXIS 10833 (Tex. App. Houston 1st Dist. Dec. 2 2004).*

55. In connection with a hearing to review the suspension of a motorist's driver's license, the motorist failed to object to the introduction of an officer's report on the ground that the officer was absent, and thus, the motorist waived this issue, but assuming that a supervisor's report and intoxilyzer record were improperly admitted, the admission of the officer's report rendered any such error harmless because the primary source of the evidence relevant to and supporting the factual issues before the administrative law judge was the officer's report. Most of the information in the supervisor's report and intoxilyzer record was also reported in the officer's report, and thus the motorist was not prejudiced by the error, if any, pursuant to *Tex. Gov't Code Ann. § 2001.174. Reisel v. Tex. Dep't of Pub. Safety, 2004 Tex. App. LEXIS 8596 (Tex. App. San Antonio Sept. 29 2004).*

56. Trial court did not err in limiting a state medical board of examiner's consideration to the administrative law judge record on remand; the instructions did not conflict with the provision of *Tex. Gov't Code Ann. § 2001.174* of the Administrative Procedure Act, *Tex. Gov't Code Ann. §§ 2001.001-.902. Tex. State Bd. of Med. Examiners v. Dunn, 2003 Tex. App. LEXIS 9833 (Tex. App. Austin Nov. 20 2003).*

57. Because contested-case hearings before the Motor Vehicle Board of the Texas Department of Transportation are heard under the APA without a specified standard of review, the substantial evidence rule applies under *Tex. Gov't Code Ann. § 2001.174. BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

58. Under *Tex. Gov't Code Ann. § 2001.174*, an appellate court reviews the legal conclusions of the Motor Vehicle Board of the Texas Department of Transportation for errors of law, and the court reviews the board's findings of fact for support by substantial evidence. *BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

59. Appellate review under *Tex. Gov't Code Ann. § 2001.174(f)*, ensures that an agency does not act arbitrarily or without regard to the facts. *BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

60. Administrative error will not be grounds for reversal or remand unless the appellant's substantive rights have been prejudiced under *Tex. Gov't Code Ann. § 2001.174(2).. BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

61. When the trial court entertains a suit for judicial review of a department of insurance decision that is brought under *Tex. Ins. Code Ann. §§ 36.201-.05* and *Tex. Gov't Code Ann. §§ 2001.171*,.174, the trial court is authorized to reverse the case under *Tex. Gov't Code Ann. § 2001.174(2)(A)* and (D), if the agency's findings, inferences, conclusions, or decisions are characterized by abuse of discretion, in violation of a statutory provision, or affected by another error of law. *Serv. Lloyds Ins. Co. v. Montemayor, 108 S.W.3d 454, 2003 Tex. App. LEXIS 4318 (Tex. App. Austin 2003).*

62. To secure a reversal a party needs to show that the agency committed an error of law and relating prejudice to the appellant's substantial rights under *Tex. Gov't Code Ann. § 2001.174*; where there is an error of law, it does not necessarily follow that there is also demonstrable prejudice to substantial rights. *DOT v. Jones Bros. Dirt & Paving Contrs., 24 S.W.3d 893, 2000 Tex. App. LEXIS 4920 (Tex. App. Austin 2000),* reversed by *92 S.W.3d 477, 2002 Tex. LEXIS 101, 45 Tex. Sup. Ct. J. 937 (Tex. 2002).*

63. In reviewing administrative license suspension decisions under the substantial evidence standard in *Tex. Transp. Code Ann. § 524.041* and *Tex. Gov't. Code Ann. § 2001.174*, the reviewing court may not substitute its judgment for that of the agency. The issue for the court is not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action as shown by a "scintilla" of evidence. *Mireles v. Texas Dep't of Pub. Safety, 9 S.W.3d 128, 1999 Tex. LEXIS 125, 43 Tex. Sup. Ct. J. 169 (Tex. 1999).*

64. The Administrative Procedure Act (Act), *Tex. Gov't Code Ann. § 2001.174*, which empowered the Board of Trustees of the Employees Retirement System of Texas to prepare coverage specifications made under the Act, was construed in a manner that entitled the trustees' interpretation of policy exclusions to be given judicial respect regarding any uncertainty where the interpretation was reasonable; the finding that an optometrist's "vision therapy treatments" fell within the policy exclusion of "orthoptics or visual training" was held to be reasonable. *McMullen v. Employees Retirement Sys., 935 S.W.2d 189, 1996 Tex. App. LEXIS 5142 (Tex. App. Austin 1996).*

65. Administrative law judge (ALJ) did not err in quashing the driver's subpoena of the arresting officer in the administrative license suspension proceeding, because the ALJ's application of the 150-mile limit in *Tex. R. Civ. P. 176.3* was not an abuse of discretion; the ALJ was expressly authorized to consider the *Texas Rules of Civil Procedure. Hodge v. Tex. Dep't of Pub. Safety, 2012 Tex. App. LEXIS 10526 (Tex. App. Houston 1st Dist. Dec. 20 2012).*

66. Because coalition members' property was along the creek in close proximity to the dairy in question, discharges into water would impact them differently from the general public; to the extent the Texas Commission on Environmental Quality's denial of the coalition's hearing request was based on an implied determination that the dairy's contributions of waste to the creek under the amended permit would have no impact on water quality, the denial was an abuse of discretion. *Bosque River Coalition v. Tex. Comm'n on Envtl. Quality, 347 S.W.3d 366, 2011 Tex. App. LEXIS 6043 (Tex. App. Austin 2011).*

67. Texas Commission on Environmental Quality's conclusion that a coalition was not an affected person was made through improper procedure, was affected by error of law, and was an abuse of discretion under *Tex. Gov't Code Ann. § 2001.174(2)(C)*, (D), (F); the court reversed. *Bosque River Coalition v. Tex. Comm'n on Envtl. Quality, 347 S.W.3d 366, 2011 Tex. App. LEXIS 6043 (Tex. App. Austin 2011).*

68. When the trial court entertains a suit for judicial review of a department of insurance decision that is brought under *Tex. Ins. Code Ann. §§ 36.201-.05* and *Tex. Gov't Code Ann. §§ 2001.171*,.174, the trial court is authorized to reverse

the case under *Tex. Gov't Code Ann. § 2001.174(2)(A)* and (D), if the agency's findings, inferences, conclusions, or decisions are characterized by abuse of discretion, in violation of a statutory provision, or affected by another error of law. *Serv. Lloyds Ins. Co. v. Montemayor, 108 S.W.3d 454, 2003 Tex. App. LEXIS 4318 (Tex. App. Austin 2003).*

69. Since the Texas Legislature had expressed no intent that the Texas Department of Public Safety (DPS) be penalized for the failure of an officer to submit a report within the five-day deadline of *Tex. Transp. Code Ann. § 724.032(c)(4)*, the failure of an officer to comply with the statute did not render the report inadmissible at an administrative hearing, and the judgment that the evidence was insufficient to authorize suspension of the driver's license was reversed and remanded because the erroneous exclusion of exhibits prejudiced the DPS's substantial rights since the administrative law judge denied the DPS the opportunity to satisfy its evidentiary burden at the license suspension hearing. *Tex. Dep't of Pub. Safety v. Kimbrough, 106 S.W.3d 747, 2003 Tex. App. LEXIS 3566 (Tex. App. Fort Worth 2003).*

70. Under the Administrative Procedure Act, specifically *Tex. Gov't Code Ann. § 2001.174*, a reviewing court acts in an appellate capacity and may not substitute its judgment for that of the agency. *Cash Am. Int'l, Inc. v. Bennett, 35 S.W.3d 12, 2000 Tex. LEXIS 82, 43 Tex. Sup. Ct. J. 1047 (Tex. 2000).*

71. Public Utility Commission was arbitrary and capricious in deciding not to allow rate-case expenses from earlier proceedings without prior Commissioner approval where it departed from prior Commission practice without explaining the reason for its change in position, made findings of fact and conclusions of law without adequate support in the record, and failed to give notice before the hearing of its intention to implement a new requirement. *Oncor Elec. Delivery Co. Llc v. PUC of Tex., 406 S.W.3d 253, 2013 Tex. App. LEXIS 7334 (Tex. App. Austin 2013).*

72. Public Utility Commission of Texas' finding that it was appropriate to limit the amount that the telecommunications provider should refund to the amount of overcharges to the county hospital district and order a partial refund was arbitrary and capricious, *16 Tex. Admin. Code § 26.27*; l]this imitation prejudiced the substantial rights of the district, *Tex. Gov't Code Ann. § 2001.174(2). Harris County Hosp. Dist. v. PUC of Tex., 2012 Tex. App. LEXIS 5707 (Tex. App. Austin July 13 2012).*

73. Texas Commission on Environmental Quality's findings did not conflict with its decision to grant a landfill permit, the company complied with rule requirements of the rule, and conclusions that the proposed groundwater-monitoring system would adequately monitor the groundwater and will protect the groundwater, human health, and the environment was also arbitrary or capricious. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

74. Texas Commission on Environmental Quality (TCEQ) was required to make findings that supported its determinations that the statutory requirements, for purposes of *Tex. Health & Safety Code Ann. § 361.002* and *Tex. Gov't Code Ann. § 2001.141(b)*, (d), for approving a permit application had been met, and TCEQ made 200 findings supporting its decision to grant the permit; given this, and that substantial evidence supported a finding that there were no springs near the proposed landfill, the court would have subjected the order to a hypertechnical standard of review if the court found the order to be arbitrary and capricious because TCEQ failed to make a negative finding of fact concerning the existence of springs. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

75. To the extent the Texas Commission on Environmental Quality denied a coalition's hearing request based on the premise that an amended permit would be more protective of the environment than the current one, the Commission acted arbitrarily by relying on a factor that was irrelevant to the standing of the coalition's to obtain a hearing. *Bosque River Coalition v. Tex. Comm'n on Envtl. Quality, 347 S.W.3d 366, 2011 Tex. App. LEXIS 6043 (Tex. App. Austin 2011).*

76. Because the court did not find that *28 Tex. Admin. Code § 134.1* was vague, the court overruled an operator's claims that the application or misapplication of § 134.1 to its reimbursement claim caused the final order rejecting its claim to be arbitrary and based on an error of law, for purposes of *Tex. Gov't Code Ann. § 2001.174(2)(D)*, (F). *Vista Healthcare, Inc. v. Tex. Mut. Ins. Co., 324 S.W.3d 264, 2010 Tex. App. LEXIS 7046 (Tex. App. Austin 2010).*

77. In a highway construction contract dispute, although *Tex. Transp. Code Ann. § 201.112* gave the executive director of the Texas Department of Transportation broad discretion to make changes to the proposed findings of fact and conclusions of law of the administrative law judge (ALJ), the executive director could not ignore the evidence; where the ALJ, and not the executive director, heard the testimony and observed the demeanor of the witnesses, and in the absence of independent evidence in the record to support the executive director's credibility choice, the executive director's decision to reject the ALJ's findings based on credibility was arbitrary and capricious under *Tex. Gov't Code Ann. § 2001.174. State v. Mid-South Pavers, Inc., 246 S.W.3d 711, 2007 Tex. App. LEXIS 9905 (Tex. App. Austin 2007).*

78. Doctor's due process rights were not violated when the State Board of Medical Examiners revoked his license because the record failed to show that the presence of two doctors that served on the disciplinary panel unduly influenced the Board's final decision and there was no record that ex parte communications took place; further, the Board's conclusions were not arbitrary or capricious under *Tex. Gov't Code Ann. § 2001.174* where there was no evidence that the Board based its decision on peer review evidence pursuant to *Tex. Occ. Code Ann. § 151.003(2)* or that the doctor was harmed by such evidence under *Tex. R. App. P. 44.1. Chalifoux v. Tex. State Bd. of Med. Examiners, 2006 Tex. App. LEXIS 9598 (Tex. App. Austin Nov. 1 2006).*

79. Decision of the Texas State Board of Medical Examiners to revoke a doctor's license was not arbitrary or capricious under *Tex. Gov't Code Ann § 2001.174(2)(F)*; there was no evidence that the Board considered peer-review evidence in reaching its final decision, and its conclusions were explicitly based on its findings and the evidence presented at the hearing. *Chalifoux v. Tex. State Bd. of Med. Exam'rs, 2006 Tex. App. LEXIS 4738 (Tex. App. Austin June 2 2006).*

80. Professional disciplinary action against a doctor, based on stale allegations of improper touching of a female patient's breasts, resulted in a due process violation that caused actual prejudice to the doctor's substantial rights, and the action was therefore arbitrary and capricious under *Tex. Gov't Code Ann. § 2001.174(2)(A)*; staleness was not a significant concern as to another patient's complaints, however, because contemporaneous documentary evidence of the complaints existed. *Granek v. Tex. State Bd. of Med. Exam'rs, 172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

81. Appellate review under *Tex. Gov't Code Ann. § 2001.174(f)*, ensures that an agency does not act arbitrarily or without regard to the facts. *BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

82. Trial court was not free to substitute its judgment for the judgment of the prison, through its disciplinary commission, on the weight of the evidence, and, thus, the disciplinary conviction and fine imposed on the inmate for the damage the inmate caused to state property during a riot had to be upheld because the hearing captain's finding the inmate committed the damage was not arbitrary or capricious. Warriner v. Tex. Dep't of Crim. Justice - *Institutional Div., 2002 Tex. App. LEXIS 6410 (Tex. App. Corpus Christi Aug. 29 2002).*

83. Appellate court must reverse an order of the Texas Railroad Commission if the commission's action was arbitrary, capricious, or an abuse of discretion pursuant to *Tex. Gov't Code Ann. § 2001.174*. An agency decision is arbitrary when its final order denies parties due process of law or fails to demonstrate a connection between the agency decision and the factors that are made relevant to that decision by the applicable statutes and regulations; a court reviewing a decision for arbitrariness should consider all relevant factors and may not substitute its judgment for that of the agency. *Occidental Permian, Ltd. v. R.R. Comm'n, 47 S.W.3d 801, 2001 Tex. App. LEXIS 3583, 149 Oil & Gas Rep. 321 (Tex. App. Austin 2001).*

84. Under the Administrative Procedure Act, specifically *Tex. Gov't Code Ann. § 2001.174*, a reviewing court acts in an appellate capacity and may not substitute its judgment for that of the agency. *Cash Am. Int'l, Inc. v. Bennett, 35 S.W.3d 12, 2000 Tex. LEXIS 82, 43 Tex. Sup. Ct. J. 1047 (Tex. 2000).*

85. Under the Texas Administrative Procedures Act, *Tex. Gov't Code Ann. § 2001.174(2)*, the trial court has the authority to reverse an agency determination if it finds that the substantive rights of the appellant are prejudiced due to a constitutional or statutory violation, the decision was made unlawfully or affected by an error of law, not supported by sub-

stantial evidence, or was found to be arbitrary or capricious. *Dep't of Pub. Safety v. Breazeale, 1999 Tex. App. LEXIS 7131 (Tex. App. Houston 14th Dist. Sept. 23 1999).*

86. Courts are entitled to review agency decisions under the former Administrative Procedure and Texas Register Act, *Tex. Rev. Civ. Stat. Ann. art. 6252-13a § 19 (e)*, and may reverse an administrative order if it lacks substantial evidence supporting it or if it is arbitrary and capricious. *City of Alvin v. Public Util. Comm'n, 876 S.W.2d 346, 1993 Tex. App. LEXIS 2381 (Tex. App. Austin 1993).*

87. Order of the Texas Railroad Commission, directing appellant company to backfill and compact certain sludge pits and to dispose of all oil or oil by-products located in them, was not arbitrary and capricious under former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(6) because the fact that appellant controlled the pits for 23 years was not legally irrelevant, nor was it inherently arbitrary to proceed against only appellant even though other potentially liable parties existed; while the pits had been conveyed to appellant by a corporation that had disposed of sludge in the pits, and appellant subsequently had released its interest in the pits to another party, the harm caused by the joint tortfeasors was indivisible, and thus the Commission could choose to proceed against only one of them. *Lone Star Salt Water Disposal Co. v. Railroad Comm'n, 800 S.W.2d 924, 1990 Tex. App. LEXIS 3123, 115 Oil & Gas Rep. 166 (Tex. App. Austin 1990).*

88. Utility commission's failure to set forth findings of fact and conclusions of law in its rate order, as required by the Administrative Procedure and Texas Register Act, Tex. *Rev. Civ. Stat. Ann. art. 16(b)*, constituted an arbitrary and capricious omission. *Consumers Water, Inc. v. Public Util. Comm'n., 774 S.W.2d 719, 1989 Tex. App. LEXIS 2127 (Tex. App. Austin 1989).*

89. Trial court erred by reversing dentistry board's order revoking dentist license because the members of the board were in a better position to determine the relevance and materiality of the State's expert witness than the reviewing judge unendowed with evaluation evidence or expertise. *Board of Dental Exmrs. v. Silagi, 766 S.W.2d 280, 1989 Tex. App. LEXIS 207 (Tex. App. El Paso 1989).*

90. While the Administrative Procedures Act is deferential toward agency decisions and expressly prohibits a reviewing court from substituting its own judgment for the decision of the state agency on questions committed to agency discretion, questions of law are not left to agency discretion and are therefore subject to de novo review under *Tex. Gov't Code Ann. § 2001.174 DOT v. Jones Bros. Dirt & Paving Contrs., 24 S.W.3d 893, 2000 Tex. App. LEXIS 4920 (Tex. App. Austin 2000),* reversed by *92 S.W.3d 477, 2002 Tex. LEXIS 101, 45 Tex. Sup. Ct. J. 937 (Tex. 2002).*

91. Texas Commission on Environmental Quality violated *Tex. Health & Safety Code Ann. § 361.0832(f)* and exceeded its statutory authority by failing to explain in its order why it rejected the administrative law judge's findings that all of the landfill's operations be conducted during the recommended operating hours, Heritage on the San Gabriel Homeowners Ass?n v. *Tex. Comm'n on Envtl. Quality, 393 S.W.3d 417, 2012 Tex. App. LEXIS 10767 (Tex. App. Austin 2012).*

92. Basis of the business owner's declaratory-judgment action was simply that the Texas Department of Licensing and Regulation (Department) had no authority to regulate eyebrow threading because eyebrow threading did not constitute the practice of cosmetology, and although she presented several constitutional arguments as to how the Department's actions affected her individually, she made no broad constitutional challenge to the entire statutory scheme; her constitutional arguments could be asserted under the Administrative Procedure Act (APA), and because the relief the owner sought under the Uniform Declaratory Judgment Act would be considered "redundant" of her APA judicial-review claim, she failed to invoke the district court's subject-matter jurisdiction to grant such relief, and the district court should have dismissed those claims. *Kuntz v. Khan, 2010 Tex. App. LEXIS 7252 (Tex. App. Austin Aug. 31 2010).*

93. Under the administrative rule, the company's programs, including those funded with the settlement money, were programs implemented under that rule, and the Public Utility Commission, by limiting the company's bonus based on

the specific source of funds expended on the programs, adopted an interpretation that was contrary to the rule, such that the court reversed. *Centerpoint Energy Houston Elec., Llc v. PUC of Tex., 408 S.W.3d 910, 2013 Tex. App. LEXIS 10363 (Tex. App. Austin 2013).*

94. Texas Commission of Licensing and Regulation complied with *Tex. Gov't Code Ann. § 2001.058(e)* by specifying the reason and legal basis for its modifications to the ALJ's findings and conclusions and its decision was supported by substantial evidence and made through lawful procedure. *Tex. Gov't Code Ann. §§ 2001.058(e)*, .174; the Commission expressly addressed and made findings in its decisions to the statutory factors in the *Occupation Code. Tex. Dep't of Licensing & Regulation v. Thompson, 2013 Tex. App. LEXIS 8832 (Tex. App. Austin July 18 2013).*

95. In an administrative license suspension proceeding, substantial evidence supported the judge's decision that a trooper had reasonable suspicion to stop the driver's vehicle because he was committing a traffic offense by driving a vehicle whose taillamps failed to illuminate the rear license plate. *Tex. Dep't of Pub. Safety v. Flanagan, 2014 Tex. App. LEXIS 1713 (Tex. App. Austin Feb. 14 2014).*

96. Substantial evidence supported the decision of the Texas Insurance Commissioner revoking an insurance agent's license, because he engaged in fraudulent acts or practices with regard to the sale of universal leases and unauthorized annuity transactions. *Zaal v. Tex. Dep't of INS., 2013 Tex. App. LEXIS 13296 (Tex. App. Austin Oct. 29 2013).*

97. Administrative Procedure Act provisions governing substantial-evidence did not authorize monetary relief sought by a workers' compensation insurance carrier against a health care provider relating to stop-loss reimbursement, and monetary relief had not been awarded incident to reversing and remanding an administrative order. *Vista Med. Ctr. Hosp. v. Tex. Mut. INS. Co., 416 S.W.3d 11, 2013 Tex. App. LEXIS 12172 (Tex. App. Austin 2013).*

98. ALJ's administrative decision was supported by substantial evidence and the record demonstrated some reasonable basis for the ALJ's action. and the County Court at Law improperly re-weighed the evidence and substituted its judgment for that of the ALJ when the driver appealed from the ALJ's administrative determination. *Tex. Dep't of Pub. Safety v. Castro, 406 S.W.3d 782, 2013 Tex. App. LEXIS 9107 (Tex. App. El Paso 2013).*

99. Texas Alcoholic Beverage Commission properly suspended the licensee's alcoholic beverage permit and license for five days, because substantial evidence supported the conclusion that the third party was an employee, agent, or servant for purposes of establishing a violation of *Tex. Alco. Bev. Code Ann. § 104.01(4)*, when the focus was whether there was substantial evidence to support the determination that the third party was an employee, agent, or servant for purposes of establishing a violation. *Villatoro v. Tex. Alcoholic Bev. Comm'n, 2013 Tex. App. LEXIS 6780 (Tex. App. Dallas June 3 2013).*

100. Administrative law judge's finding that the deputy had reasonable suspicion to stop the driver was not reasonably supported by substantial evidence and therefore it erred by suspending the driver's license under *Tex. Transp. Code Ann. §§ 524.022*, .041, because the evidence only showed that the driver was observed driving slowly on a highway at 1:40 a.m; the record was silent regarding the deputy's training and experience and was silent as to the characteristics of the area in which the driver was observed driving. In addition, there was no evidence that the deputy stopped the driver because he was concerned for her safety, as there was no evidence she was alone in her vehicle, that there were any other vehicles sharing the roadway with the driver, or that driving slowly was inherently unsafe; the deputy stated in his report that he had reasonable suspicion to contact that driver only because he observed her vehicle traveling 40 m.p.h. in a 65 m.p.h. posted zone. *Peters v. Tex. Dep't of Pub. Safety, 404 S.W.3d 1, 2013 Tex. App. LEXIS 2798 (Tex. App. Houston 1st Dist. 2013).*

101. In a case relating to the revocation of a doctor's license, a finding that a kyphoplasty constituted a "spine surgery" was reasonably supported by substantial evidence where there was testimony from other physicians that the procedure constituted a surgery. The doctor's performance of this procedure violated an agreed order whereby he was prohibited

from being present at or performing "spine surgery." *Baker v. Tex. Med. Bd., 2013 Tex. App. LEXIS 1259 (Tex. App. Austin Feb. 6 2013).*

102. Trial court erred by reversing the administrative decision allowing the suspension of the driver's license because substantial evidence supported that decision, as the officer testified multiple times that he saw the driver on the road and then enter the parking lot and that he saw the driver in the vehicle's driver's seat when it was parked under a light in the parking lot; when the driver approached the officer, he saw that the driver was intoxicated and therefore had reasonable suspicion or probable cause to detain the driver and administer field sobriety tests. The officer's report, which bore the seal and signature of the Texas Department of Public Safety's custodian of records, corroborated the officer's testimony that the driver did not provide a breath sample on request and that he refused to provide a post-arrest breath sample. *Tex. Dep't of Pub. Safety v. Perez, 2013 Tex. App. LEXIS 659 (Tex. App. Corpus Christi Jan. 24 2013).*

103. Where a subcontractor filed a claim alleging that unforeseen conditions caused it to incur additional costs to complete foundation drilling work on a highway construction contract, substantial evidence under *Tex. Gov't Code Ann. § 2001.174(2)(E)* supported the Texas Department of Transportation's decision that (1) the site conditions were not significantly different; (2) the contract provided that casing was required to prevent caving and water intrusion; and therefore, (3) the subcontractor was not entitled to damages. *Granite Constr. Co. v. Tex. DOT, 2012 Tex. App. LEXIS 9706 (Tex. App. Austin Nov. 20 2012).*

104. Agreed Final Judgment purported to find facts (that the city had met the criteria for issuance of a permit) and to render judgment granting a permit, and *Tex. Gov't Code Ann. § 2001.174* did not empower courts to take such action, which went beyond their limited authority in a substantial-evidence review, and having concluded that there was error prejudicing substantial rights of the city's, the court's only options were to reverse or remand the case for further proceedings; accordingly, the district court's Agreed Final Judgment, which had the effect of rendering a specific judgment, contravened the direct restriction on the special statutory jurisdiction delegated to the court in its substantial-evidence review, and because the judgment violated the separation-of-powers doctrine of the Texas Constitution, *Tex. Const. art. II, § 1*, it was void and its rendition was fundamental error. *Save Our Springs Alliance, Inc. v. City of Kyle, 382 S.W.3d 540, 2012 Tex. App. LEXIS 7548 (Tex. App. Austin 2012).*

105. Group's substantial rights were not prejudiced by the addition of the special provision to the landfill application, because the appellate court could not see how the group had been harmed by the Texas Commission on Environmental Quality adopting a permit that provided more groundwater monitoring than was required by the administrative rules, when the permit not only satisfied the rules' requirements that groundwater from the uppermost aquifer be monitored, as it must, but it also provided for extra monitoring of groundwater that the evidence showed was not in the uppermost aquifer. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 5243 (Tex. App. Austin June 28 2012).*

106. Trial court exceeded its authority when it modified an administrative law judge's (ALJ) decision that a driver's license was suspended for 2 years under *Tex. Transp. Code Ann. § 724.035(a)* and stated that the suspension was for 180 days. *Tex. Dep't of Pub. Safety v. Hudson, 2012 Tex. App. LEXIS 1148 (Tex. App. Dallas Feb. 13 2012).*

107. Both the administrative law judge and the Texas Commission on Environmental Quality agreed that an aquifer was a regional one, and the conclusion was supported by substantial evidence. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

108. There was sufficient evidence for the Texas Commission on Environmental Quality to find that a company met the requirements in its search for springs and there were none in the landfill's vicinity. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

109. Texas Commission on Environmental Quality (TCEQ) was required to make findings that supported its determinations that the statutory requirements, for purposes of *Tex. Health & Safety Code Ann. § 361.002* and *Tex. Gov't Code Ann. § 2001.141(b)*, (d), for approving a permit application had been met, and TCEQ made 200 findings supporting its decision to grant the permit; given this, and that substantial evidence supported a finding that there were no springs near the proposed landfill, the court would have subjected the order to a hypertechnical standard of review if the court found the order to be arbitrary and capricious because TCEQ failed to make a negative finding of fact concerning the existence

of springs. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

110. Although a group was correct that a company did not raise adding a special provision to its groundwater monitoring plan until after the proposal for decision had been submitted, and thus the company did not formally introduce the provision, the court's task was to review the order of the Texas Commission on Environmental Quality to see if substantial evidence supported the order, considering the evidence in the record as a whole, for purposes of *Tex. Gov't Code Ann. § 2001.174(2)(E)*; the administrative law judge considered the provision in reaching findings and conclusions, such that the provision was part of the record as a whole under *Tex. Gov't Code Ann. § 2001.060(1)*, (2), (5), (6). *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

111. Even if the court assumed the record contained no evidence regarding a special provision, the court could reverse on substantial-evidence grounds if a group's substantial rights were prejudiced under *Tex. Gov't Code Ann. § 2001.174(2)*, but the group failed to show this. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 1108 (Tex. App. Austin Feb. 10 2012).*

112. Insurance agent's license was properly revoked because the insurance agent's statement to clients that when they wanted out of a universal lease program, a leasing agent would buy back the timeshare for the amount of the investment proved to be untrue; substantial evidence under *Tex. Gov't Code Ann. § 2001.174(2)(E)* supported the finding that the insurance agent acted recklessly with respect to the truth or falsity of the representations. *Meyer v. Tex. Dep't of Ins., 2011 Tex. App. LEXIS 9270 (Tex. App. Austin Nov. 23 2011).*

113. Legislature granted the Texas State Board of Medical Examiners (Board) the power to protect the public interest by regulating those physicians who were granted the privilege of practicing medicine, *Tex. Occ. Code Ann. § 151.003*; the legislature also provided that the Board's decision to revoke a physician's license was subject to the substantial-evidence standard of review, *Tex. Gov't Code Ann. § 2001.174*, and the lack of a trial de novo (either a bench or jury trial) for license-revocation appeals by physicians was rationally related to the legitimate governmental purpose of conservation of judicial resources. *Scally v. Tex. State Bd. of Med. Examiners, 351 S.W.3d 434, 2011 Tex. App. LEXIS 6117 (Tex. App. Austin 2011).*

114. Because a coalition never had the opportunity to develop an evidentiary record before the Texas Commission on Environmental Quality through contested-case or adjudicative processes, substantial-evidence review was inapplicable and unavailable. *Bosque River Coalition v. Tex. Comm'n on Envtl. Quality, 347 S.W.3d 366, 2011 Tex. App. LEXIS 6043 (Tex. App. Austin 2011).*

115. Court's use of the term "substantial-evidence review" in this opinion was intended in the narrower sense to refer only to a determination of whether the agency order was reasonably supported by substantial evidence considering the reliable evidence as a whole. *Bosque River Coalition v. Tex. Comm'n on Envtl. Quality, 347 S.W.3d 366, 2011 Tex. App. LEXIS 6043 (Tex. App. Austin 2011).*

116. Dismissal of the teacher's request for assault leave by the Texas Commissioner of Education was supported by substantial evidence, because the teacher submitted her request for assault leave under *Tex. Educ. Code Ann. § 22.003(b)* 720 days after the date of the incident, and reasonable minds could have reached the same conclusion; since the Texas Education Code did not expressly define the scope of judicial review of decisions made by the Texas Commissioner of Education, the substantial-evidence standard applied. *Poole v. Karnack Indep. Sch. Dist., 344 S.W.3d 440, 2011 Tex. App. LEXIS 3456 (Tex. App. Austin 2011).*

117. Substantial evidence under *Tex. Gov't Code Ann. § 2001.174* supported the administrative suspension of appellee's driver's license under *Tex. Transp. Code Ann. §§ 724.035*, *724.042*, because he was stopped for speeding, had trouble maintaining balance, refused to provide a breath or blood specimen, and admitted to ingesting hydrocodone, a controlled substance. *Tex. Dep't of Pub. Safety v. Greathouse, 2011 Tex. App. LEXIS 2119 (Tex. App. Waco Mar. 23 2011).*

118. Although the formal posture was an appeal of a transportation department order determining that its engineer did not commit gross error in denying a company additional compensation, to which the court applied the substantial evi-

dence standard under *Tex. Gov't Code Ann. § 2001.174*, these inquiries turned on pure questions of law that the court reviewed *de novo. Cce, Ltd. v. Tex. DOT, 2011 Tex. App. LEXIS 1587 (Tex. App. Austin Mar. 2 2011).*

119. Where a deputy observed a pickup truck make a right turn so wide that it caused the front driver's side tire to go onto the grassy area of the road, the deputy had reasonable suspicion to stop appellee's vehicle because he committed a traffic violation under *Tex. Transp. Code Ann. §§ 545.051(a), 545.101(a)*; based on the strong odor of an alcoholic beverage emitting from appellee, his admission that he was drinking beer, and his poor performance on field sobriety tests, the deputy had probable cause to arrest appellee for driving while intoxicated. Because the requirements of *Tex. Transp. Code Ann. § 524.035(a)(1)*, (2) were met, the Texas Department of Public Safety's decision to suspend appellee's driver's license was supported by substantial evidence under *Tex. Gov't Code Ann. § 2001.174. Tex. Dep't of Pub. Safety v. Garza, 2010 Tex. App. LEXIS 9523 (Tex. App. Corpus Christi Dec. 2 2010).*

120. Trial court erred in overturning an administrative decision suspending appellee's driver's license based on appellee's refusal to submit a breath specimen; the administrative law judge chose to credit the statements by the arresting officer in the officer's report over the testimony of appellee, and there was sufficient evidence in the record to support the findings as reasonable and supported by substantial evidence. *Tex. Dep't of Pub. Safety v. Gutierrez, 2010 Tex. App. LEXIS 7567 (Tex. App. San Antonio Sept. 15 2010).*

121. Suspension of a driver's license for refusal to submit to a breath test under *Tex. Transp. Code Ann. § 724.035* was supported by substantial evidence because even if the officer's sworn report was inadmissible under *Tex. R. Evid. 803(8)* based on a lack of a signature, the admissible evidence demonstrated the four elements required to uphold the suspension; that evidence included the DIC-24 form, under *Tex. Transp. Code Ann. § 724.032*, which indicated refusal to submit to the breath test and was signed by the driver. *Tex. Dep't of Pub. Safety v. Guajardo, 2010 Tex. App. LEXIS 6000 (Tex. App. Corpus Christi July 29 2010).*

122. Substantial evidence supported the suspension of the minor's driver's license, because the minor was properly advised of the consequences set forth under *Tex. Transp. Code Ann. § 724.015* and he voluntarily refused to submit a specimen at the officer's request, and since the officer was not required to give the minor the notice of suspension before requesting a specimen, any irregularity on the notice of suspension did not affect the voluntariness of the minor's refusal to submit a specimen for purposes of *Tex. Transp. Code Ann. § 724.042. Tex. Dep't of Pub. Safety v. Henson, 2010 Tex. App. LEXIS 3478 (Tex. App. Houston 14th Dist. May 11 2010).*

123. Motorist argued that at least one half of the license plate was working and that the officer could see the license plate when he turned on his headlights, and while the court could concede the rear license plate was barely illuminated, nothing suggested the plate was clearly legible at a distance of 50 feet from the rear under *Tex. Transp. Code Ann. § 547.322(f)*; the court does not rewrite the statute to say the plate must be legible if a police officer is driving behind a suspect with his lights on because the statute's purpose may also be to ensure officers on foot and potential witnesses are able to see the license plate, and in any event, even had the motorist presented conflicting evidence on this point, the court would still have been unable to disregard the administrative law judge's factual determinations, for purposes of *Tex. Gov't Code Ann. § 2001.174. Tex. Dep't of Pub. Safety v. Eller, 2009 Tex. App. LEXIS 8473 (Tex. App. Texarkana Nov. 4 2009).*

124. Trial court erred in finding that a notice of an enforcement action hearing before the Texas Alcoholic Beverage Commission (TABC) was ineffective because evidence that the TABC sent the notice to the licensee at the address indicated in the TABC's records and that it received a signed green card in return was substantial evidence under *Tex. Alco. Bev. Code Ann. § 11.67(b)* and *Tex. Gov't Code Ann. § 2001.174(2)* for the TABC's finding that the licensee had actual notice; the agency was entitled to resolve conflicts in the evidence, and, here, the evidence could have supported a finding either way. The trial court impermissibly substituted its judgment for that of the agency as the agency's resolution of the issues of any "address problems" and the green card signature was not unreasonable. *Tex. Alcoholic Bev. Comm'n v. Aga Trading, Inc., 2009 Tex. App. LEXIS 7842 (Tex. App. Houston 14th Dist. Oct. 8 2009).*

125. Driver was parked in his usual parking space behind the building where he worked, he did not have a foot on the brake and had not turned on the headlights, and the car was in park and the front seat was reclined to better accommodate him sleeping, and this would have made it difficult if not impossible for the driver to enable the vehicle's use for its intended purpose of driving, rather than a source of air conditioning; thus, the driver did not take an action to affect the

functioning of his vehicle in a manner that would enable the vehicle's use, such that the finding that probable cause existed to believe that the driver was operating his vehicle while intoxicated, for purposes of *Tex. Transp. Code Ann. § 724.042*, was not supported by substantial evidence, for purposes of *Tex. Gov't Code Ann. § 2001.174(2)*, and the court affirmed the reversal of the suspension of the driver's license under *Tex. Transp. Code Ann. § 724.035. Tex. Dep't of Pub. Safety v. Allocca, 2009 Tex. App. LEXIS 7039 (Tex. App. Austin Aug. 31 2009).*

126. Final order of the Public Utility Commission of Texas, which reconciled an electric utility company's eligible fuel expenses and revenues for a certain time period, was upheld on appeal as a reasonable remedy within the Commission's statutory authority; the Commission's final order was found to have reasonably required the utility company to account for all revenues it collected after December 31, 2001, that were directly attributable to the generation of electricity through that date, and reasonably required it to reconcile all fuel revenues it received and expenses it incurred after that date, to serve customers who were not yet switched to a retail electric provider; the Commission reconciliation methodology was found to have been proper and reasonably interpreted the Texas Legislature's directive to conduct a final reconciliation by accounting for all revenues associated with the expenses of providing bundled service during the reconciliation period; a reasonable basis existed for the Commission's decision to discount approximately $ 2.7 million in fuel costs and that the decision was supported by substantial evidence; and the Commission was found to have properly delineated and applied its reasonableness or prudence standard of review, which took into account, among other things, changes in the market. Aep Tex. N. Co. v. Public Util. Comm?n of *Tex., 297 S.W.3d 435, 2009 Tex. App. LEXIS 7064 (Tex. App. Austin 2009).*

127. Decision of an ALJ administratively suspending a driver's license was supported by substantial evidence, *Tex. Gov't Code Ann. § 2001.174(2)(E)*, including that it took the driver more than 20 seconds to get his door open and exit the car, he was swaying, had red, bloodshot eyes, had a strong odor of alcohol coming from his mouth, and admitted coming from a bar where he had had eight or nine drinks. *Tex. Dep't of Pub. Safety v. Dishman, 2009 Tex. App. LEXIS 3052 (Tex. App. San Antonio May 6 2009).*

128. Under the substantial evidence standard of review, it was determined that driving privileges were properly suspended because there was probable cause to believe that a driver was operating a motor vehicle in a public place under *Tex. Transp. Code Ann. § 724.042(2)(A)*; the public had unrestricted access to a private road, and it did not matter that travelers were infrequent or that the road had not been converted to a county road. *Tex. Dep't of Pub. Safety v. Castro, 2009 Tex. App. LEXIS 3198 (Tex. App. San Antonio Apr. 29 2009).*

129. Substantial evidence supported the Texas State Board of Dental Examiners' conclusion that the dentist practiced dentistry in a manner that constituted dishonorable conduct as defined in *22 Tex. Admin. Code Ann. § 108.9(6)* where the dentist offered to show a teenaged patient and her mother the scars on her breasts from surgery. *Tex. State Bd. of Dental Examiners v. Brown, 281 S.W.3d 692, 2009 Tex. App. LEXIS 2247 (Tex. App. Corpus Christi 2009).*

130. Texas State Board of Dental Examiners' conclusion that the dentist practiced dentistry in a manner that constituted dishonorable conduct as defined in *22 Tex. Admin. Code Ann. § 108.9(6)* was supported by the administrative law judge's findings that the dentist allowed her non-dentist employees to adjust occlusion on a patient's teeth and failed to keep adequate medical records where a patient's chart contained neither a written review of medical history, a medical exam, radiographs and findings, a treatment plan, or a written formal consent nor an explanation why that chart was incomplete. *Tex. State Bd. of Dental Examiners v. Brown, 281 S.W.3d 692, 2009 Tex. App. LEXIS 2247 (Tex. App. Corpus Christi 2009).*

131. Substantial evidence supported the Texas State Board of Dental Examiners' order that the dentist pay restitution to a patient as she improperly allowed her assistants to perform non-delegable dental work on the patient. The district court erred when it reversed the Board's restitution order because the Board did not make adjudicative findings contrary to the ALJ's findings. *Tex. State Bd. of Dental Examiners v. Brown, 281 S.W.3d 692, 2009 Tex. App. LEXIS 2247 (Tex. App. Corpus Christi 2009).*

132. Application approval did not violate both the laws of trespass and the constitutional restrictions against taking property without just compensation, because approving the application for authority to use a well to inject and dispose of salt water below the surface neither took property from the adjoining land owners nor authorized a trespass, and evi-

dence appeared of record supporting the ruling and the ruling comported with the law. *Berkley v. R.R. Comm'n of Tex., 282 S.W.3d 240, 2009 Tex. App. LEXIS 2312 (Tex. App. Amarillo 2009).*

133. While bloodshot eyes, an odor of alcohol, and unsteady balance were all symptoms of intoxication, those facts did not, without more, give rise to probable cause to believe the driver was driving while intoxicated. As the rest of the evidence did not support the conclusion that the driver was driving while intoxicated, the administrative law judge's decision to suspend the driver's operator's license was not reasonably supported by substantial evidence. *Tex. Dep't of Pub. Safety v. Gilfeather, 2009 Tex. App. LEXIS 1502 (Tex. App. Fort Worth Mar. 5 2009).*

134. Trial court erred in reversing an administrative law judge's (ALJ) decision to suspend a motorist's driver's license pursuant to *Tex. Transp. Code Ann. § 724.035*, after the motorist refused to give a breath specimen test, because there was substantial evidence supporting the administrative order as required by *Tex. Transp. Code Ann. § 524.041* and *Tex. Gov't Code Ann. § 2001.174*; a court may not substitute its judgment for that of the *ALJ. Tex. Dep't of Pub. Safety v. Escobedo, 2008 Tex. App. LEXIS 5651 (Tex. App. Corpus Christi July 29 2008).*

135. Judgment suspending driver's license for 180 days was affirmed where the totality of circumstances was substantial evidence of probable cause for the driver's arrest for driving while intoxicated. The record showed that the driver drove past a roadblock, that he had a strong alcoholic odor, that he had bloodshot eyes, that he admitted drinking an alcoholic beverage, that he was extremely argumentative, and that he refused to take field sobriety tests. *Gault v. Tex. Dep't of Pub. Safety, 2008 Tex. App. LEXIS 5465 (Tex. App. Eastland July 24 2008).*

136. Because the Texas Railroad Commission's final order was consistent with the statutes and rules authorizing the Commission to regulate oil and gas waste, including under *Tex. Nat. Res. Code Ann. § 91.101* and *Tex. Water Code Ann. § 26.131(a)*, and the Commission's final order finding a company's permit violation was supported by substantial evidence under *Tex. Nat. Res. Code Ann. § 85.241* and *Tex. Gov't Code Ann. § 2001.174*, the court affirmed the judgment affirming the Commission's final order. *Osage Envtl. v. R.R. Comm'n of Tex., 2008 Tex. App. LEXIS 5558, 38 Envtl. L. Rep. 20196 (Tex. App. Austin 2008).*

137. There was substantial evidence in the record to support the Texas State Board of Public Accountancy's conclusion that a certificate holder had presented himself as an accountant while his certificate was suspended; the record did not support the holder's claim that he misunderstood the effect of a 1999 order suspending his certificate to practice public accountancy; the holder had committed violations in the past, and he was found to be not fit to practice public accountancy under *Tex. Occ. Code Ann. § 901.502(11). Rogers v. State Bd. of Pub. Accountancy, 310 S.W.3d 1, 2008 Tex. App. LEXIS 2961 (Tex. App. Austin 2008).*

138. District court erred in reversing the decision of the administrative law judge (ALJ), which revoked the driver's operating license for two years, because substantial evidence supported the ALJ's reasonable suspicion determination, when the ALJ was presented with evidence from the officer that the license plate light was not working when he pulled the driver over and that the license plate was not clearly legible from fifty feet, and there was sufficient evidence to uphold the decision of the ALJ that the officer had probable cause to believe that the driver was operating a motor vehicle in a public place while intoxicated; the officer noticed that the driver's license plate as not properly illuminated, the driver admitted he had drunk four beers, and evidence presented at the administrative hearing included the officer's report stating that the driver had slurred speech, bloodshot eyes, and an odor of an alcoholic beverage on his person. *Tex. Dep't of Pub. Safety v. Harris, 2007 Tex. App. LEXIS 9819 (Tex. App. Texarkana Dec. 18 2007).*

139. Revocation of a respiratory care practitioner's certificate for taking a drug from an intravenous bag for personal use was properly upheld as an administrative law judge's (ALJ) decision was supported by substantial evidence pursuant to *Tex. Gov't Code Ann. § 2001.174(2)(F)*, affirmative findings as to each 25 Tex. Admin. Code § 123.14(f)(4) factor were unnecessary, and a negative inference could be drawn from the practitioner's invoking the Fifth Amendment, which was done improperly as a blanket assertion rather than in response to a particular question. *Andrews v. Tex. Dep't of Health, 2007 Tex. App. LEXIS 1129 (Tex. App. Austin Feb. 15 2007).*

140. Where an officer initiated a traffic stop and smelled alcohol, appellee admitted that she had just left a bar where she had consumed alcohol; in the license suspension proceeding, the judge's finding that the police had probable cause to arrest appellee for DWI was supported by substantial evidence under *Tex. Gov't Code Ann. § 2001.174*; the admission

of unqualified testimony from a police officer concerning the horizontal gaze nystagmus test was harmless. *Tex. Dep't of Pub. Safety v. Bishop, 2007 Tex. App. LEXIS 360 (Tex. App. Austin Jan. 22 2007).*

141. Trial court erred in reversing the suspension of a driver's license by an administrative law judge (ALJ) because substantial evidence supported the ALJ's finding under *Tex. Transp. Code Ann. § 724.042* that the driver voluntarily refused to submit to a breath test; although the driver claimed he was misled about the consequences of refusal, the ALJ, as the sole trier of fact under *Tex. Gov't Code Ann. § 2001.174*, was free to disbelieve the driver. *Tex. Dep't of Pub. Safety v. Patel, 2006 Tex. App. LEXIS 9720 (Tex. App. Corpus Christi Nov. 9 2006).*

142. Trial court did not apply the law properly in setting review of an administrative permitting decision of the Edwards Aquifer Authority under the substantial evidence de novo rule because *Tex. Water Code Ann. § 36.253* required the Authority's permitting decisions to be reviewed under the substantial evidence rule by a judge sitting without a jury; judicial review under the substantial evidence rule encompassed the constitutional issues raised by the landowners challenging the Authority's decision. *In re Edwards Aquifer Auth., 217 S.W.3d 581, 2006 Tex. App. LEXIS 8934 (Tex. App. San Antonio 2006).*

143. Texas Racing Commission's decision to modify the ALJ's conclusion and impose the steward's initial penalty of disqualifying the horse and the loss of the purse due the use of ipratropium, a prohibited Class 3 drug, was within the Commission's authority under *Tex. Gov't Code Ann. § 2001.058(e)*, and the "loss of purse" penalty was expressly authorized by the Texas Racing Act, Tex. *Rev. Civ. Stat. Ann. art. 179e*, and the Commission's rules, guidelines, and zero-drug tolerance policy; further, the burden of proof was correctly placed on the owner and at the appropriate standard because nothing in the Tex. *Rev. Civ. Stat. Ann. art. 179e* states that the burden of proof should be placed on the agency. *Pierce v. Tex. Racing Comm'n, 212 S.W.3d 745, 2006 Tex. App. LEXIS 9062 (Tex. App. Austin 2006).*

144. Trial court did not err in affirming the suspension of the driver's license where although the ALJ found that the driver had operated a watercraft while intoxicated, this was an obvious clerical error which did not negate the administrative order, and the decision was supported by substantial evidence, *Tex. Gov't Code Ann. § 2001.174. Goldstein v. Tex. Dep't of Pub. Safety, 2006 Tex. App. LEXIS 11285 (Tex. App. San Antonio Oct. 11 2006).*

145. Trial court's conclusion that the state motor vehicle board's findings of fact that a motor vehicle distributor engaged in business as a dealer in Texas were not supported by substantial evidence, and that the board's conclusions of law that the distributor violated statutory prohibitions, were affected by error of law, was upheld where the undisputed facts were that, in response to a Texas city's solicitation, the distributor sold and delivered two buses to the city in New Mexico and that, from there, the city paid for the buses to be brought into Texas; there was no evidence that the distributor ever physically crossed the New Mexico border into Texas related to the transaction, and, under *Tex. Bus. & Com. Code Ann. § 2.401*, legal title to the buses passed in New Mexico because the agreement of the parties required the distributor to deliver the buses in *New Mexico. Motor Vehicle Bd.   v. Prevost Car (US), Inc., 2006 Tex. App. LEXIS 8461 (Tex. App. Austin Sept. 26 2006).*

146. Texas Railroad Commission's findings regarding the gas utility's costs to acquire its predecessor were supported by substantial evidence as required under *Tex. Gov't Code Ann. § 2001.174* and *Tex. Util. Code Ann. § 105.001*; further, the Commission did not err by including the gas utility's costs in acquiring its predecessor as a known and measurable change" in its gas rate award because nothing in *Tex. Util. Code Ann. § 103.055* prohibited the Commission from accounting for additional expenses as a "known and measurable change" simply because they were known to a utility at the time of its updated rate request. *City of Port Neches v. R.R. Comm'n of Tex., 212 S.W.3d 565, 2006 Tex. App. LEXIS 6936 (Tex. App. Austin 2006).*

147. "Substantial evidence" under *Tex. Gov't Code Ann § 2001.174(2)(E)* supported a finding that a doctor violated the standard of care by discharging a patient from the hospital when she had suffered a postsurgery seizure and had other preseizure symptoms, and her Dilantin level was 3.9 at the time of her discharge; the doctor admitted the Dilantin level was sub-therapeutic, and another doctor testified that the treatment fell below the standard of care. *Chalifoux v. Tex. State Bd. of Med. Exam'rs, 2006 Tex. App. LEXIS 4738 (Tex. App. Austin June 2 2006).*

148. "Substantial evidence" under *Tex. Gov't Code Ann § 2001.174(2)(E)* supported a finding that a doctor violated the standard of care in assessing the possibility of a cerebrospinal fluid (CSF) leak because he had the patient lie down,

which minimized the possibility of the patient experiencing the classic symptoms of a CSF leak; his claim that his discharge decision was not based solely on his observation of the patient after she was lying down for two hours was insufficient to overcome the presumption that the finding was supported by substantial evidence. *Chalifoux v. Tex. State Bd. of Med. Exam'rs, 2006 Tex. App. LEXIS 4738 (Tex. App. Austin June 2 2006).*

149. Texas Railroad Commission's rejection of a gas company's fee assessment against residents of outlying areas was not supported by substantial evidence because the Commission's order did not satisfy requirements for findings of fact. *CenterPoint Energy Entex v. R.R. Comm'n, 213 S.W.3d 364, 2006 Tex. App. LEXIS 3518 (Tex. App. Austin 2006).*

150. License suspension was reinstated because the Texas Department of Public Safety produced more than a scintilla of evidence on the factors set forth in *Tex. Transp. Code Ann. § 724.042*, when the driver was properly stopped for violation of *Tex. Transp. Code Ann. § 545.104(a)*, and the officer smelled alcohol on the driver's breath, noticed that the driver's eyes were bloodshot and his speech was slurred. *Tex. Dep't of Pub. Safety v. Shellberg, 2005 Tex. App. LEXIS 6644 (Tex. App. Corpus Christi Aug. 18 2005).*

151. Trial court did not err in affirming an agency decision that found that no vacancy existed, for purposes of *Tex. Nat. Res. Code Ann. § 51.172(5)*; the agency was free to consider evidence other than the evidence provided by two surveys, and substantial evidence supported the ruling pursuant to *Tex. Gov't Code Ann. § 2001.174(2)(E)* of the *Administrative Procedure Act. Dixon v. Dewhurst, 169 S.W.3d 515, 2005 Tex. App. LEXIS 6100 (Tex. App. Texarkana 2005).*

152. Texas State Board of Medical Examiners' conclusion that disciplinary grounds existed for a doctor's improper contact with a female patient was supported by its findings, conclusions and evidence, in accordance with *Tex. Gov't Code Ann. § 2001.174(2)(E)*, where even though the patient was somewhat confused and inconsistent regarding the details of her surroundings when the incidents occurred, she testified unequivocally that the doctor touched her breasts despite her attempts to shield herself with magazines. The administrative law judge heard the patient's testimony firsthand, was able to observe her and her demeanor, and concluded that she made a credible witness, and the appellate court could not second-guess such credibility determinations in the guise of a substantial-evidence inquiry. *Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 6232 (Tex. App. Austin Aug. 3 2005),* substituted opinion at, opinion withdrawn by *172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

153. Doctor's failure to attend a patient in the emergency room was properly found to be a failure to practice medicine in an acceptable professional manner consistent with public health and welfare, in violation of *Tex. Occ. Code Ann. § 164.051(a)(6)*, and unprofessional or dishonorable conduct that was likely to injure the public, in violation of *Tex. Occ. Code Ann. §§ 164.051(a)(1), 164.052(a)(5)*, where the Texas State Board of Medical Examiners' expert testified that, based on her review of relevant medical records, the doctor's care and treatment of the patient did not meet the standard of care and was a professional failure to practice medicine consistent with the public health and welfare, and where, because patients were considered members of the public, the expert's testimony, which was unchallenged on appeal, also supported the Board's conclusion that the doctor committed unprofessional conduct that was likely to injure the public. Furthermore, because the hospital's disciplinary action against the doctor was directed to the same conduct, there was substantial evidence to support discipline under *Tex. Occ. Code Ann. § 164.051(a)(7). Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 6232 (Tex. App. Austin Aug. 3 2005),* substituted opinion at, opinion withdrawn by *172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

154. Appellate court could not modify an order of the Motor Vehicle Board of the Texas Department of Transportation to include findings of fact and conclusions of law favorable to the dealer in its franchise dispute with a motor home manufacturer because under *Tex. Occ. Code Ann. §§ 2301.001, 2301.151*, and *Tex. Gov't Code Ann. § 2001.174(2)(E)*, the court could only review the order to determine if they are reasonably supported by substantial evidence. Further, the order complied with *Tex. Occ. Code Ann. § 2301.711(a). Buddy Gregg Motor Homes, Inc. v. Motor Vehicle Bd., 179 S.W.3d 589, 2005 Tex. App. LEXIS 5952 (Tex. App. Austin 2005).*

155. Statute governing license suspension appeals is the touchstone in deciding which standard of review should apply: the statute specifically requires the reviewing court to use the substantial evidence rule. Because a court applying the substantial evidence standard of review may not substitute its judgment for that of the administrative law judge as to the weight of the evidence, the equally plausible but opposite inferences construct can not be part of the substantial evidence rule. *Dep't of Pub. Safety v. Hirschman, 169 S.W.3d 331, 2005 Tex. App. LEXIS 4579 (Tex. App. Waco 2005).*

156. At the license suspension hearing, the arresting officer testified that the driver's vehicle was moving erratically, the officer smelled alcohol coming from the interior of the vehicle, and the driver failed sobriety tests; there was substantial evidence to support the administrative finding that there was reasonable suspicion to stop and probable cause to arrest the driver for driving while intoxicated. The trial court erred by reversing the administrative decision to suspend her driver's license, because she refused to provide a breath sample. *Tex. Dep't of Pub. Safety v. Leath, 2005 Tex. App. LEXIS 3927 (Tex. App. Amarillo May 18 2005).*

157. Substantial evidence in the record supported the Texas Natural Resource Conservation Commission's finding that a landfill owner's expansion application was administratively and technically complete because the owner had included all necessary information in the application, and while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information, and the opponents to the application did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Because the application was determined to be administratively and technically complete prior to the contested case hearing, the owner was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality, 169 S.W.3d 258, 2005 Tex. App. LEXIS 3583 (Tex. App. Austin 2005).*

158. Decision of the Public Utility Commission of Texas (PUC) to use the electric company's original overstated estimate of its transmission system capital costs for a particular interconnection project was not supported by substantial evidence as required by *Tex. Util. Code Ann. § 15.001* of the Public Utility Regulatory Act (PURA), *Tex. Util. Code Ann. §§ 11.001-64.158*, and *Tex. Gov't Code Ann. § 2001.174(2)(E).* The electric company's witness had reduced his estimate on rebuttal due to the fact that new technology increased the capacity of existing transmission facilities and eliminated the need to construct certain new projects; therefore no reasonable basis existed for the PUC's use of the original estimate. *Reliant Energy, Inc. v. PUC, 153 S.W.3d 174, 2004 Tex. App. LEXIS 11280 (Tex. App. Austin 2004).*

159. Texas Department of Public Safety properly suspended an individual's driver's license for his refusal to give a breath specimen after he was arrested for suspicion of DWI. On review, the county court ruled that substantial evidence existed to affirm the administrative decision suspending his driver's license, and that the individual failed to prove that the administrative decision prejudiced his substantial rights. *Parks v. Tex. Dep't of Pub. Safety, 2004 Tex. App. LEXIS 9365 (Tex. App. Houston 1st Dist. Oct. 21 2004).*

160. Substantial evidence pursuant to *Tex. Gov't Code Ann. § 2001.174* supported an order of the Public Utility Commission of Texas that raised the fuel factor component of the price-to-beat for an affiliated retail electric provider (AREP) because the Commission linked the measurement of the adequacy of the fuel factor to reflect significant changes in market price and the mechanism to correct inadequacies, and concluded that the New York Mercantile Exchange (NYMEX) was sufficient for both tasks, and because the Commission did not err in barring the order's opponents from presenting relevant evidence under *Tex. R. Evid. 401* where evidence regarding the AREP's purchase price and any windfall profits resulting from the fuel-factor adjustment did not bear on whether the NYMEX index had changed the requisite amount. Furthermore, the fuel-factor increase did not violate a set limit on the price-to-beat under *Tex. Util. Code Ann. § 39.202* because the adjustments under § 39.202(l) were not limited by § 39.202(p). *City of Alvin v. PUC of Tex., 143 S.W.3d 872, 2004 Tex. App. LEXIS 7685 (Tex. App. Austin 2004).*

161. Court rejected a motorist's claim that field sobriety tests were inadmissible in connection with the administrative suspension of the motorist's license where, considering the standard of review under *Tex. Transp. Code Ann. § 524.041* and *Tex. Gov't Code Ann. § 2001.174*, the court found that there was more than a scintilla of evidence to support an administrative law judge's inference that the officer acted in the following order regardless of the time notations entered on the officer's report: (1) that the officer stopped the motorist, (2) noticed signs of intoxication, (3) asked the motorist what and where the motorist had been drinking, (4) administered field sobriety tests, (5) arrested the motorist, and (6) then read the motorist his Miranda rights. *Hesskew v. Tex. Dep't of Pub. Safety, 144 S.W.3d 189, 2004 Tex. App. LEXIS 6972 (Tex. App. Tyler 2004).*

162. The district court's judgment upholding the Board's second order was affirmed (1) suspending the doctor's medical license until he could show that he was safe and competent to practice medicine, (2) setting forth the minimum terms and conditions with which the doctor had to comply to make that showing, and (3) imposing an administrative penalty

on the doctor where the record revealed ample evidence that the doctor over-administered anesthesia to the patient, failed to properly monitor her while she was sedated, and failed to properly respond when the patient went into respiratory arrest. *Berezoski v. Tex. State Bd. of Med. Examiners, 2004 Tex. App. LEXIS 6255 (Tex. App. Austin July 15 2004).*

163. Revocation of a doctor's medical license was supported by substantial evidence where there was scientific evidence that two of the doctor's urine samples tested positive for cocaine, and one expert witness definitively testified that the tests foreclosed the possibility of ingestion by inadvertent passive exposure. *Hinkley v. Tex. State Bd. of Med. Exam'rs, 140 S.W.3d 737, 2004 Tex. App. LEXIS 5078 (Tex. App. Austin 2004).*

164. Sufficient evidence supported a two-year administrative license suspension where the driver had prior offenses and the officer's report indicated that the driver exhibited a number of traits consistent with intoxication. The officer's report was properly admitted, even though his name was omitted from the introductory portion of the affidavit. *Tex. Dep't of Pub. Safety v. Salinas, 2004 Tex. App. LEXIS 4257 (Tex. App. San Antonio May 12 2004).*

165. Where substantial evidence supported the findings that an insurance licensee wrongfully paid premiums from another business account, paid bonuses or compensation for referring new business, offered to rebate premiums, and paid unlicensed persons for the services of an agent, revocation of an insurance license was proper. *Murphy v. Comm'r of Ins., 2003 Tex. App. LEXIS 10156 (Tex. App. Austin Dec. 4 2003).*

166. Substantial evidence supported a decision by the Texas Racing Commission to impose penalties under Tex. *Rev. Civ. Stat. Ann. art. 179e*, § 3.07(b) on a horse owner and trainer whose racing horse tested positive for prohibited drug; although the Commission's rules did not set forth any procedures for handling a urine sample that was inadvertently returned, the Commission acted reasonably in storing and resending the sample for testing, and the integrity of that sample had not been compromised. *Keeton v. Tex. Racing Comm'n, 2003 Tex. App. LEXIS 6925 (Tex. App. Austin Aug. 14 2003).*

167. Because contested-case hearings before the Motor Vehicle Board of the Texas Department of Transportation are heard under the APA without a specified standard of review, the substantial evidence rule applies under *Tex. Gov't Code Ann. § 2001.174. BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

168. Under *Tex. Gov't Code Ann. § 2001.174*, an appellate court reviews the legal conclusions of the Motor Vehicle Board of the Texas Department of Transportation for errors of law, and the court reviews the board's findings of fact for support by substantial evidence. *BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

169. Under *Tex. Gov't Code Ann. § 2001.174(f)*, the evidentiary test of a decision of the Motor Vehicle Board of the Texas Department of Transportation is whether the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion the agency must have reached to justify the disputed action. *BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

170. Appellate review under *Tex. Gov't Code Ann. § 2001.174(f)*, ensures that an agency does not act arbitrarily or without regard to the facts. *BMW of N. Am., L.L.C. v. Motor Vehicle Bd., 115 S.W.3d 722, 2003 Tex. App. LEXIS 6923 (Tex. App. Austin 2003).*

171. Substantial evidence supported the decision of an administrative law judge to suspend the driver's license of an individual arrested for operating a motor vehicle in a public place while intoxicated. *Tex. Dep't of Pub. Safety v. Hernandez, 2003 Tex. App. LEXIS 6333 (Tex. App. Corpus Christi July 24 2003).*

172. Public utility commission properly denied an energy corporation's request for a rate increase to recover additional sums from its share in the construction of a nuclear power plant where the corporation failed to present a prima facie case that the additional cost of the plant's construction above the adjusted definitive cost estimate was prudent. *Entergy Gulf States, Inc. v. PUC, 112 S.W.3d 208, 2003 Tex. App. LEXIS 5940 (Tex. App. Austin 2003).*

173. In reviewing the Texas Commissioner of Insurance's decision denying the applicant a local recording agent's license under the substantial evidence rule, *Tex. Gov't Code Ann. § 2001.174*, the Commissioner's consideration of two 25-year-old felony convictions that involved the defrauding of elderly victims through the sale of an unauthorized insurance product was not erroneous under *Tex. Occ. Code Ann. §§ 53.021,*.022 and substantial evidence existed demonstrating that the applicant failed to make restitution and failed to provide letters of recommendation from prosecutors, law enforcement, and correctional officers, as required by *Tex. Occ. Code Ann. § 53.023(a)(6)(A)* and (b); thus, there was ample evidence in the record to support the Commissioner's decision denying the applicant a local recording agent's license. *Smith v. Montemayor, 2003 Tex. App. LEXIS 5099 (Tex. App. Austin June 19 2003).*

174. Pursuant to *Tex. Gov't Code Ann. § 2001.174*, the district court's judgment affirming the Texas Commission on Environmental Quality's order granting the landfill operator a permit to build and operate a municipal landfill facility was proper because there was substantial evidence to support the findings and conclusions that: (1) the operator's groundwater-monitoring plan was sufficient; (2) a fault with displacement in the Holocene time did not exist within 200 feet of the proposed landfill; (3) the landfill liner's integrity would not be compromised; (4) the operator's floodplain analysis provided an accurate delineation of the 100-year floodplain; (5) the operator adequately demonstrated the effects of its proposed project on flood conditions with respect to soil-cover operations; and (6) the project would not significantly alter natural drainage. *Coalition for Long Point Preservation v. Tex. Comm'n on Envtl. Quality, 106 S.W.3d 363, 2003 Tex. App. LEXIS 3987 (Tex. App. Austin 2003).*

175. Under *Tex. Gov't Code Ann. § 2001.174*, when reviewing an administrative decision, the reviewing court must reverse or remand the case for further proceedings if the appellant's substantial rights are prejudiced because the administrative decision is not reasonably supported by substantial evidence. *Tex. Dep't of Pub. Safety v. Mitchell, 2003 Tex. App. LEXIS 3407 (Tex. App. Fort Worth Apr. 17 2003).*

176. Texas Government Code, in providing only substantial-evidence review, specifically *Tex. Gov't Code Ann. § 2001.174*, does not deny equal protection of the laws under *U. S. Const. amend. XIV*, § 1, and *Tex. Const. art. I, § 3. Pretzer v. Motor Vehicle Bd., 125 S.W.3d 23, 2003 Tex. App. LEXIS 277 (Tex. App. Austin 2003),* affirmed in part and reversed in part by *138 S.W.3d 908, 2004 Tex. LEXIS 193, 47 Tex. Sup. Ct. J. 340 (Tex. 2004).*

177. Substantial evidence supported administrative law judge's decision to uphold the driver's suspension of the driver's license as the evidence showed the driver was driving while intoxicated, that reasonable suspicion supported the detention of the driver to investigate the accident the driver had been in, that probable cause existed to arrest the driver for driving while intoxicated, and that the suspension of his license was warranted. *Tex. Dep't of Pub. Safety v. Celedon, 2002 Tex. App. LEXIS 6409 (Tex. App. Corpus Christi Aug. 29 2002).*

178. Since statute making an inmate liable for intentional damage to state property did not specify a judicial standard of review, the "substantial evidence" standard of review applied and dictated that disciplinary conviction and fine imposed on inmate for property damage inmate caused during riot be supported by evidence that amounted to "only more than a mere scintilla" in order to uphold the prison's disciplinary action against the inmate. Warriner v. Tex. Dep't of Crim. Justice - *Institutional Div., 2002 Tex. App. LEXIS 6410 (Tex. App. Corpus Christi Aug. 29 2002).*

179. Trial court did not err in reversing the county civil service commission's holding that the suspended employee could be suspended as the constable's failure to show up at a hearing implicated the suspended employee's substantial rights and prejudiced him; suspended employee was entitled to have an order entered, pursuant to the civil service commission's own rules, nullifying the entire action against him. *Bexar County Civ. Serv. Comm'n v. Casals, 63 S.W.3d 57, 2001 Tex. App. LEXIS 6561 (Tex. App. San Antonio 2001).*

180. Substantial evidence existed to support administrative law judge's findings that widow was excluded from receiving benefits under insurance policy when evidence showed her dead husband was driving truck that overturned, killing himself and a passenger, and, if husband had survived, he would have been charged with manslaughter. *Nobles v. Employees Ret. Sys. of Tex., 53 S.W.3d 483, 2001 Tex. App. LEXIS 4997 (Tex. App. Austin 2001).*

181. Motor vehicle board's decision to grant a new franchisee's application for an auto-dealer license was based on substantial evidence within the meaning of *Tex. Gov't Code Ann. § 2001.174(2)(E)* where the evidence supported the ele-

ments of good cause under former *Tex. Rev. Stat. Ann. art. 4413(36), § 4.06(c). Graff Chevrolet Co. v. Texas Motor Vehicle Bd., 60 S.W.3d 154, 2001 Tex. App. LEXIS 3896 (Tex. App. Austin 2001).*

182. Under the substantial evidence rule of *Tex. Govt. Code Ann. § 2001.174*, the court erred in reversing a license suspension decision by the Texas Department of Public Safety; the administrative law judge did not err in finding, pursuant to *Tex. Transp. Code Ann. § 524.035(a)(2)*, that the officer had probable cause to arrest defendant for driving while intoxicated. *State Dep't of Pub. Safety v. Boeck, 2001 Tex. App. LEXIS 2785 (Tex. App. Corpus Christi Apr. 26 2001).*

183. Because a regional groundwater district was not a state agency with statewide jurisdiction, the Administrative Procedures Act did not apply, except that the substantial evidence rule contained in *Tex. Gov't Code Ann. § 2001.174* was made applicable under *Tex. Water Code Ann. § 36.253* for purposes of judicial review of district actions. *S. Plains Lamesa R.R. v. High Plains Underground Water Conservation Dist. No. 1, 52 S.W.3d 770, 2001 Tex. App. LEXIS 2497 (Tex. App. Amarillo 2001).*

184. Final orders of the Railroad Commission are deemed to be prima facie valid and subject to review under the substantial evidence rule. An appellate court reviews the Commission's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Tex. Gov't Code Ann. § 2001.174. H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000).*

185. Under the substantial evidence standard of review applied to final orders of the Railroad Commission pursuant to *Tex. Gov't Code Ann. § 2001.174*, the proper test is whether the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion that the Commission must have reached to justify the disputed action. The issue is whether the Commission acted arbitrarily and without regard to the facts. *H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000).*

186. Reviewing court may not substitute its judgment for that of a state agency on questions committed to agency discretion. *H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000).*

187. Party appealing an agency's decision bears the burden of showing a lack of substantial evidence. The evidence in the record may actually weigh by a preponderance against the agency's decision, yet satisfy the substantial evidence standard. *H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000).*

188. When applying the substantial evidence standard of review under *Tex. Gov't Code Ann. § 2001.174(2)(E)*, a court may not substitute its judgment for the agency; the issue is not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action. Substantial evidence requires more than a mere scintilla of evidence; the evidence may preponderate against the agency's decision and still be substantial evidence *Texas Dep't of Pub. Safety v. Favela, 2000 Tex. App. LEXIS 6638 (Tex. App. Austin Oct. 5 2000).*

189. Under *Tex. Gov't Code Ann. 2001.174* a reviewing court must reverse and remand for further administrative proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole. *Central Power & Light Co. v. PUC of Texas, 36 S.W.3d 547, 2000 Tex. App. LEXIS 4905 (Tex. App. Austin 2000).*

190. Under the Texas Administrative Procedures Act, *Tex. Gov't Code Ann. § 2001.174(2)*, the trial court has the authority to reverse an agency determination if it finds that the substantive rights of the appellant are prejudiced due to a constitutional or statutory violation, the decision was made unlawfully or affected by an error of law, not supported by substantial evidence, or was found to be arbitrary or capricious. *Dep't of Pub. Safety v. Breazeale, 1999 Tex. App. LEXIS 7131 (Tex. App. Houston 14th Dist. Sept. 23 1999).*

191. The standard of review of an agency decision is set out in *Tex. Gov't. Code Ann. § 2001.174*; a court may reverse the agency's decision only if the substantial rights of the appellant had been prejudiced; here, a railroad commission could reasonably have concluded that a well operator received actual notice of the hearing and that his failure to appear

was due to conscious indifference rather than accident or mistake. *Anderson v. Railroad Comm'n, 963 S.W.2d 217, 1998 Tex. App. LEXIS 1329, 139 Oil & Gas Rep. 382 (Tex. App. Austin 1998).*

192. Where death benefits were denied by the Board of Trustees of the Employees Retirement System of Texas on the basis that the death was not accidental and was caused by the decedent's intentional act, the decision was reviewed on the basis of the substantial evidence standard pursuant to *Tex. Gov't Code Ann. § 2001.174* and *Tex. Ins. Code Ann. art. 3.50-2, § 4B(d). Butler v. Group Life & Health Ins. Co., 962 S.W.2d 296, 1998 Tex. App. LEXIS 858 (Tex. App. Austin 1998).*

193. Where a decedent dry-fired a gun several times, someone then replaced the clip in the gun without the decedent's knowledge, and the decedent fired the gun again, killing himself, the decision of the Board of Trustees of the Employees Retirement System of Texas that decedent's death was not accidental and denying the beneficiary recovery under the insurance policy was not supported by substantial evidence as required under *Tex. Gov't Code Ann. § 2001.174. Butler v. Group Life & Health Ins. Co., 962 S.W.2d 296, 1998 Tex. App. LEXIS 858 (Tex. App. Austin 1998).*

194. Substantial evidence was before the Board of Trustees of the Employees Retirement System of Texas to support its finding that air travel or flight caused decedent's runway accident and that this was a risk contemplated by the aviation exclusion in the accidental death benefits provision of the public employees life insurance plan; the standard of judicial review of the board's order was that provided for cases of "substantial evidence" review under the terms of the Administrative Procedures Act, specifically *Tex. Gov't Code § 2001.174*, and because its order was supported by substantial evidence and was not arbitrary or capricious, the district court erred in not affirming the decision of the board to deny accidental death benefits to decedent's spouse. *Board of Trustees v. Benge, 942 S.W.2d 742, 1997 Tex. App. LEXIS 1519 (Tex. App. Austin 1997).*

195. The Administrative Procedure Act (Act), *Tex. Gov't Code Ann. § 2001.174*, which empowered the Board of Trustees of the Employees Retirement System of Texas to prepare coverage specifications made under the Act, was construed in a manner that entitled the trustees' interpretation of policy exclusions to be given judicial respect regarding any uncertainty where the interpretation was reasonable; the finding that an optometrist's "vision therapy treatments" fell within the policy exclusion of "orthoptics or visual training" was held to be reasonable. *McMullen v. Employees Retirement Sys., 935 S.W.2d 189, 1996 Tex. App. LEXIS 5142 (Tex. App. Austin 1996).*

196. Under *Tex. Gov't Code Ann. § 2001.174(2)(E)* the court was not required to reverse the Texas Department of Agriculture order imposing administrative penalties on an aerial crop-dusting service because the service's substantial rights were not prejudiced where the agency decision finding that the service had violated a regulation by spraying an automobile with pesticide was reasonably supported by substantial evidence. *Lauderdale v. Department of Agric., 923 S.W.2d 834, 1996 Tex. App. LEXIS 2221 (Tex. App. Austin 1996).*

197. A decision of the Texas Railroad Commission was upheld on appeal where the decision was supported by substantial evidence because, under the substantial evidence standard of review pursuant to *Tex. Gov't Code § 2001.174*, the review of a decision of a state agency that fell within the agency's authority required the court to give significant deference to the agency in its field of expertise and did not allow the court to substitute its judgment for that of the agency. *Railroad Comm'n v. Torch Operating Co., 912 S.W.2d 790, 1995 Tex. LEXIS 162, 39 Tex. Sup. Ct. J. 165, 131 Oil & Gas Rep. 128 (Tex. 1995).*

198. Appellate court review is governed by 2001.174(2)(E) of the Administrative Procedure Act ("APA"), *Tex. Gov't Code Ann. § 2001.174*, under which appellate courts review for substantial evidence questions committed to an agency's discretion and challenged by the parties on appeal; in conducting a substantial evidence review, appellate courts determine whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Texas Educ. Agency v. Goodrich Indep. Sch. Dist., 898 S.W.2d 954, 1995 Tex. App. LEXIS 1038 (Tex. App. Austin 1995).*

199. Although there was evidence that doctor charged more than other doctors for the services rendered or that doctor charged for services that other doctors would not charge for, the evidence was insufficient to support a finding of flagrant or persistent overcharging; the court held that doctor's evidence that he sent an enormous amount of time with the

patients because of their complicated cases showed that the charges were not excessive and was not refuted. *Texas Bd. of Med. Exmnrs. v. Birenbaum, 891 S.W.2d 333, 1995 Tex. App. LEXIS 44 (Tex. App. Austin 1995).*

200. In reviewing the findings of the hearings examiner, both the trial court and the appellate court must employ the substantial evidence standard; an appellant bears the burden to prove that the findings, inferences, conclusions, and decisions of the administrative agency are not supported by substantial evidence, and in making the determination, the trial and appellate courts must review all the evidence presented; to sustain the burden under this standard, the appellant must show that no substantial evidence existed at the time of the hearing to support the order, and the court may not substitute its judgment for the agency's as to the weight of evidence on questions committed to the discretion of the agency but may reverse the decision if the administrative findings, inferences, conclusions, or decisions 1) violate constitutional or statutory provisions, 2) exceed the statutory authority of the agency, 3) rely on unlawful procedure, 4) are affected by other error of law, 5) are not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole, or 6) are arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; substantial evidence is more than a scintilla, but may be less than a preponderance, and if reasonable minds could have reached the conclusion of the administrator, the court must uphold the decision. *Fox v. Medina, 848 S.W.2d 866, 1993 Tex. App. LEXIS 479 (Tex. App. Corpus Christi 1993).*

201. Where a stipulation and evidence was introduced both for and against a rate increase, sufficient evidence supported the Public Utilities Commission's finding under former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(5). *Abilene v. Public Utility Com., 1993 Tex. App. LEXIS 349 (Tex. App. Austin Feb. 3 1993),* opinion withdrawn by, substituted opinion at *854 S.W.2d 932, 1993 Tex. App. LEXIS 1310 (Tex. App. Austin 1993).*

202. Texas Motor Vehicle Commission's (commission) final order in favor of franchisee concerning a franchise agreement of a motorcycle dealership was properly reversed because the commission did not have statutory authority to adjudicate claims between franchisors and franchisees or to order payment by the franchisor to the franchisee. *Kawasaki Motors Corp. v. Texas Motor Vehicle Com., 1993 Tex. App. LEXIS 44 (Tex. App. Austin Jan. 13 1993),* opinion withdrawn by, substituted opinion at *855 S.W.2d 792, 1993 Tex. App. LEXIS 1292 (Tex. App. Austin 1993).*

203. Substantial evidence existed, under former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(5), in the form of expert witness testimony, to support appellant's commission's order denying appellee's request for an amendment to the allocation formula of the field rules of an oil field. *V-f Petro. v. A.K. Guthrie Operating Co., 792 S.W.2d 508, 1990 Tex. App. LEXIS 1868, 118 Oil & Gas Rep. 341 (Tex. App. Austin 1990).*

204. Where the Texas State Board of Pharmacy revoked a pharmacist license held by an individual and his pharmacy, the revocation was improper; the Board's conclusions of law were not fairly supported by its findings of underlying fact, as there was no evidence that filled prescriptions did not have a therapeutic purpose. *State Bd. of Pharmacy v. Seely, 764 S.W.2d 806, 1988 Tex. App. LEXIS 3416 (Tex. App. Austin 1988).*

205. Substantial evidence test under the Administrative Procedure and Texas Register Act, former Tex. Rev. Civ. Stat. Ann. art. 6252-13a (now *Tex. Gov't Code Ann. § 2001.174*) must be applied to judicial review of decisions of the Texas State Board of Dental Examiners to determine if there was some reasonable basis for petitioner' s action; on review the appellate court erroneously disregarded this test when it applied a test based on due process consideration. *Texas State Bd. of Dental Exmrs. v. Sizemore, 759 S.W.2d 114, 1988 Tex. LEXIS 80, 31 Tex. Sup. Ct. J. 537 (Tex. 1988).*

206. Pursuant to *Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)* (now *Tex. Gov't Code Ann. § 2001.174*), a reviewing court is only allowed to reverse a Texas Board of Medical Examiners decision in the absence of substantial evidence and only if the absence had prejudiced the substantial rights of the physician. *Balla v. Texas State Bd. of Med. Exmrs., 693 S.W.2d 715, 1985 Tex. App. LEXIS 6827 (Tex. App. Dallas 1985).*

207. The Texas Administrative Procedure and Texas Register Act, former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(5) (now *Tex. Gov't Code Ann. § 2001.174*), authorizes a reviewing court to test an agency's findings, inferences, conclusions, and decisions to determine whether they are reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; in applying the test, a court is prohibited from substituting its judgment for that of the agency as to the weight of the evidence on questions committed to agency discretion; a reviewing court may reverse an agency decision because of the absence of substantial evidence only if such absence has preju-

diced substantial rights of the litigant. *Texas Health Facilities Comm'n. v. Charter Med., 665 S.W.2d 446, 1984 Tex. LEXIS 319, 27 Tex. Sup. Ct. J. 234 (Tex. 1984).*

208. Trial court's order sustaining a determination by the Texas Real Estate Commission suspending a real estate broker's license for breach of an alleged promise to a buyer to pay for the fencing of a lot if purchased was reversed where the record did not support the requisite elements of fraud by substantial evidence as required by the Administrative Procedure and Texas Register Act, former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(5) and ordinary breach of contract did not constitute fraud. *Texas Real Estate Comm'n. v. Hinde, 627 S.W.2d 537, 1982 Tex. App. LEXIS 3818 (Tex. App. Fort Worth 1982).*

209. Where respondent cancelled several permits to sell alcoholic beverages because petitioner had been intoxicated on the licensed premises, the trial court abused its discretion when it set aside respondent's administrative decisions when respondent's decision was supported by substantial evidence as required by former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19. *Texas Alcoholic Beverage Comm'n. v. Lancaster, 1979 Tex. App. LEXIS 3891 (Tex. Civ. App. San Antonio Nov. 1 1979).*

210. Texas Commission on Environmental Quality's conclusion that a coalition was not an affected person was made through improper procedure, was affected by error of law, and was an abuse of discretion under *Tex. Gov't Code Ann. § 2001.174(2)(C)*, (D), (F); the court reversed. *Bosque River Coalition v. Tex. Comm'n on Envtl. Quality, 347 S.W.3d 366, 2011 Tex. App. LEXIS 6043 (Tex. App. Austin 2011).*

211. Agreed Final Judgment purported to find facts (that the city had met the criteria for issuance of a permit) and to render judgment granting a permit, and *Tex. Gov't Code Ann. § 2001.174* did not empower courts to take such action, which went beyond their limited authority in a substantial-evidence review, and having concluded that there was error prejudicing substantial rights of the city's, the court's only options were to reverse or remand the case for further proceedings; accordingly, the district court's Agreed Final Judgment, which had the effect of rendering a specific judgment, contravened the direct restriction on the special statutory jurisdiction delegated to the court in its substantial-evidence review, and because the judgment violated the separation-of-powers doctrine of the Texas Constitution, *Tex. Const. art. II, § 1*, it was void and its rendition was fundamental error. *Save Our Springs Alliance, Inc. v. City of Kyle, 382 S.W.3d 540, 2012 Tex. App. LEXIS 7548 (Tex. App. Austin 2012).*

212. Although appellee acknowledged that appellant owned 100 percent of the leasehold oil and gas estate, and that he had the right "to inject saltwater under the tract produced from the tract" to benefit that lease tract, resolution of appellant's complaint turned on construction of the deeds in appellee's chain of title--specifically, the parameters of the "surface estate" conveyed through those instruments. Thus, it was the sort of issue that was beyond the Texas Railroad Commission's jurisdiction under *16 Tex. Admin. Code § 3.9. Rosenthal v. R.R. Comm'n, 2009 Tex. App. LEXIS 6522 (Tex. App. Austin Aug. 20 2009).*

213. Remand for further administrative proceedings was proper under the primary jurisdiction doctrine after a trial court erred in denying a manufacturer's plea to the jurisdiction in a dealership transfer case; however, the remand order could not require the agency to act. *Ford Motor Co. v. Butnaru, 157 S.W.3d 142, 2005 Tex. App. LEXIS 465 (Tex. App. Austin 2005).*

214. Redundant remedies doctrine did not bar challenges to licensing regulations by unlicensed individuals in the business of eyebrow threading, even if some of them could seek substantive relief through the administrative process, because there was no administrative action pending against one of the individuals. *Patel v. Tex. Dep't of Licensing And Regulation, 2012 Tex. App. LEXIS 6187 (Tex. App. Austin July 25 2012).*

215. Where one of the pooled unit's property owners sought to dissolve the gas pooling unit as moot, but, on appeal, failed to provide a party, who was originally an intervenor but was a party under the definition provided for in *Tex. Gov't Code Ann. § 2001.003(4)*, with service of a copy of the petition for judicial review, the complaining owner did not meet a necessary condition on which its right to seek judicial review of the Texas Railroad Commission's order depended and, thus, the complaining owner did not prove its right to the relief it sought from the trial court; pursuant to *Tex. Gov't Code Ann. § 2001.174*, the trial court had no choice but to affirm the order of the Commission denying the complaining owner's request to dissolve the pooling unit and it did affirm that order. *Helton v. R.R. Comm'n, 126 S.W.3d 111, 2003 Tex. App. LEXIS 4832, 164 Oil & Gas Rep. 1057 (Tex. App. Houston 1st Dist. 2003).*

216. Business owner could not bring claims for declaratory relief under *Tex. Civ. Prac. & Rem. Code Ann. § 37.004* against state agency regarding practicing cosmetology without a license as the owner had already sought judicial review of the agency decision under *Tex. Gov't Code Ann. § 2001.174*; the remedy would be redundant as the basis for both claims was that eyebrow threading did not fall within the definition of cosmetology in *Tex. Occ. Code Ann. § 1602.002(a)*, a proper basis for a claim for judicial review under *Tex. Gov't Code Ann. § 2001.174(2)(A)* & (B). *Kuntz v. Khan, 2011 Tex. App. LEXIS 446 (Tex. App. Austin Jan. 21 2011).*

217. Declaratory judgment action against the Texas State Board of Public Accountancy claiming that the Board's standards and principles were so unconstitutionally vague that they did not sufficiently identify what constituted a violation was redundant as auditors, who had their professional certificates revoked or suspended, had filed an administrative appeal under *Tex. Occ. Code Ann. § 901.556(a). Tex. State Bd. of Pub. Accountancy v. Bass, 2011 Tex. App. LEXIS 294 (Tex. App. Austin Jan. 14 2011).*

218. In a case where a power agency sought judicial review of a final order from the Public Utility Commission of Texas under *Tex. Util. Code Ann. § 15.001* and *Tex. Gov't Code Ann. § 2001.174*, declaratory relief on the ground of jurisdiction was redundant and unnecessary since the issue was already raised. *Tex. Mun. Power Agency v. PUC of Tex., 260 S.W.3d 647, 2008 Tex. App. LEXIS 5555 (Tex. App. Austin 2008).*

219. By refusing to strike the Edwards Aquifer Authority's jury demand and setting landowners' appeal of the Authority's permitting decision for a jury trial, a trial court failed to apply the law correctly and fundamentally altered the nature of the judicial review prescribed by statute because the Authority had a clear right to proceed to a final determination without a jury, pursuant to *Tex. Water Code Ann. § 36.253* and *Tex. Gov't Code Ann. § 2001.174* and *Tex. Gov't Code Ann. § 2001.175(e). In re Edwards Aquifer Auth., 217 S.W.3d 581, 2006 Tex. App. LEXIS 8934 (Tex. App. San Antonio 2006).*

220. In a suit involving a utility rate increase, although *Tex. R. App. P. 54(a)* precluded appellate court from considering a late-filed statement of facts, it did not require affirming a judgment as a matter of course because the statement of facts was not mandatory for appeal under *Tex. R. App. P. 50(a)*; the appellate court was obligated to address every issue under Tex. R. App. P. 90(a), and some issues did not require reference to a statement of facts; and while an appellate court generally could not determine whether an agency finding was supported by "substantial evidence" without reviewing the administrative record pursuant to *Tex. Gov't Code Ann. § 2001.174(2)(E)*, that would not preclude the appellate court from addressing issues, such as those involving legal error, that did not require a statement of facts. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n, 878 S.W.2d 598, 1994 Tex. LEXIS 125, 37 Tex. Sup. Ct. J. 1168 (Tex. 1994).*

221. In employing a substantial evidence standard of review, the appellate court determined trial court erred in reversing the decision of the ALJ suspending the driver's privileges to drive; the prosecutor's decisions to dismiss the criminal charges did not amount to an acquittal. *Tex. Dep't of Pub. Safety v. Nielsen, 102 S.W.3d 313, 2003 Tex. App. LEXIS 2427 (Tex. App. Beaumont 2003).*

222. Where a driver was asked to provide a breath sample to the investigating officer, and attempted to do so, but her attempts were unsuccessful solely due to her intoxication, under *Tex. Penal Code Ann. § 8.04(a)*, the driver could not successfully argue that the initial stop of her car was not supported by reasonable suspicion, under *Tex. Gov't Code Ann. § 2001.174(2)(D)* and 1 Tex. Admin. Code § 159.37(a), because substantial evidence supported the findings that reasonable suspicion existed for the police officer to stop her for driving under the influence when the sole basis of the call of another motorist following the driver. *Malkowsky v. Texas Dep't of Pub. Safety, 53 S.W.3d 873, 2001 Tex. App. LEXIS 5554 (Tex. App. Houston 1st Dist. 2001).*

223. In a suit involving a utility rate increase, although *Tex. R. App. P. 54(a)* precluded appellate court from considering a late-filed statement of facts, it did not require affirming a judgment as a matter of course because the statement of facts was not mandatory for appeal under *Tex. R. App. P. 50(a)*; the appellate court was obligated to address every issue under Tex. R. App. P. 90(a), and some issues did not require reference to a statement of facts; and while an appellate court generally could not determine whether an agency finding was supported by "substantial evidence" without reviewing the administrative record pursuant to *Tex. Gov't Code Ann. § 2001.174(2)(E)*, that would not preclude the appellate court from addressing issues, such as those involving legal error, that did not require a statement of facts. *Office of Pub. Util. Counsel v. Pub. Util. Comm'n, 878 S.W.2d 598, 1994 Tex. LEXIS 125, 37 Tex. Sup. Ct. J. 1168 (Tex. 1994).*

224. Administrative law judge's (ALJ) suspension of a driver's license was supported by substantial evidence where the arresting officer surmised in his sworn report that the driver had been driving while intoxicated because he emitted a strong odor of alcohol, had glassy eyes and slurred speech, and his movements were slowed and staggered, and where the record revealed that the driver admitted to drinking a few beers before the accident. That gave the officer reasonable suspicion to investigate the driver further, and the officer's reasonable suspicion evolved into probable cause when he observed five out of the six points of the horizontal gaze nystagmus test and the driver refused to provide a breath specimen. *Tex. Dep't of Pub. Safety v. Burrer, 2005 Tex. App. LEXIS 3534 (Tex. App. San Antonio May 11 2005).*

225. Professional disciplinary action against a doctor, based on stale allegations of improper touching of a female patient's breasts, resulted in a due process violation that caused actual prejudice to the doctor's substantial rights, and the action was therefore arbitrary and capricious under *Tex. Gov't Code Ann. § 2001.174(2)(A)*; staleness was not a significant concern as to another patient's complaints, however, because contemporaneous documentary evidence of the complaints existed. *Granek v. Tex. State Bd. of Med. Exam'rs, 172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

226. Medical board did not deny a physician due process regarding a disciplinary hearing that took place six years after the incidents at issue because under *Tex. Gov't Code Ann. § 2001.174(2)(A)*, because he failed to establish actual prejudice, and neither party cited any Texas case addressing the degree or nature of delay in an agency disciplinary action that would give rise to constitutionally significant prejudice. Witness's reliance on notes established actual prejudice. *Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 3396 (Tex. App. Austin May 5 2005),* opinion withdrawn by, substituted opinion at *2005 Tex. App. LEXIS 6232* (Tex. App. Austin Aug. 3, 2005).

227. In a case in which a water conservancy association contested the approval of Amendment 1318C, which resulted in the issuance by the Texas Commission on Environmental Quality (TCEQ) of Certificate of Adjudication No. 14-1318C, the association failed to establish the violation of a constitutionally protected property right by an arbitrary use of power by TCEQ. Therefore, the association's point of error asserting that its due process rights were violated was overruled.

*Concho River Basin Water Conservancy Ass'n v. Tex. Comm'n on Envtl. Quality, 2013 Tex. App. LEXIS 14622 (Tex. App. Amarillo Dec. 3 2013).*

228. Texas Government Code, in providing only substantial-evidence review, specifically *Tex. Gov't Code Ann. § 2001.174*, does not deny equal protection of the laws under *U. S. Const. amend. XIV, § 1*, and *Tex. Const. art. I, § 3. Pretzer v. Motor Vehicle Bd., 125 S.W.3d 23, 2003 Tex. App. LEXIS 277 (Tex. App. Austin 2003),* affirmed in part and reversed in part by *138 S.W.3d 908, 2004 Tex. LEXIS 193, 47 Tex. Sup. Ct. J. 340 (Tex. 2004).*

229. At the license suspension hearing, the arresting officer testified that the driver's vehicle was moving erratically, the officer smelled alcohol coming from the interior of the vehicle, and the driver failed sobriety tests; there was substantial evidence to support the administrative finding that there was reasonable suspicion to stop and probable cause to arrest the driver for driving while intoxicated. The trial court erred by reversing the administrative decision to suspend her driver's license, because she refused to provide a breath sample. *Tex. Dep't of Pub. Safety v. Leath, 2005 Tex. App. LEXIS 3927 (Tex. App. Amarillo May 18 2005).*

230. Administrative law judge's (ALJ) suspension of a driver's license was supported by substantial evidence where the arresting officer surmised in his sworn report that the driver had been driving while intoxicated because he emitted a strong odor of alcohol, had glassy eyes and slurred speech, and his movements were slowed and staggered, and where the record revealed that the driver admitted to drinking a few beers before the accident. That gave the officer reasonable suspicion to investigate the driver further, and the officer's reasonable suspicion evolved into probable cause when he observed five out of the six points of the horizontal gaze nystagmus test and the driver refused to provide a breath specimen. *Tex. Dep't of Pub. Safety v. Burrer, 2005 Tex. App. LEXIS 3534 (Tex. App. San Antonio May 11 2005).*

231. Substantial evidence supported the decision of an administrative law judge to suspend the driver's license of an individual arrested for operating a motor vehicle in a public place while intoxicated. *Tex. Dep't of Pub. Safety v. Hernandez, 2003 Tex. App. LEXIS 6333 (Tex. App. Corpus Christi July 24 2003).*

232. Under the substantial evidence rule of *Tex. Govt. Code Ann. § 2001.174*, the court erred in reversing a license suspension decision by the Texas Department of Public Safety; the administrative law judge did not err in finding, pursuant to *Tex. Transp. Code Ann. § 524.035(a)(2)*, that the officer had probable cause to arrest defendant for driving while intoxicated. *State Dep't of Pub. Safety v. Boeck, 2001 Tex. App. LEXIS 2785 (Tex. App. Corpus Christi Apr. 26 2001).*

233. The holder of a driver's license that was suspended following his arrest for driving while intoxicated was not entitled to have the suspension lifted by a trial court on the basis of breath test results that were admitted into evidence by an administrative law judge even after the Department of Public Safety failed to timely respond to the holder's discovery request for the breath test documentation; while recognizing that the request had been directed to the wrong address, the court stated that the requirements imposed by *Tex. Gov't Code Ann. § 2001.174(2)* for reversal of the suspension were not met and that the holder failed to show that the suspension violated his substantive rights, given that he was free to request a continuance after receiving the documentation only two days before the suspension hearing. *Department of Pub. Safety v. Cantu, 944 S.W.2d 493, 1997 Tex. App. LEXIS 1984 (Tex. App. Houston 14th Dist. 1997).*

234. Texas Department of Public Safety properly suspended an individual's driver's license for his refusal to give a breath specimen after he was arrested for suspicion of DWI. On review, the county court ruled that substantial evidence existed to affirm the administrative decision suspending his driver's license, and that the individual failed to prove that the administrative decision prejudiced his substantial rights. *Parks v. Tex. Dep't of Pub. Safety, 2004 Tex. App. LEXIS 9365 (Tex. App. Houston 1st Dist. Oct. 21 2004).*

235. There was substantial evidence to support an administrative law judge's decision authorizing the suspension of a driver's license under *Tex. Transp. Code Ann. § 524.012(b)(1)* because there was a reasonable suspicion to stop a vehicle based on a failure to stop at a red light, there was probable cause to arrest due to an odor of alcohol and signs of intoxication, and the driver's blood alcohol was above the legal limit. *Tex. Dep't of Pub. Safety v. Caruana, 2012 Tex. App. LEXIS 7125 (Tex. App. Austin Aug. 23 2012).*

236. Substantial evidence, under *Tex. Gov't Code Ann. § 2001.174(2)(E)*, supported an administrative law judge's (ALJ) determination that a police officer had reasonable suspicion to stop a driver, under *Tex. Transp. Code Ann. § 524.035(a)*, because (1) the officer could have reasonably concluded that the driver had committed a traffic offense each time she traveled onto the shoulder, under *Tex. Transp. Code Ann. § 545.058(a)*; (2) the officer could have reasonably concluded that the driver's conduct in driving on the shoulder three times negated application of any of the seven statutory reasons permitting a one-time driving on the shoulder; and (3) conflicting evidence existed before the *ALJ. Tex. Dep't of Pub. Safety v. Riley, 2008 Tex. App. LEXIS 6049 (Tex. App. Fort Worth Aug. 7 2008).*

237. In an administrative license suspension proceeding, substantial evidence supported the judge's decision that a trooper had reasonable suspicion to stop the driver's vehicle because he was committing a traffic offense by driving a vehicle whose taillamps failed to illuminate the rear license plate. *Tex. Dep't of Pub. Safety v. Flanagan, 2014 Tex. App. LEXIS 1713 (Tex. App. Austin Feb. 14 2014).*

238. The holder of a driver's license that was suspended following his arrest for driving while intoxicated was not entitled to have the suspension lifted by a trial court on the basis of breath test results that were admitted into evidence by an administrative law judge even after the Department of Public Safety failed to timely respond to the holder's discovery request for the breath test documentation; while recognizing that the request had been directed to the wrong address, the court stated that the requirements imposed by *Tex. Gov't Code Ann. § 2001.174(2)* for reversal of the suspension were not met and that the holder failed to show that the suspension violated his substantive rights, given that he was free to request a continuance after receiving the documentation only two days before the suspension hearing. *Department of Pub. Safety v. Cantu, 944 S.W.2d 493, 1997 Tex. App. LEXIS 1984 (Tex. App. Houston 14th Dist. 1997).*

239. Under *Tex. Gov't Code Ann. § 2001.174*, the appellate court had to reverse when a substantial right had been prejudiced because the administrative decision was affected by an error of law; the administrative law judge erred in applying the law to the facts as she found them where no necessity justification existed at the time of the driver's arrest because his drive back to the scene was not in avoidance of any imminent harm. *Tex. Dep't of Pub. Safety v. Moore, 175 S.W.3d 270, 2004 Tex. App. LEXIS 4401 (Tex. App. Houston 1st Dist. 2004).*

240. Where one of the pooled unit's property owners sought to dissolve the gas pooling unit as moot, but, on appeal, failed to provide a party, who was originally an intervenor but was a party under the definition provided for in *Tex. Gov't Code Ann. § 2001.003(4)*, with service of a copy of the petition for judicial review, the complaining owner did not meet a necessary condition on which its right to seek judicial review of the Texas Railroad Commission's order depended and, thus, the complaining owner did not prove its right to the relief it sought from the trial court; pursuant to *Tex. Gov't Code Ann. § 2001.174*, the trial court had no choice but to affirm the order of the Commission denying the complaining owner's request to dissolve the pooling unit and it did affirm that order. *Helton v. R.R. Comm'n, 126 S.W.3d 111, 2003 Tex. App. LEXIS 4832, 164 Oil & Gas Rep. 1057 (Tex. App. Houston 1st Dist. 2003).*

241. Final orders of the Railroad Commission are deemed to be prima facie valid and subject to review under the substantial evidence rule. An appellate court reviews the Commission's legal conclusions for errors of law and its findings

of fact for support by substantial evidence. *Tex. Gov't Code Ann. § 2001.174. H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000).*

242. Under the substantial evidence standard of review applied to final orders of the Railroad Commission pursuant to *Tex. Gov't Code Ann. § 2001.174*, the proper test is whether the evidence in its entirety is sufficient that reasonable minds could have reached the conclusion that the Commission must have reached to justify the disputed action. The issue is whether the Commission acted arbitrarily and without regard to the facts. *H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000).*

243. Decision of the Public Utility Commission of Texas (PUC) to use the electric company's original overstated estimate of its transmission system capital costs for a particular interconnection project was not supported by substantial evidence as required by *Tex. Util. Code Ann. § 15.001* of the Public Utility Regulatory Act (PURA), *Tex. Util. Code Ann. §§ 11.001-64.158*, and *Tex. Gov't Code Ann. § 2001.174(2)(E)*. The electric company's witness had reduced his estimate on rebuttal due to the fact that new technology increased the capacity of existing transmission facilities and eliminated the need to construct certain new projects; therefore no reasonable basis existed for the PUC's use of the original estimate. *Reliant Energy, Inc. v. PUC, 153 S.W.3d 174, 2004 Tex. App. LEXIS 11280 (Tex. App. Austin 2004).*

244. Substantial evidence pursuant to *Tex. Gov't Code Ann. § 2001.174* supported an order of the Public Utility Commission of Texas that raised the fuel factor component of the price-to-beat for an affiliated retail electric provider (AREP) because the Commission linked the measurement of the adequacy of the fuel factor to reflect significant changes in market price and the mechanism to correct inadequacies, and concluded that the New York Mercantile Exchange (NYMEX) was sufficient for both tasks, and because the Commission did not err in barring the order's opponents from presenting relevant evidence under *Tex. R. Evid. 401* where evidence regarding the AREP's purchase price and any windfall profits resulting from the fuel-factor adjustment did not bear on whether the NYMEX index had changed the requisite amount. Furthermore, the fuel-factor increase did not violate a set limit on the price-to-beat under *Tex. Util. Code Ann. § 39.202* because the adjustments under § 39.202(l) were not limited by § 39.202(p). *City of Alvin v. PUC of Tex., 143 S.W.3d 872, 2004 Tex. App. LEXIS 7685 (Tex. App. Austin 2004).*

245. Granting of a certificate of convenience and necessity to the power and light company was proper where the application adequately addressed the factors of probable improvement of service or lowering of costs to consumers; further, the evidence supported that the individuals had notice of ex parte communications and an opportunity to address them, *Tex. Gov't Code Ann. §§ 2001.061, 2001.174. Hammack v. PUC, 2003 Tex. App. LEXIS 8980 (Tex. App. Austin Oct. 23 2003),* opinion withdrawn by, substituted opinion at *131 S.W.3d 713, 2004 Tex. App. LEXIS 3396 (Tex. App. Austin 2004).*

246. There are two requirements that the Texas Public Utility Commission must meet in order to consider a non-unanimous settlement stipulation (NUS) as part of its final order; first, the commission must afford any non-stipulating party the opportunity to be heard on the merits of the stipulation and, second, the commission must make an independent finding, on the merits, that the terms of the stipulation are fair, just and reasonable, and are supported by evidence in the record; the second requirement reflects the rule that an agency's decision, whether or not based on an NUS, must be supported by substantial evidence. *City of Somerville v. Public Util. Comm'n, 865 S.W.2d 557, 1993 Tex. App. LEXIS 2992 (Tex. App. Austin 1993),* vacated by *865 S.W.2d 557, 1993 Tex. App. LEXIS 3265 (Tex. App. Austin 1993),* overruled by *Public Util. Comm'n v. GTE-Southwest, 901 S.W.2d 401, 1995 Tex. LEXIS 45, 38 Tex. Sup. Ct. J. 485 (Tex. 1995).*

247. In an action involving a grant of an amended certificate of convenience and necessity, the trial court upheld defendant's grant to the applicant when the applicant was under no duty to present evidence that it studied alternative routes and thus plaintiff was not prejudiced within the meaning of former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e). *Frost v. Public Util. Comm'n, 672 S.W.2d 883, 1984 Tex. App. LEXIS 5627 (Tex. App. Austin 1984).*

248. Public Utility Commission of Texas' finding that it was appropriate to limit the amount that the telecommunications provider should refund to the amount of overcharges to the county hospital district and order a partial refund was arbitrary and capricious, *16 Tex. Admin. Code § 26.27*; l]this imitation prejudiced the substantial rights of the district, *Tex. Gov't Code Ann. § 2001.174(2)*. *Harris County Hosp. Dist. v. PUC of Tex., 2012 Tex. App. LEXIS 5707 (Tex. App. Austin July 13 2012)*.

249. In a case where a power agency sought judicial review of a final order from the Public Utility Commission of Texas under *Tex. Util. Code Ann. § 15.001* and *Tex. Gov't Code Ann. § 2001.174*, declaratory relief on the ground of jurisdiction was redundant and unnecessary since the issue was already raised. *Tex. Mun. Power Agency v. PUC of Tex., 260 S.W.3d 647, 2008 Tex. App. LEXIS 5555 (Tex. App. Austin 2008)*.

250. Substantial evidence supported the Public Utility Commission's findings and conclusions that the contract reflected a conveyance of capacity because it could have reasonably determined that the electric company had paid not only for the variable "energy" costs of the power it took but the public service company's fixed costs of making its generation assets available. In addition, the Commission's application of the Former Fuel Rule § 23.23(b)(2)(B)(iv), 16 Tex. Admin. Code § 23.23 (1995), repealed by 24 Tex. Reg. 4998 (1999) (current version at *16 Tex. Admin. Code § 25.236* (2010)), to those facts to conclude that the electric company's purchases had a "capacity" component was reasonable and not plainly erroneous or inconsistent with the rule. *City of El Paso v. Puc of Tex., 344 S.W.3d 609, 2011 Tex. App. LEXIS 5040 (Tex. App. Austin 2011)*.

251. Texas Railroad Commission's adoption of a non-publicly traded gas utility's rate adjustment mechanism did not violate the procedural requirements of the Administrative Procedure Act because the substantive aspects of the adjustment mechanism were fully reviewed in a contested-case hearing, during which witnesses were permitted to, and did, present testimony both in favor of and opposed to the adjustment mechanism. Moreover, there was testimony regarding additional procedural requirements recommended for inclusion in the adjustment mechanism, and all parties had the opportunity to present additional testimony in that regard or to challenge the testimony provided. *State Agencies & Insts. of Higher Educ. v. R.R. Comm'n of Tex., 421 S.W.3d 690, 2014 Tex. App. LEXIS 566 (Tex. App. Austin 2014)*.

252. *16 Tex. Admin. Code § 25.263(l)(3)* was held to be invalid as it was inconsistent with the legislature's intent, expressed in Tex. Util. Code Ann. ch. 39 of the Texas Public Utility Regulatory Act, that utilities could fully recover their net, verifiable, nonmitigable stranded costs incurred in purchasing power and providing electric generation service, that existed on the last day of the freeze period (December 31, 2001). A two- or three-year gap in recovery of carrying costs would not have permitted the companies full recovery of their stranded costs as the legislature envisioned. *Centerpoint Energy, Inc. v. PUC of Tex., 2004 Tex. LEXIS 540, 47 Tex. Sup. Ct. J. 672 (Tex. 2004)*, opinion withdrawn by, substituted opinion at *143 S.W.3d 81, 2004 Tex. LEXIS 881, 47 Tex. Sup. Ct. J. 1156 (Tex. 2004)*.

253. Granting of a certificate of convenience and necessity to the power and light company was proper where the application adequately addressed the factors of probable improvement of service or lowering of costs to consumers; further, the evidence supported that the individuals had notice of ex parte communications and an opportunity to address them, *Tex. Gov't Code Ann. §§ 2001.061, 2001.174*. *Hammack v. PUC, 2003 Tex. App. LEXIS 8980 (Tex. App. Austin Oct. 23 2003)*, opinion withdrawn by, substituted opinion at *131 S.W.3d 713, 2004 Tex. App. LEXIS 3396 (Tex. App. Austin 2004)*.

254. Final order of the Public Utility Commission of Texas, which reconciled an electric utility company's eligible fuel expenses and revenues for a certain time period, was upheld on appeal as a reasonable remedy within the Commission's statutory authority; the Commission's final order was found to have reasonably required the utility company to account for all revenues it collected after December 31, 2001, that were directly attributable to the generation of electricity

through that date, and reasonably required it to reconcile all fuel revenues it received and expenses it incurred after that date, to serve customers who were not yet switched to a retail electric provider; the Commission reconciliation methodology was found to have been proper and reasonably interpreted the Texas Legislature's directive to conduct a final reconciliation by accounting for all revenues associated with the expenses of providing bundled service during the reconciliation period; a reasonable basis existed for the Commission's decision to discount approximately $ 2.7 million in fuel costs and that the decision was supported by substantial evidence; and the Commission was found to have properly delineated and applied its reasonableness or prudence standard of review, which took into account, among other things, changes in the market. Aep Tex. N. Co. v. Public Util. Comm?n of *Tex., 297 S.W.3d 435, 2009 Tex. App. LEXIS 7064 (Tex. App. Austin 2009).*

255. Where one of the pooled unit's property owners sought to dissolve the gas pooling unit as moot, but, on appeal, failed to provide a party, who was originally an intervenor but was a party under the definition provided for in *Tex. Gov't Code Ann. § 2001.003(4)*, with service of a copy of the petition for judicial review, the complaining owner did not meet a necessary condition on which its right to seek judicial review of the Texas Railroad Commission's order depended and, thus, the complaining owner did not prove its right to the relief it sought from the trial court; pursuant to *Tex. Gov't Code Ann. § 2001.174*, the trial court had no choice but to affirm the order of the Commission denying the complaining owner's request to dissolve the pooling unit and it did affirm that order. *Helton v. R.R. Comm'n, 126 S.W.3d 111, 2003 Tex. App. LEXIS 4832, 164 Oil & Gas Rep. 1057 (Tex. App. Houston 1st Dist. 2003).*

256. Substantial evidence supported the Public Utility Commission's findings and conclusions that the contract reflected a conveyance of capacity because it could have reasonably determined that the electric company had paid not only for the variable "energy" costs of the power it took but the public service company's fixed costs of making its generation assets available. In addition, the Commission's application of the Former Fuel Rule § 23.23(b)(2)(B)(iv), 16 Tex. Admin. Code § 23.23 (1995), repealed by 24 Tex. Reg. 4998 (1999) (current version at *16 Tex. Admin. Code § 25.236* (2010)), to those facts to conclude that the electric company's purchases had a "capacity" component was reasonable and not plainly erroneous or inconsistent with the rule. *City of El Paso v. Puc of Tex., 344 S.W.3d 609, 2011 Tex. App. LEXIS 5040 (Tex. App. Austin 2011).*

257. Public utility commission properly determined that a utility company could recover costs incurred before the commencement of commercial operations at a wind farm in a fuel reconciliation proceeding, where a prior settlement order was ambiguous as to the recovery of those costs. Substantial evidence supporting the determination included testimony from a company expert that pre-commercial wind-energy costs should be treated the same as other purchased power costs that were included in reconcilable fuel expense. *Cities of Abilene, San Angelo, & Vernon v. PUC, 146 S.W.3d 742, 2004 Tex. App. LEXIS 8453 (Tex. App. Austin 2004).*

258. Railroad commission's decision to base a gas corporation's rates on a statewide basis was reasonable and based on substantial evidence, given the factors analyzed, despite a city's evidence based on its distribution system. *City of Dallas v. R.R. Comm'n of Tex., 2008 Tex. App. LEXIS 8479 (Tex. App. Austin Nov. 6 2008).*

259. Public Utility Commission was arbitrary and capricious in deciding not to allow rate-case expenses from earlier proceedings without prior Commissioner approval where it departed from prior Commission practice without explaining the reason for its change in position, made findings of fact and conclusions of law without adequate support in the record, and failed to give notice before the hearing of its intention to implement a new requirement. *Oncor Elec. Delivery Co. Llc v. PUC of Tex., 406 S.W.3d 253, 2013 Tex. App. LEXIS 7334 (Tex. App. Austin 2013).*

260. Texas Railroad Commission's findings regarding the gas utility's costs to acquire its predecessor were supported by substantial evidence as required under *Tex. Gov't Code Ann. § 2001.174* and *Tex. Util. Code Ann. § 105.001*; further, the

Commission did not err by including the gas utility's costs in acquiring its predecessor as a known and measurable change" in its gas rate award because nothing in *Tex. Util. Code Ann. § 103.055* prohibited the Commission from accounting for additional expenses as a "known and measurable change" simply because they were known to a utility at the time of its updated rate request. *City of Port Neches v. R.R. Comm'n of Tex., 212 S.W.3d 565, 2006 Tex. App. LEXIS 6936 (Tex. App. Austin 2006).*

261. Texas Commission on Environmental Quality did not err in issuing an air quality permit to an applicant seeking to build a pulverized coal power plant because although opponents of the permit argued that an application had to be denied or that an offset had to be obtained when any downwind contribution was made to a national ambient air quality standards (NAAQS) ozone exceedance, both the federal and state interpretation of the "cause or contribute to" standard for a violation of NAAQS will tolerate some insignificant level of contribution to a downwind NAAQS ozone exceedance. Moreover, the Commission's decision of whether the applicant's proposed facility would have a significant impact on particular nonattainment areas applied only to the present case and did not create a rule or policy of general applicability that any downwind impact on a nonattainment area that was less than what was measurable by monitor would be deemed insignificant. *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality, 2009 Tex. App. LEXIS 596 (Tex. App. Amarillo Jan. 29 2009).*

262. Texas Commission on Environmental Quality did not err under *Tex. Health & Safety Code Ann. § 382.0518(b)(1)* in excluding as not relevant evidence that the best available control technology (BACT) analysis for an air quality permit applicant's coal-fueled power plant should have included consideration of integrated gasification combined cycle (IGCC) where the Commission had appropriately drawn the line between what constituted a control technology that could be applied to the applicant's proposed plant and what constituted a redesign of the proposed plant. An IGCC process was significantly different from the pulverized coal power plant proposed by the applicant, and because an opponent of the application had offered no evidence that IGCC was a process that could be applied to the proposed pulverized coal power plant, it had failed to meet its burden. *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality, 2009 Tex. App. LEXIS 596 (Tex. App. Amarillo Jan. 29 2009).*

263. Texas Commission on Environmental Quality did not err in issuing an air quality permit to an applicant seeking to build a pulverized coal power plant because although opponents of the permit argued that an application had to be denied or that an offset had to be obtained when any downwind contribution was made to a national ambient air quality standards (NAAQS) ozone exceedance, both the federal and state interpretation of the "cause or contribute to" standard for a violation of NAAQS will tolerate some insignificant level of contribution to a downwind NAAQS ozone exceedance. Moreover, the Commission's decision of whether the applicant's proposed facility would have a significant impact on particular nonattainment areas applied only to the present case and did not create a rule or policy of general applicability that any downwind impact on a nonattainment area that was less than what was measurable by monitor would be deemed insignificant. *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality, 2009 Tex. App. LEXIS 596 (Tex. App. Amarillo Jan. 29 2009).*

264. Texas Commission on Environmental Quality properly approved an application for an air quality permit necessary for an applicant to build a pulverized coal power plant where far more than substantial evidence supported its finding that the proposed plant would not significantly contribute to the national ambient air quality standards ozone nonattainment of the areas at issue because, among other things, there was no record evidence identified by an opponent of the application of what, if any, impact the applicant's less than 0.03 ppb ozone contribution would have on the ozone nonattainment areas, and the opponent also failed to identify any evidence of the extent to which a less than 0.03 ppb ozone increase in an ozone nonattainment area would adversely impact the health of residents of the nonattainment area. The Commission's decision of whether the applicant's proposed facility would have a significant impact on the nonattainment areas at issue applied only to the present case and did not create a rule or policy of general applicability that any downwind impact on a nonattainment area that was less than what was measurable by monitor would be deemed insig-

nificant. *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality, 283 S.W.3d 525, 2009 Tex. App. LEXIS 2534 (Tex. App. Amarillo 2009).*

265. Texas Commission on Environmental Quality properly approved an application for an air quality permit necessary for an applicant to build a pulverized coal power plant where far more than substantial evidence supported its finding that the proposed plant would not significantly contribute to the national ambient air quality standards ozone nonattainment of the areas at issue because, among other things, there was no record evidence identified by an opponent of the application of what, if any, impact the applicant's less than 0.03 ppb ozone contribution would have on the ozone nonattainment areas, and the opponent also failed to identify any evidence of the extent to which a less than 0.03 ppb ozone increase in an ozone nonattainment area would adversely impact the health of residents of the nonattainment area. The Commission's decision of whether the applicant's proposed facility would have a significant impact on the nonattainment areas at issue applied only to the present case and did not create a rule or policy of general applicability that any downwind impact on a nonattainment area that was less than what was measurable by monitor would be deemed insignificant. *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality, 283 S.W.3d 525, 2009 Tex. App. LEXIS 2534 (Tex. App. Amarillo 2009).*

266. Texas Commission on Environmental Quality did not err under *Tex. Health & Safety Code Ann. § 382.0518(b)(1)* in excluding as not relevant evidence that the best available control technology (BACT) analysis for an air quality permit applicant's coal-fueled power plant should have included consideration of integrated gasification combined cycle (IGCC) where the Commission had appropriately drawn the line between what constituted a control technology that could be applied to the applicant's proposed plant and what constituted a redesign of the proposed plant. An IGCC process was significantly different from the pulverized coal power plant proposed by the applicant, and because an opponent of the application had offered no evidence that IGCC was a process that could be applied to the proposed pulverized coal power plant, it had failed to meet its burden. *Blue Skies Alliance v. Tex. Comm'n on Envtl. Quality, 2009 Tex. App. LEXIS 596 (Tex. App. Amarillo Jan. 29 2009).*

267. Pursuant to the former Texas Administrative Procedure and Texas Register Act, Tex. Rev. Civ. Stat. Ann. § 19(e)(5), the evidence was sufficient for the Texas Water Commission (Commission) to deny applicant permits to construct and operate a hazardous waste facility, where the applicant proposed to store hazardous slurry in a salt dome cavern, where the applicant could not guarantee that the slurry would maintain proper contact with the cavern walls, where the salt dome was structurally unstable, and where tow aquifers were located above the salt dome. *United Resource Recovery, Inc. v. Water Comm'n, 815 S.W.2d 797, 1991 Tex. App. LEXIS 2034 (Tex. App. Austin 1991).*

268. Because *Tex. Health and Safety Code Ann. § 361.0832* of the Texas Solid Waste Disposal Act, *Tex. Health and Safety Code Ann. §§ 361.001-.754*, provides standards detailing when the Texas Natural Resources Conservation Commission (commission) may properly overturn the findings, conclusions, and ultimate findings of a hearing examiner, *Tex. Gov't. Code Ann. § 2001.174(2)* of the Texas Administrative Procedures Act governs the court's review of the commission's decision. *Hunter Indus. Facilities v. Texas Natural Resource Conservation Comm'n, 910 S.W.2d 96, 1995 Tex. App. LEXIS 2515 (Tex. App. Austin 1995).*

269. Order of the Texas Railroad Commission, directing appellant company to backfill and compact certain sludge pits and to dispose of all oil or oil by-products located in them, was not arbitrary and capricious under former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e)(6) because the fact that appellant controlled the pits for 23 years was not legally irrelevant, nor was it inherently arbitrary to proceed against only appellant even though other potentially liable parties existed; while the pits had been conveyed to appellant by a corporation that had disposed of sludge in the pits, and appellant subsequently had released its interest in the pits to another party, the harm caused by the joint tortfeasors was indi-

visible, and thus the Commission could choose to proceed against only one of them. *Lone Star Salt Water Disposal Co. v. Railroad Comm'n, 800 S.W.2d 924, 1990 Tex. App. LEXIS 3123, 115 Oil & Gas Rep. 166 (Tex. App. Austin 1990).*

270. Texas Commission on Environmental Quality did not abuse its discretion in approving the expansion of a municipal solid-waste landfill to increase the height of allowable waste disposal by 50 to 75 feet from its existing height of 720 feet, despite odors affecting the neighbors, because odor was not a specifically delineated factor for land-use-compatibility determinations in *30 Tex. Admin. Code § 330.61*, .53. *Northeast Neighbors Coalition v. Tex. Comm'n on Envtl. Quality, 2013 Tex. App. LEXIS 4064 (Tex. App. Austin Mar. 28 2013).*

271. Texas Commission on Environmental Quality (TCEQ) violated *Tex. Health & Safety Code Ann. § 361.0832* when it expanded a landfill's operating hours and overturned an administrative law judge's (ALJ) findings with no explanation of its reasoning or grounds for so deciding. The appellate court was unable to substitute its judgment for that of the TCEQ by affirming the ALJ's decision; rather, the options were to reverse or to remand the case to the agency for further proceedings. *Heritage v. Tex. Comm'n on Envtl. Quality & Williamson County, 2012 Tex. App. LEXIS 6460 (Tex. App. Austin July 31 2012).*

272. Texas Commission on Environmental Quality (TCEQ) violated *Tex. Health & Safety Code Ann. § 361.0832* when it expanded a landfill's operating hours and overturned an administrative law judge's (ALJ) findings with no explanation of its reasoning or grounds for so deciding. The appellate court was unable to substitute its judgment for that of the TCEQ by affirming the ALJ's decision; rather, the options were to reverse or to remand the case to the agency for further proceedings. *Heritage v. Tex. Comm'n on Envtl. Quality & Williamson County, 2012 Tex. App. LEXIS 6460 (Tex. App. Austin July 31 2012).*

273. Substantial evidence in the record supported the Texas Natural Resource Conservation Commission's finding that a landfill owner's expansion application was administratively and technically complete because the owner had included all necessary information in the application, and while some witnesses could not independently verify particular documents or exhibits, there was nothing in the record that cast doubt upon the information, and the opponents to the application did not introduce any contrary exhibits to demonstrate that the limited evidence was altered or falsified. Because the application was determined to be administratively and technically complete prior to the contested case hearing, the owner was not required to establish at the contested-case hearing that its application complied with each administrative and technical requirement because it had already done so prior to the hearing. *Citizens Against Landfill Location v. Tex. Comm'n on Envtl. Quality, 169 S.W.3d 258, 2005 Tex. App. LEXIS 3583 (Tex. App. Austin 2005).*

274. Pursuant to *Tex. Gov't Code Ann. § 2001.174*, the district court's judgment affirming the Texas Commission on Environmental Quality's order granting the landfill operator a permit to build and operate a municipal landfill facility was proper because there was substantial evidence to support the findings and conclusions that: (1) the operator's groundwater-monitoring plan was sufficient; (2) a fault with displacement in the Holocene time did not exist within 200 feet of the proposed landfill; (3) the landfill liner's integrity would not be compromised; (4) the operator's floodplain analysis provided an accurate delineation of the 100-year floodplain; (5) the operator adequately demonstrated the effects of its proposed project on flood conditions with respect to soil-cover operations; and (6) the project would not significantly alter natural drainage. *Coalition for Long Point Preservation v. Tex. Comm'n on Envtl. Quality, 106 S.W.3d 363, 2003 Tex. App. LEXIS 3987 (Tex. App. Austin 2003).*

275. Texas Commission on Environmental Quality did not abuse its discretion in approving the expansion of a municipal solid-waste landfill to increase the height of allowable waste disposal by 50 to 75 feet from its existing height of 720 feet, despite odors affecting the neighbors, because odor was not a specifically delineated factor for land-use-compatibility determinations in *30 Tex. Admin. Code § 330.61*, .53. *Northeast Neighbors Coalition v. Tex. Comm'n on Envtl. Quality, 2013 Tex. App. LEXIS 4064 (Tex. App. Austin Mar. 28 2013).*

276. Texas Commission on Environmental Quality violated *Tex. Health & Safety Code Ann. § 361.0832(f)* and exceeded its statutory authority by failing to explain in its order why it rejected the administrative law judge's findings that all of the landfill's operations be conducted during the recommended operating hours, Heritage on the San Gabriel Homeowners Ass?n v. *Tex. Comm'n on Envtl. Quality, 393 S.W.3d 417, 2012 Tex. App. LEXIS 10767 (Tex. App. Austin 2012)*.

277. Group's substantial rights were not prejudiced by the addition of the special provision to the landfill application, because the appellate court could not see how the group had been harmed by the Texas Commission on Environmental Quality adopting a permit that provided more groundwater monitoring than was required by the administrative rules, when the permit not only satisfied the rules' requirements that groundwater from the uppermost aquifer be monitored, as it must, but it also provided for extra monitoring of groundwater that the evidence showed was not in the uppermost aquifer. *City of Jacksboro v. Two Bush Cmty. Action Group, 2012 Tex. App. LEXIS 5243 (Tex. App. Austin June 28 2012)*.

278. Texas Racing Commission's decision to modify the ALJ's conclusion and impose the steward's initial penalty of disqualifying the horse and the loss of the purse due the use of ipratropium, a prohibited Class 3 drug, was within the Commission's authority under *Tex. Gov't Code Ann. § 2001.058(e)*, and the "loss of purse" penalty was expressly authorized by the Texas Racing Act, Tex. *Rev. Civ. Stat. Ann. art. 179e*, and the Commission's rules, guidelines, and zero-drug tolerance policy; further, the burden of proof was correctly placed on the owner and at the appropriate standard because nothing in the Tex. *Rev. Civ. Stat. Ann. art. 179e* states that the burden of proof should be placed on the agency. *Pierce v. Tex. Racing Comm'n, 212 S.W.3d 745, 2006 Tex. App. LEXIS 9062 (Tex. App. Austin 2006)*.

279. Party appealing an agency's decision bears the burden of showing a lack of substantial evidence. The evidence in the record may actually weigh by a preponderance against the agency's decision, yet satisfy the substantial evidence standard. *H. G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd., 36 S.W.3d 597, 2000 Tex. App. LEXIS 7557, 151 Oil & Gas Rep. 265 (Tex. App. Austin 2000)*.

280. Under the Texas Administrative Procedures Act, *Tex. Gov't Code Ann. § 2001.174(2)*, the trial court has the authority to reverse an agency determination if it finds that the substantive rights of the appellant are prejudiced due to a constitutional or statutory violation, the decision was made unlawfully or affected by an error of law, not supported by substantial evidence, or was found to be arbitrary or capricious. *Dep't of Pub. Safety v. Breazeale, 1999 Tex. App. LEXIS 7131 (Tex. App. Houston 14th Dist. Sept. 23 1999)*.

281. Where the Railroad Commission of Texas and a motor carrier challenged a ruling which denied the commission an opportunity to correct defects in an order, the order could be corrected; the Texas constitution's prohibition against retroactive laws did not apply to procedural or remedial statutes. *Railroad Com. v. Merchants Fast Motor Lines, Inc., 545 S.W.2d 198, 1976 Tex. App. LEXIS 3326 (Tex. Civ. App. Austin 1976),* reversed by *573 S.W.2d 502, 1978 Tex. LEXIS 409, 22 Tex. Sup. Ct. J. 54 (Tex. 1978)*.

282. Texas Government Code, in providing only substantial-evidence review, specifically *Tex. Gov't Code Ann. § 2001.174*, does not deny equal protection of the laws under *U. S. Const. amend. XIV*, § 1, and *Tex. Const. art. I, § 3*. *Pretzer v. Motor Vehicle Bd., 125 S.W.3d 23, 2003 Tex. App. LEXIS 277 (Tex. App. Austin 2003),* affirmed in part and reversed in part by *138 S.W.3d 908, 2004 Tex. LEXIS 193, 47 Tex. Sup. Ct. J. 340 (Tex. 2004)*.

283. When providing an independent right to judicial review in *Tex. Gov't Code Ann. § 2001.171* of the Texas Administrative Procedure Act, the legislature has necessarily understood that state agencies will be sued in court by persons ex-

ercising that right, that contested-case decisions of those agencies will be judicially reviewed under the standards set forth in *Tex. Gov't Code Ann. § 2001.174*, and that the challenged administrative decisions will be either affirmed, reversed, or remanded as provided by § 2001.174. Therefore, *Tex. Gov't Code Ann. § 2001.171* provides a limited waiver of sovereign immunity. *Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc., 145 S.W.3d 170, 2004 Tex. LEXIS 780, 47 Tex. Sup. Ct. J. 1116 (Tex. 2004).*

284. By expressly excluding a decision on a disqualification for a foul from appeal, Tex. *Rev. Civ. Stat. Ann. art. 179e*, § 3.08(b) makes other decisions on disqualification of racehorses appealable by implication; thus, an owner whose horses were disqualified for wearing the wrong saddle cloth numbers had a right to an administrative appeal, and his request for declaratory relief under *Tex. Civ. Prac. & Rem. Code Ann. § 37.004* fell within the ultra vires exception to sovereign immunity. The trial court lacked subject matter jurisdiction to make further rulings on the merits until the owner exhausted administrative remedies as provided in Tex. *Rev. Civ. Stat. Ann. art. 179e*, §§ 3.02, 3.08 and *Tex. Gov't Code Ann. § 2001.174. Tex. Racing Comm'n v. Marquez, 2011 Tex. App. LEXIS 6653 (Tex. App. Austin Aug. 19 2011).*

285. Substantial evidence supported a decision by the Texas Racing Commission to impose penalties under Tex. *Rev. Civ. Stat. Ann. art. 179e*, § 3.07(b) on a horse owner and trainer whose racing horse tested positive for prohibited drug; although the Commission's rules did not set forth any procedures for handling a urine sample that was inadvertently returned, the Commission acted reasonably in storing and resending the sample for testing, and the integrity of that sample had not been compromised. *Keeton v. Tex. Racing Comm'n, 2003 Tex. App. LEXIS 6925 (Tex. App. Austin Aug. 14 2003).*

286. Texas Commission of Licensing and Regulation complied with *Tex. Gov't Code Ann. § 2001.058(e)* by specifying the reason and legal basis for its modifications to the ALJ's findings and conclusions and its decision was supported by substantial evidence and made through lawful procedure. *Tex. Gov't Code Ann. §§ 2001.058(e)*, .174; the Commission expressly addressed and made findings in its decisions to the statutory factors in the *Occupation Code. Tex. Dep't of Licensing & Regulation v. Thompson, 2013 Tex. App. LEXIS 8832 (Tex. App. Austin July 18 2013).*

287. Texas Alcoholic Beverage Commission properly suspended the licensee's alcoholic beverage permit and license for five days, because substantial evidence supported the conclusion that the third party was an employee, agent, or servant for purposes of establishing a violation of *Tex. Alco. Bev. Code Ann. § 104.01(4)*, when the focus was whether there was substantial evidence to support the determination that the third party was an employee, agent, or servant for purposes of establishing a violation. *Villatoro v. Tex. Alcoholic Bev. Comm'n, 2013 Tex. App. LEXIS 6780 (Tex. App. Dallas June 3 2013).*

288. Enforced suspension of appellee's pharmacist license by the Texas State Board of Pharmacy concurrently with the suspension of her North Carolina license resulted from the improper application of a "rule" as that term was defined in the Administrative Procedure Act (APA), *Tex. Gov't Code Ann. § 2001.003(6)*. The Board's informally announced reciprocal-sanctions policy was invalid under *Tex. Gov't Code Ann. § 2001.174(2)*, because it not adopted in accordance with the APA's rulemaking procedures. *Tex. State Bd. of Pharm. v. Witcher, 2013 Tex. App. LEXIS 5482 (Tex. App. Austin May 3 2013).*

289. Substantial rights of a business were not prejudiced, for purposes of *Tex. Gov't Code Ann. § 2001.174(2)*, by a rehearing on the cancellation of its liquor license: a rehearing was not essential to due process in administrative proceedings, and different treatment from other violators was insufficient to establish discrimination. *Melmat, Inc. v. Tex. Alcoholic Bev. Comm'n, 362 S.W.3d 211, 2012 Tex. App. LEXIS 1550 (Tex. App. Dallas 2012).*

290. Order canceling a business's mixed beverage, late hours, and beverage cartage permits and denying its application to renew its food and beverage certificate did not prejudice the business's rights within the meaning of *Tex. Gov't Code Ann § 2001.174*. Making false statements on the application was not a minor violation as to which the penalty was unreasonable. *Melmat, Inc. v. Tex. Alcoholic Bev. Comm'n, 2012 Tex. App. LEXIS 1553 (Tex. App. Dallas Feb. 29 2012).*

291. In a medical license suspension case, the court erred by denying a doctor's motion for rehearing because the doctor timely filed a motion for rehearing giving the Board fair notice that he was dissatisfied with its conclusions that he failed to practice medicine in a manner consistent with public health and welfare and failed to treat a patient according to the generally accepted standard of care. *Johnson v. Tex. Med. Bd., 2010 Tex. App. LEXIS 845 (Tex. App. Austin Feb. 5 2010).*

292. There was substantial evidence in the record to support the Texas State Board of Public Accountancy's conclusion that a certificate holder had presented himself as an accountant while his certificate was suspended; the record did not support the holder's claim that he misunderstood the effect of a 1999 order suspending his certificate to practice public accountancy; the holder had committed violations in the past, and he was found to be not fit to practice public account-ancy under *Tex. Occ. Code Ann. § 901.502(11). Rogers v. State Bd. of Pub. Accountancy, 310 S.W.3d 1, 2008 Tex. App. LEXIS 2961 (Tex. App. Austin 2008).*

293. Trial court's conclusion that the state motor vehicle board's findings of fact that a motor vehicle distributor engaged in business as a dealer in Texas were not supported by substantial evidence, and that the board's conclusions of law that the distributor violated statutory prohibitions, were affected by error of law, was upheld where the undisputed facts were that, in response to a Texas city's solicitation, the distributor sold and delivered two buses to the city in New Mexico and that, from there, the city paid for the buses to be brought into Texas; there was no evidence that the distributor ever physically crossed the New Mexico border into Texas related to the transaction, and, under *Tex. Bus. & Com. Code Ann. § 2.401*, legal title to the buses passed in New Mexico because the agreement of the parties required the distributor to deliver the buses in *New Mexico. Motor Vehicle Bd. v. Prevost Car (US), Inc., 2006 Tex. App. LEXIS 8461 (Tex. App. Austin Sept. 26 2006).*

294. Trial court erred by concluding that cancellation of a permittee's mixed beverage permits was an inappropriate penalty for a single violation where, in addition to the permittee's selling of an alcoholic beverage to a patron who ex-hibited obvious signs of intoxication, the Texas Alcoholic Beverage Commission had assessed administrative penalties against the permittee for seven separate violations of the Texas Alcoholic Beverage Code (ABC); because the repeated violations evidenced a disregard for the provisions of the ABC and the sanctions imposed by the Commission, the Commission had not acted arbitrarily or capriciously or abused its discretion by canceling the permittee's mixed bever-age and late night permits. *Tex. Alcoholic Bev. Comm'n v. Quintana, 225 S.W.3d 200, 2005 Tex. App. LEXIS 9988 (Tex. App. El Paso 2005).*

295. Texas State Board of Medical Examiners' conclusion that disciplinary grounds existed for a doctor's improper con-tact with a female patient was supported by its findings, conclusions and evidence, in accordance with *Tex. Gov't Code Ann. § 2001.174(2)(E)*, where even though the patient was somewhat confused and inconsistent regarding the details of her surroundings when the incidents occurred, she testified unequivocally that the doctor touched her breasts despite her attempts to shield herself with magazines. The administrative law judge heard the patient's testimony firsthand, was able to observe her and her demeanor, and concluded that she made a credible witness, and the appellate court could not second-guess such credibility determinations in the guise of a substantial-evidence inquiry. *Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 6232 (Tex. App. Austin Aug. 3 2005),* substituted opinion at, opinion withdrawn by *172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

296. Doctor's failure to attend a patient in the emergency room was properly found to be a failure to practice medicine in an acceptable professional manner consistent with public health and welfare, in violation of *Tex. Occ. Code Ann. § 164.051(a)(6)*, and unprofessional or dishonorable conduct that was likely to injure the public, in violation of *Tex. Occ. Code Ann. §§ 164.051(a)(1), 164.052(a)(5)*, where the Texas State Board of Medical Examiners' expert testified that, based on her review of relevant medical records, the doctor's care and treatment of the patient did not meet the standard of care and was a professional failure to practice medicine consistent with the public health and welfare, and where, because patients were considered members of the public, the expert's testimony, which was unchallenged on appeal, also supported the Board's conclusion that the doctor committed unprofessional conduct that was likely to injure the public. Furthermore, because the hospital's disciplinary action against the doctor was directed to the same conduct, there was substantial evidence to support discipline under *Tex. Occ. Code Ann. § 164.051(a)(7). Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 6232 (Tex. App. Austin Aug. 3 2005),* substituted opinion at, opinion withdrawn by *172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

297. Revocation of a doctor's medical license was supported by substantial evidence where there was scientific evidence that two of the doctor's urine samples tested positive for cocaine, and one expert witness definitively testified that the tests foreclosed the possibility of ingestion by inadvertent passive exposure. *Hinkley v. Tex. State Bd. of Med. Exam'rs, 140 S.W.3d 737, 2004 Tex. App. LEXIS 5078 (Tex. App. Austin 2004).*

298. Trial court remanded for reconsideration the penalty of cancelling a bar's mixed beverage and late hours permits because two of the grounds for revocation of the license were not supported by substantial evidence, the determination did not require further evidence, and the appellate court found that the agency did not abuse its discretion in denying an evidentiary hearing pursuant to *Tex. Gov't Code Ann. § 2001.174(2). Allen-Burch, Inc. v. Tex. Alcoholic Bev. Comm'n, 104 S.W.3d 345, 2003 Tex. App. LEXIS 3945 (Tex. App. Dallas 2003).*

299. Contrary to the trial court's findings, the officer's testimony, that the driver admitted to drinking, had slurred speech, blood shot eyes, an odor of intoxication, and unsteadiness, was sufficient to support the ALJ findings, and the appellate court ordered the suspension of the driver's license to be reinstated. *Tex. Dep't of Pub. Safety v. Gutierrez, 2003 Tex. App. LEXIS 2989 (Tex. App. San Antonio Apr. 9 2003).*

300. Motor vehicle board's decision to grant a new franchisee's application for an auto-dealer license was based on substantial evidence within the meaning of *Tex. Gov't Code Ann. § 2001.174(2)(E)* where the evidence supported the elements of good cause under former Tex. Rev. Stat. Ann. art. 4413(36), § 4.06(c). *Graff Chevrolet Co. v. Texas Motor Vehicle Bd., 60 S.W.3d 154, 2001 Tex. App. LEXIS 3896 (Tex. App. Austin 2001).*

301. Texas State Board of Medical Examiner's decision to revoke doctor's license to practice was an abuse of discretion under the Administrative Procedure and Texas Register Act, former Tex. Rev. Civ. Stat. Ann. art. 6252-13a (now *Tex. Gov't Code Ann. § 2001.174*), because it was not based on unlawful procedure. *Board of Med. Exmnrs. v. Nacol, 696 S.W.2d 687, 1985 Tex. App. LEXIS 7359 (Tex. App. Beaumont 1985).*

302. Texas Alcoholic Beverage Commission exceeded its authority under former Tex. Rev. Civ. Stat. Ann. art. 6252-13a, § 19(e) (now *Tex. Gov't Code Ann. § 2001.174*) when it declined to renew a liquor license pursuant to *Tex. Alco. Bev. Code Ann. § 11.46(3),* (8) and (10) where the record failed to show that the retailer posed a threat to the general welfare or would continue to conduct itself contrary to the law. *Texas Alcoholic Beverage Comm'n v. Wines of Germany & World, Inc., 691 S.W.2d 817, 1985 Tex. App. LEXIS 6940 (Tex. App. Houston 1st Dist. 1985).*

303. Though a suspension hearing for a dentist's license contained some irregularities, especially the in and out presence of the overseeing board's members who were involved in decision-making regarding the dentist's license, the appeals court upheld the board's determination to suspend the dentist's license for two years in the absence of a demonstration that there was no substantial justice and fair play; former Tex. Rev. Civ. Stat. Ann. art. 6252-13A, § 19(e) (now *Tex. Gov't Code Ann. § 2001.174*) required reversal if there was unlawful procedure resulting in prejudice to substantial rights. *Blankfield v. Texas State Bd. of Dental Exmrs., 1985 Tex. App. LEXIS 6216 (Tex. App. Houston 1st Dist. Feb. 14 1985).*

304. Pursuant to *Tex. Water Code Ann. §§ 11.021(a), 11.022, 11.121,* and *11.046(c),* the Texas Commission on Environmental Quality incorrectly concluded that the city's effluent remained private groundwater that could be diverted without an appropriation permit; notwithstanding the city's stated intent not to abandon its effluent, the physical reality of the city's reuse project was that the effluent was abandoned to the public domain once the city discharged it into the San Marcos River where it was admittedly commingled and diluted by that state watercourse. *City of San Marcos v. Tex. Comm'n on Envtl. Quality, 128 S.W.3d 264, 2004 Tex. App. LEXIS 96 (Tex. App. Austin 2004).*

305. Texas State Board of Medical Examiners' conclusion that disciplinary grounds existed for a doctor's improper contact with a female patient was supported by its findings, conclusions and evidence, in accordance with *Tex. Gov't Code Ann. § 2001.174(2)(E),* where even though the patient was somewhat confused and inconsistent regarding the details of

her surroundings when the incidents occurred, she testified unequivocally that the doctor touched her breasts despite her attempts to shield herself with magazines. The administrative law judge heard the patient's testimony firsthand, was able to observe her and her demeanor, and concluded that she made a credible witness, and the appellate court could not second-guess such credibility determinations in the guise of a substantial-evidence inquiry. *Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 6232 (Tex. App. Austin Aug. 3 2005),* substituted opinion at, opinion withdrawn by *172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

306. Doctor's failure to attend a patient in the emergency room was properly found to be a failure to practice medicine in an acceptable professional manner consistent with public health and welfare, in violation of *Tex. Occ. Code Ann. § 164.051(a)(6),* and unprofessional or dishonorable conduct that was likely to injure the public, in violation of *Tex. Occ. Code Ann. §§ 164.051(a)(1), 164.052(a)(5),* where the Texas State Board of Medical Examiners' expert testified that, based on her review of relevant medical records, the doctor's care and treatment of the patient did not meet the standard of care and was a professional failure to practice medicine consistent with the public health and welfare, and where, because patients were considered members of the public, the expert's testimony, which was unchallenged on appeal, also supported the Board's conclusion that the doctor committed unprofessional conduct that was likely to injure the public. Furthermore, because the hospital's disciplinary action against the doctor was directed to the same conduct, there was substantial evidence to support discipline under *Tex. Occ. Code Ann. § 164.051(a)(7). Granek v. Tex. State Bd. of Med. Examiners, 2005 Tex. App. LEXIS 6232 (Tex. App. Austin Aug. 3 2005),* substituted opinion at, opinion withdrawn by *172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

307. In reviewing the administrative decision of the Texas State Board of Medical Examiners, the court used the substantial evidence scope of review defined under *Tex. Gov't Code Ann. § 2001.174(2)(E),* of the *Administrative Procedure Act, Texas Bd. of Med. Exmrs. v. Scheffey, 949 S.W.2d 431, 1997 Tex. App. LEXIS 3458 (Tex. App. Austin 1997).*

308. Substantial evidence under *Tex. Gov't Code Ann. § 2001.174(E)* supported the Texas State Board of Dental Examiners' exercise of its authority under *Tex. Occ. Code Ann. §§ 254.001, 263.002(a)* to revoke a dentist's license for unprofessional billing practices in violation of *Tex. Occ. Code Ann. § 259.008(1).* Although an administrative law judge recommended suspension, the Board was empowered to reject the recommendation and adequately explained its reasoning that the dentist's disciplinary history should have been given more weight as an aggravating factor. *Froemming v. Tex. State Bd. of Dental Examiners, 380 S.W.3d 787, 2012 Tex. App. LEXIS 4406 (Tex. App. Austin 2012).*

309. Revocation of an osteopathic doctor's license to practice medicine in Texas by the State Board of Medical Examiners was supported by substantial evidence under *Tex. Gov't Code Ann. § 2001.174* because the complaint provided proper notice under *Tex. Occ. Code Ann. § 164.005* and the evidence showed specific allegations of wrongdoing. *Chalifoux v. Tex. State Bd. of Med. Examiners, 2006 Tex. App. LEXIS 9598 (Tex. App. Austin Nov. 1 2006).*

310. Professional disciplinary action against a doctor, based on stale allegations of improper touching of a female patient's breasts, resulted in a due process violation that caused actual prejudice to the doctor's substantial rights, and the action was therefore arbitrary and capricious under *Tex. Gov't Code Ann. § 2001.174(2)(A)*; staleness was not a significant concern as to another patient's complaints, however, because contemporaneous documentary evidence of the complaints existed. *Granek v. Tex. State Bd. of Med. Exam'rs, 172 S.W.3d 761, 2005 Tex. App. LEXIS 6954 (Tex. App. Austin 2005).*

311. The district court's judgment upholding the Board's second order was affirmed (1) suspending the doctor's medical license until he could show that he was safe and competent to practice medicine, (2) setting forth the minimum terms and conditions with which the doctor had to comply to make that showing, and (3) imposing an administrative penalty on the doctor where the record revealed ample evidence that the doctor over-administered anesthesia to the patient, failed to properly monitor her while she was sedated, and failed to properly respond when the patient went into respiratory arrest. *Berezoski v. Tex. State Bd. of Med. Examiners, 2004 Tex. App. LEXIS 6255 (Tex. App. Austin July 15 2004).*

312. In a case relating to the revocation of a doctor's license, a finding that a kyphoplasty constituted a "spine surgery" was reasonably supported by substantial evidence where there was testimony from other physicians that the procedure constituted a surgery. The doctor's performance of this procedure violated an agreed order whereby he was prohibited from being present at or performing "spine surgery." *Baker v. Tex. Med. Bd., 2013 Tex. App. LEXIS 1259 (Tex. App. Austin Feb. 6 2013).*

313. Substantial evidence under *Tex. Gov't Code Ann. § 2001.174(E)* supported the Texas State Board of Dental Examiners' exercise of its authority under *Tex. Occ. Code Ann. §§ 254.001, 263.002(a)* to revoke a dentist's license for unprofessional billing practices in violation of *Tex. Occ. Code Ann. § 259.008(1).* Although an administrative law judge recommended suspension, the Board was empowered to reject the recommendation and adequately explained its reasoning that the dentist's disciplinary history should have been given more weight as an aggravating factor. *Froemming v. Tex. State Bd. of Dental Examiners, 380 S.W.3d 787, 2012 Tex. App. LEXIS 4406 (Tex. App. Austin 2012).*

314. Legislature granted the Texas State Board of Medical Examiners (Board) the power to protect the public interest by regulating those physicians who were granted the privilege of practicing medicine, *Tex. Occ. Code Ann. § 151.003*; the legislature also provided that the Board's decision to revoke a physician's license was subject to the substantial-evidence standard of review, *Tex. Gov't Code Ann. § 2001.174*, and the lack of a trial de novo (either a bench or jury trial) for license-revocation appeals by physicians was rationally related to the legitimate governmental purpose of conservation of judicial resources. *Scally v. Tex. State Bd. of Med. Examiners, 351 S.W.3d 434, 2011 Tex. App. LEXIS 6117 (Tex. App. Austin 2011).*

315. Substantial evidence supported the Texas State Board of Dental Examiners' conclusion that the dentist practiced dentistry in a manner that constituted dishonorable conduct as defined in *22 Tex. Admin. Code Ann. § 108.9(6)* where the dentist offered to show a teenaged patient and her mother the scars on her breasts from surgery. *Tex. State Bd. of Dental Examiners v. Brown, 281 S.W.3d 692, 2009 Tex. App. LEXIS 2247 (Tex. App. Corpus Christi 2009).*

316. Texas State Board of Dental Examiners' conclusion that the dentist practiced dentistry in a manner that constituted dishonorable conduct as defined in *22 Tex. Admin. Code Ann. § 108.9(6)* was supported by the administrative law judge's findings that the dentist allowed her non-dentist employees to adjust occlusion on a patient's teeth and failed to keep adequate medical records where a patient's chart contained neither a written review of medical history, a medical exam, radiographs and findings, a treatment plan, or a written formal consent nor an explanation why that chart was incomplete. *Tex. State Bd. of Dental Examiners v. Brown, 281 S.W.3d 692, 2009 Tex. App. LEXIS 2247 (Tex. App. Corpus Christi 2009).*

317. Substantial evidence supported the Texas State Board of Dental Examiners' order that the dentist pay restitution to a patient as she improperly allowed her assistants to perform non-delegable dental work on the patient. The district court erred when it reversed the Board's restitution order because the Board did not make adjudicative findings contrary to the ALJ's findings. *Tex. State Bd. of Dental Examiners v. Brown, 281 S.W.3d 692, 2009 Tex. App. LEXIS 2247 (Tex. App. Corpus Christi 2009).*

318. Texas State Board of Medical Examiners had a final order to enforce because (1) a district court did not reverse and remand the entire case to the Board, under *Tex. Gov't Code Ann. § 2001.174(1)*, because the district court reversed only that portion of the amended final order imposing an administrative penalty against a doctor and affirmed the Board's order in all other respects; (2) by affirming the Board's order in all other respects, the district court confirmed that, with the exception of the administrative penalty, the Board's amended final order, which imposed a three-year probated license suspension, was valid and remained in full force and effect; (3) because the Board chose to accept the district court's judgment and take no further action regarding the administrative penalty, there was nothing for the Board to change; and (4) the Board could not have issued another final order even if it had wanted to do so because *Tex. Gov't Code Ann. § 2001.1775* expressly precluded an agency from modifying its findings or decision in a contested case after proceedings for judicial review have begun. *Granek v. Tex. State Bd. of Med. Examiners, 2008 Tex. App. LEXIS 2025 (Tex. App. Austin Mar. 19 2008).*

319. Revocation of a respiratory care practitioner's certificate for taking a drug from an intravenous bag for personal use was properly upheld as an administrative law judge's (ALJ) decision was supported by substantial evidence pursuant to

*Tex. Gov't Code Ann. § 2001.174(2)(F)*, affirmative findings as to each 25 Tex. Admin. Code § 123.14(f)(4) factor were unnecessary, and a negative inference could be drawn from the practitioner's invoking the Fifth Amendment, which was done improperly as a blanket assertion rather than in response to a particular question. *Andrews v. Tex. Dep't of Health, 2007 Tex. App. LEXIS 1129 (Tex. App. Austin Feb. 15 2007).*

320. Revocation of an osteopathic doctor's license to practice medicine in Texas by the State Board of Medical Examiners was supported by substantial evidence under *Tex. Gov't Code Ann. § 2001.174* because the complaint provided proper notice under *Tex. Occ. Code Ann. § 164.005* and the evidence showed specific allegations of wrongdoing. *Chalifoux v. Tex. State Bd. of Med. Examiners, 2006 Tex. App. LEXIS 9598 (Tex. App. Austin Nov. 1 2006).*

321. Doctor's due process rights were not violated when the State Board of Medical Examiners revoked his license because the record failed to show that the presence of two doctors that served on the disciplinary panel unduly influenced the Board's final decision and there was no record that ex parte communications took place; further, the Board's conclusions were not arbitrary or capricious under *Tex. Gov't Code Ann. § 2001.174* where there was no evidence that the Board based its decision on peer review evidence pursuant to *Tex. Occ. Code Ann. § 151.003(2)* or that the doctor was harmed by such evidence under *Tex. R. App. P. 44.1. Chalifoux v. Tex. State Bd. of Med. Examiners, 2006 Tex. App. LEXIS 9598 (Tex. App. Austin Nov. 1 2006).*

322. "Substantial evidence" under *Tex. Gov't Code Ann § 2001.174(2)(E)* supported a finding that a doctor violated the standard of care by discharging a patient from the hospital when she had suffered a postsurgery seizure and had other preseizure symptoms, and her Dilantin level was 3.9 at the time of her discharge; the doctor admitted the Dilantin level was sub-therapeutic, and another doctor testified that the treatment fell below the standard of care. *Chalifoux v. Tex. State Bd. of Med. Exam'rs, 2006 Tex. App. LEXIS 4738 (Tex. App. Austin June 2 2006).*

323. "Substantial evidence" under *Tex. Gov't Code Ann § 2001.174(2)(E)* supported a finding that a doctor violated the standard of care in assessing the possibility of a cerebrospinal fluid (CSF) leak because he had the patient lie down, which minimized the possibility of the patient experiencing the classic symptoms of a CSF leak; his claim that his discharge decision was not based solely on his observation of the patient after she was lying down for two hours was insufficient to overcome the presumption that the finding was supported by substantial evidence. *Chalifoux v. Tex. State Bd. of Med. Exam'rs, 2006 Tex. App. LEXIS 4738 (Tex. App. Austin June 2 2006).*

324. Decision of the Texas State Board of Medical Examiners to revoke a doctor's license was not arbitrary or capricious under *Tex. Gov't Code Ann § 2001.174(2)(F)*; there was no evidence that the Board considered peer-review evidence in reaching its final decision, and its conclusions were explicitly based on its findings and the evidence presented at the hearing. *Chalifoux v. Tex. State Bd. of Med. Exam'rs, 2006 Tex. App. LEXIS 4738 (Tex. App. Austin June 2 2006).*

325. Where substantial evidence supported the findings that an insurance licensee wrongfully paid premiums from another business account, paid bonuses or compensation for referring new business, offered to rebate premiums, and paid unlicensed persons for the services of an agent, revocation of an insurance license was proper. *Murphy v. Comm'r of Ins., 2003 Tex. App. LEXIS 10156 (Tex. App. Austin Dec. 4 2003).*

326. In reviewing the Texas Commissioner of Insurance's decision denying the applicant a local recording agent's license under the substantial evidence rule, *Tex. Gov't Code Ann. § 2001.174*, the Commissioner's consideration of two 25-year-old felony convictions that involved the defrauding of elderly victims through the sale of an unauthorized insurance product was not erroneous under *Tex. Occ. Code Ann. §§ 53.021,.022* and substantial evidence existed demonstrating that the applicant failed to make restitution and failed to provide letters of recommendation from prosecutors, law enforcement, and correctional officers, as required by *Tex. Occ. Code Ann. § 53.023(a)(6)(A)* and (b); thus, there was ample evidence in the record to support the Commissioner's decision denying the applicant a local recording agent's license. *Smith v. Montemayor, 2003 Tex. App. LEXIS 5099 (Tex. App. Austin June 19 2003).*

327. Substantial evidence supported the decision of the Texas Insurance Commissioner revoking an insurance agent's license, because he engaged in fraudulent acts or practices with regard to the sale of universal leases and unauthorized annuity transactions. *Zaal v. Tex. Dep't of INS., 2013 Tex. App. LEXIS 13296 (Tex. App. Austin Oct. 29 2013).*

328. In a case in which the Commissioner of the Texas Department of Insurance upheld a decision of the Texas Medical Liability Insurance Underwriting Association (JUA) that informed an orthopedic surgeon that he had to pay a surcharge in order to renew his professional liability insurance policy, the Commissioner's order was supported by substantial evidence because, by basing the calculation of a surcharge on a policyholder's claim history, the JUA's schedule produced rates that reflected an increase in the risk of insuring a particular policyholder, which was consistent with the statutory requirements that individualized rates be based on plans measuring variations in hazards or expenses. *Scheffey v. Geeslin, 2008 Tex. App. LEXIS 1137 (Tex. App. Austin Feb. 15 2008),* review denied by *Scheffey v. Geeslin, 2008 Tex. LEXIS 684 (Tex. 2008).*

329. In an appeal concerning a rate supervision order issued by the Texas Commissioner of Insurance, which revoked an insurer's ability to file and use its insurance rates without prior approval from the Texas Department of Insurance, there was nothing in the order to suggest that it was not a final, completed agency action, where the only means of challenging the Commissioner's supervision order was to seek judicial review of the order, and, accordingly, the appellate court and the district court had jurisdiction to address the insurer's claims under Tex. Ins. Code Ann. ch. 36. Furthermore, several of the insurer's claims--that the actions for which the Commissioner placed it under supervision were not "rating practices," that the supervision order was arbitrary and capricious, that the Commissioner acted outside his authority in issuing the supervision order, and that its due process rights were violated--did not require review of an administrative record, and all were authorized grounds for reversal or remand of a decision under the Administrative Procedure Act, *Tex. Gov't Code Ann. §§ 2001.051-.178. Texas Dep't of Ins. v. State Farm Lloyds, 260 S.W.3d 233, 2008 Tex. App. LEXIS 5563 (Tex. App. Austin 2008).*

330. In a case in which the Commissioner of the Texas Department of Insurance upheld a decision of the Texas Medical Liability Insurance Underwriting Association (JUA) that informed an orthopedic surgeon that he had to pay a surcharge in order to renew his professional liability insurance policy, the Commissioner's order was supported by substantial evidence because, by basing the calculation of a surcharge on a policyholder's claim history, the JUA's schedule produced rates that reflected an increase in the risk of insuring a particular policyholder, which was consistent with the statutory requirements that individualized rates be based on plans measuring variations in hazards or expenses. *Scheffey v. Geeslin, 2008 Tex. App. LEXIS 1137 (Tex. App. Austin Feb. 15 2008),* review denied by *Scheffey v. Geeslin, 2008 Tex. LEXIS 684 (Tex. 2008).*

331. Where a decedent dry-fired a gun several times, someone then replaced the clip in the gun without the decedent's knowledge, and the decedent fired the gun again, killing himself, the decision of the Board of Trustees of the Employees Retirement System of Texas that decedent's death was not accidental and denying the beneficiary recovery under the insurance policy was not supported by substantial evidence as required under *Tex. Gov't Code Ann. § 2001.174. Butler v. Group Life & Health Ins. Co., 962 S.W.2d 296, 1998 Tex. App. LEXIS 858 (Tex. App. Austin 1998).*

332. Substantial evidence existed to support administrative law judge's findings that widow was excluded from receiving benefits under insurance policy when evidence showed her dead husband was driving truck that overturned, killing himself and a passenger, and, if husband had survived, he would have been charged with manslaughter. *Nobles v. Employees Ret. Sys. of Tex., 53 S.W.3d 483, 2001 Tex. App. LEXIS 4997 (Tex. App. Austin 2001).*

333. Substantial evidence was before the Board of Trustees of the Employees Retirement System of Texas to support its finding that air travel or flight caused decedent's runway accident and that this was a risk contemplated by the aviation exclusion in the accidental death benefits provision of the public employees life insurance plan; the standard of judicial review of the board's order was that provided for cases of "substantial evidence" review under the terms of the Administrative Procedures Act, specifically *Tex. Gov't Code § 2001.174*, and because its order was supported by substantial evidence and was not arbitrary or capricious, the district court erred in not affirming the decision of the board to deny accidental death benefits to decedent's spouse. *Board of Trustees v. Benge, 942 S.W.2d 742, 1997 Tex. App. LEXIS 1519 (Tex. App. Austin 1997).*

334. In a former employee's action for disability benefits, substantial evidence, as required by *Tex. Gov't Code Ann. §§ 815.511(f), 2001.174* supported a determination that the employee was not entitled to a waiver of a preexisting-condition exclusion because the evidence showed that the employee was not "actively at work" during the relevant time period. Medical records indicated that the employee had surgery at the beginning of the relevant time period and by the end was interpreting only one or two hours a week; there was no evidence showing whether the employee took paid vacation time or sick leave in the months after the surgery. *Schneider v. Employees Ret. Sys. of Tex., 2009 Tex. App. LEXIS 2276 (Tex. App. Austin Apr. 3 2009).*

335. In a case involving an exception to a preexisting-condition exclusion, substantial evidence, as required by *Tex. Gov't Code Ann. §§ 815.511(f), 2001.174* supported interpreting the exclusion to require that an employee be actively at work for six consecutive months after disability coverage began, rather than for six consecutive months at any time before becoming disabled. *Schneider v. Employees Ret. Sys. of Tex., 2009 Tex. App. LEXIS 2276 (Tex. App. Austin Apr. 3 2009).*

336. Application for occupational disability retirement benefits was properly denied where a reasonable basis existed for the conclusion of the Employees Retirement System of Texas Board of Trustees (Board) that the applicant's at-work injury was not the primary cause of his disability; the Board's order and the relevant findings and conclusions that the applicant was not entitled to benefits because his preexisting condition was the primary cause of his disability were supported by substantial evidence because: (1) the applicant had reported problems with his lower back prior to the at-work injury; (2) the applicant had repeated problems with his cervical spine prior to the injury; (3) the applicant had more degeneration in his spine than would be expected for someone his age; and (4) both the applicant's neurosurgeon and the medical board agreed that the injury that the applicant sustained at work would not have been disabling without his preexisting condition. *Larimore v. Employees Ret. Sys. of Tex., 2006 Tex. App. LEXIS 512 (Tex. App. Austin Jan. 20 2006),* opinion withdrawn by, substituted opinion at *2006 Tex. App. LEXIS 2246* (Tex. App. Austin Mar. 24, 2006).

337. Application for occupational disability retirement benefits was properly denied where a reasonable basis existed for the conclusion of the Employees Retirement System of Texas Board of Trustees (Board) that the applicant's at-work injury was not the primary cause of his disability; the Board's order and the relevant findings and conclusions that the applicant was not entitled to benefits because his preexisting condition was the primary cause of his disability were supported by substantial evidence because: (1) the applicant had reported problems with his lower back prior to the at-work injury; (2) the applicant had repeated problems with his cervical spine prior to the injury; (3) the applicant had more degeneration in his spine than would be expected for someone his age; and (4) both the applicant's neurosurgeon and the medical board agreed that the injury that the applicant sustained at work would not have been disabling without his preexisting condition. *Larimore v. Employees Ret. Sys. of Tex., 2006 Tex. App. LEXIS 512 (Tex. App. Austin Jan. 20 2006),* opinion withdrawn by, substituted opinion at *2006 Tex. App. LEXIS 2246* (Tex. App. Austin Mar. 24, 2006).

338. Pursuant to *Tex. Gov't Code Ann. § 2001.174(2)(F)*, the Board of Trustees for the Employees Retirement System of Texas (ERS) acted arbitrarily and capriciously and abused its discretion in terminating a disability retiree's occupational

disability retirement benefits, resulting in the retiree's substantial rights being prejudiced, because due process and fundamental principals of fairness dictated that the Board should have provided meaningful notice to the retiree before applying its new 80 percent threshold standard in *34 Tex. Admin. Code § 73.17*, which construed *Tex. Gov't Code Ann. § 814.208(d)*, to his post disability earnings to terminate his benefits; being advised of the Board's construction of "comparable pay" to include its 80 percent threshold standard at the hearing was not sufficient notice to satisfy due process concerns, and a 2005 letter advising the retiree that his benefits had been terminated similarly was not sufficient, and, thus, prior to his hearing, the retiree did not have meaningful notice that earning 80 percent of his adjusted final annual state salary could cause his benefits to be terminated. *Patton v. Employees Ret. Sys. of Tex., 2007 Tex. App. LEXIS 9901 (Tex. App. Austin Dec. 19 2007).*

339. *Tex. Occ. Code Ann. § 1051.703(a)* of the Architecture Practice Act did not categorically preclude licensed engineers from preparing comprehensive building plans and specifications for the class of public works projects identified in that section, nor did *Tex. Occ. Code Ann. § 1051.601* categorically exempt licensed engineers from the Act's requirements. Instead, the enforcement matter at issue depended on whether preparation of the engineers' particular building plans and specifications was within the scope and practice of engineering as defined by the Engineering Practice Act; because the record was insufficiently developed to determine that issue as a matter of law, summary disposition was not appropriate, and therefore the district court did not abuse its discretion in reversing the Board's decision and remanding the case for further proceedings. *Winton v. Tex. Bd. of Architectural Examiners (in re Rogers), 390 S.W.3d 377, 2011 Tex. App. LEXIS 6110 (Tex. App. Austin 2011).*

340. Because it was unclear whether Texas law would allow plaintiff landowners' inverse condemnation suit for a regulatory groundwater taking, and they had not pursued compensation in state court, their Fifth Amendment takings claim against defendant water district's directors was not ripe and was dismissed without prejudice. *Coates v. Hall, 512 F. Supp. 2d 770, 2007 U.S. Dist. LEXIS 17168 (W.D. Tex. 2007).*

341. Although appellee acknowledged that appellant owned 100 percent of the leasehold oil and gas estate, and that he had the right "to inject saltwater under the tract produced from the tract" to benefit that lease tract, resolution of appellant's complaint turned on construction of the deeds in appellee's chain of title--specifically, the parameters of the "surface estate" conveyed through those instruments. Thus, it was the sort of issue that was beyond the Texas Railroad Commission's jurisdiction under *16 Tex. Admin. Code § 3.9. Rosenthal v. R.R. Comm'n, 2009 Tex. App. LEXIS 6522 (Tex. App. Austin Aug. 20 2009).*

342. Where a subcontractor filed a claim alleging that unforeseen conditions caused it to incur additional costs to complete foundation drilling work on a highway construction contract, substantial evidence under *Tex. Gov't Code Ann. § 2001.174(2)(E)* supported the Texas Department of Transportation's decision that (1) the site conditions were not significantly different; (2) the contract provided that casing was required to prevent caving and water intrusion; and therefore, (3) the subcontractor was not entitled to damages. *Granite Constr. Co. v. Tex. DOT, 2012 Tex. App. LEXIS 9706 (Tex. App. Austin Nov. 20 2012).*

343. In a highway construction contract dispute, although *Tex. Transp. Code Ann. § 201.112* gave the executive director of the Texas Department of Transportation broad discretion to make changes to the proposed findings of fact and conclusions of law of the administrative law judge (ALJ), the executive director could not ignore the evidence; where the ALJ, and not the executive director, heard the testimony and observed the demeanor of the witnesses, and in the absence of independent evidence in the record to support the executive director's credibility choice, the executive director's decision to reject the ALJ's findings based on credibility was arbitrary and capricious under *Tex. Gov't Code Ann. § 2001.174. State v. Mid-South Pavers, Inc., 246 S.W.3d 711, 2007 Tex. App. LEXIS 9905 (Tex. App. Austin 2007).*

344. In a toll violation case arising from an order under *Tex. Transp. Code Ann. §§ 284.201*, *284.202(a)* and an administrative adjudication hearing procedure under *Tex. Transp. Code Ann. § 284.204*, the alleged violator was not entitled to a trial de novo, even though the appeal hinged on a question of law. The procedure was created by a commissioner court order and was consistent with the substantial evidence standard in *Tex. Gov't Code Ann § 2001.174*; it did not prevent the trial court from considering questions of law. *Enter. Leasing Co. v. Harris County Toll Rd. Auth., 356 S.W.3d 85, 2011 Tex. App. LEXIS 1962 (Tex. App. Houston 1st Dist. 2011).*

345. Where an officer initiated a traffic stop and smelled alcohol, appellee admitted that she had just left a bar where she had consumed alcohol; in the license suspension proceeding, the judge's finding that the police had probable cause to arrest appellee for DWI was supported by substantial evidence under *Tex. Gov't Code Ann. § 2001.174*; the admission of unqualified testimony from a police officer concerning the horizontal gaze nystagmus test was harmless. *Tex. Dep't of Pub. Safety v. Bishop, 2007 Tex. App. LEXIS 360 (Tex. App. Austin Jan. 22 2007).*

346. Trial court erred in reversing the suspension of a driver's license by an administrative law judge (ALJ) because substantial evidence supported the ALJ's finding under *Tex. Transp. Code Ann. § 724.042* that the driver voluntarily refused to submit to a breath test; although the driver claimed he was misled about the consequences of refusal, the ALJ, as the sole trier of fact under *Tex. Gov't Code Ann. § 2001.174*, was free to disbelieve the driver. *Tex. Dep't of Pub. Safety v. Patel, 2006 Tex. App. LEXIS 9720 (Tex. App. Corpus Christi Nov. 9 2006).*

347. Trial court did not err in affirming the suspension of the driver's license where although the ALJ found that the driver had operated a watercraft while intoxicated, this was an obvious clerical error which did not negate the administrative order, and the decision was supported by substantial evidence, *Tex. Gov't Code Ann. § 2001.174. Goldstein v. Tex. Dep't of Pub. Safety, 2006 Tex. App. LEXIS 11285 (Tex. App. San Antonio Oct. 11 2006).*

348. In a review under *Tex. Gov't Code Ann § 2001.174(2)(E)*, the trial court erred in reversing a license suspension; reasonable suspicion was unnecessary for an initial contact between officers and the driver because the driver stopped his vehicle on the side of a public roadway entirely on his own volition and the officers made contact with him to see if he was in need of assistance; substantial evidence supported a finding of probable cause to arrest the driver because his breath smelled strongly of alcohol, he had bloodshot eyes, his speech was slurred, he admitted that he consumed six beers, and he failed every field sobriety test. *Tex. Dep't of Pub. Safety v. Svoboda, 2006 Tex. App. LEXIS 5266 (Tex. App. San Antonio June 21 2006).*

349. Substantial evidence, as required by *Tex. Transp. Code Ann. § 524.043* and *Tex. Gov't Code Ann § 2001.174*, supported a license suspension, even though the underlying accident occurred in an apartment parking lot, because the lot was ungated and open to the public and thus was a "public place." *Tex. Dep't of Pub. Safety v. Briggs, 2006 Tex. App. LEXIS 1129 (Tex. App. Austin Feb. 9 2006).*

350. License suspension was reinstated because the Texas Department of Public Safety produced more than a scintilla of evidence on the factors set forth in *Tex. Transp. Code Ann. § 724.042*, when the driver was properly stopped for violation of *Tex. Transp. Code Ann. § 545.104(a)*, and the officer smelled alcohol on the driver's breath, noticed that the driver's eyes were bloodshot and his speech was slurred. *Tex. Dep't of Pub. Safety v. Shellberg, 2005 Tex. App. LEXIS 6644 (Tex. App. Corpus Christi Aug. 18 2005).*

351. Statute governing license suspension appeals is the touchstone in deciding which standard of review should apply: the statute specifically requires the reviewing court to use the substantial evidence rule. Because a court applying the substantial evidence standard of review may not substitute its judgment for that of the administrative law judge as to the weight of the evidence, the equally plausible but opposite inferences construct can not be part of the substantial evidence rule. *Dep't of Pub. Safety v. Hirschman, 169 S.W.3d 331, 2005 Tex. App. LEXIS 4579 (Tex. App. Waco 2005).*

352. At the license suspension hearing, the arresting officer testified that the driver's vehicle was moving erratically, the officer smelled alcohol coming from the interior of the vehicle, and the driver failed sobriety tests; there was substantial

evidence to support the administrative finding that there was reasonable suspicion to stop and probable cause to arrest the driver for driving while intoxicated. The trial court erred by reversing the administrative decision to suspend her driver's license, because she refused to provide a breath sample. *Tex. Dep't of Pub. Safety v. Leath, 2005 Tex. App. LEXIS 3927 (Tex. App. Amarillo May 18 2005).*

353. Administrative law judge's (ALJ) suspension of a driver's license was supported by substantial evidence where the arresting officer surmised in his sworn report that the driver had been driving while intoxicated because he emitted a strong odor of alcohol, had glassy eyes and slurred speech, and his movements were slowed and staggered, and where the record revealed that the driver admitted to drinking a few beers before the accident. That gave the officer reasonable suspicion to investigate the driver further, and the officer's reasonable suspicion evolved into probable cause when he observed five out of the six points of the horizontal gaze nystagmus test and the driver refused to provide a breath specimen. *Tex. Dep't of Pub. Safety v. Burrer, 2005 Tex. App. LEXIS 3534 (Tex. App. San Antonio May 11 2005).*

354. Texas Department of Public Safety properly suspended an individual's driver's license for his refusal to give a breath specimen after he was arrested for suspicion of DWI. On review, the county court ruled that substantial evidence existed to affirm the administrative decision suspending his driver's license, and that the individual failed to prove that the administrative decision prejudiced his substantial rights. *Parks v. Tex. Dep't of Pub. Safety, 2004 Tex. App. LEXIS 9365 (Tex. App. Houston 1st Dist. Oct. 21 2004).*

355. Department of Public Safely was not obligated to prove compliance with a 15-minute observation period before admitting a breath test at a license-revocation hearing because no fact issue was raised with respect to the particular requirement; thus, the breath test was properly admitted, and the trial court erred in reversing the license suspension. *Tex. Dep't of Pub. Safety v. Barrera, 2004 Tex. App. LEXIS 5346 (Tex. App. Corpus Christi June 17 2004).*

356. Under *Tex. Gov't Code Ann. § 2001.174*, the appellate court had to reverse when a substantial right had been prejudiced because the administrative decision was affected by an error of law; the administrative law judge erred in applying the law to the facts as she found them where no necessity justification existed at the time of the driver's arrest because his drive back to the scene was not in avoidance of any imminent harm. *Tex. Dep't of Pub. Safety v. Moore, 175 S.W.3d 270, 2004 Tex. App. LEXIS 4401 (Tex. App. Houston 1st Dist. 2004).*

357. Substantial evidence supported the decision of an administrative law judge to suspend the driver's license of an individual arrested for operating a motor vehicle in a public place while intoxicated. *Tex. Dep't of Pub. Safety v. Hernandez, 2003 Tex. App. LEXIS 6333 (Tex. App. Corpus Christi July 24 2003).*

358. Since the Texas Legislature had expressed no intent that the Texas Department of Public Safety (DPS) be penalized for the failure of an officer to submit a report within the five-day deadline of *Tex. Transp. Code Ann. § 724.032(c)(4)*, the failure of an officer to comply with the statute did not render the report inadmissible at an administrative hearing, and the judgment that the evidence was insufficient to authorize suspension of the driver's license was reversed and remanded because the erroneous exclusion of exhibits prejudiced the DPS's substantial rights since the administrative law judge denied the DPS the opportunity to satisfy its evidentiary burden at the license suspension hearing. *Tex. Dep't of Pub. Safety v. Kimbrough, 106 S.W.3d 747, 2003 Tex. App. LEXIS 3566 (Tex. App. Fort Worth 2003).*

359. Under the substantial evidence rule of *Tex. Govt. Code Ann. § 2001.174*, the court erred in reversing a license suspension decision by the Texas Department of Public Safety; the administrative law judge did not err in finding, pursuant to *Tex. Transp. Code Ann. § 524.035(a)(2)*, that the officer had probable cause to arrest defendant for driving while intoxicated. *State Dep't of Pub. Safety v. Boeck, 2001 Tex. App. LEXIS 2785 (Tex. App. Corpus Christi Apr. 26 2001).*

360. In reviewing administrative license suspension decisions under the substantial evidence standard in *Tex. Transp. Code Ann. § 524.041* and *Tex. Gov't. Code Ann. § 2001.174*, the reviewing court may not substitute its judgment for that of the agency. The issue for the court is not whether the agency's decision was correct, but only whether the record demonstrates some reasonable basis for the agency's action as shown by a "scintilla" of evidence. *Mireles v. Texas Dep't of Pub. Safety, 9 S.W.3d 128, 1999 Tex. LEXIS 125, 43 Tex. Sup. Ct. J. 169 (Tex. 1999).*

361. Administrative law judge's finding that the deputy had reasonable suspicion to stop the driver was not reasonably supported by substantial evidence and therefore it erred by suspending the driver's license under *Tex. Transp. Code Ann. §§ 524.022, .041*, because the evidence only showed that the driver was observed driving slowly on a highway at 1:40 a.m; the record was silent regarding the deputy's training and experience and was silent as to the characteristics of the area in which the driver was observed driving. In addition, there was no evidence that the deputy stopped the driver because he was concerned for her safety, as there was no evidence she was alone in her vehicle, that there were any other vehicles sharing the roadway with the driver, or that driving slowly was inherently unsafe; the deputy stated in his report that he had reasonable suspicion to contact that driver only because he observed her vehicle traveling 40 m.p.h. in a 65 m.p.h. posted zone. *Peters v. Tex. Dep't of Pub. Safety, 404 S.W.3d 1, 2013 Tex. App. LEXIS 2798 (Tex. App. Houston 1st Dist. 2013).*

362. Trial court erred by reversing the administrative decision allowing the suspension of the driver's license because substantial evidence supported that decision, as the officer testified multiple times that he saw the driver on the road and then enter the parking lot and that he saw the driver in the vehicle's driver's seat when it was parked under a light in the parking lot; when the driver approached the officer, he saw that the driver was intoxicated and therefore had reasonable suspicion or probable cause to detain the driver and administer field sobriety tests. The officer's report, which bore the seal and signature of the Texas Department of Public Safety's custodian of records, corroborated the officer's testimony that the driver did not provide a breath sample on request and that he refused to provide a post-arrest breath sample. *Tex. Dep't of Pub. Safety v. Perez, 2013 Tex. App. LEXIS 659 (Tex. App. Corpus Christi Jan. 24 2013).*

363. Administrative law judge (ALJ) did not err in quashing the driver's subpoena of the arresting officer in the administrative license suspension proceeding, because the ALJ's application of the 150-mile limit in *Tex. R. Civ. P. 176.3* was not an abuse of discretion; the ALJ was expressly authorized to consider the *Texas Rules of Civil Procedure. Hodge v. Tex. Dep't of Pub. Safety, 2012 Tex. App. LEXIS 10526 (Tex. App. Houston 1st Dist. Dec. 20 2012).*

364. There was substantial evidence to support an administrative law judge's decision authorizing the suspension of a driver's license under *Tex. Transp. Code Ann. § 524.012(b)(1)* because there was a reasonable suspicion to stop a vehicle based on a failure to stop at a red light, there was probable cause to arrest due to an odor of alcohol and signs of intoxication, and the driver's blood alcohol was above the legal limit. *Tex. Dep't of Pub. Safety v. Caruana, 2012 Tex. App. LEXIS 7125 (Tex. App. Austin Aug. 23 2012).*

365. Trial court exceeded its authority when it modified an administrative law judge's (ALJ) decision that a driver's license was suspended for 2 years under *Tex. Transp. Code Ann. § 724.035(a)* and stated that the suspension was for 180 days. *Tex. Dep't of Pub. Safety v. Hudson, 2012 Tex. App. LEXIS 1148 (Tex. App. Dallas Feb. 13 2012).*

366. Driver's license suspension was proper because the facts established probable cause that the licensee was operating a motor vehicle in a public place while intoxicated for purposes of *Tex. Transp. Code Ann. § 724.042*; witnesses at an accident scene reported that a pickup had rear-ended another vehicle and driven away, a license plate at the scene was matched to the licensee's pickup, which was later found abandoned with front end damage, and according to the licensee's wife, the licensee called her to pick him up near the site of the abandoned pickup. After the wife drive the licensee to the sheriff's office, a trooper and others observed the licensee and detected an odor of an alcoholic beverage on his breath. *Tex. Dep't of Pub. Safety v. Allen, 2011 Tex. App. LEXIS 4268 (Tex. App. Amarillo June 3 2011).*

367. Substantial evidence under *Tex. Gov't Code Ann. § 2001.174* supported the administrative suspension of appellee's driver's license under *Tex. Transp. Code Ann. §§ 724.035, 724.042*, because he was stopped for speeding, had trouble maintaining balance, refused to provide a breath or blood specimen, and admitted to ingesting hydrocodone, a controlled substance. *Tex. Dep't of Pub. Safety v. Greathouse, 2011 Tex. App. LEXIS 2119 (Tex. App. Waco Mar. 23 2011).*

368. Where a deputy observed a pickup truck make a right turn so wide that it caused the front driver's side tire to go onto the grassy area of the road, the deputy had reasonable suspicion to stop appellee's vehicle because he committed a traffic violation under *Tex. Transp. Code Ann. §§ 545.051(a), 545.101(a)*; based on the strong odor of an alcoholic beverage emitting from appellee, his admission that he was drinking beer, and his poor performance on field sobriety tests, the deputy had probable cause to arrest appellee for driving while intoxicated. Because the requirements of *Tex. Transp. Code Ann. § 524.035(a)(1)*, (2) were met, the Texas Department of Public Safety's decision to suspend appellee's driv-

er's license was supported by substantial evidence under *Tex. Gov't Code Ann. § 2001.174. Tex. Dep't of Pub. Safety v. Garza, 2010 Tex. App. LEXIS 9523 (Tex. App. Corpus Christi Dec. 2 2010).*

369. Suspension of a driver's license for refusal to submit to a breath test under *Tex. Transp. Code Ann. § 724.035* was supported by substantial evidence because even if the officer's sworn report was inadmissible under *Tex. R. Evid. 803(8)* based on a lack of a signature, the admissible evidence demonstrated the four elements required to uphold the suspension; that evidence included the DIC-24 form, under *Tex. Transp. Code Ann. § 724.032*, which indicated refusal to submit to the breath test and was signed by the driver. *Tex. Dep't of Pub. Safety v. Guajardo, 2010 Tex. App. LEXIS 6000 (Tex. App. Corpus Christi July 29 2010).*

370. Substantial evidence supported the suspension of the minor's driver's license, because the minor was properly advised of the consequences set forth under *Tex. Transp. Code Ann. § 724.015* and he voluntarily refused to submit a specimen at the officer's request, and since the officer was not required to give the minor the notice of suspension before requesting a specimen, any irregularity on the notice of suspension did not affect the voluntariness of the minor's refusal to submit a specimen for purposes of *Tex. Transp. Code Ann. § 724.042. Tex. Dep't of Pub. Safety v. Henson, 2010 Tex. App. LEXIS 3478 (Tex. App. Houston 14th Dist. May 11 2010).*

371. There was sufficient evidence for the administrative judge to uphold the suspension of the driver's license, because the driver was speeding and veering back and forth, an odor of alcohol emanated from inside the car, the driver's eyes were bloodshot and glassy, the driver's speech was slurred, the driver was unable to complete the one-leg-stand test and he exhibited six clues of intoxication on the walk-and-turn test, and the driver displayed clues of intoxication on the horizontal gaze nystagmus test and the vertical nystagmus test. *Tex. Dep't of Pub. Safety v. Williams, 303 S.W.3d 356, 2009 Tex. App. LEXIS 9708 (Tex. App. El Paso 2009).*

372. Driver's license revocation under *Tex. Transp. Code Ann. § 724.035* was not supported by substantial evidence, as required by *Tex. Transp. Code Ann. §§ 524.002(b), 724.047* and *Tex. Gov't Code Ann. § 2001.174*, that the licensee actually operated his vehicle while intoxicated. He was asleep when an officer approached him, and although the engine was running, he was parked in his usual space behind the building where he worked, did not have a foot on the brake, and had not turned on the headlights; also, the car was in park and the front seat was reclined. *Tex. Dep't of Pub. Safety v. Allocca, 301 S.W.3d 364, 2009 Tex. App. LEXIS 8781 (Tex. App. Austin 2009).*

373. Decision of an ALJ administratively suspending a driver's license was supported by substantial evidence, *Tex. Gov't Code Ann. § 2001.174(2)(E)*, including that it took the driver more than 20 seconds to get his door open and exit the car, he was swaying, had red, bloodshot eyes, had a strong odor of alcohol coming from his mouth, and admitted coming from a bar where he had had eight or nine drinks. *Tex. Dep't of Pub. Safety v. Dishman, 2009 Tex. App. LEXIS 3052 (Tex. App. San Antonio May 6 2009).*

374. Under the substantial evidence standard of review, it was determined that driving privileges were properly suspended because there was probable cause to believe that a driver was operating a motor vehicle in a public place under *Tex. Transp. Code Ann. § 724.042(2)(A)*; the public had unrestricted access to a private road, and it did not matter that travelers were infrequent or that the road had not been converted to a county road. *Tex. Dep't of Pub. Safety v. Castro, 2009 Tex. App. LEXIS 3198 (Tex. App. San Antonio Apr. 29 2009).*

375. While bloodshot eyes, an odor of alcohol, and unsteady balance were all symptoms of intoxication, those facts did not, without more, give rise to probable cause to believe the driver was driving while intoxicated. As the rest of the evidence did not support the conclusion that the driver was driving while intoxicated, the administrative law judge's decision to suspend the driver's operator's license was not reasonably supported by substantial evidence. *Tex. Dep't of Pub. Safety v. Gilfeather, 2009 Tex. App. LEXIS 1502 (Tex. App. Fort Worth Mar. 5 2009).*

376. Suspension of an operator's license was improper because an officer did not have reasonable suspicion for a stop under *Tex. Transp. Code Ann. § 724.042* since slow driving alone was not enough to show that the operator was impeding traffic, there was no violation of San Antonio, Tex., Code of Ordinances § 19-133 since the conditions were foggy and rainy, and an investigatory stop was not proper based on the operator's weaving since the officer did not testify that he suspected that defendant was intoxicated or that the operator's driving was unsafe. *Tex. Dep't of Pub. Safety v. Gonzales, 276 S.W.3d 88, 2008 Tex. App. LEXIS 7985 (Tex. App. San Antonio 2008).*

377. Administrative suspension of an operator's license was not subject to reversal based on a clerical error made by an administrative law judge (ALJ) because it did not affect an operator's substantial rights; the ALJ relied on an improper date of arrest. *Tex. Dep't of Pub. Safety v. Gonzales, 276 S.W.3d 88, 2008 Tex. App. LEXIS 7985 (Tex. App. San Antonio 2008).*

378. Although a clerical error relating to the date that an operator was stopped did not prejudice his substantial rights, a suspension of the operator's license was not warranted because there was no reasonable suspicion for an officer's decision to stop him for driving 20 miles under the posted speed limit. There was no evidence that the operator was impeding traffic under *Tex. Transp. Code Ann. § 545.363(a)* since slow driving in and of itself was not enough to show a violation, the fact that the operator drifted in his own lane of travel did not justify the investigatory stop where the officer did not state that he suspected that the operator was intoxicated or that the driving was unsafe, and driving 10 miles an hour or more below the posted speed limit did not constitute a per se violation of San Antonio, Tex., Code of Ordinances § 19-133 because the ordinance was concerned with the maximum reasonable, safe, and prudent speed limit; there was no testimony regarding what a reasonable speed would have been under the weather conditions present at the time of the stop. *Tex. Dep't of Pub. Safety v. Gonzales, 2008 Tex. App. LEXIS 6327 (Tex. App. San Antonio Aug. 20 2008).*

379. Trial court erred in reversing an administrative law judge's (ALJ) decision to suspend a motorist's driver's license pursuant to *Tex. Transp. Code Ann. § 724.035*, after the motorist refused to give a breath specimen test, because there was substantial evidence supporting the administrative order as required by *Tex. Transp. Code Ann. § 524.041* and *Tex. Gov't Code Ann. § 2001.174*; a court may not substitute its judgment for that of the *ALJ. Tex. Dep't of Pub. Safety v. Escobedo, 2008 Tex. App. LEXIS 5651 (Tex. App. Corpus Christi July 29 2008).*

380. Judgment suspending driver's license for 180 days was affirmed where the totality of circumstances was substantial evidence of probable cause for the driver's arrest for driving while intoxicated. The record showed that the driver drove past a roadblock, that he had a strong alcoholic odor, that he had bloodshot eyes, that he admitted drinking an alcoholic beverage, that he was extremely argumentative, and that he refused to take field sobriety tests. *Gault v. Tex. Dep't of Pub. Safety, 2008 Tex. App. LEXIS 5465 (Tex. App. Eastland July 24 2008).*

381. Suspension of an operator's license was improper because an officer did not have reasonable suspicion for a stop under *Tex. Transp. Code Ann. § 724.042* since slow driving alone was not enough to show that the operator was impeding traffic, there was no violation of San Antonio, Tex., Code of Ordinances § 19-133 since the conditions were foggy and rainy, and an investigatory stop was not proper based on the operator's weaving since the officer did not testify that he suspected that defendant was intoxicated or that the operator's driving was unsafe. *Tex. Dep't of Pub. Safety v. Gonzales, 276 S.W.3d 88, 2008 Tex. App. LEXIS 7985 (Tex. App. San Antonio 2008).*

382. Although a clerical error relating to the date that an operator was stopped did not prejudice his substantial rights, a suspension of the operator's license was not warranted because there was no reasonable suspicion for an officer's decision to stop him for driving 20 miles under the posted speed limit. There was no evidence that the operator was impeding traffic under *Tex. Transp. Code Ann. § 545.363(a)* since slow driving in and of itself was not enough to show a violation, the fact that the operator drifted in his own lane of travel did not justify the investigatory stop where the officer did not state that he suspected that the operator was intoxicated or that the driving was unsafe, and driving 10 miles an hour or more below the posted speed limit did not constitute a per se violation of San Antonio, Tex., Code of Ordinances § 19-133 because the ordinance was concerned with the maximum reasonable, safe, and prudent speed limit; there was no testimony regarding what a reasonable speed would have been under the weather conditions present at the time of the stop. *Tex. Dep't of Pub. Safety v. Gonzales, 2008 Tex. App. LEXIS 6327 (Tex. App. San Antonio Aug. 20 2008).*

383. Motor vehicle board's decision to grant a new franchisee's application for an auto-dealer license was based on substantial evidence within the meaning of *Tex. Gov't Code Ann. § 2001.174(2)(E)* where the evidence supported the elements of good cause under former Tex. Rev. Stat. Ann. art. 4413(36), § 4.06(c). *Graff Chevrolet Co. v. Texas Motor Vehicle Bd., 60 S.W.3d 154, 2001 Tex. App. LEXIS 3896 (Tex. App. Austin 2001).*

384. Texas Railroad Commission's findings regarding the gas utility's costs to acquire its predecessor were supported by substantial evidence as required under *Tex. Gov't Code Ann. § 2001.174* and *Tex. Util. Code Ann. § 105.001*; further, the Commission did not err by including the gas utility's costs in acquiring its predecessor as a known and measurable change" in its gas rate award because nothing in *Tex. Util. Code Ann. § 103.055* prohibited the Commission from accounting for additional expenses as a "known and measurable change" simply because they were known to a utility at the time of its updated rate request. *City of Port Neches v. R.R. Comm'n of Tex., 212 S.W.3d 565, 2006 Tex. App. LEXIS 6936 (Tex. App. Austin 2006).*

385. *Tex. Lab. Code Ann § 413.016(a)* "refunds" may arise from excessive reimbursement occurring due to a subsequently reversed administrative order in a workers' compensation medical-fee dispute, in part because such coverage was contemplated by the regime under *Tex. Lab. Code Ann §§ 413.031*, *402.073*, *408.027*, and *Tex. Gov't Code Ann §§ 2001.174(2)*, *2001.176(b)(3)*. Therefore, the medical-fee-dispute-resolution process supplants judicial jurisdiction to award refunds. *Vista Med. Ctr. Hosp. v. Tex. Mut. INS. Co., 2013 Tex. App. LEXIS 6853 (Tex. App. Austin June 6 2013).*

386. Administrative Procedure Act provisions governing substantial-evidence did not authorize monetary relief sought by a workers' compensation insurance carrier against a health care provider relating to stop-loss reimbursement, and monetary relief had not been awarded incident to reversing and remanding an administrative order. *Vista Med. Ctr. Hosp. v. Tex. Mut. INS. Co., 416 S.W.3d 11, 2013 Tex. App. LEXIS 12172 (Tex. App. Austin 2013).*

387. *Tex. Lab. Code Ann § 413.016(a)* "refunds" may arise from excessive reimbursement occurring due to a subsequently reversed administrative order in a workers' compensation medical-fee dispute, in part because such coverage was contemplated by the regime under *Tex. Lab. Code Ann §§ 413.031*, *402.073*, *408.027*, and *Tex. Gov't Code Ann §§ 2001.174(2)*, *2001.176(b)(3)*. Therefore, the medical-fee-dispute-resolution process supplants judicial jurisdiction to award refunds. *Vista Med. Ctr. Hosp. v. Tex. Mut. INS. Co., 2013 Tex. App. LEXIS 6853 (Tex. App. Austin June 6 2013).*

388. In workers' compensation medical-fee disputes, the insurer's explanations of benefits (EOBs) did not provide substantial evidence supporting the hospital's waiver argument because the EOBs did not violate the applicable rule, as interpreted by the *Texas Department of Insurance's Division of Workers' Compensation. Vista Med. Ctr. Hosp. v. Tex. Mut. INS. Co., 2013 Tex. App. LEXIS 6853 (Tex. App. Austin June 6 2013).*

OPINIONS OF ATTORNEY GENERAL

1. Since administrative hearings are not limited to the strict rules of evidence, introduction of an officer's affidavit at an administrative hearing on suspending a driver's license under Article 802f, Vernon's Texas Penal Code, is not error so long as there is an opportunity for a trial de novo in the county court.   Op. Tex. Att'y Gen. No. H-164 (1973).

LAW REVIEWS

1. *65 Tex. B. J. 598,* ARTICLE: ADMINISTRATIVE LICENSE REVOCATION HEARINGS: A DWI SPECIALIST'S PRIMER FOR THE GENERAL PRACTITIONER, By Doug Murphy and J. Gary Trichter, July, 2002, Copyright (c) 2002 by State Bar of Texas, Texas Bar Journal.

TREATISES AND ANALYTICAL MATERIALS

1. *25-422 Dorsaneo, Texas Litigation Guide § 422.04*, Administrative Proceedings (Chs. 420-425), CONTESTED CASES, Evidence, Dorsaneo, Texas Litigation Guide.

2. *25-423 Dorsaneo, Texas Litigation Guide § 423.03*, Administrative Proceedings (Chs. 420-425), JUDICIAL RE-VIEW OF CONTESTED CASES, Method of Judicial Review, Dorsaneo, Texas Litigation Guide.

3. *25-423 Dorsaneo, Texas Litigation Guide § 423.05*, Administrative Proceedings (Chs. 420-425), JUDICIAL RE-VIEW OF CONTESTED CASES, Judgment of the Court, Dorsaneo, Texas Litigation Guide.

4. *25-423 Dorsaneo, Texas Litigation Guide § 423.50*, Administrative Proceedings (Chs. 420-425), JUDICIAL RE-VIEW OF CONTESTED CASES, Petition for Judicial Review of Administrative Action in Contested Case, Dorsaneo, Texas Litigation Guide.

5. *25-423 Dorsaneo, Texas Litigation Guide § 423.100*, Administrative Proceedings (Chs. 420-425), JUDICIAL RE-VIEW OF CONTESTED CASES, Petition--Judicial Review Under Substantial Evidence Rule, Dorsaneo, Texas Litiga-tion Guide.

6. *25-424 Dorsaneo, Texas Litigation Guide § 424.01*, Administrative Proceedings (Chs. 420-425), DIRECT JUDI-CIAL PROCEEDINGS, Constraints on Direct Judicial Proceedings, Dorsaneo, Texas Litigation Guide.

7. *25-425 Dorsaneo, Texas Litigation Guide § 425.20*, Administrative Proceedings (Chs. 420-425), RESOLVING STATE CONTRACT DISPUTES, Contract Claims Covered by *Transportation Code Section 201.112* and Exempted From Government Code Chapter 2260, Dorsaneo, Texas Litigation Guide.

8. *47 Baylor L. Rev. 989,* ARTICLE: When and How Should Texas Courts Review Agency Rules? *, Fall, 1995.

9. *47 Baylor L. Rev. 1201,* NOTE: Texas Education Agency v. Leeper: Did the Texas Supreme Court Sacrifice Sover-eign Immunity for the Sake of Attorneys' Fees?, Fall, 1995.

10. *50 Baylor L. Rev. 65,* ARTICLE: When Can an Agency Change the Findings or Conclusions of an Administrative Law Judge?, Winter, 1998.

11. *49 SMU L. Rev. 901,* ANNUAL SURVEY OF TEXAS LAW: ARTICLE: EDUCATION, May / June, 1996.

12. *50 SMU L. Rev. 1173,* ARTICLE: Environmental Law, May / June, 1997.

13. *52 SMU L. Rev. 1105,* ARTICLE: Environmental Law, Summer, 1999.

14. *34 Houston Lawyer 28,* FEATURE: APPEALING ADMINISTRATIVE AGENCY DECISIONS -- HOW TO DO IT AND WHAT TO EXPECT, by Stephen L. Lundwall, May/June, 1997, Copyright (c) 1997 Houston Bar Association, The Houston Lawyer.

**LexisNexis 50 State Surveys, Legislation & Regulations**

Administrative Procedures

# TAB 15



1 of 1 DOCUMENT

TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 50. ACTION ON APPLICATIONS AND OTHER AUTHORIZATIONS
SUBCHAPTER G. ACTION BY THE EXECUTIVE DIRECTOR

*30 TAC § 50.139*   (2014)

§ 50.139. Motion to Overturn Executive Director's Decision

   (a) The applicant, public interest counsel or other person may file with the chief clerk a motion to overturn the executive director's action on an application or water quality management plan (WQMP) update certification. Notwithstanding any other law, a state agency, except a river authority, may not file a motion to overturn the executive director's action on an application that was received by the commission on or after September 1, 2011 unless the state agency is the applicant. Wherever other commission rules refer to a "motion for reconsideration," that term should be considered interchangeable with the term "motion to overturn executive director's decision."

   (b) A motion to overturn must be filed no later than 23 days after the date the agency mails notice of the signed permit, approval, or other action of the executive director to the applicant and persons on any required mailing list for the action.

   (c) A motion to overturn must be filed no later than 20 days after the date persons who timely commented on the WQMP update are notified of the response to comments and the certified WQMP update. A person is presumed to have been notified on the third day after the date the notice of the executive director's action is mailed by first class mail.

   (d) An action by the executive director under this subchapter is not affected by a motion to overturn filed under this section unless expressly ordered by the commission.

   (e) With the agreement of the parties or on their own motion, the commission of the general counsel may, by written order, extend the period of time for filing motions to overturn and for taking action on the motions so long as the period for taking action is not extended beyond 90 days after the date the agency mails notice of the signed permit, approval, or other action of the executive director.

   (f) Disposition of motion.

   (1) Unless an extension of time is granted, if a motion to overturn is not acted on by the commission within 45 days after the date the agency mails notice of the signed permit, approval, or other action of the executive director, the motion is denied.

   (2) In the event of an extension, the motion to overturn is overruled by operation of law on the date fixed by the order, or in the absence of a fixed date, 90 days after the date the agency mails notice of the signed permit, approval, or other action of the executive director.

   (g) When a motion to overturn is denied under subsection (f) of this section, a motion for rehearing does not need to be filed as a prerequisite for appeal. Section 80.272 of this title (relating to Motion for Rehearing) and *Texas Government Code, § 2001.146*, regarding motions for rehearing in contested cases do not apply when a motion to overturn is denied. If applicable, the commission decision may be subject to judicial review under *Texas Water Code, § 5.351*, or *Texas Health and Safety Code, §§ 361.321*, *382.032*, or *401.341*.

SOURCE: The provisions of this § 50.139 adopted to be effective September 23, 1999, 24 TexReg 8254; amended to be effective February 3, 2000, 25 TexReg 593; amended to be effective April 1, 2001, 26 TexReg 2393; amended to be effective May 3, 2012, 37 TexReg 3120

**NOTES:**

CROSS-REFERENCES: This Section cited in *30 TAC § 50.131*, (relating to Purpose and Applicability); *30 TAC § 50.133*, (relating to Executive Director Action on Application or WQMP Update); *30 TAC § 55.201*, (relating to Requests for Reconsideration or Contested Case Hearing); *30 TAC § 116.114*, (relating to Application Review Schedule); 30 TAC § 117.121, (relating to Alternative Case Specific Specifications); 30 TAC § 117.221, (relating to Alternative Case Specific Specifications); *30 TAC § 205.4*, (relating to Authorizations and Notices of Intent); *30 TAC § 115.783*, (relating to Equipment Standards); *30 TAC § 91.20*, (relating to Applicability); *30 TAC § 330.69*, (relating to Public Notice for Registrations); *30 TAC § 330.71*, (relating to Duration and Limits of Registrations and Permits); *30 TAC § 117.125*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.225*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.325*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.425*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.1025*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.1125*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.1225*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.1325*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.2025*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.2125*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.3025*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.3125*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.3325*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.4025*, (relating to Alternative Case Specific Specifications); *30 TAC § 117.4125*, (relating to Alternative Case Specific Specifications).

This Chapter cited in *30 TAC § 39.9*, (relating to Deadline for Public Comment and Hearing Requests); *30 TAC § 39.11*, (relating to Text of Public Notice); *30 TAC § 39.409*, (relating to Deadline for Public Comment, and for Requests for Reconsideration, Contested Case Hearing, or Notice and Comment Hearing); *30 TAC § 39.411*, (relating to Text of Public Notice); *30 TAC § 291.107*, (relating to Action on Applications); *30 TAC § 293.6*, (relating to Applications Processing Requirements); *30 TAC § 297.72*, (relating to Notice and Hearing); *30 TAC § 305.69*, (relating to Solid Waste Permit Modification at the Request of the Permittee); *30 TAC § 335.23*, (relating to Procedures for Case-by-Case Regulation of Hazardous Waste Recycling Activities); *30 TAC § 335.24*, (relating to Requirements for Recyclable Materials and Nonhazardous Recyclable Materials); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.213*, (relating to Standards Applicable to Storers of Materials That Are To Be Used in a Manner That Constitutes Disposal Who Are Not the Ultimate Users); *30 TAC § 335.214*, (relating to Standards Applicable to Users of Materials That Are Used in a Manner That Constitutes Disposal); *30 TAC § 335.241*, (relating to Applicability and Requirements); *30 TAC § 335.251*, (relating to Applicability and Requirements); *30 TAC § 303.90*, (relating to Action on Application Without Public Hearing).

This Subchapter cited in *30 TAC § 55.253*, (relating to Public Comment Processing); *30 TAC § 50.31*, (relating to Purpose and Applicability).

**TAB 16**



TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.3*   (2014)

§ 330.3. Definitions

Unless otherwise noted, all terms contained in this section are defined by their plain meaning. This section contains definitions for terms that appear throughout this chapter. Additional definitions may appear in the specific section to which they apply. The following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise.

(1) 100-year flood--A flood that has a 1.0% or greater chance of recurring in any given year or a flood of a magnitude equaled or exceeded once in 100 years on the average over a significantly long period.

(2) Active disposal area--All landfill working faces and areas covered with daily and alternative daily cover.

(3) Active life--The period of operation beginning with the initial receipt of solid waste and ending at certification/completion of closure activities in accordance with §§ 330.451 - 330.459 of this title (relating to Closure and Post-Closure).

(4) Active portion--That part of a facility or unit that has received or is receiving wastes and that has not been closed in accordance with §§ 330.451 - 330.459 of this title (relating to Closure and Post-Closure).

(5) Airport--A public-use airport open to the public without prior permission and without restrictions within the physical capacities of available facilities.

(6) Ancillary equipment--Any device that is used to distribute, meter, or control the flow of solid waste from its point of generation to a storage or processing tank(s), between solid waste storage and processing tanks to a point of disposal on-site, or to a point of shipment for disposal off-site. Such devices include, but are not limited to, piping, fittings, flanges, valves, and pumps.

(7) Animal crematory--A facility for the incineration of animal remains that meets the following criteria:

(A) control of combustion air to maintain adequate temperature for efficient combustion;

(B) containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion; and

(C) control of the emission of the combustion products.

(8) Aquifer--A geological formation, group of formations, or portion of a formation capable of yielding significant quantities of groundwater to wells or springs.

(9) Areas susceptible to mass movements--Areas of influence (i.e., areas characterized as having an active or substantial possibility of mass movement) where the movement of earth material at, beneath, or adjacent to the municipal solid waste landfill unit, because of natural or man-induced events, results in the downslope transport of soil and rock

material by means of gravitational influence. Areas of mass movement include, but are not limited to, landslides, avalanches, debris slides and flows, soil fluctuation, block sliding, and rock fall.

(10) Asbestos-containing materials--Include the following.

(A) Category I nonfriable asbestos-containing material means asbestos-containing packings, gaskets, resilient floor covering, and asphalt roofing products containing more than 1.0% asbestos as determined using the method specified in Appendix A, Subpart F, 40 Code of Federal Regulations (CFR) Part 763, § 1, Polarized Light Microscopy.

(B) Category II nonfriable asbestos-containing material means any material, excluding Category I nonfriable asbestos-containing material, containing more than 1.0% asbestos as determined using the methods specified in Appendix A, Subpart F, 40 CFR Part 763, § 1, Polarized Light Microscopy, that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure.

(C) Friable asbestos-containing material means any material containing more than 1.0% asbestos that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure.

(D) Nonfriable asbestos-containing material means any material containing more than 1.0% asbestos that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure.

(11) ASTM--The American Society for Testing and Materials.

(12) Battery--An electrochemical device that generates electric current by converting chemical energy. Its essential components are positive and negative electrodes made of more or less electrically conductive materials, a separate medium, and an electrolyte. There are four major types:

(A) primary batteries (dry cells);

(B) storage or secondary batteries;

(C) nuclear and solar cells or energy converters; and

(D) fuel cells.

(13) Battery acid (also known as electrolyte acid)--A solution of not more than 47% sulfuric acid in water suitable for use in storage batteries, which is water white, odorless, and practically free from iron.

(14) Battery retailer--A person or business location that sells lead-acid batteries to the general public, without restrictions to limit purchases to institutional or industrial clients only.

(15) Battery wholesaler--A person or business location that sells lead-acid batteries directly to battery retailers, to government entities by contract sale, or to large-volume users, either directly or by contract sale.

(16) Bird hazard--An increase in the likelihood of bird/aircraft collisions that may cause damage to an aircraft or injury to its occupants.

(17) Boiler--An enclosed device using controlled flame combustion and having the following characteristics.

(A) The unit must have physical provisions for recovering and exporting thermal energy in the form of steam, heated fluids, or heated gases.

(B) The unit's combustion chamber and primary energy recovery section(s) must be of integral design. To be of integral design, the combustion chamber and the primary energy recovery section(s) (such as waterwalls and superheaters) must be physically formed into one manufactured or assembled unit. A unit in which the combustion chamber and the primary energy recovery section(s) are joined only by ducts or connections carrying flue gas is not integrally designed; however, secondary energy recovery equipment (such as economizers or air preheaters) need not be physically formed into the same unit as the combustion chamber and the primary energy recovery section. The following units are not precluded from being boilers solely because they are not of integral design:

(i) process heaters (units that transfer energy directly to a process stream); and

(ii) fluidized bed combustion units.

(C) While in operation, the unit must maintain a thermal energy recovery efficiency of at least 60%, calculated in terms of the recovered energy compared with the thermal value of the fuel.

(D) The unit must export and utilize at least 75% of the recovered energy, calculated on an annual basis. In this calculation, no credit shall be given for recovered heat used internally in the same unit. Examples of internal use are the preheating of fuel or combustion air, and the driving of induced or forced draft fans or feedwater pumps.

(18) Brush--Cuttings or trimmings from trees, shrubs, or lawns and similar materials.

(19) Buffer zone--A zone free of municipal solid waste processing and disposal activities within and adjacent to the facility boundary on property owned or controlled by the owner or operator.

(20) Citizens' collection station--A facility established for the convenience and exclusive use of residents (not commercial or industrial users or collection vehicles), except that in small communities where regular collections are not available, small quantities of commercial waste may be deposited by the generator of the waste. The facility may consist of one or more storage containers, bins, or trailers.

(21) Class 1 wastes--Any industrial solid waste or mixture of industrial solid wastes that because of its concentration, or physical or chemical characteristics is toxic, corrosive, flammable, a strong sensitizer or irritant, a generator of sudden pressure by decomposition, heat, or other means, or may pose a substantial present or potential danger to human health or the environment when improperly processed, stored, transported, or disposed of or otherwise managed, as further defined in § 335.505 of this title (relating to Class 1 Waste Determination).

(22) Class 2 wastes--Any individual solid waste or combination of industrial solid waste that are not described as Hazardous, Class 1, or Class 3 as defined in § 335.506 of this title (relating to Class 2 Waste Determination).

(23) Class 3 wastes--Inert and essentially insoluble industrial solid waste, usually including, but not limited to, materials such as rock, brick, glass, dirt, and certain plastics and rubber, etc., that are not readily decomposable, as further defined in § 335.507 of this title (relating to Class 3 Waste Determination).

(24) Collection--The act of removing solid waste (or materials that have been separated for the purpose of recycling) for transport elsewhere.

(25) Collection system--The total process of collecting and transporting solid waste. It includes storage containers; collection crews, vehicles, equipment, and management; and operating procedures. Systems are classified as municipal, contractor, or private.

(26) Commence physical construction--The initiation of physical on-site construction on a site for which an application to authorize a municipal solid waste management unit is pending, the construction of which requires approval of the commission. Construction of actual waste management units and necessary appurtenances requires approval of the commission, but other features not specific to waste management are allowed without commission approval.

(27) Commercial solid waste--All types of solid waste generated by stores, offices, restaurants, warehouses, and other nonmanufacturing activities, excluding residential and industrial wastes.

(28) Compacted waste--Waste that has been reduced in volume by a collection vehicle or other means including, but not limited to, dewatering, composting, incineration, and similar processes, with the exception of waste that has been reduced in volume by a small, in-house compactor device owned and/or operated by the generator of the waste.

(29) Composite liner--A liner system consisting of two components: the upper component must consist of a minimum 30-mil geomembrane liner or minimum 60-mil high-density polyethylene, and the lower component must consist of at least a two-foot layer of re-compacted soil deposited in lifts with a hydraulic conductivity of no more than 1 x 10-7 centimeters/second. The geomembrane liner component must be installed in direct and uniform contact with the compacted soil component.

(30) Compost--The stabilized product of the decomposition process that is used or sold for use as a soil amendment, artificial top soil, growing medium amendment, or other similar uses.

(31) Composting--The controlled biological decomposition of organic materials through microbial activity.

(32) Conditionally exempt small-quantity generator--A person that generates no more than 220 pounds of hazardous waste in a calendar month.

(33) Construction or demolition waste--Waste resulting from construction or demolition projects; includes all materials that are directly or indirectly the by-products of construction work or that result from demolition of buildings and other structures, including, but not limited to, paper, cartons, gypsum board, wood, excelsior, rubber, and plastics.

(34) Container--Any portable device in which a material is stored, transported, or processed.

(35) Contaminate--To alter the chemical, physical, biological, or radiological integrity of ground or surface water by man-made or man-induced means.

(36) Contaminated water--Leachate, gas condensate, or water that has come into contact with waste.

(37) Controlled burning--The combustion of solid waste with control of combustion air to maintain adequate temperature for efficient combustion; containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion; and control of the emission of the combustion products, i.e., incineration in an incinerator.

(38) Discard--To abandon a material and not use, re-use, reclaim, or recycle it. A material is abandoned by being disposed of; burned or incinerated (except where the material is being burned as a fuel for the purpose of recovering usable energy); or physically, chemically, or biologically treated (other than burned or incinerated) in lieu of or prior to being disposed.

(39) Discharge--Includes deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release, or to allow, permit, or suffer any of these acts or omissions.

(40) Discharge of dredged material--Any addition of dredged material into the waters of the United States. The term includes, without limitation, the addition of dredged material to a specified disposal site located in waters of the United States and the runoff or overflow from a contained land or water disposal area.

(41) Discharge of fill material--The addition of fill material into waters of the United States. The term generally includes placement of fill necessary to the construction of any structure in waters of the United States: the building of any structure or improvement requiring rock, sand, dirt, or other inert material for its construction; the building of dams, dikes, levees, and riprap.

(42) Discharge of pollutant--Any addition of any pollutant to navigable waters from any point source or any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source.

(43) Displacement--The measured or estimated distance between two formerly adjacent points situated on opposite walls of a fault (synonymous with net slip).

(44) Disposal--The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainerized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwater.

(45) Dredged material--Material that is excavated or dredged from waters of the United States.

(46) Drinking-water intake--The point at which water is withdrawn from any water well, spring, or surface water body for use as drinking water for humans, including standby public water supplies.

(47) Elements of nature--Rainfall, snow, sleet, hail, wind, sunlight, or other natural phenomenon.

(48) Endangered or threatened species--Any species listed as such under the Federal Endangered Species Act, § 4, 16 United States Code, § 1536, as amended or under the Texas Endangered Species Act.

(49) Essentially insoluble--Any material that, if representatively sampled and placed in static or dynamic contact with deionized water at ambient temperature for seven days, will not leach any quantity of any constituent of the material into the water in excess of the maximum contaminant levels in 40 Code of Federal Regulations (CFR) Part 141, Subparts B and G, and 40 CFR Part 143 for total dissolved solids.

(50) Existing municipal solid waste landfill unit--Any municipal solid waste landfill unit that received solid waste as of October 9, 1993.

(51) Experimental project--Any new proposed method of managing municipal solid waste, including resource and energy recovery projects, that appears to have sufficient merit to warrant commission approval.

(52) Facility--All contiguous land and structures, other appurtenances, and improvements on the land used for the storage, processing, or disposal of solid waste.

(53) Fault--A fracture or a zone of fractures in any material along which strata, rocks, or soils on one side have been displaced with respect to those on the other side.

(54) Fill material--Any material used for the primary purpose of filling an excavation.

(55) Floodplain--The lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, that are inundated by the 100-year flood.

(56) Garbage--Solid waste consisting of putrescible animal and vegetable waste materials resulting from the handling, preparation, cooking, and consumption of food, including waste materials from markets, storage facilities, handling, and sale of produce and other food products.

(57) Gas condensate--The liquid generated as a result of any gas recovery process at a municipal solid waste facility.

(58) Generator--Any person, by site or location, that produces solid waste to be shipped to any other person, or whose act or process produces a solid waste or first causes it to become regulated.

(59) Grease trap waste--Material collected in and from a grease interceptor in the sanitary sewer service line of a commercial, institutional, or industrial food service or processing establishment, including the solids resulting from dewatering processes.

(60) Grit trap waste--Grit trap waste includes waste from interceptors placed in the drains prior to entering the sewer system at maintenance and repair shops, automobile service stations, car washes, laundries, and other similar establishments.

(61) Groundwater--Water below the land surface in a zone of saturation.

(62) Hazardous waste--Any solid waste identified or listed as a hazardous waste by the administrator of the United States Environmental Protection Agency under the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, 42 United States Code, §§ 6901 et seq., as amended.

(63) Holocene--The most recent epoch of the Quaternary Period, extending from the end of the Pleistocene Epoch to the present.

(64) Household waste--Any solid waste (including garbage, trash, and sanitary waste in septic tanks) derived from households (including single and multiple residences, hotels and motels, bunkhouses, ranger stations, crew quarters, campgrounds, picnic grounds, and day-use recreation areas); does not include brush.

(65) Incinerator--Any enclosed device that:

(A) uses controlled flame combustion and neither meets the criteria for classification as a boiler, sludge dryer, or carbon regeneration unit, nor is listed as an industrial furnace, as defined in § 335.1 of this title (relating to Definitions); or

(B) meets the definition of infrared incinerator or plasma arc incinerator.

(66) Industrial solid waste--Solid waste resulting from or incidental to any process of industry or manufacturing, or mining or agricultural operations.

(67) Inert material--A natural or man-made nonputrescible, nonhazardous material that is essentially insoluble, usually including, but not limited to, soil, dirt, clay, sand, gravel, brick, glass, concrete with reinforcing steel, and rock.

(68) Infrared incinerator--Any enclosed device that uses electric-powered resistance heaters as a source of radiant heat followed by an afterburner using controlled flame combustion and is not listed as an industrial furnace as defined in § 335.1 of this title (relating to Definitions).

(69) Injection well--A well into which fluids are injected.

(70) In situ--In natural or original position.

(71) Karst terrain--An area where karst topography, with its characteristic surface and/or subterranean features, is developed principally as the result of dissolution of limestone, dolomite, or other soluble rock. Characteristic physiographic features present in karst terrains include, but are not limited to, sinkholes, sinking streams, caves, large springs, and blind valleys.

(72) Lateral expansion--A horizontal expansion of the waste boundaries of an existing municipal solid waste landfill unit.

(73) Land application of solid waste--The disposal or use of solid waste (including, but not limited to, sludge or septic tank pumpings or mixture of shredded waste and sludge) in which the solid waste is applied within three feet of the surface of the land.

(74) Land treatment unit--A solid waste management unit at which solid waste is applied onto or incorporated into the soil surface and that is not a corrective action management unit; such units are disposal units if the waste will remain after closure.

(75) Landfill--A solid waste management unit where solid waste is placed in or on land and which is not a pile, a land treatment unit, a surface impoundment, an injection well, a salt dome formation, a salt bed formation, an underground mine, a cave, or a corrective action management unit.

(76) Landfill cell--A discrete area of a landfill.

(77) Landfill mining--The physical procedures associated with the excavation of buried municipal solid waste and processing of the material to recover material for beneficial use.

(78) Leachate--A liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste.

(79) Lead acid battery--A secondary or storage battery that uses lead as the electrode and dilute sulfuric acid as the electrolyte and is used to generate electrical current.

(80) License--

(A) A document issued by an approved county authorizing and governing the operation and maintenance of a municipal solid waste facility used to process, treat, store, or dispose of municipal solid waste, other than hazardous waste, in an area not in the territorial limits or extraterritorial jurisdiction of a municipality.

(B) An occupational license as defined in Chapter 30 of this title (relating to Occupational Licenses and Registrations).

(81) Liquid waste--Any waste material that is determined to contain "free liquids" as defined by United States Environmental Protection Agency (EPA) Method 9095 (Paint Filter Test), as described in "Test Methods for Evaluating Solid Wastes, Physical/Chemical Methods" (EPA Publication Number SW-846).

(82) Litter--Rubbish and putrescible waste.

(83) Low volume transfer station--A transfer station used for the storage of collected household waste limited to a total storage capacity of 40 cubic yards located in an unincorporated area that is not within the extraterritorial jurisdiction of a city.

(84) Lower explosive limit--The lowest percent by volume of a mixture of explosive gases in air that will propagate a flame at 25 degrees Celsius and atmospheric pressure.

(85) Medical waste--Treated and untreated special waste from health care-related facilities that is comprised of animal waste, bulk blood, bulk human blood, bulk human body fluids, microbiological waste, pathological waste, and sharps as those terms are defined in *25 TAC § 1.132* (relating to Definitions) from the sources specified in *25 TAC § 1.134* (relating to Application), as well as regulated medical waste as defined in *49 Code of Federal Regulations § 173.134(a)(5)*, except that the term does not include medical waste produced on a farm or ranch as defined in *34 TAC § 3.296(f)* (relating to Agriculture, Animal Life, Feed, Seed, Plants, and Fertilizer), nor does the term include artificial, nonhuman materials removed from a patient and requested by the patient, including, but not limited to, orthopedic devices and breast implants. Health care-related facilities do not include:

(A) single or multi-family dwellings; and

(B) hotels, motels, or other establishments that provide lodging and related services for the public.

(86) Monofill--A landfill or landfill cell into which only one type of waste is placed.

(87) Municipal hazardous waste--Any municipal solid waste or mixture of municipal solid wastes that has been identified or listed as a hazardous waste by the administrator, United States Environmental Protection Agency.

(88) Municipal solid waste--Solid waste resulting from or incidental to municipal, community, commercial, institutional, and recreational activities, including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.

(89) Municipal solid waste facility--All contiguous land, structures, other appurtenances, and improvements on the land used for processing, storing, or disposing of solid waste. A facility may be publicly or privately owned and may consist of several processing, storage, or disposal operational units, e.g., one or more landfills, surface impoundments, or combinations of them.

(90) Municipal solid waste landfill unit--A discrete area of land or an excavation that receives household waste and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are defined under *40 Code of Federal Regulations § 257.2*. A municipal solid waste (MSW) landfill unit also may receive other types of Resource Conservation and Recovery Act Subtitle D wastes, such as commercial solid waste, nonhazardous sludge, conditionally exempt small-quantity generator waste, and industrial solid waste. Such a landfill may be publicly or privately owned. An MSW landfill unit may be a new MSW landfill unit, an existing MSW landfill unit, a vertical expansion, or a lateral expansion.

(91) New facility--A municipal solid waste facility that has not begun construction.

(92) Nonpoint source--Any origin from which pollutants emanate in an unconfined and unchanneled manner, including, but not limited to, surface runoff and leachate seeps.

(93) Non-regulated asbestos-containing material--Non-regulated asbestos-containing material as defined in 40 Code of Federal Regulations Part 61. This is asbestos material in a form such that potential health risks resulting from exposure to it are minimal.

(94) Notification--The act of filing information with the commission for specific solid waste management activities that do not require a permit or a registration, as determined by this chapter.

(95) Nuisance--Municipal solid waste that is stored, processed, or disposed of in a manner that causes the pollution of the surrounding land, the contamination of groundwater or surface water, the breeding of insects or rodents, or the creation of odors adverse to human health, safety, or welfare. A nuisance is further set forth in Texas Health and Safety Code, Chapters 341 and 382; Texas Water Code, Chapter 26; and any other applicable regulation or statute.

(96) Open burning--The combustion of solid waste without:

(A) control of combustion air to maintain adequate temperature for efficient combustion;

(B) containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion; and

(C) control of the emission of the combustion products.

(97) Operate--To conduct, work, run, manage, or control.

(98) Operating hours--The hours when the facility is open to receive waste, operate heavy equipment, and transport materials on- or off-site.

(99) Operating record--All plans, submittals, and correspondence for a municipal solid waste facility required under this chapter; required to be maintained at the facility or at a nearby site acceptable to the executive director.

(100) Operation--A municipal solid waste (MSW) site or facility is considered to be in operation from the date that solid waste is first received or deposited at the MSW site or facility until the date that the site or facility is properly closed in accordance with this chapter.

(101) Operator--The person(s) responsible for operating the facility or part of a facility.

(102) Owner--The person that owns a facility or part of a facility.

(103) Permitted landfill--Any type of municipal solid waste landfill that received a permit from the State of Texas to operate and has not completed post-closure operations.

(104) Physical construction--The first placement of permanent construction on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, the laying of underground pipework, or any work beyond the stage of excavation. Physical construction does not include land preparation, such as clearing, grading, excavating, and filling; nor does it include the installation of roads and/or walkways. Physical construction includes issuance of a building or other construction permit, provided that permanent construction commences within 180 days of the date that the building permit was issued.

(105) Plasma arc incinerator--Any enclosed device using a high intensity electrical discharge or arc as a source of heat followed by an afterburner using controlled flame combustion and not listed as an industrial furnace as defined by § 335.1 of this title (relating to Definitions).

(106) Point of compliance--A vertical surface located no more than 500 feet from the hydraulically downgradient limit of the waste management unit boundary, extending down through the uppermost aquifer underlying the regulated units, and located on land owned by the owner of the facility.

(107) Point source--Any discernible, confined, and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, or discrete fissure from which pollutants are or may be discharged.

(108) Pollutant--Contaminated dredged spoil, solid waste, contaminated incinerator residue, sewage, sewage sludge, munitions, chemical wastes, or biological materials discharged into water.

(109) Pollution--The man-made or man-induced alteration of the chemical, physical, biological, or radiological integrity of an aquatic ecosystem.

(110) Polychlorinated biphenyl (PCB)--Any chemical substance that is limited to the biphenyl molecule that has been chlorinated to varying degrees or any combination of substances that contains such substance.

(111) Polychlorinated biphenyl (PCB) waste(s)--Those PCBs and PCB items that are subject to the disposal requirements of 40 Code of Federal Regulations (CFR) Part 761. Substances that are regulated by 40 CFR Part 761 include, but are not limited to: PCB articles, PCB article containers, PCB containers, PCB-contaminated electrical equipment, PCB equipment, PCB transformers, recycled PCBs, capacitors, microwave ovens, electronic equipment, and light ballasts and fixtures.

(112) Poor foundation conditions--Areas where features exist, indicating that a natural or man-induced event may result in inadequate foundation support for the structural components of a municipal solid waste landfill unit.

(113) Population equivalent--The hypothetical population that would generate an amount of solid waste equivalent to that actually being managed based on a generation rate of five pounds per capita per day and applied to situations involving solid waste not necessarily generated by individuals. It is assumed, for the purpose of these sections, that the average volume per ton of waste entering a municipal solid waste disposal facility is three cubic yards.

(114) Post-consumer waste--A material or product that has served its intended use and has been discarded after passing through the hands of a final user. For the purposes of this subchapter, the term does not include industrial or hazardous waste.

(115) Premises--A tract of land with the buildings thereon, or a building or part of a building with its grounds or other appurtenances.

(116) Process to further reduce pathogens--The process to further reduce pathogens as described in 40 Code of Federal Regulations Part 503, Appendix B.

(117) Processing--Activities including, but not limited to, the extraction of materials, transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal, including the treatment or neutralization of waste, designed to change the physical, chemical, or biological character or composition of any waste to neutralize such waste, or to recover energy or material from the waste, or render the waste safer to transport, store, dispose of, or make it amenable for recovery, amenable for storage, or reduced in volume.

(118) Public highway--The entire width between property lines of any road, street, way, thoroughfare, bridge, public beach, or park in this state, not privately owned or controlled, if any part of the road, street, way, thoroughfare, bridge, public beach, or park is opened to the public for vehicular traffic, is used as a public recreational area, or is under the state's legislative jurisdiction through its police power.

(119) Putrescible waste--Organic wastes, such as garbage, wastewater treatment plant sludge, and grease trap waste, that are capable of being decomposed by microorganisms with sufficient rapidity as to cause odors or gases or are capable of providing food for or attracting birds, animals, and disease vectors.

(120) Qualified groundwater scientist--A licensed geoscientist or licensed engineer who has received a baccalaureate or post-graduate degree in the natural sciences or engineering and has sufficient training in groundwater hydrology and related fields as may be demonstrated by state registration, professional certifications, or completion of accredited university programs that enable the individual to make sound professional judgments regarding groundwater monitoring, contaminant fate and transport, and corrective action.

(121) Radioactive waste--Waste that requires specific licensing under 25 TAC Chapter 289 (relating to Radiation Control), and the rules adopted by the commission under the Texas Health and Safety Code.

(122) Recyclable material--A material that has been recovered or diverted from the nonhazardous waste stream for purposes of reuse, recycling, or reclamation, a substantial portion of which is consistently used in the manufacture of products that may otherwise be produced using raw or virgin materials. Recyclable material is not solid waste. However, recyclable material may become solid waste at such time, if any, as it is abandoned or disposed of rather than recycled, whereupon it will be solid waste with respect only to the party actually abandoning or disposing of the material.

(123) Recycling--A process by which materials that have served their intended use or are scrapped, discarded, used, surplus, or obsolete are collected, separated, or processed and returned to use in the form of raw materials in the production of new products. Except for mixed municipal solid waste composting, that is, composting of the typical mixed solid waste stream generated by residential, commercial, and/or institutional sources, recycling includes the composting process if the compost material is put to beneficial use.

(124) Refuse--Same as rubbish.

(125) Registration--The act of filing information with the commission for review and approval for specific solid waste management activities that do not require a permit, as determined by this chapter.

(126) Regulated asbestos-containing material--Regulated asbestos-containing material as defined in 40 Code of Federal Regulations Part 61, as amended, includes: friable asbestos material, Category I nonfriable asbestos-containing material that has become friable; Category I nonfriable asbestos-containing material that will be or has been subjected to sanding, grinding, cutting, or abrading; or Category II nonfriable asbestos-containing material that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations.

(127) Regulated hazardous waste--A solid waste that is a hazardous waste as defined in 40 Code of Federal Regulations (CFR) § 261.3 and that is not excluded from regulation as a hazardous waste under *40 CFR § 261.4(b)*, or that was not generated by a conditionally exempt small-quantity generator.

(128) Resource recovery--The recovery of material or energy from solid waste.

(129) Resource recovery facility--A solid waste processing facility at which solid waste is processed for the purpose of extracting, converting to energy, or otherwise separating and preparing solid waste for reuse.

(130) Rubbish--Nonputrescible solid waste (excluding ashes), consisting of both combustible and noncombustible waste materials. Combustible rubbish includes paper, rags, cartons, wood, excelsior, furniture, rubber, plastics, brush, or similar materials; noncombustible rubbish includes glass, crockery, tin cans, aluminum cans, and similar materials that will not burn at ordinary incinerator temperatures (1,600 degrees Fahrenheit to 1,800 degrees Fahrenheit).

(131) Run-off--Any rainwater, leachate, or other liquid that drains over land from any part of a facility.

(132) Run-on--Any rainwater, leachate, or other liquid that drains over land onto any part of a facility.

(133) Salvaging--The controlled removal of waste materials for utilization, recycling, or sale.

(134) Saturated zone--That part of the earth's crust in which all voids are filled with water.

(135) Scavenging--The uncontrolled and unauthorized removal of materials at any point in the solid waste management system.

(136) Scrap tire--Any tire that can no longer be used for its original intended purpose.

(137) Seasonal high water level--The highest measured or calculated water level in an aquifer during investigations for a permit application and/or any groundwater characterization studies at a facility.

(138) Septage--The liquid and solid material pumped from a septic tank, cesspool, or similar sewage treatment system.

(139) Site--Same as facility.

(140) Site development plan--A document, prepared by the design engineer, that provides a detailed design with supporting calculations and data for the development and operation of a solid waste site.

(141) Site operating plan--A document, prepared by the design engineer in collaboration with the facility operator, that provides general instruction to facility management and operating personnel throughout the operating life of the facility in a manner consistent with the engineer's design and the commission's regulations to protect human health and the environment and prevent nuisances.

(142) Site operator--The holder of, or the applicant for, an authorization (or license) for a municipal solid waste facility.

(143) Sludge--Any solid, semi-solid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water-supply treatment plant, or air pollution control facility, exclusive of the treated effluent from a wastewater treatment plant.

(144) Small municipal solid waste landfill--A municipal solid waste landfill unit (Type IAE) at which less than 20 tons of authorized types of waste are disposed of daily based on an annual average and/or a Type IVAE landfill unit at which less than 20 tons of authorized types of waste are disposed of daily based on an annual average. A Type IAE landfill permit may include additional authorization for a separate Type IVAE landfill unit. If a permit contains dual authorization for Type IAE and Type IVAE landfill units, the permit must designate separate areas for the units and where all disposal cells will be located within each unit.

(145) Solid waste--Garbage, rubbish, refuse, sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities. The term does not include:

(A) solid or dissolved material in domestic sewage, or solid or dissolved material in irrigation return flows, or industrial discharges subject to regulation by permit issued under Texas Water Code, Chapter 26;

(B) soil, dirt, rock, sand, and other natural or man-made inert solid materials used to fill land if the object of the fill is to make the land suitable for the construction of surface improvements; or

(C) waste materials that result from activities associated with the exploration, development, or production of oil or gas or geothermal resources and other substance or material regulated by the Railroad Commission of Texas under *Natural Resources Code, § 91.101*, unless the waste, substance, or material results from activities associated with gasoline plants, natural gas liquids processing plants, pressure maintenance plants, or repressurizing plants and is hazardous waste as defined by the administrator of the United States Environmental Protection Agency under the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as amended (42 United States Code, §§ 6901 et seq.).

(146) Solid waste management unit--A landfill, surface impoundment, waste pile, furnace, incinerator, kiln, injection well, container, drum, salt dome waste containment cavern, land treatment unit, tank, container storage area, or any other structure, vessel, appurtenance, or other improvement on land used to manage solid waste.

(147) Source-separated recyclable material--Recyclable material from residential, commercial, municipal, institutional, recreational, industrial, and other community activities, that at the point of generation has been separated, collected, and transported separately from municipal solid waste (MSW), or transported in the same vehicle as MSW, but in separate containers or compartments. Source-separation does not require the recovery or separation of non-recyclable components that are integral to a recyclable product, including:

(A) the non-recyclable components of white goods, whole computers, whole automobiles, or other manufactured items for which dismantling and separation of recyclable from non-recyclable components by the generator are impractical, such as insulation or electronic components in white goods;

(B) source-separated recyclable material rendered unmarketable by damage during collection, unloading, and sorting, such as broken recyclable glass; and

(C) tramp materials, such as:

(i) glass from recyclable metal windows;

(ii) nails and roofing felt attached to recyclable shingles;

(iii) nails and sheetrock attached to recyclable lumber generated through the demolition of buildings; and

(iv) pallets and packaging materials.

(148) Special waste--Any solid waste or combination of solid wastes that because of its quantity, concentration, physical or chemical characteristics, or biological properties requires special handling and disposal to protect the human health or the environment. If improperly handled, transported, stored, processed, or disposed of or otherwise managed, it may pose a present or potential danger to the human health or the environment. Special wastes are:

(A) hazardous waste from conditionally exempt small-quantity generators that may be exempt from full controls under Chapter 335, Subchapter N of this title (relating to Household Materials Which Could Be Classified as Hazardous Wastes);

(B) Class 1 industrial nonhazardous waste;

(C) untreated medical waste;

(D) municipal wastewater treatment plant sludges, other types of domestic sewage treatment plant sludges, and water-supply treatment plant sludges;

(E) septic tank pumpings;

(F) grease and grit trap wastes;

(G) wastes from commercial or industrial wastewater treatment plants; air pollution control facilities; and tanks, drums, or containers used for shipping or storing any material that has been listed as a hazardous constituent in 40 Code of Federal Regulations (CFR) Part 261, Appendix VIII but has not been listed as a commercial chemical product in *40 CFR § 261.33(e)* or (f);

(H) slaughterhouse wastes;

(I) dead animals;

(J) drugs, contaminated foods, or contaminated beverages, other than those contained in normal household waste;

(K) pesticide (insecticide, herbicide, fungicide, or rodenticide) containers;

(L) discarded materials containing asbestos;

(M) incinerator ash;

(N) soil contaminated by petroleum products, crude oils, or chemicals in concentrations of greater than 1,500 milligrams per kilogram total petroleum hydrocarbons; or contaminated by constituents of concern that exceed the concentrations listed in Table 1 of § 335.521(a)(1) of this title (relating to Appendices);

(O) used oil;

(P) waste from oil, gas, and geothermal activities subject to regulation by the Railroad Commission of Texas when those wastes are to be processed, treated, or disposed of at a solid waste management facility authorized under this chapter;

(Q) waste generated outside the boundaries of Texas that contains:

(i) any industrial waste;

(ii) any waste associated with oil, gas, and geothermal exploration, production, or development activities; or

(iii) any item listed as a special waste in this paragraph;

(R) lead acid storage batteries; and

(S) used-oil filters from internal combustion engines.

(149) Stabilized sludges--Those sludges processed to significantly reduce pathogens, by processes specified in 40 Code of Federal Regulations Part 257, Appendix II.

(150) Storage--The keeping, holding, accumulating, or aggregating of solid waste for a temporary period, at the end of which the solid waste is processed, disposed, or stored elsewhere.

(A) Examples of storage facilities are collection points for:

(i) only nonputrescible source-separated recyclable material;

(ii) consolidation of parking lot or street sweepings or wastes collected and received in sealed plastic bags from such activities as periodic citywide cleanup campaigns and cleanup of rights-of-way or roadside parks; and

(iii) accumulation of used or scrap tires prior to transportation to a processing or disposal facility.

(B) Storage includes operation of pre-collection or post-collection as follows:

(i) pre-collection--that storage by the generator, normally on his premises, prior to initial collection; or

(ii) post-collection--that storage by a transporter or processor, at a processing facility, while the waste is awaiting processing or transfer to another storage, disposal, or recovery facility.

(151) Storage battery--A secondary battery, so called because the conversion from chemical to electrical energy is reversible and the battery is thus rechargeable. Secondary or storage batteries contain an electrode made of sponge lead and lead dioxide, nickel-iron, nickel-cadmium, silver-zinc, or silver-cadmium. The electrolyte used is sulfuric acid. Other types of storage batteries contain lithium, sodium-liquid sulfur, or chlorine-zinc using titanium electrodes.

(152) Structural components--Liners, leachate collection systems, final covers, run-on/run-off systems, and any other component used in the construction and operation of the municipal solid waste landfill that is necessary for protection of human health and the environment.

(153) Surface impoundment--A natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-made materials) that is designed to hold an accumulation of liquids; examples include holding, storage, settling, and aeration pits, ponds, and lagoons.

(154) Surface water--Surface water as included in water in the state.

(155) Tank--A stationary device, designed to contain an accumulation of solid waste, which is constructed primarily of non-earthen materials (e.g., wood, concrete, steel, plastic) that provide structural support.

(156) Tank system--A solid waste storage or processing tank and its associated ancillary equipment and containment system.

(157) Transfer station--A facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit). It is not a storage facility such as one where individual residents can dispose of their wastes in bulk storage containers that are serviced by collection vehicles.

(158) Transportation unit--A truck, trailer, open-top box, enclosed container, rail car, piggy-back trailer, ship, barge, or other transportation vehicle used to contain solid waste being transported from one geographical area to another.

(159) Transporter--A person that collects, conveys, or transports solid waste; does not include a person transporting his or her household waste.

(160) Trash--Same as Rubbish.

(161) Treatment--Same as Processing.

(162) Triple rinse--To rinse a container three times using a volume of solvent capable of removing the contents equal to 10% of the volume of the container or liner for each rinse.

(163) Uncompacted waste--Any waste that is not a liquid or a sludge, has not been mechanically compacted by a collection vehicle, has not been driven over by heavy equipment prior to collection, or has not been compacted prior to collection by any type of mechanical device other than small, in-house compactor devices owned and/or operated by the generator of the waste.

(164) Unified soil classification system--The standardized system devised by the United States Army Corps of Engineers for classifying soil types.

(165) Universal waste--Any of the following hazardous wastes that are subject to the universal waste requirements of Chapter 335, Subchapter H, Division 5 of this title (relating to Universal Waste Rule):

(A) batteries, as described in 40 Code of Federal Regulations (CFR) § 273.2;

(B) pesticides, as described in *40 CFR § 273.3*;

(C) thermostats, as described in *40 CFR § 273.4*;

(D) paint and paint-related waste, as described in § 335.262(b) of this title (relating to Standards for Management of Paint and Paint-Related Waste); and

(E) lamps, as described in *40 CFR § 273.5*.

(166) Unloading areas--Areas designated for unloading, including all working faces, active disposal areas, storage areas, and other processing areas.

(167) Unstable area--A location that is susceptible to natural or human-induced events or forces capable of impairing the integrity of some or all of the landfill structural components responsible for preventing releases from a landfill. Unstable areas can include poor foundation conditions, areas susceptible to mass movements, and karst terrains.

(168) Uppermost aquifer--The geologic formation nearest the natural ground surface that is an aquifer; includes lower aquifers that are hydraulically interconnected with this aquifer within the facility's property boundary.

(169) Vector--An agent, such as an insect, snake, rodent, bird, or animal capable of mechanically or biologically transferring a pathogen from one organism to another.

(170) Washout--The carrying away of solid waste by waters.

(171) Waste acceptance hours--Those hours when waste is received from off-site.

(172) Waste management unit boundary--A vertical surface located at the perimeter of the unit. This vertical surface extends down into the uppermost aquifer.

(173) Waste-separation/intermediate-processing center--A facility, sometimes referred to as a materials recovery facility, to which recyclable materials arrive as source-separated materials, or where recyclable materials are separated from the municipal waste stream and processed for transport off-site for reuse, recycling, or other beneficial use.

(174) Waste-separation/recycling facility--A facility, sometimes referred to as a material recovery facility, in which recyclable materials are removed from the waste stream for transport off-site for reuse, recycling, or other beneficial use.

(175) Water in the state--Groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, marshes, inlets, canals, the Gulf of Mexico inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or non-navigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state.

(176) Water table--The upper surface of the zone of saturation at which water pressure is equal to atmospheric pressure, except where that surface is formed by a confining unit.

(177) Waters of the United States--All waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters that are subject to the ebb and flow of the tide, with their tributaries and adjacent wetlands, interstate waters and their tributaries, including interstate wetlands; all other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, and wetlands, the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters

that are or could be used by interstate or foreign travelers for recreational or other purposes; from which fish or shellfish are or could be taken and sold in interstate or foreign commerce; that are used or could be used for industrial purposes by industries in interstate commerce; and all impoundments of waters otherwise considered as navigable waters; including tributaries of and wetlands adjacent to waters identified herein.

(178) Wetlands--As defined in Chapter 307 of this title (relating to Texas Surface Water Quality Standards).

(179) White goods--Discarded large household appliances such as refrigerators, stoves, washing machines, or dishwashers.

(180) Working face--Areas in a landfill where waste has been deposited for disposal but has not been covered.

(181) Yard waste--Leaves, grass clippings, yard and garden debris, and brush, including clean woody vegetative material not greater than six inches in diameter, that results from landscaping maintenance and land-clearing operations. The term does not include stumps, roots, or shrubs with intact root balls.

SOURCE: The provisions of this § 330.3 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in 30 TAC § 330.14, (relating to Arid Exemption Process); 30 TAC § 330.41, (relating to Types of Municipal Solid Waste Sites); 30 TAC § 330.230, (relating to Applicability); *30 TAC § 330.239*, (relating to Groundwater Monitoring at Type IV Landfills); *30 TAC § 330.15*, (relating to General Prohibitions); *30 TAC § 330.63*, (relating to Contents of Part III of the Application); *30 TAC § 330.171*, (relating to Disposal of Special Wastes); *30 TAC § 330.173*, (relating to Disposal of Industrial Wastes); *30 TAC § 330.213*, (relating to Citizen's Collection Stations); *30 TAC § 330.401*, (relating to Applicability); *30 TAC § 330.403*, (relating to Groundwater Monitoring Systems); *30 TAC § 330.951*, (relating to Definitions); *30 TAC § 330.1201*, (relating to Purpose); *30 TAC § 330.1205*, (relating to Definitions); *30 TAC § 330.1207*, (relating to Generators of Medical Waste).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

**TAB 17**



1 of 1 DOCUMENT

TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.3*   (2014)

§ 330.3. Definitions

   Unless otherwise noted, all terms contained in this section are defined by their plain meaning. This section contains definitions for terms that appear throughout this chapter. Additional definitions may appear in the specific section to which they apply. The following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise.

   (1) 100-year flood--A flood that has a 1.0% or greater chance of recurring in any given year or a flood of a magnitude equaled or exceeded once in 100 years on the average over a significantly long period.

   (2) Active disposal area--All landfill working faces and areas covered with daily and alternative daily cover.

   (3) Active life--The period of operation beginning with the initial receipt of solid waste and ending at certification/completion of closure activities in accordance with §§ 330.451 - 330.459 of this title (relating to Closure and Post-Closure).

   (4) Active portion--That part of a facility or unit that has received or is receiving wastes and that has not been closed in accordance with §§ 330.451 - 330.459 of this title (relating to Closure and Post-Closure).

   (5) Airport--A public-use airport open to the public without prior permission and without restrictions within the physical capacities of available facilities.

   (6) Ancillary equipment--Any device that is used to distribute, meter, or control the flow of solid waste from its point of generation to a storage or processing tank(s), between solid waste storage and processing tanks to a point of disposal on-site, or to a point of shipment for disposal off-site. Such devices include, but are not limited to, piping, fittings, flanges, valves, and pumps.

   (7) Animal crematory--A facility for the incineration of animal remains that meets the following criteria:

   (A) control of combustion air to maintain adequate temperature for efficient combustion;

   (B) containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion; and

   (C) control of the emission of the combustion products.

   (8) Aquifer--A geological formation, group of formations, or portion of a formation capable of yielding significant quantities of groundwater to wells or springs.

   (9) Areas susceptible to mass movements--Areas of influence (i.e., areas characterized as having an active or substantial possibility of mass movement) where the movement of earth material at, beneath, or adjacent to the municipal solid waste landfill unit, because of natural or man-induced events, results in the downslope transport of soil and rock

material by means of gravitational influence. Areas of mass movement include, but are not limited to, landslides, avalanches, debris slides and flows, soil fluctuation, block sliding, and rock fall.

(10) Asbestos-containing materials--Include the following.

(A) Category I nonfriable asbestos-containing material means asbestos-containing packings, gaskets, resilient floor covering, and asphalt roofing products containing more than 1.0% asbestos as determined using the method specified in Appendix A, Subpart F, 40 Code of Federal Regulations (CFR) Part 763, § 1, Polarized Light Microscopy.

(B) Category II nonfriable asbestos-containing material means any material, excluding Category I nonfriable asbestos-containing material, containing more than 1.0% asbestos as determined using the methods specified in Appendix A, Subpart F, 40 CFR Part 763, § 1, Polarized Light Microscopy, that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure.

(C) Friable asbestos-containing material means any material containing more than 1.0% asbestos that, when dry, can be crumbled, pulverized, or reduced to powder by hand pressure.

(D) Nonfriable asbestos-containing material means any material containing more than 1.0% asbestos that, when dry, cannot be crumbled, pulverized, or reduced to powder by hand pressure.

(11) ASTM--The American Society for Testing and Materials.

(12) Battery--An electrochemical device that generates electric current by converting chemical energy. Its essential components are positive and negative electrodes made of more or less electrically conductive materials, a separate medium, and an electrolyte. There are four major types:

(A) primary batteries (dry cells);

(B) storage or secondary batteries;

(C) nuclear and solar cells or energy converters; and

(D) fuel cells.

(13) Battery acid (also known as electrolyte acid)--A solution of not more than 47% sulfuric acid in water suitable for use in storage batteries, which is water white, odorless, and practically free from iron.

(14) Battery retailer--A person or business location that sells lead-acid batteries to the general public, without restrictions to limit purchases to institutional or industrial clients only.

(15) Battery wholesaler--A person or business location that sells lead-acid batteries directly to battery retailers, to government entities by contract sale, or to large-volume users, either directly or by contract sale.

(16) Bird hazard--An increase in the likelihood of bird/aircraft collisions that may cause damage to an aircraft or injury to its occupants.

(17) Boiler--An enclosed device using controlled flame combustion and having the following characteristics.

(A) The unit must have physical provisions for recovering and exporting thermal energy in the form of steam, heated fluids, or heated gases.

(B) The unit's combustion chamber and primary energy recovery section(s) must be of integral design. To be of integral design, the combustion chamber and the primary energy recovery section(s) (such as waterwalls and superheaters) must be physically formed into one manufactured or assembled unit. A unit in which the combustion chamber and the primary energy recovery section(s) are joined only by ducts or connections carrying flue gas is not integrally designed; however, secondary energy recovery equipment (such as economizers or air preheaters) need not be physically formed into the same unit as the combustion chamber and the primary energy recovery section. The following units are not precluded from being boilers solely because they are not of integral design:

(i) process heaters (units that transfer energy directly to a process stream); and

(ii) fluidized bed combustion units.

(C) While in operation, the unit must maintain a thermal energy recovery efficiency of at least 60%, calculated in terms of the recovered energy compared with the thermal value of the fuel.

(D) The unit must export and utilize at least 75% of the recovered energy, calculated on an annual basis. In this calculation, no credit shall be given for recovered heat used internally in the same unit. Examples of internal use are the preheating of fuel or combustion air, and the driving of induced or forced draft fans or feedwater pumps.

(18) Brush--Cuttings or trimmings from trees, shrubs, or lawns and similar materials.

(19) Buffer zone--A zone free of municipal solid waste processing and disposal activities within and adjacent to the facility boundary on property owned or controlled by the owner or operator.

(20) Citizens' collection station--A facility established for the convenience and exclusive use of residents (not commercial or industrial users or collection vehicles), except that in small communities where regular collections are not available, small quantities of commercial waste may be deposited by the generator of the waste. The facility may consist of one or more storage containers, bins, or trailers.

(21) Class 1 wastes--Any industrial solid waste or mixture of industrial solid wastes that because of its concentration, or physical or chemical characteristics is toxic, corrosive, flammable, a strong sensitizer or irritant, a generator of sudden pressure by decomposition, heat, or other means, or may pose a substantial present or potential danger to human health or the environment when improperly processed, stored, transported, or disposed of or otherwise managed, as further defined in § 335.505 of this title (relating to Class 1 Waste Determination).

(22) Class 2 wastes--Any individual solid waste or combination of industrial solid waste that are not described as Hazardous, Class 1, or Class 3 as defined in § 335.506 of this title (relating to Class 2 Waste Determination).

(23) Class 3 wastes--Inert and essentially insoluble industrial solid waste, usually including, but not limited to, materials such as rock, brick, glass, dirt, and certain plastics and rubber, etc., that are not readily decomposable, as further defined in § 335.507 of this title (relating to Class 3 Waste Determination).

(24) Collection--The act of removing solid waste (or materials that have been separated for the purpose of recycling) for transport elsewhere.

(25) Collection system--The total process of collecting and transporting solid waste. It includes storage containers; collection crews, vehicles, equipment, and management; and operating procedures. Systems are classified as municipal, contractor, or private.

(26) Commence physical construction--The initiation of physical on-site construction on a site for which an application to authorize a municipal solid waste management unit is pending, the construction of which requires approval of the commission. Construction of actual waste management units and necessary appurtenances requires approval of the commission, but other features not specific to waste management are allowed without commission approval.

(27) Commercial solid waste--All types of solid waste generated by stores, offices, restaurants, warehouses, and other nonmanufacturing activities, excluding residential and industrial wastes.

(28) Compacted waste--Waste that has been reduced in volume by a collection vehicle or other means including, but not limited to, dewatering, composting, incineration, and similar processes, with the exception of waste that has been reduced in volume by a small, in-house compactor device owned and/or operated by the generator of the waste.

(29) Composite liner--A liner system consisting of two components: the upper component must consist of a minimum 30-mil geomembrane liner or minimum 60-mil high-density polyethylene, and the lower component must consist of at least a two-foot layer of re-compacted soil deposited in lifts with a hydraulic conductivity of no more than 1 x 10-7 centimeters/second. The geomembrane liner component must be installed in direct and uniform contact with the compacted soil component.

(30) Compost--The stabilized product of the decomposition process that is used or sold for use as a soil amendment, artificial top soil, growing medium amendment, or other similar uses.

(31) Composting--The controlled biological decomposition of organic materials through microbial activity.

(32) Conditionally exempt small-quantity generator--A person that generates no more than 220 pounds of hazardous waste in a calendar month.

(33) Construction or demolition waste--Waste resulting from construction or demolition projects; includes all materials that are directly or indirectly the by-products of construction work or that result from demolition of buildings and other structures, including, but not limited to, paper, cartons, gypsum board, wood, excelsior, rubber, and plastics.

(34) Container--Any portable device in which a material is stored, transported, or processed.

(35) Contaminate--To alter the chemical, physical, biological, or radiological integrity of ground or surface water by man-made or man-induced means.

(36) Contaminated water--Leachate, gas condensate, or water that has come into contact with waste.

(37) Controlled burning--The combustion of solid waste with control of combustion air to maintain adequate temperature for efficient combustion; containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion; and control of the emission of the combustion products, i.e., incineration in an incinerator.

(38) Discard--To abandon a material and not use, re-use, reclaim, or recycle it. A material is abandoned by being disposed of; burned or incinerated (except where the material is being burned as a fuel for the purpose of recovering usable energy); or physically, chemically, or biologically treated (other than burned or incinerated) in lieu of or prior to being disposed.

(39) Discharge--Includes deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release, or to allow, permit, or suffer any of these acts or omissions.

(40) Discharge of dredged material--Any addition of dredged material into the waters of the United States. The term includes, without limitation, the addition of dredged material to a specified disposal site located in waters of the United States and the runoff or overflow from a contained land or water disposal area.

(41) Discharge of fill material--The addition of fill material into waters of the United States. The term generally includes placement of fill necessary to the construction of any structure in waters of the United States: the building of any structure or improvement requiring rock, sand, dirt, or other inert material for its construction; the building of dams, dikes, levees, and riprap.

(42) Discharge of pollutant--Any addition of any pollutant to navigable waters from any point source or any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source.

(43) Displacement--The measured or estimated distance between two formerly adjacent points situated on opposite walls of a fault (synonymous with net slip).

(44) Disposal--The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste (whether containerized or uncontainerized) into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwater.

(45) Dredged material--Material that is excavated or dredged from waters of the United States.

(46) Drinking-water intake--The point at which water is withdrawn from any water well, spring, or surface water body for use as drinking water for humans, including standby public water supplies.

(47) Elements of nature--Rainfall, snow, sleet, hail, wind, sunlight, or other natural phenomenon.

(48) Endangered or threatened species--Any species listed as such under the Federal Endangered Species Act, § 4, 16 United States Code, § 1536, as amended or under the Texas Endangered Species Act.

(49) Essentially insoluble--Any material that, if representatively sampled and placed in static or dynamic contact with deionized water at ambient temperature for seven days, will not leach any quantity of any constituent of the material into the water in excess of the maximum contaminant levels in 40 Code of Federal Regulations (CFR) Part 141, Subparts B and G, and 40 CFR Part 143 for total dissolved solids.

(50) Existing municipal solid waste landfill unit--Any municipal solid waste landfill unit that received solid waste as of October 9, 1993.

(51) Experimental project--Any new proposed method of managing municipal solid waste, including resource and energy recovery projects, that appears to have sufficient merit to warrant commission approval.

(52) Facility--All contiguous land and structures, other appurtenances, and improvements on the land used for the storage, processing, or disposal of solid waste.

(53) Fault--A fracture or a zone of fractures in any material along which strata, rocks, or soils on one side have been displaced with respect to those on the other side.

(54) Fill material--Any material used for the primary purpose of filling an excavation.

(55) Floodplain--The lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, that are inundated by the 100-year flood.

(56) Garbage--Solid waste consisting of putrescible animal and vegetable waste materials resulting from the handling, preparation, cooking, and consumption of food, including waste materials from markets, storage facilities, handling, and sale of produce and other food products.

(57) Gas condensate--The liquid generated as a result of any gas recovery process at a municipal solid waste facility.

(58) Generator--Any person, by site or location, that produces solid waste to be shipped to any other person, or whose act or process produces a solid waste or first causes it to become regulated.

(59) Grease trap waste--Material collected in and from a grease interceptor in the sanitary sewer service line of a commercial, institutional, or industrial food service or processing establishment, including the solids resulting from dewatering processes.

(60) Grit trap waste--Grit trap waste includes waste from interceptors placed in the drains prior to entering the sewer system at maintenance and repair shops, automobile service stations, car washes, laundries, and other similar establishments.

(61) Groundwater--Water below the land surface in a zone of saturation.

(62) Hazardous waste--Any solid waste identified or listed as a hazardous waste by the administrator of the United States Environmental Protection Agency under the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, 42 United States Code, §§ 6901 et seq., as amended.

(63) Holocene--The most recent epoch of the Quaternary Period, extending from the end of the Pleistocene Epoch to the present.

(64) Household waste--Any solid waste (including garbage, trash, and sanitary waste in septic tanks) derived from households (including single and multiple residences, hotels and motels, bunkhouses, ranger stations, crew quarters, campgrounds, picnic grounds, and day-use recreation areas); does not include brush.

(65) Incinerator--Any enclosed device that:

(A) uses controlled flame combustion and neither meets the criteria for classification as a boiler, sludge dryer, or carbon regeneration unit, nor is listed as an industrial furnace, as defined in § 335.1 of this title (relating to Definitions); or

(B) meets the definition of infrared incinerator or plasma arc incinerator.

(66) Industrial solid waste--Solid waste resulting from or incidental to any process of industry or manufacturing, or mining or agricultural operations.

(67) Inert material--A natural or man-made nonputrescible, nonhazardous material that is essentially insoluble, usually including, but not limited to, soil, dirt, clay, sand, gravel, brick, glass, concrete with reinforcing steel, and rock.

(68) Infrared incinerator--Any enclosed device that uses electric-powered resistance heaters as a source of radiant heat followed by an afterburner using controlled flame combustion and is not listed as an industrial furnace as defined in § 335.1 of this title (relating to Definitions).

(69) Injection well--A well into which fluids are injected.

(70) In situ--In natural or original position.

(71) Karst terrain--An area where karst topography, with its characteristic surface and/or subterranean features, is developed principally as the result of dissolution of limestone, dolomite, or other soluble rock. Characteristic physiographic features present in karst terrains include, but are not limited to, sinkholes, sinking streams, caves, large springs, and blind valleys.

(72) Lateral expansion--A horizontal expansion of the waste boundaries of an existing municipal solid waste landfill unit.

(73) Land application of solid waste--The disposal or use of solid waste (including, but not limited to, sludge or septic tank pumpings or mixture of shredded waste and sludge) in which the solid waste is applied within three feet of the surface of the land.

(74) Land treatment unit--A solid waste management unit at which solid waste is applied onto or incorporated into the soil surface and that is not a corrective action management unit; such units are disposal units if the waste will remain after closure.

(75) Landfill--A solid waste management unit where solid waste is placed in or on land and which is not a pile, a land treatment unit, a surface impoundment, an injection well, a salt dome formation, a salt bed formation, an underground mine, a cave, or a corrective action management unit.

(76) Landfill cell--A discrete area of a landfill.

(77) Landfill mining--The physical procedures associated with the excavation of buried municipal solid waste and processing of the material to recover material for beneficial use.

(78) Leachate--A liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste.

(79) Lead acid battery--A secondary or storage battery that uses lead as the electrode and dilute sulfuric acid as the electrolyte and is used to generate electrical current.

(80) License--

(A) A document issued by an approved county authorizing and governing the operation and maintenance of a municipal solid waste facility used to process, treat, store, or dispose of municipal solid waste, other than hazardous waste, in an area not in the territorial limits or extraterritorial jurisdiction of a municipality.

(B) An occupational license as defined in Chapter 30 of this title (relating to Occupational Licenses and Registrations).

(81) Liquid waste--Any waste material that is determined to contain "free liquids" as defined by United States Environmental Protection Agency (EPA) Method 9095 (Paint Filter Test), as described in "Test Methods for Evaluating Solid Wastes, Physical/Chemical Methods" (EPA Publication Number SW-846).

(82) Litter--Rubbish and putrescible waste.

(83) Low volume transfer station--A transfer station used for the storage of collected household waste limited to a total storage capacity of 40 cubic yards located in an unincorporated area that is not within the extraterritorial jurisdiction of a city.

(84) Lower explosive limit--The lowest percent by volume of a mixture of explosive gases in air that will propagate a flame at 25 degrees Celsius and atmospheric pressure.

(85) Medical waste--Treated and untreated special waste from health care-related facilities that is comprised of animal waste, bulk blood, bulk human blood, bulk human body fluids, microbiological waste, pathological waste, and sharps as those terms are defined in *25 TAC § 1.132* (relating to Definitions) from the sources specified in *25 TAC § 1.134* (relating to Application), as well as regulated medical waste as defined in *49 Code of Federal Regulations § 173.134(a)(5)*, except that the term does not include medical waste produced on a farm or ranch as defined in *34 TAC § 3.296(f)* (relating to Agriculture, Animal Life, Feed, Seed, Plants, and Fertilizer), nor does the term include artificial, nonhuman materials removed from a patient and requested by the patient, including, but not limited to, orthopedic devices and breast implants. Health care-related facilities do not include:

(A) single or multi-family dwellings; and

(B) hotels, motels, or other establishments that provide lodging and related services for the public.

(86) Monofill--A landfill or landfill cell into which only one type of waste is placed.

(87) Municipal hazardous waste--Any municipal solid waste or mixture of municipal solid wastes that has been identified or listed as a hazardous waste by the administrator, United States Environmental Protection Agency.

(88) Municipal solid waste--Solid waste resulting from or incidental to municipal, community, commercial, institutional, and recreational activities, including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.

(89) Municipal solid waste facility--All contiguous land, structures, other appurtenances, and improvements on the land used for processing, storing, or disposing of solid waste. A facility may be publicly or privately owned and may consist of several processing, storage, or disposal operational units, e.g., one or more landfills, surface impoundments, or combinations of them.

(90) Municipal solid waste landfill unit--A discrete area of land or an excavation that receives household waste and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are defined under *40 Code of Federal Regulations § 257.2*. A municipal solid waste (MSW) landfill unit also may receive other types of Resource Conservation and Recovery Act Subtitle D wastes, such as commercial solid waste, nonhazardous sludge, conditionally exempt small-quantity generator waste, and industrial solid waste. Such a landfill may be publicly or privately owned. An MSW landfill unit may be a new MSW landfill unit, an existing MSW landfill unit, a vertical expansion, or a lateral expansion.

(91) New facility--A municipal solid waste facility that has not begun construction.

(92) Nonpoint source--Any origin from which pollutants emanate in an unconfined and unchanneled manner, including, but not limited to, surface runoff and leachate seeps.

(93) Non-regulated asbestos-containing material--Non-regulated asbestos-containing material as defined in 40 Code of Federal Regulations Part 61. This is asbestos material in a form such that potential health risks resulting from exposure to it are minimal.

(94) Notification--The act of filing information with the commission for specific solid waste management activities that do not require a permit or a registration, as determined by this chapter.

(95) Nuisance--Municipal solid waste that is stored, processed, or disposed of in a manner that causes the pollution of the surrounding land, the contamination of groundwater or surface water, the breeding of insects or rodents, or the creation of odors adverse to human health, safety, or welfare. A nuisance is further set forth in Texas Health and Safety Code, Chapters 341 and 382; Texas Water Code, Chapter 26; and any other applicable regulation or statute.

(96) Open burning--The combustion of solid waste without:

(A) control of combustion air to maintain adequate temperature for efficient combustion;

(B) containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion; and

(C) control of the emission of the combustion products.

(97) Operate--To conduct, work, run, manage, or control.

(98) Operating hours--The hours when the facility is open to receive waste, operate heavy equipment, and transport materials on- or off-site.

(99) Operating record--All plans, submittals, and correspondence for a municipal solid waste facility required under this chapter; required to be maintained at the facility or at a nearby site acceptable to the executive director.

(100) Operation--A municipal solid waste (MSW) site or facility is considered to be in operation from the date that solid waste is first received or deposited at the MSW site or facility until the date that the site or facility is properly closed in accordance with this chapter.

(101) Operator--The person(s) responsible for operating the facility or part of a facility.

(102) Owner--The person that owns a facility or part of a facility.

(103) Permitted landfill--Any type of municipal solid waste landfill that received a permit from the State of Texas to operate and has not completed post-closure operations.

(104) Physical construction--The first placement of permanent construction on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, the laying of underground pipework, or any work beyond the stage of excavation. Physical construction does not include land preparation, such as clearing, grading, excavating, and filling; nor does it include the installation of roads and/or walkways. Physical construction includes issuance of a building or other construction permit, provided that permanent construction commences within 180 days of the date that the building permit was issued.

(105) Plasma arc incinerator--Any enclosed device using a high intensity electrical discharge or arc as a source of heat followed by an afterburner using controlled flame combustion and not listed as an industrial furnace as defined by § 335.1 of this title (relating to Definitions).

(106) Point of compliance--A vertical surface located no more than 500 feet from the hydraulically downgradient limit of the waste management unit boundary, extending down through the uppermost aquifer underlying the regulated units, and located on land owned by the owner of the facility.

(107) Point source--Any discernible, confined, and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, or discrete fissure from which pollutants are or may be discharged.

(108) Pollutant--Contaminated dredged spoil, solid waste, contaminated incinerator residue, sewage, sewage sludge, munitions, chemical wastes, or biological materials discharged into water.

(109) Pollution--The man-made or man-induced alteration of the chemical, physical, biological, or radiological integrity of an aquatic ecosystem.

(110) Polychlorinated biphenyl (PCB)--Any chemical substance that is limited to the biphenyl molecule that has been chlorinated to varying degrees or any combination of substances that contains such substance.

(111) Polychlorinated biphenyl (PCB) waste(s)--Those PCBs and PCB items that are subject to the disposal requirements of 40 Code of Federal Regulations (CFR) Part 761. Substances that are regulated by 40 CFR Part 761 include, but are not limited to: PCB articles, PCB article containers, PCB containers, PCB-contaminated electrical equipment, PCB equipment, PCB transformers, recycled PCBs, capacitors, microwave ovens, electronic equipment, and light ballasts and fixtures.

(112) Poor foundation conditions--Areas where features exist, indicating that a natural or man-induced event may result in inadequate foundation support for the structural components of a municipal solid waste landfill unit.

(113) Population equivalent--The hypothetical population that would generate an amount of solid waste equivalent to that actually being managed based on a generation rate of five pounds per capita per day and applied to situations involving solid waste not necessarily generated by individuals. It is assumed, for the purpose of these sections, that the average volume per ton of waste entering a municipal solid waste disposal facility is three cubic yards.

(114) Post-consumer waste--A material or product that has served its intended use and has been discarded after passing through the hands of a final user. For the purposes of this subchapter, the term does not include industrial or hazardous waste.

(115) Premises--A tract of land with the buildings thereon, or a building or part of a building with its grounds or other appurtenances.

(116) Process to further reduce pathogens--The process to further reduce pathogens as described in 40 Code of Federal Regulations Part 503, Appendix B.

(117) Processing--Activities including, but not limited to, the extraction of materials, transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal, including the treatment or neutralization of waste, designed to change the physical, chemical, or biological character or composition of any waste to neutralize such waste, or to recover energy or material from the waste, or render the waste safer to transport, store, dispose of, or make it amenable for recovery, amenable for storage, or reduced in volume.

(118) Public highway--The entire width between property lines of any road, street, way, thoroughfare, bridge, public beach, or park in this state, not privately owned or controlled, if any part of the road, street, way, thoroughfare, bridge, public beach, or park is opened to the public for vehicular traffic, is used as a public recreational area, or is under the state's legislative jurisdiction through its police power.

(119) Putrescible waste--Organic wastes, such as garbage, wastewater treatment plant sludge, and grease trap waste, that are capable of being decomposed by microorganisms with sufficient rapidity as to cause odors or gases or are capable of providing food for or attracting birds, animals, and disease vectors.

(120) Qualified groundwater scientist--A licensed geoscientist or licensed engineer who has received a baccalaureate or post-graduate degree in the natural sciences or engineering and has sufficient training in groundwater hydrology and related fields as may be demonstrated by state registration, professional certifications, or completion of accredited university programs that enable the individual to make sound professional judgments regarding groundwater monitoring, contaminant fate and transport, and corrective action.

(121) Radioactive waste--Waste that requires specific licensing under 25 TAC Chapter 289 (relating to Radiation Control), and the rules adopted by the commission under the Texas Health and Safety Code.

(122) Recyclable material--A material that has been recovered or diverted from the nonhazardous waste stream for purposes of reuse, recycling, or reclamation, a substantial portion of which is consistently used in the manufacture of products that may otherwise be produced using raw or virgin materials. Recyclable material is not solid waste. However, recyclable material may become solid waste at such time, if any, as it is abandoned or disposed of rather than recycled, whereupon it will be solid waste with respect only to the party actually abandoning or disposing of the material.

(123) Recycling--A process by which materials that have served their intended use or are scrapped, discarded, used, surplus, or obsolete are collected, separated, or processed and returned to use in the form of raw materials in the production of new products. Except for mixed municipal solid waste composting, that is, composting of the typical mixed solid waste stream generated by residential, commercial, and/or institutional sources, recycling includes the composting process if the compost material is put to beneficial use.

(124) Refuse--Same as rubbish.

(125) Registration--The act of filing information with the commission for review and approval for specific solid waste management activities that do not require a permit, as determined by this chapter.

(126) Regulated asbestos-containing material--Regulated asbestos-containing material as defined in 40 Code of Federal Regulations Part 61, as amended, includes: friable asbestos material, Category I nonfriable asbestos-containing material that has become friable; Category I nonfriable asbestos-containing material that will be or has been subjected to sanding, grinding, cutting, or abrading; or Category II nonfriable asbestos-containing material that has a high probability of becoming or has become crumbled, pulverized, or reduced to powder by the forces expected to act on the material in the course of demolition or renovation operations.

(127) Regulated hazardous waste--A solid waste that is a hazardous waste as defined in 40 Code of Federal Regulations (CFR) § 261.3 and that is not excluded from regulation as a hazardous waste under *40 CFR § 261.4(b)*, or that was not generated by a conditionally exempt small-quantity generator.

(128) Resource recovery--The recovery of material or energy from solid waste.

(129) Resource recovery facility--A solid waste processing facility at which solid waste is processed for the purpose of extracting, converting to energy, or otherwise separating and preparing solid waste for reuse.

(130) Rubbish--Nonputrescible solid waste (excluding ashes), consisting of both combustible and noncombustible waste materials. Combustible rubbish includes paper, rags, cartons, wood, excelsior, furniture, rubber, plastics, brush, or similar materials; noncombustible rubbish includes glass, crockery, tin cans, aluminum cans, and similar materials that will not burn at ordinary incinerator temperatures (1,600 degrees Fahrenheit to 1,800 degrees Fahrenheit).

(131) Run-off--Any rainwater, leachate, or other liquid that drains over land from any part of a facility.

(132) Run-on--Any rainwater, leachate, or other liquid that drains over land onto any part of a facility.

(133) Salvaging--The controlled removal of waste materials for utilization, recycling, or sale.

(134) Saturated zone--That part of the earth's crust in which all voids are filled with water.

(135) Scavenging--The uncontrolled and unauthorized removal of materials at any point in the solid waste management system.

(136) Scrap tire--Any tire that can no longer be used for its original intended purpose.

(137) Seasonal high water level--The highest measured or calculated water level in an aquifer during investigations for a permit application and/or any groundwater characterization studies at a facility.

(138) Septage--The liquid and solid material pumped from a septic tank, cesspool, or similar sewage treatment system.

(139) Site--Same as facility.

(140) Site development plan--A document, prepared by the design engineer, that provides a detailed design with supporting calculations and data for the development and operation of a solid waste site.

(141) Site operating plan--A document, prepared by the design engineer in collaboration with the facility operator, that provides general instruction to facility management and operating personnel throughout the operating life of the facility in a manner consistent with the engineer's design and the commission's regulations to protect human health and the environment and prevent nuisances.

(142) Site operator--The holder of, or the applicant for, an authorization (or license) for a municipal solid waste facility.

(143) Sludge--Any solid, semi-solid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water-supply treatment plant, or air pollution control facility, exclusive of the treated effluent from a wastewater treatment plant.

(144) Small municipal solid waste landfill--A municipal solid waste landfill unit (Type IAE) at which less than 20 tons of authorized types of waste are disposed of daily based on an annual average and/or a Type IVAE landfill unit at which less than 20 tons of authorized types of waste are disposed of daily based on an annual average. A Type IAE landfill permit may include additional authorization for a separate Type IVAE landfill unit. If a permit contains dual authorization for Type IAE and Type IVAE landfill units, the permit must designate separate areas for the units and where all disposal cells will be located within each unit.

(145) Solid waste--Garbage, rubbish, refuse, sludge from a wastewater treatment plant, water supply treatment plant, or air pollution control facility, and other discarded material, including solid, liquid, semi-solid, or contained gaseous material resulting from industrial, municipal, commercial, mining, and agricultural operations and from community and institutional activities. The term does not include:

(A) solid or dissolved material in domestic sewage, or solid or dissolved material in irrigation return flows, or industrial discharges subject to regulation by permit issued under Texas Water Code, Chapter 26;

(B) soil, dirt, rock, sand, and other natural or man-made inert solid materials used to fill land if the object of the fill is to make the land suitable for the construction of surface improvements; or

(C) waste materials that result from activities associated with the exploration, development, or production of oil or gas or geothermal resources and other substance or material regulated by the Railroad Commission of Texas under *Natural Resources Code, § 91.101*, unless the waste, substance, or material results from activities associated with gasoline plants, natural gas liquids processing plants, pressure maintenance plants, or repressurizing plants and is hazardous waste as defined by the administrator of the United States Environmental Protection Agency under the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as amended (42 United States Code, §§ 6901 et seq.).

(146) Solid waste management unit--A landfill, surface impoundment, waste pile, furnace, incinerator, kiln, injection well, container, drum, salt dome waste containment cavern, land treatment unit, tank, container storage area, or any other structure, vessel, appurtenance, or other improvement on land used to manage solid waste.

(147) Source-separated recyclable material--Recyclable material from residential, commercial, municipal, institutional, recreational, industrial, and other community activities, that at the point of generation has been separated, collected, and transported separately from municipal solid waste (MSW), or transported in the same vehicle as MSW, but in separate containers or compartments. Source-separation does not require the recovery or separation of non-recyclable components that are integral to a recyclable product, including:

(A) the non-recyclable components of white goods, whole computers, whole automobiles, or other manufactured items for which dismantling and separation of recyclable from non-recyclable components by the generator are impractical, such as insulation or electronic components in white goods;

(B) source-separated recyclable material rendered unmarketable by damage during collection, unloading, and sorting, such as broken recyclable glass; and

(C) tramp materials, such as:

(i) glass from recyclable metal windows;

(ii) nails and roofing felt attached to recyclable shingles;

(iii) nails and sheetrock attached to recyclable lumber generated through the demolition of buildings; and

(iv) pallets and packaging materials.

(148) Special waste--Any solid waste or combination of solid wastes that because of its quantity, concentration, physical or chemical characteristics, or biological properties requires special handling and disposal to protect the human health or the environment. If improperly handled, transported, stored, processed, or disposed of or otherwise managed, it may pose a present or potential danger to the human health or the environment. Special wastes are:

(A) hazardous waste from conditionally exempt small-quantity generators that may be exempt from full controls under Chapter 335, Subchapter N of this title (relating to Household Materials Which Could Be Classified as Hazardous Wastes);

(B) Class 1 industrial nonhazardous waste;

(C) untreated medical waste;

(D) municipal wastewater treatment plant sludges, other types of domestic sewage treatment plant sludges, and water-supply treatment plant sludges;

(E) septic tank pumpings;

(F) grease and grit trap wastes;

(G) wastes from commercial or industrial wastewater treatment plants; air pollution control facilities; and tanks, drums, or containers used for shipping or storing any material that has been listed as a hazardous constituent in 40 Code of Federal Regulations (CFR) Part 261, Appendix VIII but has not been listed as a commercial chemical product in *40 CFR § 261.33(e)* or (f);

(H) slaughterhouse wastes;

(I) dead animals;

(J) drugs, contaminated foods, or contaminated beverages, other than those contained in normal household waste;

(K) pesticide (insecticide, herbicide, fungicide, or rodenticide) containers;

(L) discarded materials containing asbestos;

(M) incinerator ash;

(N) soil contaminated by petroleum products, crude oils, or chemicals in concentrations of greater than 1,500 milligrams per kilogram total petroleum hydrocarbons; or contaminated by constituents of concern that exceed the concentrations listed in Table 1 of § 335.521(a)(1) of this title (relating to Appendices);

(O) used oil;

(P) waste from oil, gas, and geothermal activities subject to regulation by the Railroad Commission of Texas when those wastes are to be processed, treated, or disposed of at a solid waste management facility authorized under this chapter;

(Q) waste generated outside the boundaries of Texas that contains:

(i) any industrial waste;

(ii) any waste associated with oil, gas, and geothermal exploration, production, or development activities; or

(iii) any item listed as a special waste in this paragraph;

(R) lead acid storage batteries; and

(S) used-oil filters from internal combustion engines.

(149) Stabilized sludges--Those sludges processed to significantly reduce pathogens, by processes specified in 40 Code of Federal Regulations Part 257, Appendix II.

(150) Storage--The keeping, holding, accumulating, or aggregating of solid waste for a temporary period, at the end of which the solid waste is processed, disposed, or stored elsewhere.

(A) Examples of storage facilities are collection points for:

(i) only nonputrescible source-separated recyclable material;

(ii) consolidation of parking lot or street sweepings or wastes collected and received in sealed plastic bags from such activities as periodic citywide cleanup campaigns and cleanup of rights-of-way or roadside parks; and

(iii) accumulation of used or scrap tires prior to transportation to a processing or disposal facility.

(B) Storage includes operation of pre-collection or post-collection as follows:

(i) pre-collection--that storage by the generator, normally on his premises, prior to initial collection; or

(ii) post-collection--that storage by a transporter or processor, at a processing facility, while the waste is awaiting processing or transfer to another storage, disposal, or recovery facility.

(151) Storage battery--A secondary battery, so called because the conversion from chemical to electrical energy is reversible and the battery is thus rechargeable. Secondary or storage batteries contain an electrode made of sponge lead and lead dioxide, nickel-iron, nickel-cadmium, silver-zinc, or silver-cadmium. The electrolyte used is sulfuric acid. Other types of storage batteries contain lithium, sodium-liquid sulfur, or chlorine-zinc using titanium electrodes.

(152) Structural components--Liners, leachate collection systems, final covers, run-on/run-off systems, and any other component used in the construction and operation of the municipal solid waste landfill that is necessary for protection of human health and the environment.

(153) Surface impoundment--A natural topographic depression, man-made excavation, or diked area formed primarily of earthen materials (although it may be lined with man-made materials) that is designed to hold an accumulation of liquids; examples include holding, storage, settling, and aeration pits, ponds, and lagoons.

(154) Surface water--Surface water as included in water in the state.

(155) Tank--A stationary device, designed to contain an accumulation of solid waste, which is constructed primarily of non-earthen materials (e.g., wood, concrete, steel, plastic) that provide structural support.

(156) Tank system--A solid waste storage or processing tank and its associated ancillary equipment and containment system.

(157) Transfer station--A facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit). It is not a storage facility such as one where individual residents can dispose of their wastes in bulk storage containers that are serviced by collection vehicles.

(158) Transportation unit--A truck, trailer, open-top box, enclosed container, rail car, piggy-back trailer, ship, barge, or other transportation vehicle used to contain solid waste being transported from one geographical area to another.

(159) Transporter--A person that collects, conveys, or transports solid waste; does not include a person transporting his or her household waste.

(160) Trash--Same as Rubbish.

(161) Treatment--Same as Processing.

(162) Triple rinse--To rinse a container three times using a volume of solvent capable of removing the contents equal to 10% of the volume of the container or liner for each rinse.

(163) Uncompacted waste--Any waste that is not a liquid or a sludge, has not been mechanically compacted by a collection vehicle, has not been driven over by heavy equipment prior to collection, or has not been compacted prior to collection by any type of mechanical device other than small, in-house compactor devices owned and/or operated by the generator of the waste.

(164) Unified soil classification system--The standardized system devised by the United States Army Corps of Engineers for classifying soil types.

(165) Universal waste--Any of the following hazardous wastes that are subject to the universal waste requirements of Chapter 335, Subchapter H, Division 5 of this title (relating to Universal Waste Rule):

(A) batteries, as described in 40 Code of Federal Regulations (CFR) § 273.2;

(B) pesticides, as described in *40 CFR § 273.3*;

(C) thermostats, as described in *40 CFR § 273.4*;

(D) paint and paint-related waste, as described in § 335.262(b) of this title (relating to Standards for Management of Paint and Paint-Related Waste); and

(E) lamps, as described in *40 CFR § 273.5*.

(166) Unloading areas--Areas designated for unloading, including all working faces, active disposal areas, storage areas, and other processing areas.

(167) Unstable area--A location that is susceptible to natural or human-induced events or forces capable of impairing the integrity of some or all of the landfill structural components responsible for preventing releases from a landfill. Unstable areas can include poor foundation conditions, areas susceptible to mass movements, and karst terrains.

(168) Uppermost aquifer--The geologic formation nearest the natural ground surface that is an aquifer; includes lower aquifers that are hydraulically interconnected with this aquifer within the facility's property boundary.

(169) Vector--An agent, such as an insect, snake, rodent, bird, or animal capable of mechanically or biologically transferring a pathogen from one organism to another.

(170) Washout--The carrying away of solid waste by waters.

(171) Waste acceptance hours--Those hours when waste is received from off-site.

(172) Waste management unit boundary--A vertical surface located at the perimeter of the unit. This vertical surface extends down into the uppermost aquifer.

(173) Waste-separation/intermediate-processing center--A facility, sometimes referred to as a materials recovery facility, to which recyclable materials arrive as source-separated materials, or where recyclable materials are separated from the municipal waste stream and processed for transport off-site for reuse, recycling, or other beneficial use.

(174) Waste-separation/recycling facility--A facility, sometimes referred to as a material recovery facility, in which recyclable materials are removed from the waste stream for transport off-site for reuse, recycling, or other beneficial use.

(175) Water in the state--Groundwater, percolating or otherwise, lakes, bays, ponds, impounding reservoirs, springs, rivers, streams, creeks, estuaries, marshes, inlets, canals, the Gulf of Mexico inside the territorial limits of the state, and all other bodies of surface water, natural or artificial, inland or coastal, fresh or salt, navigable or non-navigable, and including the beds and banks of all watercourses and bodies of surface water, that are wholly or partially inside or bordering the state or inside the jurisdiction of the state.

(176) Water table--The upper surface of the zone of saturation at which water pressure is equal to atmospheric pressure, except where that surface is formed by a confining unit.

(177) Waters of the United States--All waters that are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters that are subject to the ebb and flow of the tide, with their tributaries and adjacent wetlands, interstate waters and their tributaries, including interstate wetlands; all other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, and wetlands, the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters

that are or could be used by interstate or foreign travelers for recreational or other purposes; from which fish or shellfish are or could be taken and sold in interstate or foreign commerce; that are used or could be used for industrial purposes by industries in interstate commerce; and all impoundments of waters otherwise considered as navigable waters; including tributaries of and wetlands adjacent to waters identified herein.

(178) Wetlands--As defined in Chapter 307 of this title (relating to Texas Surface Water Quality Standards).

(179) White goods--Discarded large household appliances such as refrigerators, stoves, washing machines, or dishwashers.

(180) Working face--Areas in a landfill where waste has been deposited for disposal but has not been covered.

(181) Yard waste--Leaves, grass clippings, yard and garden debris, and brush, including clean woody vegetative material not greater than six inches in diameter, that results from landscaping maintenance and land-clearing operations. The term does not include stumps, roots, or shrubs with intact root balls.

SOURCE: The provisions of this § 330.3 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in 30 TAC § 330.14, (relating to Arid Exemption Process); 30 TAC § 330.41, (relating to Types of Municipal Solid Waste Sites); 30 TAC § 330.230, (relating to Applicability); *30 TAC § 330.239*, (relating to Groundwater Monitoring at Type IV Landfills); *30 TAC § 330.15*, (relating to General Prohibitions); *30 TAC § 330.63*, (relating to Contents of Part III of the Application); *30 TAC § 330.171*, (relating to Disposal of Special Wastes); *30 TAC § 330.173*, (relating to Disposal of Industrial Wastes); *30 TAC § 330.213*, (relating to Citizen's Collection Stations); *30 TAC § 330.401*, (relating to Applicability); *30 TAC § 330.403*, (relating to Groundwater Monitoring Systems); *30 TAC § 330.951*, (relating to Definitions); *30 TAC § 330.1201*, (relating to Purpose); *30 TAC § 330.1205*, (relating to Definitions); *30 TAC § 330.1207*, (relating to Generators of Medical Waste).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

**TAB 18**



TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.7*   (2014)

§ 330.7. Permit Required

   (a) Except as provided in §§ 330.9, 330.11, 330.13, or 330.25 of this title (relating to Registration Required; Notification Required; Waste Management Activities Exempt from Permitting, Registration, or Notification; and Relationship with County Licensing System), no person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any solid waste unless such activity is authorized by a permit or other authorization from the commission. In the event this requirement is violated, the executive director may seek recourse against not only the person that stored, processed, or disposed of the waste but also against the generator, transporter, owner or operator, or other person who caused, suffered, allowed, or permitted its waste to be stored, processed, or disposed. No person may commence physical construction of a new municipal solid waste (MSW) management facility, a vertical expansion, or a lateral expansion without first having submitted a permit application in accordance with §§ 330.57, 330.59, 330.61, 330.63, and 330.65 of this title (relating to Permit and Registration Applications for Municipal Solid Waste Facilities; Contents of Part I of the Application; Contents of Part II of the Application; Contents of Part III of the Application; and Contents of Part IV of the Application, respectively) and received a permit from the commission, except as provided otherwise in this section.

   (b) A separate permit is required for the storage, transportation, or handling of used oil mixtures collected from oil/water separators. Any person that intends to conduct such activity shall comply with the regulatory requirements of Chapter 324 of this title (relating to Used Oil Standards).

   (c) Permits by rule may be granted for persons that compact or transport waste in enclosed containers or enclosed transportation units to a Type IV facility.

   (1) A permit by rule is granted for a generator operating a stationary compactor that is only used to compact waste to be disposed of at a Type IV landfill, if all of the following conditions are met.

   (A) The generator submits the following information and any requested additional information on forms provided by the executive director: (i) generator contact person, company name, mailing address, street address, city, state, ZIP code, and telephone number; (ii) contract renewal date, if applicable; (iii) rated compaction capability in pounds per cubic yard; (iv) container size; (v) description of waste stream to enter compactor; (vi) receiving MSW Type IV disposal facility name, permit number, mailing address, street address, city, state, ZIP code, telephone number, and contact person; and (vii) a certification from the generator that states the following: I, (name) _____, (title) _____ of (company name) _____, located at (street address) _____ in (city) _____, certify that the contents of the compactor located at the location stated herein are free of and shall be maintained free of putrescible, hazardous, infectious, and any other waste not allowed in an MSW Type IV landfill.

   (B) The generator submits a $ 75 fee along with the claim for the permit by rule.

(C) The generator complies with the operational requirements of § 330.215 of this title (relating to Requirements for Stationary Compactors).

(D) A stationary compactor permit by rule expires after one year. The generator must submit an annual renewal fee in the amount of $ 75. Failure to timely pay the annual fee eliminates the option of disposal of these wastes at a Type IV landfill until the generator claims a new or renewed permit by rule.

(2) A permit by rule is granted for transporters using enclosed containers or enclosed vehicles to collect and transport brush, construction or demolition wastes, and rubbish along special collection routes to MSW Type IV landfill facilities if all of the following conditions are met.

(A) The owner or operator seeking a special collection route permit by rule submits to the executive director the following information and any requested additional information on forms provided by the executive director: (i) name of owner and operator, mailing address, street address, city, state, ZIP code, name and title of a contact person, and telephone number; (ii) receiving MSW Type IV disposal facility name, permit number, mailing address, street address, city, state, ZIP code, telephone number, and contact person; (iii) information on each transportation unit, including, at a minimum, license number, vehicle identification number, year model, make, capacity in cubic yards, and rated compaction capability in pounds per cubic yard; (iv) route information, which shall include as a minimum the collection frequency, the day of the week the route is to be collected, and the day and time span within which the route is to arrive at the MSW Type IV landfill; (v) a description of the wastes to be transported; (vi) an alternative contingency disposal plan to include alternate trucks to be used or alternative disposal facilities; and (vii) a signed and notarized certification from the owner or operator that states the following: I, (name) _____, (title) _____, of _____ operating in _____ County, certify that the contents of the vehicles described above will be free of putrescible, household, hazardous, infectious, or any other waste not allowed in an MSW Type IV landfill.

(B) The transporter submits a $ 100 per vehicle fee along with the claim for a permit by rule.

(C) The transporter documents each load delivered with a trip ticket form provided by the executive director, and provides the trip ticket to the landfill operator prior to discharging the load.

(D) A special collection route permit by rule expires after one year. The owner or operator must submit an annual renewal fee in the amount of $ 100 per vehicle. Failure to timely pay the annual fee eliminates the option of disposal of these wastes at a Type IV landfill until the owner or operator claims a new or renewed permit by rule.

(E) This paragraph does not apply if the waste load is from a single collection point that is a stationary compactor authorized in accordance with paragraph (1) of this subsection.

(3) Revision requirements for stationary compactor permits or special collection route permits by rule identified in paragraphs (1) and (2) of this subsection are as follows.

(A) An update must be submitted if any information within the original permit by rule submittal changes.

(B) A submittal to update an existing permit by rule must include all of the same documentation required for an original permit by rule submittal.

(d) A major permit amendment, as defined by § 305.62 of this title (relating to Amendments), is required to reopen a Type I, Type IAE, Type IV, or Type IVAE MSW facility permitted by the commission or any of its predecessor or successor agencies that has either stopped accepting waste, or only accepted waste in accordance with an emergency authorization, for a period of five years or longer. The MSW facilities covered by this subsection may not be reopened to accept waste again unless the permittee demonstrates compliance with all applicable requirements of the Resource Conservation and Recovery Act, Subtitle D and the implementing Texas state regulations. If an MSW facility was subject to a contract of sale on January 1, 2001, the scope of any public hearing held on the permit amendment required by this subsection is limited to land use compatibility, as provided by § 330.57(a) of this title. This subsection does not apply to any MSW facility that has received a permit but never received waste, or that received an approved Subtitle D permit modification before September 1, 2001.

(e) A permit by rule is granted for an animal crematory that meets the following criteria. For facilities that do not meet all the requirements of this subsection, the owner or operator shall submit a permit application under §§ 330.57, 330.59, 330.61, 330.63, and 330.65 of this title and obtain a permit. To qualify for a permit by rule under this subsection, the following requirements must be met.

(1) General prohibitions. An animal crematory facility shall comply with § 330.15(a) of this title (relating to General Prohibitions).

(2) Incineration limits. Incineration of carcasses shall be limited to the conditions specified in § 106.494 of this title (relating to Pathological Waste Incinerators (Previously SE 90)). The facility shall not accept animal carcasses that weigh more than the capacity of the largest incinerator at the facility and shall not dismember any carcasses during processing.

(3) Ash control. Ash disposal must be at an authorized facility unless the ash is returned to the animal owner or sent to a pet cemetery. Ash shall be stored in an enclosed container that will prevent release of the ash to the environment. There shall be no more than 2,000 pounds of ash stored at an animal crematory at any given time.

(4) Air pollution control. Air emissions from the facility shall not cause or contribute to a condition of air pollution as defined in Texas Clean Air Act, § 382.003. All animal crematories, prior to construction or modification, must have an air permit issued under Chapter 116 of this title (relating to Control of Air Pollution by Permits for New Construction or Modification), or qualify for a permit by rule under § 106.494 of this title.

(5) Fire protection. The facility shall prepare, maintain, and follow a fire protection plan. This fire protection plan shall describe fire protection resources (a local fire department, fire hydrants, fire extinguishers, water tanks, water well, etc.), and employee training and safety procedures. The fire protection plan shall comply with local fire codes.

(6) Storage limits. Carcasses must be incinerated within two hours of receipt, unless stored at or below a temperature of 29 degrees Fahrenheit. Storage of carcasses shall be in a manner that minimizes the release of odors. Storage of carcasses shall be limited to the lesser of 3,200 pounds or the amount that can be incinerated at the maximum loading rate for the incinerators at the facility in a two-day period.

(7) Unauthorized waste. Only carcasses or animal parts, with any associated packaging, shall be processed. Carcasses shall not be accepted in packaging that includes any chlorinated plastics. Carcasses or animal parts that are either hazardous waste or medical waste are prohibited.

(8) Cleaning. Storage and processing units must be properly cleaned on a routine basis to prevent odors and the breeding of flies.

(9) Nuisance prevention. The facility shall be designed and operated in a manner so as to prevent nuisance conditions, including, but not limited to, dust from ashes, disease vectors, odors, and liquids from spills, from being released from the property boundary of the authorized facility.

(10) Diseased animals. The facility shall be equipped with appropriate protective equipment and clothing for personnel handling diseased animals that may be received at the facility. Facility owners or operators must inform customers and local veterinarians of the need to identify diseased animals for the protection of personnel handling the animals.

(11) Buffer zone. An animal crematory, including unloading and storage areas, constructed after March 2, 2003, must be at least 50 feet from the property boundary of the facility.

(12) Operating hours. A crematory shall operate within the time frames allowed by § 111.129 of this title (relating to Operating Requirements).

(13) Documentation. The operator of an animal crematory shall document the carcasses' weight, date and time when carcasses are received, and when carcasses are loaded into the incinerator. A separate entry in the records for loading into the incinerator is not required if a carcass is loaded within two hours of receipt. This information will be maintained in records on site.

(14) Breakdown. The facility is subject to § 330.241 of this title (relating to Overloading and Breakdown).

(15) Records management. The owner or operator must retain records as follows:

(A) maintain a copy of all requirements of this subsection that apply to the facility;

(B) maintain records for the previous consecutive 12-month period containing sufficient information to demonstrate compliance with all requirements of this subsection;

(C) keep all required records at the facility; and

(D) make the records available upon request to personnel from the commission or from local governments with jurisdiction over the facility.

(16) Fees. An animal crematory facility authorized under this section is exempt from the fee requirements of Subchapter P of this chapter (relating to Fees and Reporting).

(17) Other requirements. No other requirements under this chapter are applicable to a facility that meets all of the requirements of this subsection.

(f) A permit by rule is granted for a dual chamber incinerator if the owner or operator complies with § 106.491 of this title (relating to Dual-Chamber Incinerators).

(g) A permit by rule is granted for an air curtain incinerator if the owner or operator complies with § 106.496 of this title (relating to Air Curtain Incinerators). An air curtain incinerator may not be located within 300 feet of an active or closed MSW landfill unit boundary.

(h) A standard air permit is granted for facilities that comply with Subchapter U of this chapter (relating to Standard Air Permits for Municipal Solid Waste Landfill Facilities and Transfer Stations).

(i) A permit by rule is granted for a period of up to five years to a county or municipality with a population of 12,000 people or less to dispose of demolition waste from properties with nuisance or abandoned buildings.

(1) Requirements. The following conditions must be met.

(A) Form submittal. The county or municipality submits a form provided by the commission to the executive director for review and approval before construction begins.

(B) Notice to regional office. The county or municipality notifies the applicable commission regional office of the intent to dispose of waste under this authorization at least 48 hours prior to accepting the first load of waste.

(C) Facility location. The location where disposal will occur: (i) is owned or controlled by the county or municipality, and (ii) receives less than or equal to 25 inches average annual precipitation as determined from precipitation data for the nearest official precipitation recording station for at least the most recent 30-year reporting period or by another method approved by the executive director.

(D) Sources of waste. The properties on which nuisance and abandoned buildings are located have been acquired by the county or municipality by means of bankruptcy, tax delinquency, or condemnation, and the previous owners are not financially capable of paying the costs of the disposal of demolition waste at a permitted solid waste disposal facility, including transportation of the waste to the facility.

(E) Waste acceptance.   (i) Prior to demolition, structures are surveyed and abated, if required, for asbestos-containing materials in accordance with 25 TAC Chapter 295, Subchapter C (relating to Texas Asbestos Health Protection).   (ii) The facility may accept non-regulated asbestos-containing materials (non-RACM) for disposal. The wastes are placed on the active working face and covered at the end of the operating day with at least six inches of soil. Under no circumstances may any of the material containing non-RACM be placed on a surface that is subject to vehicular traffic or disposed of by any other means by which the material could be crumbled into a friable state.   (iii) The facility may accept regulated asbestos-containing materials (RACM) if the following conditions are met.

(I) The county or municipality notifies the executive director on a form provided by the commission in accordance with subparagraph (A) of this paragraph.

(II) All waste trenches are identified as receiving RACM, and deed records required under subparagraph (Q) of this paragraph include an indication that the waste trench(es) received RACM.

(III) RACM is transported and received at the facility in tightly closed and unruptured containers or bags or wrapped with at least six-mil polyethylene.

(IV) Bags or containers holding RACM are carefully unloaded and placed in the final disposal location. RACM is then covered immediately with at least six inches of soil. Care is taken during unloading and placement of RACM and during application of the cover so that the bags or containers are not ruptured.   (iv) Waste is limited to the abandoned or nuisance buildings and materials from the property on which the buildings are located. All waste disposed under this authorization must meet the limitations of § 330.5(a)(2) of this title (relating to Classification of Municipal Solid Waste Facilities) and may not include waste prohibited under § 330.15(e) of this title.

(F) Access control. Access to the disposal facility is controlled by means of fences, other artificial barriers, natural barriers, or a combination of these methods, and includes a locking gate.

(G) Buffers and easements. The county or municipality maintains a minimum distance of 50 feet as a buffer between the permit boundary and waste storage, processing and disposal areas. No disposal occurs within a utility or pipeline easement or within 25 feet of the center of a utility or pipeline easement.

(H) Below-grade placement. Waste is placed only below grade. The top of final cover is placed at pre-existing grade or up to three feet above pre-existing grade to ensure that natural drainage patterns are not altered and ponding of water over waste is prevented.

(I) Weekly cover. Waste is covered at least weekly with six inches of earthen material not previously mixed with waste, or by tarps. Use of tarps as cover is limited to a seven-day period after which the county or municipality must replace the tarp with either waste or a six-inch layer of earthen material not previously mixed with waste. Tarps may not be used in place of soil cover requirements relating to non-RACM and RACM in subparagraph (E)(ii) and (iii) of this paragraph. Any trench that has received waste but will be inactive for more than 180 days receives intermediate cover in accordance with subparagraph (J) of this paragraph, or final cover in accordance with subparagraph (P) of this paragraph.

(J) Intermediate cover. Waste is covered, including any soil weekly cover, with twelve inches of well compacted earthen material not previously mixed with waste.

(K) Maximum volume. The design waste disposal volume is less than 2.5 million cubic meters in accordance with § 106.534(3) of this title (relating to Municipal Solid Waste Landfills and Transfer Stations).

(L) Facility signs. At all entrances through which waste is received, the facility conspicuously displays a sign with letters at least three inches in height providing a statement that the facility is "NOT FOR PUBLIC USE," an emergency 24-hour contact number that reaches an individual with the authority to obligate the facility at all times that the facility is not in operation, and the local emergency fire department number.

(M) Stormwater and contaminated water. The county or municipality constructs berms to divert the 25-year/24-hour storm event from entering excavations containing waste. Water that has contacted waste is managed as contaminated water and disposed at an authorized treatment facility.

(N) Reporting. The county or municipality, while not required to provide quarterly reporting, provides annual reporting in accordance with the annual reporting provisions of § 330.675(a) of this title (relating to Reports).

(O) Reauthorization. Before reaching the permit by rule term limit of five years, the county or municipality may request reauthorization under the permit by rule by submitting a form that is current at the time of reauthorization, provided by the commission in accordance with subparagraph (A) of this paragraph, to the executive director at least 14 days before the end of the permit term.

(P) Final cover. The following conditions are met.   (i) Within 60 days after a trench reaches its capacity or waste deposition activities are complete in a trench, the county or municipality installs final cover over waste in the trench. Final cover shall be composed of no less than two feet of soil. The first 18 inches or more of cover shall be of compacted clayey soil, classification sand clay (SC) or low plasticity clay (CL) as defined in the "Unified Soils Classification System" developed by the United States Army Corps of Engineers, and placed and compacted in layers of no more than six inches to minimize the potential for water infiltration. A high plasticity clayey (CH) soil may be used; however, this soil may experience excessive cracking and shall therefore be covered by a minimum of 12 inches of topsoil to retain moisture. Other types of soil may be used with prior written approval from the executive director. The final six inches of cover shall be of suitable topsoil that is capable of sustaining native plant growth and shall be seeded or sodded as soon as practicable following the application of the final cover in order to minimize erosion.   (ii) The trench final cover procedures listed in clause (i) of this subparagraph are completed before facility closure, as described in subparagraph (Q) of this paragraph. If these procedures cannot be performed before the permit by rule term limit is reached, the county or municipality submits a current application form for reauthorization of the permit by rule to the executive director at least 14 days before the end of the permit term.

(Q) Facility closure. The county or municipality notifies the executive director and the applicable regional office at least 60 days before the anticipated closure date of the facility. Within ten days after closure, submit to the executive director by registered mail a certified copy of an "affidavit to the public" in accordance with the requirements of §

330.19 of this title (relating to Deed Recordation). In addition, record a certified notation of the deed to the facility property, or on some other instrument that is normally examined during title search, that will in perpetuity notify any potential purchaser of the property that the land has been used as a landfill facility and use of the land is restricted. Submit a certified deed to the executive director.

(2) Other provisions. The following provisions also apply to this authorization.

(A) Processing. This permit by rule also authorizes the processing of waste destined for the disposal unit. Authorized processing is limited to volume reduction, such as chipping or grinding, but not burning. Processing must occur within the permit boundary and may not occur within a buffer zone or right-of-way. Tires, RACM and non-RACM may not be processed. If required, the county or municipality must obtain authorization for air emissions resulting from this processing.

(B) Fees. Waste that is disposed under this authorization is not subject to the fee requirements of Subchapter P of this chapter.

(C) Other requirements. No other requirements under this chapter are applicable to a facility that meets all the requirements of this subsection.

SOURCE: The provisions of this § 330.7 adopted to be effective March 27, 2006, 31 TexReg 2502; amended to be effective August 16, 2012, 37 TexReg 6072; amended to be effective July 31, 2014, 39 TexReg 5796

**NOTES:**

CROSS-REFERENCES: This Section cited in 30 TAC § 330.4, (relating to Permit Required); 30 TAC § 330.253, (relating to Closure Requirements for MSWLF Units That Receive Waste on or after October 9, 1993, and MSW Sites); *30 TAC § 106.496*, (relating to Air Curtain Incinerators); *30 TAC § 106.534*, (relating to Municipal Solid Waste Landfills and Transfer Stations); *30 TAC § 330.9*, (relating to Registration Required); *30 TAC § 330.11*, (relating to Notification Required); *30 TAC § 330.13*, (relating to Waste Management Activities Exempt from Permitting, Registration, or Notification); *30 TAC § 330.15*, (relating to General Prohibitions); *30 TAC § 330.21*, (relating to Closure); *30 TAC § 330.133*, (relating to Unloading of Waste); *30 TAC § 330.169*, (relating to Waste in Enclosed Containers or Enclosed Vehicles Accepted at Type IV Landfills); *30 TAC § 330.461*, (relating to Certification of Final Facility Closure); *30 TAC § 330.951*, (relating to Definitions); *30 TAC § 330.954*, (relating to Development Permit, Development Authorization, and Registration Requirements, Procedures, and Processing); *30 TAC § 80.108*, (relating to Executive Director Party Status in Permit Hearings).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability); *30 TAC § 37.271*, (relating to Local Government Financial Test); *30 TAC § 37.8011*, (relating to Definitions).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

**TAB 19**



TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.9*   (2014)

§ 330.9. Registration Required

   (a) Except as provided in §§ 330.7, 330.11, 330.13, or 330.25 of this title (relating to Permit Required; Notification Required; Waste Management Activities Exempt from Permitting, Registration, or Notification; Relationship with County Licensing System), no person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any municipal solid waste (MSW) unless that activity is authorized by a registration or other authorization from the commission. In the event this requirement is violated, the executive director may seek recourse against not only the person that stored, processed, or disposed of the waste but also against the generator, transporter, owner or operator, or other person who caused, suffered, allowed, or permitted waste to be stored, processed, or disposed. No person may commence physical construction of a new MSW management facility subject to this registration requirement without first having submitted a registration application in accordance with §§ 330.57, 330.59, 330.61, 330.63, and 330.65 of this title (relating to Permit and Registration Application Procedures) and received a registration from the commission. A person shall include a statement justifying the facility's eligibility for a registration as established under this section. A person shall submit a claim for a registration by rule in duplicate with one copy sent directly to the appropriate Texas Commission on Environmental Quality regional office.

   (b) A registration is required for an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following:

   (1) a municipality with a population of less than 50,000;

   (2) a county with a population of less than 85,000;

   (3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less; or

   (4) a transfer station located within the permitted boundaries of an MSW Type I or Type IV facility as specified in § 330.5(a) of this title (relating to Classification of Municipal Solid Waste Facilities).

   (c) A registration is required to establish a waste-separation/recycling facility established at a permitted MSW facility if owned by the permittee.

   (d) A registration is required for a facility where the only operation is the storage and/or processing of used and scrap tires as provided for in Chapter 328 of this title (relating to Waste Minimization and Recycling). These facilities shall be registered with the executive director in accordance with Chapter 328 of this title. Failure to operate such registered facilities in accordance with the requirements established in Chapter 328 of this title may be grounds for the revocation of the registration.

   (e) A licensed hospital may function as a medical waste collection and transfer facility for generators that generate less than 50 pounds of untreated medical waste per month and that transport their own waste if:

(1) the hospital is located in an incorporated area with a population of less than 25,000 and in a county with a population of less than one million; or

(2) the hospital is located in an unincorporated area that is not within the extraterritorial jurisdiction of a city with a population more than 25,000 or within a county with a population of more than one million. The hospital shall submit a request to the executive director for registration as a medical waste collection station.

(f) A registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets all of the following requirements.

(1) Materials recovery. The owner or operator must recover 10% or more by weight or weight equivalent of the total incoming waste stream for reuse or recycling; ensure that the incoming waste has already been reduced by at least 10% through a source-separation recycling program; or, also operate one or more source-separation recycling programs in the county where the transfer station is located and those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10% or more by weight or weight equivalent of the incoming waste stream to all transfer stations to which credit is being applied. The owner or operator must demonstrate in the registration application the method that will be used to assure that the 10% requirement is achieved.

(2) Distance to a landfill. The transfer facility must demonstrate in the registration application that it will transfer the remaining nonrecyclable waste to a landfill not more than 50 miles from the facility.

(g) Except as provided in § 330.11(d) of this title, a registration is required for an MSW Type V processing facility that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes in accordance with either paragraph (1) or (2) of this subsection. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators.

(1) The facility must attain a 10% recovery of material for beneficial use from the incoming waste. Recovery of material for beneficial use is considered to be the recovery of fats, oils, greases, and the recovery of food solids for composting, but does not include the recovery of water. The Type V processing facilities issued a registration under a permit exemption based on 10% recovery of material for beneficial use must maintain records in accordance with the requirements of § 330.219(b)(9) of this title (relating to Recordkeeping and Reporting Requirements). Records and a report must be provided on a quarterly basis to the executive director that demonstrate that at least 10% of the volume of the waste received was processed to recover solid material that was recycled or reused. Failure to achieve the relevant percent recycling rate in any two quarters within any one-year period will cause a registration to terminate and will require the owner or operator of the facility to obtain a permit to continue facility operations. The quarterly report must provide the volume received, percent solids, and the method of determining the percent solids, processed, disposed, and recycled or reused. Records must be kept on a volume basis in gallons except that solids passing the paint filter test may be reported in cubic yard volume converted to gallons. The methods of recycling or reuse must be specified in the report. Records must be kept for solids and recyclable material leaving these facilities in the form of manifests, shipping documents, or trip tickets. The quarterly report must include manifests, shipping documents, or trip tickets to show where the recyclable material was taken for recycling, and the recycled material must be reconciled with the volume of waste received. Water discharged from processing is not allowed to be counted as part of the 10% recovery of material. Recovery and recycling or reuse of fats, oils, and greases may be considered a part of recycling for this activity. Composting of solids resulting from waste processing may be considered to be recycling as part of this activity. Any material such as lime, polymer, or flocculent added as part of the facility process is not allowed to be considered as part of the 10% recovery of material from the waste stream and must be subtracted from the material considered as recycled. Diversion of material from the waste stream without processing is not considered to be recycling as part of this activity.

(2) The Type V processing facility must be located at a manned treatment facility that is permitted under Texas Water Code, Chapter 26; is permitted to discharge at least one million gallons per day; and is owned by and operated for the benefit of a political subdivision of this state. Facilities that have received a permit and wish to add capacity may apply for a registration in lieu of a permit amendment if the facilities meet the registration requirements established in this chapter.

(h) A registration is required for a mobile liquid waste processing unit that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Registration applications shall contain the information specified in §§ 330.59(a) and (e) - (h), 330.61(a) and (b), and 330.63(a), (d)(6),

(h), and (j) of this title (relating to Contents of Part I of the Application; Contents of Part II of the Application; and Contents of Part III of the Application). The following requirements also apply.

(1) Mobile liquid waste processing shall be limited to the processing of liquid waste while at the generator's trap.

(2) Effluent from the processing of the liquid waste must be discharged to the generator's trap or interceptor.

(3) The mobile liquid waste processing units regulated under this section include truck-mounted processes that are also known as separator trucks, and any other liquid waste processes that are not considered to be fixed to a specific location.

(4) This section is not meant to supplant rules or ordinances of local governments where stricter standards are in effect.

(5) This section is not applicable to septage if waste has received only a pH adjustment prior to or during transportation for disposal at a treatment facility permitted under Texas Water Code, Chapter 26, or other authorized facility. Transporters who only adjust septage pH during transportation shall register in accordance with § 312.142 of this title (relating to Transporter Registration).

(i) A registration is required for an MSW Type VI facility that demonstrates new management methods for processing or handling grease trap waste, grit trap waste, septage, or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Those facilities meeting this exemption must obtain a registration by meeting the operational criteria and design criteria established in § 330.63(d)(9) of this title.

(j) A registration is required for the following material recovery operations from a landfill. The following operations are subject to the general requirements found in § 330.601 of this title (relating to General Requirements), and the requirements set for soil end product standards in § 330.615 of this title (relating to Final Soil Product Grades and Allowable Uses), and the air quality requirements in § 330.607 of this title (relating to Air Quality Requirements):

(1) operations that recover reusable or recyclable material buried in permitted or closed MSW landfill facilities, or MSW landfill facilities that were never permitted;

(2) operations that reclaim soil from permitted or closed MSW landfills, or from MSW landfill facilities that were never permitted; and

(3) facilities that have received prior approval for excavation of buried materials through permits, permit amendments, or other agency authorization, which are exempt from further authorization requirements, as established in this subchapter, for the specific authorization received. Soil final product standards shall be applicable for all registered facilities.

(k) A registration by rule is granted for the owner or operator of a Type IX MSW facility that recovers landfill gas for beneficial use if all of the following conditions are met.

(1) The owner or operator shall submit the following information at least 60 days prior to commencing operations:

(A) a large-scale plan drawing of the facility showing the following:

(i) facility boundaries (show permit boundaries and/or boundaries and dimensions of tract or land or closed MSW landfill units on which the gas recovery system is to be developed); and

(ii) landfill gas treatment, gas compression, electrical power generation equipment, and any other beneficial gas-use equipment, indicating limits of waste placement and additional easements required;

(B) for enclosed structures, provisions for fire control facilities (fire hydrants, fire extinguisher, water tanks, and waterwell), continuous methane monitoring, and explosion-proof fixtures;

(C) a discussion of the proposed method for condensate disposal, including during the landfill post-closure care period;

(D) an estimation of average daily gas production;

(E) an estimation of the design daily gas production;

(F) descriptions of the process units;

(G) a cost estimate for closure following the requirements of § 330.505 of this title (relating to Closure Cost Estimates for Storage and Processing Units); and

(H) a description of the financial assurance mechanism required by Chapter 37, Subchapter R of this title (relating to Financial Assurance for Municipal Solid Waste Facilities).

(2) The owner or operator shall acquire all authorizations regarding air emissions for the facility and comply with the following regulations:

(A) Subchapter E of this chapter (relating to Operational Standards for Municipal Solid Waste Storage and Processing Units);

(B) § 330.459 and § 330.461 of this title (relating to Closure Requirements for Municipal Solid Waste Storage and Processing Units; and Certification of Final Facility Closure); and

(C) § 330.505 of this title.

(l) A registration by rule is granted for persons that plan to transport untreated medical waste and that are not the generator of the waste if all of the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors; and

(C) description of each transportation unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable;

(iii) license plate (tag) number, including state and year; and

(iv) name of transportation unit owner.

(2) The owner or operator submits the fee required by § 330.1211(l) of this title (relating to Transporters of Untreated Medical Waste) along with the claim for the registration by rule.

(3) Registrations by rule expire after one year. The owner or operator must submit an annual fee in accordance with § 330.1211(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(4) Persons that claim the registration maintain a copy of the registration form, as annotated by the executive director with an assigned registration number, at their designated place of business and with each transportation unit used to transport untreated medical waste.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1211(m) of this title.

(m) A registration by rule is granted for owners or operators of mobile treatment units conducting on-site treatment of medical waste who are not the generator if the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations or expiration of a registration issued under the former rules before the comprehensive rule revisions in this chapter as adopted in 2006 (2006 Revisions) became effective:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors;

(C) description of each mobile treatment unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable; and

(iii) license plate (tag) number, including state and year;

(D) name of mobile treatment unit owner;

(E) description of approved treatment method to be employed and chemical preparations, as well as the procedure to be utilized for routine performance testing/parameter monitoring;

(F) evidence of competency;

(G) a description of the management and disposal of process waters generated during treatment events;

(H) a written contingency plan that describes the handling and disposal of waste in the event of treatment failure or equipment breakdown; and

(I) an estimate of the cost to remove and dispose of waste and disinfect the waste treatment equipment and evidence of financial assurance using procedures specified in Subchapter L of this chapter (relating to Closure, Post-Closure, and Corrective Action Cost Estimates) and Chapter 37, Subchapter R of this title.

(2) The owner or operator submits the fee required by § 330.1221(l) of this title (relating to On-Site Treatment Services on Mobile Treatment Units) along with the claim for the registration by rule.

(3) The executive director will send a copy of the registration form, annotated with an assigned registration number, to the owner or operator,

(4) Registrations by rule expire after one year. The owner or operator must submit an annual renewal fee in accordance with § 330.1221(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1221(m) of this title.

(6) Providers of on-site treatment of medical waste in mobile units notify the executive director, by letter, within 30 days of any changes to their registration if:

(A) the method employed to treat medical waste changes;

(B) the office or place of business is moved;

(C) the name of registrant or owner of the operation is changed;

(D) the name of the partners, corporate directors, or corporate officers change; or

(E) the unit information changes.

(n) A registration is required for facilities that store or process untreated medical waste that is received from off-site sources. For the purposes of this subsection, off-site shall be based on the definition of on-site found in § 330.1205(b) of this title (relating to Definitions).

(o) A registration is required for a new MSW transfer station that is used only in the transfer of grease trap waste, grit trap waste, septage, or other similar liquid waste if the facility used in the transfer will receive 32,000 gallons per day or less.

(p) A registration is required for a new liquid waste transfer facility to be located on, or at, other commission-authorized facilities.

SOURCE: The provisions of this § 330.9 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in *30 TAC § 330.3*, (relating to Applicability); 30 TAC § 330.52, (relating to Technical Requirements of Part I of the Application); 30 TAC § 330.66, (relating to Liquid Waste Transfer Facility Design and Operation); 30 TAC § 330.70, (relating to Registration of Facilities That Recover Gas for Beneficial Use); *30 TAC § 330.71*, (relating to Registration for Municipal Solid Waste Facilities That Process Grease Trap Waste, Grit

Trap Waste, or Septage); 30 TAC § 330.72, (relating to Registration for Mobile Liquid Waste Processing Units); *30 TAC § 330.73*, (relating to Registration of Demonstration Projects for Liquid Waste Processing Facilities); 30 TAC § 330.416, (relating to Registration Application Preparation); *30 TAC § 330.1*, (relating to Purpose and Applicability); *30 TAC § 330.5*, (relating to Classification of Municipal Solid Waste Facilities); *30 TAC § 330.7*, (relating to Permit Required); *30 TAC § 330.11*, (relating to Notification Required); *30 TAC § 330.13*, (relating to Waste Management Activities Exempt from Permitting, Registration, or Notification); *30 TAC § 330.21*, (relating to Closure); *30 TAC § 330.61*, (relating to Contents of Part II of the Application); *30 TAC § 330.607*, (relating to Air Quality Requirements); *30 TAC § 330.1221*, (relating to On-Site Treatment Services on Mobile Treatment Units).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 20



TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.9*   (2014)

§ 330.9. Registration Required

   (a) Except as provided in §§ 330.7, 330.11, 330.13, or 330.25 of this title (relating to Permit Required; Notification Required; Waste Management Activities Exempt from Permitting, Registration, or Notification; Relationship with County Licensing System), no person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any municipal solid waste (MSW) unless that activity is authorized by a registration or other authorization from the commission. In the event this requirement is violated, the executive director may seek recourse against not only the person that stored, processed, or disposed of the waste but also against the generator, transporter, owner or operator, or other person who caused, suffered, allowed, or permitted waste to be stored, processed, or disposed. No person may commence physical construction of a new MSW management facility subject to this registration requirement without first having submitted a registration application in accordance with §§ 330.57, 330.59, 330.61, 330.63, and 330.65 of this title (relating to Permit and Registration Application Procedures) and received a registration from the commission. A person shall include a statement justifying the facility's eligibility for a registration as established under this section. A person shall submit a claim for a registration by rule in duplicate with one copy sent directly to the appropriate Texas Commission on Environmental Quality regional office.

   (b) A registration is required for an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following:

   (1) a municipality with a population of less than 50,000;

   (2) a county with a population of less than 85,000;

   (3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less; or

   (4) a transfer station located within the permitted boundaries of an MSW Type I or Type IV facility as specified in § 330.5(a) of this title (relating to Classification of Municipal Solid Waste Facilities).

   (c) A registration is required to establish a waste-separation/recycling facility established at a permitted MSW facility if owned by the permittee.

   (d) A registration is required for a facility where the only operation is the storage and/or processing of used and scrap tires as provided for in Chapter 328 of this title (relating to Waste Minimization and Recycling). These facilities shall be registered with the executive director in accordance with Chapter 328 of this title. Failure to operate such registered facilities in accordance with the requirements established in Chapter 328 of this title may be grounds for the revocation of the registration.

   (e) A licensed hospital may function as a medical waste collection and transfer facility for generators that generate less than 50 pounds of untreated medical waste per month and that transport their own waste if:

(1) the hospital is located in an incorporated area with a population of less than 25,000 and in a county with a population of less than one million; or

(2) the hospital is located in an unincorporated area that is not within the extraterritorial jurisdiction of a city with a population more than 25,000 or within a county with a population of more than one million. The hospital shall submit a request to the executive director for registration as a medical waste collection station.

(f) A registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets all of the following requirements.

(1) Materials recovery. The owner or operator must recover 10% or more by weight or weight equivalent of the total incoming waste stream for reuse or recycling; ensure that the incoming waste has already been reduced by at least 10% through a source-separation recycling program; or, also operate one or more source-separation recycling programs in the county where the transfer station is located and those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10% or more by weight or weight equivalent of the incoming waste stream to all transfer stations to which credit is being applied. The owner or operator must demonstrate in the registration application the method that will be used to assure that the 10% requirement is achieved.

(2) Distance to a landfill. The transfer facility must demonstrate in the registration application that it will transfer the remaining nonrecyclable waste to a landfill not more than 50 miles from the facility.

(g) Except as provided in § 330.11(d) of this title, a registration is required for an MSW Type V processing facility that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes in accordance with either paragraph (1) or (2) of this subsection. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators.

(1) The facility must attain a 10% recovery of material for beneficial use from the incoming waste. Recovery of material for beneficial use is considered to be the recovery of fats, oils, greases, and the recovery of food solids for composting, but does not include the recovery of water. The Type V processing facilities issued a registration under a permit exemption based on 10% recovery of material for beneficial use must maintain records in accordance with the requirements of § 330.219(b)(9) of this title (relating to Recordkeeping and Reporting Requirements). Records and a report must be provided on a quarterly basis to the executive director that demonstrate that at least 10% of the volume of the waste received was processed to recover solid material that was recycled or reused. Failure to achieve the relevant percent recycling rate in any two quarters within any one-year period will cause a registration to terminate and will require the owner or operator of the facility to obtain a permit to continue facility operations. The quarterly report must provide the volume received, percent solids, and the method of determining the percent solids, processed, disposed, and recycled or reused. Records must be kept on a volume basis in gallons except that solids passing the paint filter test may be reported in cubic yard volume converted to gallons. The methods of recycling or reuse must be specified in the report. Records must be kept for solids and recyclable material leaving these facilities in the form of manifests, shipping documents, or trip tickets. The quarterly report must include manifests, shipping documents, or trip tickets to show where the recyclable material was taken for recycling, and the recycled material must be reconciled with the volume of waste received. Water discharged from processing is not allowed to be counted as part of the 10% recovery of material. Recovery and recycling or reuse of fats, oils, and greases may be considered a part of recycling for this activity. Composting of solids resulting from waste processing may be considered to be recycling as part of this activity. Any material such as lime, polymer, or flocculent added as part of the facility process is not allowed to be considered as part of the 10% recovery of material from the waste stream and must be subtracted from the material considered as recycled. Diversion of material from the waste stream without processing is not considered to be recycling as part of this activity.

(2) The Type V processing facility must be located at a manned treatment facility that is permitted under Texas Water Code, Chapter 26; is permitted to discharge at least one million gallons per day; and is owned by and operated for the benefit of a political subdivision of this state. Facilities that have received a permit and wish to add capacity may apply for a registration in lieu of a permit amendment if the facilities meet the registration requirements established in this chapter.

(h) A registration is required for a mobile liquid waste processing unit that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Registration applications shall contain the information specified in §§ 330.59(a) and (e) - (h), 330.61(a) and (b), and 330.63(a), (d)(6),

(h), and (j) of this title (relating to Contents of Part I of the Application; Contents of Part II of the Application; and Contents of Part III of the Application). The following requirements also apply.

(1) Mobile liquid waste processing shall be limited to the processing of liquid waste while at the generator's trap.

(2) Effluent from the processing of the liquid waste must be discharged to the generator's trap or interceptor.

(3) The mobile liquid waste processing units regulated under this section include truck-mounted processes that are also known as separator trucks, and any other liquid waste processes that are not considered to be fixed to a specific location.

(4) This section is not meant to supplant rules or ordinances of local governments where stricter standards are in effect.

(5) This section is not applicable to septage if waste has received only a pH adjustment prior to or during transportation for disposal at a treatment facility permitted under Texas Water Code, Chapter 26, or other authorized facility. Transporters who only adjust septage pH during transportation shall register in accordance with § 312.142 of this title (relating to Transporter Registration).

(i) A registration is required for an MSW Type VI facility that demonstrates new management methods for processing or handling grease trap waste, grit trap waste, septage, or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Those facilities meeting this exemption must obtain a registration by meeting the operational criteria and design criteria established in § 330.63(d)(9) of this title.

(j) A registration is required for the following material recovery operations from a landfill. The following operations are subject to the general requirements found in § 330.601 of this title (relating to General Requirements), and the requirements set for soil end product standards in § 330.615 of this title (relating to Final Soil Product Grades and Allowable Uses), and the air quality requirements in § 330.607 of this title (relating to Air Quality Requirements):

(1) operations that recover reusable or recyclable material buried in permitted or closed MSW landfill facilities, or MSW landfill facilities that were never permitted;

(2) operations that reclaim soil from permitted or closed MSW landfills, or from MSW landfill facilities that were never permitted; and

(3) facilities that have received prior approval for excavation of buried materials through permits, permit amendments, or other agency authorization, which are exempt from further authorization requirements, as established in this subchapter, for the specific authorization received. Soil final product standards shall be applicable for all registered facilities.

(k) A registration by rule is granted for the owner or operator of a Type IX MSW facility that recovers landfill gas for beneficial use if all of the following conditions are met.

(1) The owner or operator shall submit the following information at least 60 days prior to commencing operations:

(A) a large-scale plan drawing of the facility showing the following:

(i) facility boundaries (show permit boundaries and/or boundaries and dimensions of tract or land or closed MSW landfill units on which the gas recovery system is to be developed); and

(ii) landfill gas treatment, gas compression, electrical power generation equipment, and any other beneficial gas-use equipment, indicating limits of waste placement and additional easements required;

(B) for enclosed structures, provisions for fire control facilities (fire hydrants, fire extinguisher, water tanks, and waterwell), continuous methane monitoring, and explosion-proof fixtures;

(C) a discussion of the proposed method for condensate disposal, including during the landfill post-closure care period;

(D) an estimation of average daily gas production;

(E) an estimation of the design daily gas production;

(F) descriptions of the process units;

(G) a cost estimate for closure following the requirements of § 330.505 of this title (relating to Closure Cost Estimates for Storage and Processing Units); and

(H) a description of the financial assurance mechanism required by Chapter 37, Subchapter R of this title (relating to Financial Assurance for Municipal Solid Waste Facilities).

(2) The owner or operator shall acquire all authorizations regarding air emissions for the facility and comply with the following regulations:

(A) Subchapter E of this chapter (relating to Operational Standards for Municipal Solid Waste Storage and Processing Units);

(B) § 330.459 and § 330.461 of this title (relating to Closure Requirements for Municipal Solid Waste Storage and Processing Units; and Certification of Final Facility Closure); and

(C) § 330.505 of this title.

(l) A registration by rule is granted for persons that plan to transport untreated medical waste and that are not the generator of the waste if all of the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors; and

(C) description of each transportation unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable;

(iii) license plate (tag) number, including state and year; and

(iv) name of transportation unit owner.

(2) The owner or operator submits the fee required by § 330.1211(l) of this title (relating to Transporters of Untreated Medical Waste) along with the claim for the registration by rule.

(3) Registrations by rule expire after one year. The owner or operator must submit an annual fee in accordance with § 330.1211(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(4) Persons that claim the registration maintain a copy of the registration form, as annotated by the executive director with an assigned registration number, at their designated place of business and with each transportation unit used to transport untreated medical waste.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1211(m) of this title.

(m) A registration by rule is granted for owners or operators of mobile treatment units conducting on-site treatment of medical waste who are not the generator if the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations or expiration of a registration issued under the former rules before the comprehensive rule revisions in this chapter as adopted in 2006 (2006 Revisions) became effective:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors;

(C) description of each mobile treatment unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable; and

(iii) license plate (tag) number, including state and year;

(D) name of mobile treatment unit owner;

(E) description of approved treatment method to be employed and chemical preparations, as well as the procedure to be utilized for routine performance testing/parameter monitoring;

(F) evidence of competency;

(G) a description of the management and disposal of process waters generated during treatment events;

(H) a written contingency plan that describes the handling and disposal of waste in the event of treatment failure or equipment breakdown; and

(I) an estimate of the cost to remove and dispose of waste and disinfect the waste treatment equipment and evidence of financial assurance using procedures specified in Subchapter L of this chapter (relating to Closure, Post-Closure, and Corrective Action Cost Estimates) and Chapter 37, Subchapter R of this title.

(2) The owner or operator submits the fee required by § 330.1221(l) of this title (relating to On-Site Treatment Services on Mobile Treatment Units) along with the claim for the registration by rule.

(3) The executive director will send a copy of the registration form, annotated with an assigned registration number, to the owner or operator,

(4) Registrations by rule expire after one year. The owner or operator must submit an annual renewal fee in accordance with § 330.1221(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1221(m) of this title.

(6) Providers of on-site treatment of medical waste in mobile units notify the executive director, by letter, within 30 days of any changes to their registration if:

(A) the method employed to treat medical waste changes;

(B) the office or place of business is moved;

(C) the name of registrant or owner of the operation is changed;

(D) the name of the partners, corporate directors, or corporate officers change; or

(E) the unit information changes.

(n) A registration is required for facilities that store or process untreated medical waste that is received from off-site sources. For the purposes of this subsection, off-site shall be based on the definition of on-site found in § 330.1205(b) of this title (relating to Definitions).

(o) A registration is required for a new MSW transfer station that is used only in the transfer of grease trap waste, grit trap waste, septage, or other similar liquid waste if the facility used in the transfer will receive 32,000 gallons per day or less.

(p) A registration is required for a new liquid waste transfer facility to be located on, or at, other commission-authorized facilities.

SOURCE: The provisions of this § 330.9 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in *30 TAC § 330.3*, (relating to Applicability); 30 TAC § 330.52, (relating to Technical Requirements of Part I of the Application); 30 TAC § 330.66, (relating to Liquid Waste Transfer Facility Design and Operation); 30 TAC § 330.70, (relating to Registration of Facilities That Recover Gas for Beneficial Use); *30 TAC § 330.71*, (relating to Registration for Municipal Solid Waste Facilities That Process Grease Trap Waste, Grit

Trap Waste, or Septage); 30 TAC § 330.72, (relating to Registration for Mobile Liquid Waste Processing Units); *30 TAC § 330.73*, (relating to Registration of Demonstration Projects for Liquid Waste Processing Facilities); 30 TAC § 330.416, (relating to Registration Application Preparation); *30 TAC § 330.1*, (relating to Purpose and Applicability); *30 TAC § 330.5*, (relating to Classification of Municipal Solid Waste Facilities); *30 TAC § 330.7*, (relating to Permit Required); *30 TAC § 330.11*, (relating to Notification Required); *30 TAC § 330.13*, (relating to Waste Management Activities Exempt from Permitting, Registration, or Notification); *30 TAC § 330.21*, (relating to Closure); *30 TAC § 330.61*, (relating to Contents of Part II of the Application); *30 TAC § 330.607*, (relating to Air Quality Requirements); *30 TAC § 330.1221*, (relating to On-Site Treatment Services on Mobile Treatment Units).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 21



TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.9* (2014)

§ 330.9. Registration Required

(a) Except as provided in §§ 330.7, 330.11, 330.13, or 330.25 of this title (relating to Permit Required; Notification Required; Waste Management Activities Exempt from Permitting, Registration, or Notification; Relationship with County Licensing System), no person may cause, suffer, allow, or permit any activity of storage, processing, removal, or disposal of any municipal solid waste (MSW) unless that activity is authorized by a registration or other authorization from the commission. In the event this requirement is violated, the executive director may seek recourse against not only the person that stored, processed, or disposed of the waste but also against the generator, transporter, owner or operator, or other person who caused, suffered, allowed, or permitted waste to be stored, processed, or disposed. No person may commence physical construction of a new MSW management facility subject to this registration requirement without first having submitted a registration application in accordance with §§ 330.57, 330.59, 330.61, 330.63, and 330.65 of this title (relating to Permit and Registration Application Procedures) and received a registration from the commission. A person shall include a statement justifying the facility's eligibility for a registration as established under this section. A person shall submit a claim for a registration by rule in duplicate with one copy sent directly to the appropriate Texas Commission on Environmental Quality regional office.

(b) A registration is required for an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following:

(1) a municipality with a population of less than 50,000;

(2) a county with a population of less than 85,000;

(3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less; or

(4) a transfer station located within the permitted boundaries of an MSW Type I or Type IV facility as specified in § 330.5(a) of this title (relating to Classification of Municipal Solid Waste Facilities).

(c) A registration is required to establish a waste-separation/recycling facility established at a permitted MSW facility if owned by the permittee.

(d) A registration is required for a facility where the only operation is the storage and/or processing of used and scrap tires as provided for in Chapter 328 of this title (relating to Waste Minimization and Recycling). These facilities shall be registered with the executive director in accordance with Chapter 328 of this title. Failure to operate such registered facilities in accordance with the requirements established in Chapter 328 of this title may be grounds for the revocation of the registration.

(e) A licensed hospital may function as a medical waste collection and transfer facility for generators that generate less than 50 pounds of untreated medical waste per month and that transport their own waste if:

(1) the hospital is located in an incorporated area with a population of less than 25,000 and in a county with a population of less than one million; or

(2) the hospital is located in an unincorporated area that is not within the extraterritorial jurisdiction of a city with a population more than 25,000 or within a county with a population of more than one million. The hospital shall submit a request to the executive director for registration as a medical waste collection station.

(f) A registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets all of the following requirements.

(1) Materials recovery. The owner or operator must recover 10% or more by weight or weight equivalent of the total incoming waste stream for reuse or recycling; ensure that the incoming waste has already been reduced by at least 10% through a source-separation recycling program; or, also operate one or more source-separation recycling programs in the county where the transfer station is located and those source-separation recycling programs manage a total weight or weight equivalent of recyclable materials equal to 10% or more by weight or weight equivalent of the incoming waste stream to all transfer stations to which credit is being applied. The owner or operator must demonstrate in the registration application the method that will be used to assure that the 10% requirement is achieved.

(2) Distance to a landfill. The transfer facility must demonstrate in the registration application that it will transfer the remaining nonrecyclable waste to a landfill not more than 50 miles from the facility.

(g) Except as provided in § 330.11(d) of this title, a registration is required for an MSW Type V processing facility that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes in accordance with either paragraph (1) or (2) of this subsection. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators.

(1) The facility must attain a 10% recovery of material for beneficial use from the incoming waste. Recovery of material for beneficial use is considered to be the recovery of fats, oils, greases, and the recovery of food solids for composting, but does not include the recovery of water. The Type V processing facilities issued a registration under a permit exemption based on 10% recovery of material for beneficial use must maintain records in accordance with the requirements of § 330.219(b)(9) of this title (relating to Recordkeeping and Reporting Requirements). Records and a report must be provided on a quarterly basis to the executive director that demonstrate that at least 10% of the volume of the waste received was processed to recover solid material that was recycled or reused. Failure to achieve the relevant percent recycling rate in any two quarters within any one-year period will cause a registration to terminate and will require the owner or operator of the facility to obtain a permit to continue facility operations. The quarterly report must provide the volume received, percent solids, and the method of determining the percent solids, processed, disposed, and recycled or reused. Records must be kept on a volume basis in gallons except that solids passing the paint filter test may be reported in cubic yard volume converted to gallons. The methods of recycling or reuse must be specified in the report. Records must be kept for solids and recyclable material leaving these facilities in the form of manifests, shipping documents, or trip tickets. The quarterly report must include manifests, shipping documents, or trip tickets to show where the recyclable material was taken for recycling, and the recycled material must be reconciled with the volume of waste received. Water discharged from processing is not allowed to be counted as part of the 10% recovery of material. Recovery and recycling or reuse of fats, oils, and greases may be considered a part of recycling for this activity. Composting of solids resulting from waste processing may be considered to be recycling as part of this activity. Any material such as lime, polymer, or flocculent added as part of the facility process is not allowed to be considered as part of the 10% recovery of material from the waste stream and must be subtracted from the material considered as recycled. Diversion of material from the waste stream without processing is not considered to be recycling as part of this activity.

(2) The Type V processing facility must be located at a manned treatment facility that is permitted under Texas Water Code, Chapter 26; is permitted to discharge at least one million gallons per day; and is owned by and operated for the benefit of a political subdivision of this state. Facilities that have received a permit and wish to add capacity may apply for a registration in lieu of a permit amendment if the facilities meet the registration requirements established in this chapter.

(h) A registration is required for a mobile liquid waste processing unit that processes only grease trap waste, grit trap waste, or septage or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Registration applications shall contain the information specified in §§ 330.59(a) and (e) - (h), 330.61(a) and (b), and 330.63(a), (d)(6),

(h), and (j) of this title (relating to Contents of Part I of the Application; Contents of Part II of the Application; and Contents of Part III of the Application). The following requirements also apply.

(1) Mobile liquid waste processing shall be limited to the processing of liquid waste while at the generator's trap.

(2) Effluent from the processing of the liquid waste must be discharged to the generator's trap or interceptor.

(3) The mobile liquid waste processing units regulated under this section include truck-mounted processes that are also known as separator trucks, and any other liquid waste processes that are not considered to be fixed to a specific location.

(4) This section is not meant to supplant rules or ordinances of local governments where stricter standards are in effect.

(5) This section is not applicable to septage if waste has received only a pH adjustment prior to or during transportation for disposal at a treatment facility permitted under Texas Water Code, Chapter 26, or other authorized facility. Transporters who only adjust septage pH during transportation shall register in accordance with § 312.142 of this title (relating to Transporter Registration).

(i) A registration is required for an MSW Type VI facility that demonstrates new management methods for processing or handling grease trap waste, grit trap waste, septage, or a combination of these three liquid wastes. For the purposes of this section, grit trap waste means grit trap waste from commercial car washes and excludes grit trap waste from other generators. Those facilities meeting this exemption must obtain a registration by meeting the operational criteria and design criteria established in § 330.63(d)(9) of this title.

(j) A registration is required for the following material recovery operations from a landfill. The following operations are subject to the general requirements found in § 330.601 of this title (relating to General Requirements), and the requirements set for soil end product standards in § 330.615 of this title (relating to Final Soil Product Grades and Allowable Uses), and the air quality requirements in § 330.607 of this title (relating to Air Quality Requirements):

(1) operations that recover reusable or recyclable material buried in permitted or closed MSW landfill facilities, or MSW landfill facilities that were never permitted;

(2) operations that reclaim soil from permitted or closed MSW landfills, or from MSW landfill facilities that were never permitted; and

(3) facilities that have received prior approval for excavation of buried materials through permits, permit amendments, or other agency authorization, which are exempt from further authorization requirements, as established in this subchapter, for the specific authorization received. Soil final product standards shall be applicable for all registered facilities.

(k) A registration by rule is granted for the owner or operator of a Type IX MSW facility that recovers landfill gas for beneficial use if all of the following conditions are met.

(1) The owner or operator shall submit the following information at least 60 days prior to commencing operations:

(A) a large-scale plan drawing of the facility showing the following:

(i) facility boundaries (show permit boundaries and/or boundaries and dimensions of tract or land or closed MSW landfill units on which the gas recovery system is to be developed); and

(ii) landfill gas treatment, gas compression, electrical power generation equipment, and any other beneficial gas-use equipment, indicating limits of waste placement and additional easements required;

(B) for enclosed structures, provisions for fire control facilities (fire hydrants, fire extinguisher, water tanks, and waterwell), continuous methane monitoring, and explosion-proof fixtures;

(C) a discussion of the proposed method for condensate disposal, including during the landfill post-closure care period;

(D) an estimation of average daily gas production;

(E) an estimation of the design daily gas production;

(F) descriptions of the process units;

(G) a cost estimate for closure following the requirements of § 330.505 of this title (relating to Closure Cost Estimates for Storage and Processing Units); and

(H) a description of the financial assurance mechanism required by Chapter 37, Subchapter R of this title (relating to Financial Assurance for Municipal Solid Waste Facilities).

(2) The owner or operator shall acquire all authorizations regarding air emissions for the facility and comply with the following regulations:

(A) Subchapter E of this chapter (relating to Operational Standards for Municipal Solid Waste Storage and Processing Units);

(B) § 330.459 and § 330.461 of this title (relating to Closure Requirements for Municipal Solid Waste Storage and Processing Units; and Certification of Final Facility Closure); and

(C) § 330.505 of this title.

(l) A registration by rule is granted for persons that plan to transport untreated medical waste and that are not the generator of the waste if all of the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors; and

(C) description of each transportation unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable;

(iii) license plate (tag) number, including state and year; and

(iv) name of transportation unit owner.

(2) The owner or operator submits the fee required by § 330.1211(l) of this title (relating to Transporters of Untreated Medical Waste) along with the claim for the registration by rule.

(3) Registrations by rule expire after one year. The owner or operator must submit an annual fee in accordance with § 330.1211(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(4) Persons that claim the registration maintain a copy of the registration form, as annotated by the executive director with an assigned registration number, at their designated place of business and with each transportation unit used to transport untreated medical waste.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1211(m) of this title.

(m) A registration by rule is granted for owners or operators of mobile treatment units conducting on-site treatment of medical waste who are not the generator if the following conditions are met.

(1) The registrant completes registration forms provided by the commission and provides the following information at least 60 days prior to commencing operations or expiration of a registration issued under the former rules before the comprehensive rule revisions in this chapter as adopted in 2006 (2006 Revisions) became effective:

(A) name, address, and telephone number of registrant;

(B) name, address, and telephone number of partners, corporate officers, and directors;

(C) description of each mobile treatment unit, including:

(i) make, model, and year;

(ii) motor vehicle identification number, if applicable; and

(iii) license plate (tag) number, including state and year;

(D) name of mobile treatment unit owner;

(E) description of approved treatment method to be employed and chemical preparations, as well as the procedure to be utilized for routine performance testing/parameter monitoring;

(F) evidence of competency;

(G) a description of the management and disposal of process waters generated during treatment events;

(H) a written contingency plan that describes the handling and disposal of waste in the event of treatment failure or equipment breakdown; and

(I) an estimate of the cost to remove and dispose of waste and disinfect the waste treatment equipment and evidence of financial assurance using procedures specified in Subchapter L of this chapter (relating to Closure, Post-Closure, and Corrective Action Cost Estimates) and Chapter 37, Subchapter R of this title.

(2) The owner or operator submits the fee required by § 330.1221(l) of this title (relating to On-Site Treatment Services on Mobile Treatment Units) along with the claim for the registration by rule.

(3) The executive director will send a copy of the registration form, annotated with an assigned registration number, to the owner or operator,

(4) Registrations by rule expire after one year. The owner or operator must submit an annual renewal fee in accordance with § 330.1221(l) of this title. Failure to timely pay the annual fee eliminates the option to manage wastes until the owner or operator claims a new or renewed registration by rule.

(5) The owner or operator submits annual summary reports in accordance with applicable provisions in § 330.1221(m) of this title.

(6) Providers of on-site treatment of medical waste in mobile units notify the executive director, by letter, within 30 days of any changes to their registration if:

(A) the method employed to treat medical waste changes;

(B) the office or place of business is moved;

(C) the name of registrant or owner of the operation is changed;

(D) the name of the partners, corporate directors, or corporate officers change; or

(E) the unit information changes.

(n) A registration is required for facilities that store or process untreated medical waste that is received from off-site sources. For the purposes of this subsection, off-site shall be based on the definition of on-site found in § 330.1205(b) of this title (relating to Definitions).

(o) A registration is required for a new MSW transfer station that is used only in the transfer of grease trap waste, grit trap waste, septage, or other similar liquid waste if the facility used in the transfer will receive 32,000 gallons per day or less.

(p) A registration is required for a new liquid waste transfer facility to be located on, or at, other commission-authorized facilities.

SOURCE: The provisions of this § 330.9 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in *30 TAC § 330.3*, (relating to Applicability); 30 TAC § 330.52, (relating to Technical Requirements of Part I of the Application); 30 TAC § 330.66, (relating to Liquid Waste Transfer Facility Design and Operation); 30 TAC § 330.70, (relating to Registration of Facilities That Recover Gas for Beneficial Use); *30 TAC § 330.71*, (relating to Registration for Municipal Solid Waste Facilities That Process Grease Trap Waste, Grit

Trap Waste, or Septage); 30 TAC § 330.72, (relating to Registration for Mobile Liquid Waste Processing Units); *30 TAC § 330.73*, (relating to Registration of Demonstration Projects for Liquid Waste Processing Facilities); 30 TAC § 330.416, (relating to Registration Application Preparation); *30 TAC § 330.1*, (relating to Purpose and Applicability); *30 TAC § 330.5*, (relating to Classification of Municipal Solid Waste Facilities); *30 TAC § 330.7*, (relating to Permit Required); *30 TAC § 330.11*, (relating to Notification Required); *30 TAC § 330.13*, (relating to Waste Management Activities Exempt from Permitting, Registration, or Notification); *30 TAC § 330.21*, (relating to Closure); *30 TAC § 330.61*, (relating to Contents of Part II of the Application); *30 TAC § 330.607*, (relating to Air Quality Requirements); *30 TAC § 330.1221*, (relating to On-Site Treatment Services on Mobile Treatment Units).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

**TAB 22**



1 of 1 DOCUMENT

TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.11*   (2014)

§ 330.11. Notification Required

   (a) Except as provided by § 330.13 of the title (relating to Waste Management Activities Exempt from Permitting, Registration, or Notification) and recycling facilities that notify in accordance with § 328.5 of this title (relating to Reporting and Recordkeeping Requirements), a person that intends to store, process, or dispose of municipal solid waste (MSW) without a permit as authorized by § 330.7 of this title (relating to Permit Required), registration as authorized by § 330.9 of this title (relating to Registration Required), or § 330.25 of this title (relating to Relationship with County Licensing System), shall notify the executive director, and any local pollution agency with jurisdiction that has requested to be notified, in writing, that storage, processing, or disposal activities are planned, at least 90 days prior to engaging in these activities, except for recycling and other activities as may be specifically exempted. Additional information may be requested to enable the executive director to determine whether such storage, processing, or disposal is in compliance with the terms of this chapter. This information may include, but is not limited to, type of waste, waste management methods, facility engineering plans and specifications, and the geology and hydrogeology at the facility. Any information provided under this subsection shall be submitted to the executive director in duplicate with one copy sent directly to the Texas Commission on Environmental Quality (TCEQ) regional office. A person shall include a statement justifying the facility's eligibility for a notification as established under this section.

   (b) Any person that stores, processes, or disposes of MSW shall have the continuing obligation to provide prompt written notice to the executive director of any changes or additional information concerning waste type, waste management methods, facility engineering plans and specifications, and geology and hydrogeology at the facility additional to that reported in subsection (a) of this section, authorized in any permit or registration, or stated in any application filed with the executive director. Any information provided under this subsection shall be submitted to the executive director in duplicate form with copies sent directly to the TCEQ's regional office and any local pollution agency with jurisdiction that has requested to be notified.

   (c) A person that stores, processes, or disposes of MSW shall notify the executive director, and any local pollution agency with jurisdiction that has requested to be notified, in writing of any closure activity or activity of facility expansion not authorized by permit or registration, at least 90 days prior to conducting this activity. The executive director may request additional information to determine whether such activity is in compliance with this chapter. Any information provided under this subsection shall be submitted to the executive director in duplicate form.

   (d) A notification is required for the storage or processing of the following types of MSW: grease trap wastes; grit trap wastes; or septage that contains free liquids if the waste is treated/processed at a permitted Type I MSW facility.

   (e) A notification is required for the following facilities or locations:

   (1) a citizens' collection station;

(2) a collection and processing point for only nonputrescible source-separated recyclable material, provided that the facility is in compliance with §§ 328.3 - 328.5 of this title (relating to General Requirements; Limitations on Storage of Recyclable Materials; and Reporting and Recordkeeping Requirements);

(3) a facility to treat petroleum-contaminated soil if the contaminated soil is treated/processed at a permitted Type I MSW facility;

(4) an MSW transfer station in existence prior to the comprehensive rule revisions in this chapter as adopted in 2006 (2006 Revisions) that is used only in the transfer of grease trap waste, grit trap waste, septage, or other similar liquid waste if the facility used in the transfer will receive 32,000 gallons per day or less. These liquid waste transfer stations must be designed and operated in accordance with the requirements of Subchapter E of this chapter (relating to Operational Standards for Municipal Solid Waste Storage and Processing Units);

(5) a temporary storage facility regulated under § 312.147 of this title (relating to Temporary Storage) that stores 8,000 gallons or less for a period of four days or less in containers. This facility is not required to follow the requirements of Subchapter E of this chapter;

(6) a liquid waste transfer facility in existence prior to the effective date of the 2006 Revisions located on or at other commission authorized facilities if the facility is designed and operated in accordance with the requirements of Subchapter E of this chapter; or

(7) a pet cemetery. A person that intends to operate a pet cemetery shall comply with the requirements of § 330.19 of this title (relating to Deed Recordation) and shall ensure that the animal carcasses are covered with at least two feet of soil within a time period that will prevent the generation of nuisance odors or health risks. A pet cemetery is a facility used only for the burial of domesticated animals kept as pets and service animals such as seeing-eye dogs. Animals raised for meat production or used only for animal husbandry may not be disposed of in a pet cemetery authorized under this subsection.

(f) A generator is required to notify the commission of the operation of an approved treatment process unit used only for the treatment of on-site generated medical waste, as defined in § 330.1205(b) of this title (relating to Definitions).

(g) An operator is required to notify the commission of the intended operation of a low-volume transfer station subject to the following conditions.

(1) The operator must own or otherwise effectively control the facility.

(2) Prior to notification, the operator must coordinate with the county authority to ensure compliance with all appropriate ordinances.

(3) The operator must notify the adjacent landowners, by first-class mail, concurrent with commission notification.

(4) Collected waste shall be sent off-site to an authorized facility at least weekly.

(h) Generators that generate greater than 50 pounds per month of untreated medical waste and that transport their own untreated waste to an authorized medical waste storage or processing facility shall notify the commission.

SOURCE: The provisions of this § 330.11 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in 30 TAC § 330.12, (relating to Relationship with County Licensing System); *30 TAC § 330.7*, (relating to Permit Required); *30 TAC § 330.9*, (relating to Registration Required); *30 TAC § 330.171*, (relating to Disposal of Special Wastes).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC §*

*336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 23



TEXAS ADMINISTRATIVE CODE

*** This document reflects all regulations in effect as of July 31, 2014 ***

TITLE 30. ENVIRONMENTAL QUALITY
PART 1. TEXAS COMMISSION ON ENVIRONMENTAL QUALITY
CHAPTER 330. MUNICIPAL SOLID WASTE
SUBCHAPTER A. GENERAL INFORMATION

*30 TAC § 330.13*   (2014)

§ 330.13. Waste Management Activities Exempt from Permitting, Registration, or Notification

   (a) A permit, registration, notification, or other authorization is not required for the disposal of up to 2,000 pounds per year of litter or other solid waste generated by an individual on that individual's own land and is not required to comply with § 330.19 of this title (relating to Deed Recordation) provided that:

   (1) the litter or waste is generated on land that the individual owns;

   (2) the litter or waste is not generated as a result of an activity related to a commercial purpose;

   (3) the disposal occurs on land that the individual owns;

   (4) the disposal is not for a commercial purpose;

   (5) the waste disposed of is not hazardous waste or industrial waste;

   (6) the waste disposal method complies with Chapter 111, Subchapter B of this title (relating to Outdoor Burning); and

   (7) the waste disposal method does not contribute to a nuisance and does not endanger the public health or the environment. Exceeding 2,000 pounds per individual's residence per year is considered to be a nuisance.

   (b) A permit, registration, notification, or other authorization is not required for the disposal of animal carcasses from government roadway maintenance where:

   (1) either of the following:

   (A) the animals were killed on county or municipal roadways and the carcasses are buried on property owned by the entity that is responsible for road maintenance; or

   (B) the animals were killed on state highway rights-of-way and the carcasses are disposed of by the Texas Department of Transportation by burying the carcasses on state highway rights-of-way; and

   (2) the waste disposal method does not contribute to a nuisance and does not endanger the public health or the environment; and

   (3) the animal carcasses are covered with at least two feet of soil within 24 hours of collection in accordance with § 330.171(c)(2) of this title (relating to Disposal of Special Wastes).

   (c) A permit, registration, notification, or other authorization is not required for veterinarians performing activities as authorized by *Texas Occupations Code, § 801.361*, Disposal of Animal Remains. Disposal by burning under this section must comply only with § 111.209(3) of this title (relating to Exception for Disposal Fires).

(d) A permit, registration, notification, or other authorization is not required for on-site storage of medical waste for a generator that uses a medical waste storage facility only for medical waste generated on-site. Storage of medical waste generated on-site must be in compliance with § 330.1209(a) of this title (relating to Storage of Medical Waste).

(e) A permit, registration, notification, or other authorization is not required for generators that generate less than 50 pounds per month of untreated medical waste that transport their own waste to an authorized medical waste storage or processing facility.

(f) Except as required by § 330.7(c)(2) and § 330.9(1) of this title (relating to Permit Required; and Registration Required), a permit, registration, notification, or other authorization is not required for transporters of municipal solid waste.

(g) A permit, registration, notification, or other authorization is not required for a collection point for parking lot or street sweepings or wastes collected and received in sealed plastic bags from such activities as periodic city-wide cleanup campaigns and cleanup of rights-of-way or roadside parks.

(h) A permit, registration, notification, or other authorization is not required from a car wash facility for drying grit trap waste as long as these wastes are dried and disposed of in compliance with applicable federal, state, and local regulations. Grit trap waste from car wash facilities may be transported for drying purposes to other property if the car wash facility and the property with the drying bed have the same owner and if the facilities are located within 50 miles of each other. This subsection is not intended to preempt or supersede local government regulation of grit trap waste-drying facilities. Drying facilities must comply with Chapter 116 of this title (relating to Control of Air Pollution by Permits for New Construction or Modification) if applicable.

SOURCE: The provisions of this § 330.13 adopted to be effective March 27, 2006, 31 TexReg 2502

**NOTES:**

CROSS-REFERENCES: This Section cited in *30 TAC § 330.7*, (relating to Permit Required); *30 TAC § 330.9*, (relating to Registration Required); *30 TAC § 330.21*, (relating to Closure).

This Chapter cited in *30 TAC § 55.1*, (relating to Applicability); *30 TAC § 55.101*, (relating to Applicability); *30 TAC § 305.127*, (relating to Conditions To Be Determined for Individual Permits); *30 TAC § 334.483*, (relating to Disposal by Generator); *30 TAC § 335.78*, (relating to Special Requirements for Hazardous Waste Generated by Conditionally Exempt Small Quantity Generators); *30 TAC § 335.501*, (relating to Purpose, Scope, and Applicability); 30 TAC § 336.337, (relating to Disposal of Specific Wastes); *30 TAC § 350.2*, (relating to Applicability); *30 TAC § 336.225*, (relating to Disposal of Specific Wastes); *30 TAC § 305.127*, (relating to Conditions to be Determined for Individual Permits); *30 TAC § 91.20*, (relating to Applicability).

**LexisNexis 50 State Surveys, Legislation & Regulations**

Solid Waste Management

# TAB 24

That the general, great and essential principles of liberty and free government may be recognized and established, we declare:

Sec. 19.  DEPRIVATION OF LIFE, LIBERTY, ETC.; DUE COURSE OF LAW.  No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.

(Added Nov. 3, 2009.)